Robert L. Brace, SBN 122240
Email: rlbrace@hbsb.com
Michael P. Denver, SBN 199279
Email: mpdenver@hbsb.com
Peter L. Candy, SBN 149976
Email: pcandy@hbsb.com
**HOLLISTER & BRACE**
P.O. Box 630
Santa Barbara, CA 93102
Telephone: (805) 963-6711
Facsimile: (805) 965-0329

Attorneys for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group LLC

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC

Plaintiff,

vs.

CONTINENTAL CASUALTY COMPANY, an Illinois corporation.

Defendant

**Case No.: C 10-5238-JW**
**Related Case No.: C 09-2388-JW**

**THE RECEIVER'S MOTION FOR SUMMARY JUDGMENT ON THE 2004 POLICY ISSUED TO VESTA BY CONTINENTAL CASUALTY COMPANY**

**Hearing Date: October 15, 2012**
**Time: 9:00a.m.**
**Location: CR 9, 19th Floor**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 15, 2012, at 9:00 a.m. or as soon thereafter as the matter may be heard before the Honorable James Ware, in the United States District Court located at 450 Golden Gate Avenue, San Francisco, California, Plaintiff Thomas A. Dillon ("Dillon"), the court-appointed Receiver for Vesta Strategies, LLC ("Vesta") will move the Court to enter summary judgment on the claims asserted pursuant to the 2004 Policy issued to Vesta by Defendant Continental Casualty Company ("Continental").

This motion is made pursuant to Federal Rule of Civil Procedure 56, and is based on this Notice of Motion, the Memorandum of Points and Authorities, and Declarations of Robert L. Brace, John Terzakis, Peter Ye, Kristine Carlos, Susan Woo, filed herewith, and all other pleadings and papers in the Court's file and such other oral argument as will be made at the time of the hearing on the motion.

DATED this 31st day of August, 2012

By: /s/ Robert L. Brace

Robert L. Brace, Esq., SBN. 122240
Michael P. Denver, Esq., SBN 199279
Peter L. Candy, Esq., SBN. 149976
**HOLLISTER & BRACE**
P.O. Box 630
Santa Barbara, CA 93102

Attorneys for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group LLC

# TABLE OF CONTENTS


I. PARTIES ........ 1

A. Plaintiff Thomas A. Dillon ("Dillon") ........ 1

B. Defendant Continental Casualty Company ("Continental") ........ 1

II. PROCEDURAL STATUS ........ 2

A. The Complaint Filed by Dillon, on Behalf of Vesta, Against Continental ........ 2

B. The Law of This Insurance Case is Set Forth in the Court's Orders Denying U.S. Fire's and Continental's Motions to Dismiss. The Law of This Case Establishes There is Coverage, Provided Dillon Can Prove Adverse Domination and Continental is Unable to Rebut the Presumption That Vesta Did Not Discover the Losses Until The Receiver Was Appointed. ........ 3

1. The Order Denying Continental's Motion to Dismiss ........ 3

a. The Original Thefts of Exchange Funds in 2004 Were Covered Losses Under the 2004 Vesta Policy ........ 3

b. The Wrongdoers' "Discovery" of Their Own Thefts Does Not Constitute Discovery of the Loss by Vesta Under the Policies. ........ 4

c. If Proven, the Adverse Domination of Vesta by Terzakis and Estupinian Tolled the Discovery Period for Vesta to Discover the Thefts Until a Receiver Was Appointed ........ 4

2. The Order Denying U.S. Fire's Motion to Dismiss ........ 4

a. The Adverse Domination Theory Applies Because the Lack of Discovery of Thefts by Non-Wrongdoing Employees at Vesta Was Reasonable ........ 4

b. The Public Policy Exception to Adverse Domination Is Not Triggered Because the Money to be Paid by Continental Will Go to the Exchangers with Unfunded Exchanges ........ 5

III. SUMMARY OF ARGUMENT ........ 6

IV. THE STANDARD FOR GRANTING OR DENYING SUMMARY JUDGMENT ........ 7

V. STATEMENT OF UNDISPUTED FACTS ........ 8

A. Continental Issued a $5,000,000 Policy to Vesta for Owner Theft of Client Funds ........ 8

B. John Terzakis Was an "Owner" of Vesta and He Controlled Vesta Pursuant to the Vesta Operating Agreement........ 8

C. Terzakis, As the Owner of Vesta, Stole Exchange Funds Deposited with Vesta During the 2004 Policy Period. ........ 12

D. No Claim Was Made to Continental on the 2004 Vesta Policy Because Such a Claim Would Implicate Terzakis and Estupinian in the Thefts of Exchange Funds........ 14

E. The Non-Wrongdoing Rank and File Employees at Vesta Did Not Discover That Terzakis Had Stolen Exchange Funds and They Had Neither the Duty Nor Authority to Make a Claim to Continental. ........ 14

F. The Vesta Exchangers Did Not Know That Terzakis Had Stolen Their Exchange Funds ........ 14

G. The Vesta Exchange Agreements Expressly Precluded Vesta From Transferring Exchange Funds Held in Trust by Vesta to Terzakis' Personal Accounts. ........ 15

H. Continental Agrees That Vesta Exchange Funds Are Held in Trust by Vesta. ........ 16

VI. LEGAL ARGUMENT ........ 16

A. The $9.3 Million Transferred to Terzakis Consituted the Embezzlement of Exchange Funds ........ 16

1. The Legal Duties of a QI While Acting as a Trustee of Exchange Funds. ........ 16
2. Terzakis Embezzled the Trust Funds. ........ 17

B. Terzakis' Embezzlement of Trust Funds is a Dishonest Act Covered Under the Policy. ........ 17

C. Terzakis and Estupinian Adversely Dominated Vesta, Which Tolled the Discovery of Loss by Vesta Until The Receiver Was Appointed. ........ 18

D. It Was Reasonable For Non-Wrongdoing Employees to Fail to Discover a Loss and Report a Claim to Continental. ........ 19

E. Continental Must Rebut the Presumption That It Was Impossible For Non-Wrongdoing Employees at Vesta to Discover the Thefts and Make a Claim........22

VII. CONCLUSION ........ 24

## TABLE OF AUTHORITIES

**Cases** **Page No.(s)**

*Admiralty Fund v. Peerless Insurance Co.*, 143 Cal. App. 3d 379 (1983) ........ 19

*American Surety Co. v. Pauly*, 170 U.S. 133, 42 L. Ed. 977, 18 S.Ct. 552 (1898) ........ 19

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986) ........ 7

*California Union Insurance Co. v. American Diversified Savings Bank*, 948 F. 2d. 556 (9th Cir. 1991) ........ 23

*Celotex v. Catrett*, 477 U.S. 317 (1986) ........ 7

*DeGroot v. Exchanged Titles, Inc.*, 159 B.R. 303 ........ 17

*F.D.I.C. v. O'Melveny & Myers*, 969 F.2d 744 (9th Cir. 1992) ........ 18

*F.D.I.C. v. Dawson*, 4 F.3d 1303 (5th Cir. 1993) ........

*F.D.I.C v. Howse*, 736 F.Supp. 1437 (S.D. Tex. 1990) ........ 23

*Hecht v. Resolution Trust Corp.*, 333 Md. 324; 635 A.2d 394 (Md. Ct. of Appeals 1994) ........ 23

*Siegel v. Boston (In re: Sale Guaranty Corp.)*, 220 B.R. 660;1998 Bankr. LEXIS 530 (Bankr. 9th Cir. 1998); aff'd by *Sigel v. Newman* (*In re Sale Guar. Corp.*), 199 F.3d 1375 (9th Cir. Cal. 2000) ........ 17

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1992) ........ 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........ 7

*O'Melveny & Meyers v. F.D.I.C*, 512 U.S. 79 (1994), reaff'd on remand, *F.D.I.C. v. O'Melveny & Meyers*, 61 F.3d 17 (9th Cir. 1995) ........ 18

*People v. Miller*, 188 Cal. App. 2d 156 (Cal. App. 2d Dist. 1961) ........ 17

*People v. Parker,*
235 Cal. App. 2d 100 (Cal. App. 3d Dist. 1965) ........ 17

*People v. Talbot,*
220 Cal. 3 (Cal. 1934)........ 17

*Resolution Trust Corp. v. Franz,*
909 F. Supp 1128 (N.D. Ill. 1995)........ 23

*Resolution Trust Corp. v. Smith,*
872 F.Supp 805 (D. Or. 1995) ........ 23

*Shields v. National Union Fire Insurance Co.,*
153 B.R. 677 (E.D. Penn, 1993) ........ 19

*T.W. Elec. Serv. v. Pac. Elec. Contractors Assoc.,*
809 F.2d 626 (9th Cir. 1987) ........ 7

*Utica Mutual Ins. Co. v. Firemans Fund Ins. Co.,*
748 F.2d 118 (2d Cir. 1984)........ 20

**Codes**

Cal. Penal Code §503........ 17

California Corporations Code § 17154(b) ........ 22

Probate Code § 16000........ 17

Probate Code § 16006........ 17

Probate Code § 16323........ 17

Probate Code § 16002

Probate Code § 16004........ 17

Probate Code §16009........ 17

**Rules**

Fed. R. Civ. P. 56(a) ........ 7

1 **Other Authority**

RESTATEMENT OF THE LAW, AGENCY, §5.03, Volume 1........21

# I.

# PARTIES

## A. Plaintiff Thomas A. Dillon ("Dillon")

In the related action styled as *United States Fire Insurance Company v. Samuel Henka*, Case No. C 09-2388-JW, certain Vesta IRC §1031 Exchangers sued Continental Casualty Company ("Continental") (Dkt. No. 13) for coverage under the 2004 Vesta Policy issued to Vesta acting as a 1031 Qualified Intermediary. Continental filed a 12(b)(6) Motion to Dismiss (Dkt. No. 98), contending that the Vesta Exchangers had no standing because they were not third party beneficiaries of the 2004 Vesta Policy. The Court agreed and dismissed the Vesta Exchangers' case. In response, the Vesta Exchangers sought the appointment of Thomas A. Dillon ("Dillon") to act as the Receiver of Vesta to prosecute claims on behalf of Vesta. (Dkt. No. 75). The Court granted the Exchangers' request and appointed Dillon as Receiver of Vesta and Excalibur (Dkt. No.123). Dillon acts as the Receiver for Vesta, charged with the obligation of collecting monies due Vesta to pay the Vesta Exchangers as beneficiaries of the trust established by Vesta.

## B. Defendant Continental Casualty Company ("Continental")

Continental issued a $5,000,000 crime policy with certain endorsements applicable to Qualified Intermediaries ("QIs") to Vesta for the policy period January 9, 2004 to August 15, 2004 (the "2004 Vesta Policy"). The 2004 Vesta Policy (No. 267920538) provided coverage to Vesta for owner theft of client Exchange Funds discovered by Vesta during the policy period, and reported to Continental as soon as possible after discovery of the theft. On February 13, 2010, Dillon made a $5 million claim on Continental for the thefts of Exchange Funds by John Terzakis ("Terzakis"), the owner of Vesta, during the 2004 Vesta Policy period. Continental rejected the claim, so Dillon sued Continental for declaratory relief and breach of contract.

///

///

## II.

## PROCEDURAL STATUS

### A. The Complaint Filed by Dillon, on Behalf of Vesta, Against Continental.

On November 1, 2010, Dillon filed a complaint against Continental seeking from the Court: (i) a declaration that there was coverage for Vesta under the 2004 Vesta Policy for the theft of Exchange Funds by John Terzakis, with the help of Robert Estupinian ("Estupinian") and Peter Ye ("Ye"), during the January 9, 2004 to August 15, 2004 policy period; and (ii) entry of a judgment for breach of contract, ordering Continental to pay damages measured by the $5,000,000 policy limits to Dillon, plus pre-judgment interest from the date of filing the complaint. Dillon contends that Terzakis, as the owner of Vesta, stole $9,360,000 in Exchange Funds on deposit at Vesta in a series of transfers from January 21, 2004 to June 24, 2004. Dillon contends further that: (i) the trust *res* was injured by the combined $9.3 million in thefts by Terzakis; (ii) Terzakis never repaid Vesta the $9.3 million stolen between January 21, 2004 to June 24, 2004; (iii) after June 24, 2004, the Vesta Balance Sheet of trust assets versus trust liabilities always carried a deficit in the trust account exceeding the $5,000,000 policy limits; and (iv) when Vesta collapsed in June of 2008, the deficit in the trust account caused by Terzakis' prior thefts contributed to Vesta's inability to fund $11.5 million in Exchanges pending at the time of its collapse.

Dillon contends that Continental should pay $5,000,000 for the Terzakis thefts occurring during the 2004 Vesta Policy period because the thefts caused a loss to the trust while Vesta was acting as the trustee of the trust. The deficit in the trust caused by the thefts was never reduced below $5,000,000, so the loss in excess of $5,000,000 continued to exist during Vesta's operations from 2004 to 2008. The $5,000,000 to be paid by Continental will be used to partially recharge the deficit in the trust to fund the exchanges of the ascertainable beneficiaries of the trust whose claims remained unpaid at the termination of Vesta. The money will not be paid to Terzakis or Estupinian as the owners of Vesta. Dillon contends that his claim is timely

because Estupinian and Terzakis adversely dominated Vesta until Dillon was appointed as Receiver.

**B. The Law of This Insurance Case is Set Forth in the Court's Orders Denying U.S. Fire's and Continental's Motions to Dismiss. The Law of This Case Establishes There is Coverage, Provided Dillon Can Prove Adverse Domination and Continental is Unable to Rebut the Presumption That Vesta Did Not Discover the Losses Until the Receiver Was Appointed.**

On July 14, 2011, the Court denied Continental's motion to dismiss Dillon's case. (Docket No. 43.) A copy of the Order denying Continental's motion is attached to RLB Decl. as Ex. 1. On the same date, the Court denied U.S. Fire's motion to dismiss the counterclaim filed by Dillon (Docket No. 246). A copy of the Order denying U.S. Fire's motion is attached to RLB Decl. as Ex. 2. Both orders set forth the law in this case against Continental, and they are quoted, in part, below.

**1. The Order Denying Continental's Motion to Dismiss**

**a. The Original Thefts of Exchange Funds in 2004 Were Covered Losses Under the 2004 Vesta Policy.**

On a theft of exchange funds being a covered loss at the time of the theft, the Court found that:

> . . . the Policies provide coverage for the alleged losses caused by Terzakis and Estupinian's embezzlement of the original exchangers' funds. In particular, the Policies define "Covered Cause of Loss" to include dishonest acts committed by employees (and owners with regard to Section 1031 exchange funds) with the manifest intent to cause a loss and obtain a financial benefit. The Court finds that the "loss" alleged by Plaintiff is the embezzlement of the original exchangers' funds by Terzakis and Estupinian for their personal use, which allegedly occurred during the discovery period. These thefts created a deficit in Vesta and Excalibur's accounts that was concealed by the continuous repayment of previous exchangers with the funds of new exchangers. Thus, although the initial exchangers were allegedly repaid while the scheme was successful, a concealed deficit in Vesta and Excalibur's accounts nonetheless existed. The proof of loss letter that Plaintiff submitted to Defendant, which identified the eighteen exchangers that Terzakis and Estupinian were unable to repay when the scheme collapsed in 2008, merely identified the ultimate damage caused by the original loss. Thus, the Court finds that Plaintiff has sufficiently alleged the occurrence of a covered loss during the discovery period of the Policies.

(RLB Decl., Ex.1, p. 7:17-8:11.) (Emphasis added.)

**b. The Wrongdoers' "Discovery" of Their Own Thefts Does Not Constitute Discovery of the Loss by Vesta Under the Policies.**

On discovery of the wrongdoing by the wrongdoing owners of Vesta, the Court held:

> . . . if an owner's knowledge of his or her own wrongdoing constituted "discovery" under a policy similar to those at issue here, the loss discovery provision would be effectively read out of the contract. Thus, the Court finds that Plaintiff's allegations regarding Terzakis and Estupinian's knowledge of their own misappropriation of client funds is not sufficient to allege "discovery" of a compensable loss by Vesta and Excalibur during the discovery period of the Policies.

(RLB Decl., Ex. 1, p. 9:20-26.)

**c. If Proven, the Adverse Domination of Vesta by Terzakis and Estupinian Tolled the Discovery Period for Vesta to Discover the Thefts Until a Receiver Was Appointed.**

On adverse domination, the Court found that:

> . . . Plaintiff has sufficiently stated a theory of adverse domination by Terzakis and Estupinian that would, if proved, equitably toll the discovery period until the appointment of Plaintiff as receiver. In particular, Plaintiff alleges that Terzakis and Estupinian were collectively 100% owners of Vesta and owned between a 50% and 100% interest in Excalibur. (Complaint ¶¶ 14,18.) Moreover, Terzakis and Estupinian allegedly formed both entities for the purpose of engaging in self-dealing and controlled the financial affairs of Vesta and Excalibur in a way that precluded non-wrongdoing employees from discovering their crimes. (Id. ¶ 29.) The Court finds that, for purposes of the instant motion to dismiss, Plaintiff has adequately alleged a theory of equitable tolling based on adverse domination.

(RLB Decl., Ex. 1, p. 11:23-12:4.)

**2. The Order Denying U.S. Fire's Motion to Dismiss**

**a. The Adverse Domination Theory Applies Because the Lack of Discovery of Thefts by Non-Wrongdoing Employees at Vesta Was Reasonable.**

Plaintiff alleges that:

> Other than Ye, Terzakis, and Estupinian, the employees at Vesta were unaware of the theft of Exchange Funds. Terzakis and Estupinian controlled the financial affairs of Vesta and exercised dominion over Vesta which incapacitated Vesta and precluded

> non-wrongdoing employees from discovering their crimes. (Counterclaim ¶ 26.)

> Terzakis and Estupinian were able to hide their ongoing theft of Exchange Funds through the constant manipulation and transfer of funds from newer clients to older clients. As long as the new escrows on "relinquished" properties were sufficient to pay for the close of escrows on "replacement" properties, Terzakis and Estupinian could conceal their theft and cover up the deficit in Vesta's client trust account. (Counterclaim ¶ 53.)

Based on the allegations above and the discovery provisions of the policies, the Court determined that:

> …the Counterclaim alleges sufficient facts to establish that non-wrongdoing employees at Vesta could not have discovered the embezzlement of funds by Terzakis and Estupinian.

(RLB Decl., Ex. 2, p. 9:12-14.)

**b. The Public Policy Exception to Adverse Domination Is Not Triggered Because the Money to be Paid by Continental Will Go to the Exchangers with Unfunded Exchanges.**

In denying U.S. Fire's motion to dismiss, the Court held that:

> In this case, the general policy that one should not be permitted to take advantage of his or her own wrong is not implicated by Counter-Claimant's adverse domination allegations. Should Counter-Claimant receive funds under the Policies for loss caused by Terzakis and Estupinian, Counter-Claimant is charged with maintaining a common fund for the payment of Vesta's creditors, including the exchangers from whom Terzakis and Estupinian stole. Thus, the Court finds that allowing recovery in this case will not provide Terzakis and Estupinian with the opportunity to take advantage of their own wrongdoing.
>
> Unlike the policy in <u>California Union</u>, the Tax-Deferred Exchange Endorsement of the Policies at issue expressly covers losses resulting from dishonest acts of the insured, Vesta, or its partners, Terzakis and Estupinian, involving Section 1031 exchange funds. **As a result, in this case, any embezzlement of Section 1031 exchange funds by company principles was expressly covered by the Policies.**

(RLB Decl., Ex. 2, p. 11:3-19.) (Emphasis added.)

///

## III.

## SUMMARY OF ARGUMENT

As the Court has previously ruled, the embezzlement of IRC section 1031 Exchange Funds by the principles of Vesta was expressly covered under the $5 million 2004 policy issued to Vesta by Continental. From January 21, 2004, to June 24, 2004, Terzakis, with the assistance of Estupinian and Ye, embezzled $9.3 million of Vesta Exchange Funds. Terzakis never repaid these sums, so the losses caused by the thefts in 2004 during the 2004 policy period were never cured. As the Court previously ruled, the ultimate damage to Vesta for the prior thefts was identified when Vesta collapsed in June 2008. There are 16 Vesta Exchangers that are owed $11.5 million.

Terzakis, Estupinian, and Ye knew they were stealing the money, but their knowledge does not constitute discovery by Vesta. In addition, these wrongdoers could not be expected to make a claim to Continental for their own thefts. Terzakis, Estupinian and Ye concealed their thefts by using new Exchange Funds deposited by new exchangers to fund older exchanges, which could not close because Terzakis had taken the $9.3 million. The non-executive employees at Vesta were unaware that the transfers to Terzakis were thefts. Prior to the June 2008 collapse, no known non-wrongdoing employee at Vesta believed the loans to Terzakis were thefts of Exchange Funds. In addition, these non-executives were not authorized to make an insurance claim to Continental, and they had no power to control or question Terzakis. In 2004, the Vesta Exchangers were powerless to discover that their money was stolen because they were not given access to Vesta bank documents, and their Exchanges were closed using new Exchangers' money.

Because Continental has repeatedly contended that a theft of Exchange Funds is not a loss until an exchange actually fails, it cannot now argue that it was possible for non-wrongdoing rank and file employees at Vesta to discover a loss before exchanges started to fail in June of 2008, when Vesta collapsed. Adverse domination of Vesta, by the 100% owners of Vesta, tolled the discovery by Vesta of the losses caused by the owners of Vesta until the

Receiver was appointed. In the alternative, if non-wrongdoing employees of Vesta objectively discovered the loss during the 2004 Vesta Policy (as Continental now claims and Dillon denies), and their knowledge is imputed to Vesta, then there is coverage for Vesta and the claim for the 2004 thefts was presented to Continental as soon as possible, upon the appointment of the Receiver.

## IV.
## THE STANDARD FOR GRANTING OR DENYING SUMMARY JUDGMENT

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).

When evaluating a motion for summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that would pertain at trial. *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 255 (1986). The court draws all reasonable inferences in favor of the nonmoving party, including questions of credibility and of the weight that particular evidence is accorded. See, e.g., *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 520 (1992). The court determines whether the non-moving party's "specific facts," coupled with disputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party. *T.W. Elec. Serv. v. Pac. Elec. Contractors Assoc*., 809 F.2d 626,631 (9th Cir. 1987). In such a case, summary judgment is inappropriate. *Anderson*, 477 U.S. at 248. However, where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The undisputed facts cited below, when juxtaposed against the law of the case cited above, entitle Dillon to a judgment against Continental for $5,000,000 as a matter of law.

## V.

## STATEMENT OF UNDISPUTED FACTS

### A. Continental Issued a $5,000,000 Policy to Vesta For Owner Theft of Client Funds.

1. Continental issued Policy No. 267920538 (the "2004 Vesta Policy) to IAG 1031, LLC (the predecessor to Vesta), which covered owner theft of client funds. A copy of the 2004 Vesta Policy is attached to the Declaration of John Terzakis ("Terzakis Decl.") as Exhibit 10.

2. On January 9, 2004, Vesta Strategies, LLC was formed as a limited liability company to take over the 1031 QI business of IAG 1031, LLC. Vesta was formed as a California limited liability company pursuant to California Corporation Code §17000, et seq. (Terzakis Decl., ¶ 4, and Exhibit 5.)

3. Continental issued an endorsement on the 2004 Vesta Policy, naming Vesta Strategies, LLC as a named insured for theft of Exchange Funds discovered by Vesta from January 9, 2004 to August 15, 2004. (Ex. 10 to Terzakis Decl.)

4. The 2004 Vesta Policy covers the theft of Exchange Funds by the principles of Vesta that are discovered by Vesta from January 9, 2004 to August 15, 2004. (Terzakis Decl. Ex. 2; RLB Decl., Ex. 2, p. 11:3-19.)

5. Continental defines "owners" of an insured business entity, acting as a QI, as those persons "with a majority controlling interest in the company." (Ex. 3 to RLB Decl.)

### B. John Terzakis Was an "Owner" of Vesta and He Controlled Vesta Pursuant to the Vesta Operating Agreement.

6. Vesta was a limited liability company formed on January 9, 2004. John Terzakis ("Terzakis") owned 100% of the shares of B&B Sparco Properties, Inc. ("B&B Sparco"), and B&B Sparco owned 51% of the membership interests in Vesta. B&B Sparco was listed as the sole manager of Vesta. Terzakis owned B&B Sparco, so Terzakis controlled Vesta through his ownership of B&B Sparco. (Terzakis Decl., ¶4; Ex. 5.)

7. The Vesta Operating Agreement provided that Terzakis had exclusive dominion and control over Vesta as the majority owner of Vesta, and Vesta employees owed no duty or

obligation to Vesta to question Terzakis' exercise of authority over Vesta. The Vesta Operating Agreement reads as follows:

> **3.3 Management**
>
> The Company shall be managed by the Member who has the majority of Ownership [Terzakis], who may unilaterally act on behalf of the Company with or without a meeting and regardless of any financial interest the Member may have in such action.
>
> **3.4 Management Rights**
>
> No person shall have any duty or obligation to inquire into the authority or power of the Manager [Terzakis] regarding the Manager's actions on behalf of the Company.

(Terzakis Decl., Ex.5, ¶¶ 3.3 and 3.4.)

8. Robert Estupinian ("Estupinian") and Ginny Estupinian owned 100% of Mutual Vision, LLC, and Mutual Vision, LLC owned 49% of the membership interests in Vesta. (Terzakis Decl., ¶4.)

9. Together, Estupinian and Terzakis owned 100% of the membership interests in Vesta, and both would be "owners" as defined by Continental when they were acting in concert with each other. (Terzakis Decl., ¶4; RLB Decl. Ex. 3.)

10. During 2004, Terzakis left the day-to-day operations of Vesta to Estupinian. Estupinian was identified as the Chief Executive Officer of Vesta; Ginny Estupinian held the title of President of Vesta; and Peter Ye held the title of the Operations Manager of Vesta. (Terzakis Decl., ¶7.)

11. The two people that were in control of Vesta, directing the affairs of Vesta and making all significant management decisions related to Vesta were Terzakis and Estupinian. (Ye Decl., ¶4; Terzakis Decl.¶4.)

12. During 2004, Peter Ye followed the directives of both Estupinian and Terzakis. Ye perceived that Ginny Estupinian (formerly known as Ginny Hillig) followed the directives of Estupinian, her lover and ultimately, her husband. Although Ginny Estupinian was identified as the President of Vesta, she spent very little time working at Vesta. (Ye decl., ¶¶ 4 and 13.)

13. During 2004, there were no employees at Vesta in a position of power at Vesta who could have acted on behalf of Vesta to prevent either Terzakis or Estupinian from using Exchange Funds for their personal investments. (Terzakis Decl. ¶4.)

14. During 2004, there was no functional way for Vesta, itself, to stop Terzakis and Estupinian from using Exchange Funds for their personal investments, because Terzakis and Estupinian owned and controlled Vesta. (Terzakis Decl., ¶4.)

15. By 2004 Ye had become a senior employee at Vesta. Ye had knowledge of the transfers of Vesta Exchange Funds to Terzakis as they were made. Ye performed the physical tasks needed to effectuate the transfers. In 2004, Ye had no reason to question either the propriety or legality of transferring Exchange Funds to Mr. Terzakis, as Ye was directed to do so by his superiors (Estupinian and Terzakis), for what Ye believed to be investments. Ye was told by Estupinian that the Exchange Agreements gave Vesta the discretionary authority to invest the Exchange Funds as Estupinian saw fit, which Ye was told by Estupinian included lending the money to Terzakis. (Ye Decl. ¶13.)

16. The Vesta Exchange Agreement gave Vesta the authority to invest Exchange Funds in a financial institution. The language granting Vesta discretionary authority to invest is quoted below:

> 3(a) . . .it is understood that these funds are fungible and may be moved at any time as [Vesta] sees fit without further notice to Exchangers. . .
>
> 14 . . . [Vesta shall] deposit all cash funds received as the Exchange Estate into accounts at a financial institution designated solely by [Vesta], and that [Vesta] hereby maintains absolute and subjective discretion to direct such funds at any time without further consent of the Exchanger.

(Ye Decl., ¶13 Ex.3.)

17. In 2004, Ye was not made aware by any employee at Vesta that they concluded the transfers of Exchange Funds to Terzakis constituted thefts. In 2004, Vesta was able to close old Exchanges pending at Vesta with new Exchange Funds deposited by new Vesta Exchangers,

so there was no reason for employees to be concerned. Ye was a senior employee at Vesta, and responsible for managing the majority of the other employees. Ye had a good relationship with the employees, and if they perceived any illegality in the business affairs of Vesta, they would have shared their concerns with Ye. No employees complained. (Ye Decl. ¶14.)

18. Kristine Carlos (a/k/a Kristine Cangco) was employed at Vesta in 2004. While employed at Vesta, Kristine Carlos ("Carlos") asked Estupinian why Vesta was making a transfer of Exchange Funds out of the depository account for a purpose other than to close an Exchange. Estupinian responded to Carlos by saying that the purpose of the transfer was to earn more interest on the Exchange Funds pending the close of the Exchanger's 1031 Exchange. Carlos believed Estupinian. (Carlos Decl., ¶7.)

19. Carlos followed the directions of her superiors at Vesta, and never questioned their ethics or business practices. While employed at Vesta, Carlos never concluded that any transfer of Exchange Funds at Vesta was suspicious or illegal. If Carlos had concluded that her superiors were involved in criminal activity, she would have terminated her involvement. (Carlos Decl., ¶¶6-8.)

20. Susan Woo ("Woo") was employed at Vesta as an exchange officer from October 2004 to November 2006. While employed at Vesta, Woo was informed that Vesta Capital Advisors was a related entity to Vesta, and that Exchange Funds were transferred to Vesta Capital Advisors to obtain higher interest rates for Vesta. (Woo Decl., ¶¶ 1 and 4)

21. While employed at Vesta, Woo followed the directives of Peter Ye and Robert Estupinian. If Woo had discovered that the principles of Vesta were engaged in illegal activity, she would have quit her job at Vesta. (Woo Decl., ¶ 6.)

22. During 2004, no employee at Vesta had the authority to make a claim on insurance coverage for Vesta. If such a claim were to be made on behalf of Vesta, the decision to make such a claim would have had to be made by Estupinian or Terzakis. (Ye Decl., ¶12.)

23. In connection with his operation of Vesta, on February 23, 2012, Terzakis pled guilty to counts 1, 5 and 10 of his indictment: Conspiracy to Commit Wire Fraud, Wire Fraud,

and Money Laundering. (Terzakis Decl. ¶1; Exs. 1 and 2.)

24. Estupinian was indicted and pled guilty to conspiracy, wire fraud, and money laundering in connection with his operation of Vesta. (Terzakis Decl., ¶5; Exs. 1 and 6.)

25. Ye pled guilty to conspiracy, wire fraud and money laundering in connection with his employment at Vesta. (Ye Decl. ¶16; Ex. 6.)

### C. Terzakis, As the Owner of Vesta, Stole Exchange Funds Deposited With Vesta During the 2004 Policy Period.

26. In a series of transfers from January 21, 2004, to June 24, 2004, Terzakis (with the assistance of Estupinian and Ye) embezzled Exchange Funds deposited by the Vesta Exchangers in the accounts Vesta used at Borel Bank. The illegal transfers totaling $9,360,000 are summarized below:

**Illegal Transfers by Terzakis, Estupinian and Ye from Borel Bank**

| Date | Amount | Wire Transfer from Accounts at Borel Bank to the following: | Use of Funds | |
|---|---|---|---|---|
| 1/21/2004 | $500,000.00 | Parkway Bank & Trust Company<br>Account Name: IAG / UIT<br>Account No.: 311650 | Internal Transfer to Single Site Solutions at Parkway Bank #..6437<br>Internal Transfers to Midwest Properties at Parkway Bank #..0800<br>1/29/04: Check No. 4211566 to David H. Malcom<br>Total Withdrawals = | $15,000.00<br>$471,000.00<br>$9,305.55<br>$495,305.55 |
| | | | Total of Both Transfers to Midwest Properties at Bank One = $4,400,000.00 | |
| 3/2/2004 | $1,950,000.00 | Bank One, Chicago<br>Account No.: 643618663<br>Account Name: Midwest Properties | Wires Out to Midwest Properties at Parkway Bank #..0800<br>Wire Out to John D Terzakis Personal Account<br>Miscellaneous Charges<br>Wire Out to Marathon Ashland Petroleum<br>Wire Out to Janice Martin<br>Wire Out to Infant Welfare Society of Chicago<br>Total Withdrawals = | $742,000.00<br>$1,870,000.00<br>$811,695.14<br>$56,140.68<br>$13,825.40<br>$900,000.00<br>$4,393,661.22 |
| 3/22/2004 | $2,450,000.00 | | | |
| 4/16/2004 | $11,300.00<br>$348,700.00 | Parkway Bank & Trust Company<br>Account Name: IAG / UIT<br>Account No.: 311650 | Check No. 4211692 to David H. Malcom<br>Check No. 4211694 to David H. Malcom<br>Total Withdrawals = | $348,000.00<br>$7,764.00<br>$355,764.00 |
| 4/26/2004 | $1,175,000.00 | Parkway Bank & Trust Company<br>Account Name: IAG / UIT<br>Account No.: 311650 | Internal Transfers to Midwest Properties at Parkway Bank #..0800<br>Internal Transfer to Single Site Solutions at Parkway Bank #..6437<br>Total Withdrawals = | $750,000.00<br>$400,000.00<br>$1,150,000.00 |
| 5/11/2004 | $1,475,000.00 | Parkway Bank & Trust Company<br>Account Name: Single Site Solutions<br>Account No.: 326437 | Internal Transfers to Midwest Properties at Parkway Bank #..0800<br>Wire Out to Lasalle Bank, Chicago Title & Trust for Mark Hunt<br>Wire Out to Harris Bank for Synergy Payroll<br>Total Withdrawals = | $60,000.00<br>$1,244,000.00<br>$170,113.17<br>$1,474,113.17 |
| 5/25/2004 | $625,000.00 | Parkway Bank & Trust Company<br>Account Name: Single Site Solutions<br>Account No.: 326437 | Internal Transfers to Midwest Properties at Parkway Bank #..0800<br>Wire Out to Bank One Chicago for Real Estate Venture Corp<br>Wire Out to Harris Bank for Synergy Payroll<br>Total Withdrawals = | $391,000.00<br>$92,500.00<br>$153,658.28<br>$637,158.28 |
| 6/24/2004 | $825,000.00 | Parkway Bank & Trust Company<br>Account Name: Single Site Solutions<br>Account No.: 326437 | Internal Transfer From Single Site to John D. Terzakis at Parkway Bank Account #..7712 | $820,000.00 |
| **Total Theft of Vesta Exchange Funds During the 2004 Continental Policy Period: $9,360,000.00** | | | | |

(Terzakis Decl. ¶¶ 12-21 and Ye Decl. ¶¶ 5-8.)

27. During the 2004 policy period, Terzakis did not repay Vesta for any of the Exchange Funds transferred to Terzakis, as set forth above. Old exchanges were closed with money from new Exchangers. All of the Exchangers who deposited the $9.3 million taken during the 2004 policy period were paid with deposits from new Exchangers. After June 24, 2004, until Vesta's collapse in June 2008, the deficit (trust assets minus trust liabilities) in Vesta's trust account was never recharged by Terzakis, Estupinian, or any other third party whereby the deficit fell below the $5,000,000 policy limit issued by Continental. In other words, From June 2004 to June 2008, Vesta's trust account deficit always exceeded $5,000,000 (Terzakis Decl. ¶22; Ye Decl. ¶¶ 9-10.)

28. When Vesta collapsed in June 2008, it could not repay Vesta Exchangers $11,462,247.94 in Exchange Funds, which was caused in part by the deficit created by the thefts in 2004. The known Vesta Exchangers who could not close their exchanges, due to the prior transfers of Vesta Exchange Funds to Terzakis, are set forth below:

| Last Name | First Name | Company | Net Loss Amount |
|---|---|---|---|
| Alonso | Maria Del Carmen | | $485,300.45 |
| Bunya | Kaeko & Irene I. | Trustees of the Tadashi Bunya Family Trust | $325,000.00 |
| Chaffee | Debra Oviatt & Hamilton | | $306,564.82 |
| Chen | Mike (Ming Kong) | Trustees of the Ming Kong Chen and Mei Li Chen Trust dated January 11, 1990 | $355,778.24 |
| Farhardi | Sue McCart | | $200,056.70 |
| Henka | Samuel W. | | $887,035.00 |
| Kao | Lily P. | Trustee of the Lily P. Kao Trust dated February 19, 1982 | $1,552,712.95 |
| Kendrick | Kathy K. Davidson & Todd A. | Kendrick & Davidson Properties | $138,390.43 |
| Pappas | Christina M. | Tesoro Coast, LLC | $2,501,487.01 |
| Sakai | Mary Bunya | Trustee of the Ted Iwao Sakai Family Trust Established May 03, 1979 | $325,000.00 |
| Simmons | Michael & Joyce | Trustees of the Michael & Joyce Simmons Family Trust Dated 11/30/02 | $1,777,350.60 |
| Simpson | Darren | | $49,410.93 |
| Simpson | Billy & Peggy | | $560,677.97 |
| Spagnola | Robert A. | | $42,291.19 |
| Tate | Thomas E. & Judith K. | Trustees of The Tate Family Trust dated December 10, 2003 | $172,825.04 |
| Walsh | Christopher L. | | $1,782,366.61 |
| | | Total: | **$11,462,247.94** |

(Terzakis Decl. ¶¶ 23-24.)

**D. No Claim Was Made to Continental on the 2004 Vesta Policy Because Such a Claim Would Implicate Terzakis and Estupinian in the Thefts of Exchange Funds.**

29. Through B&B Sparco, Terzakis was the 51% owner and sole manager of Vesta with exclusive authority to manage and control Vesta. As the 51% owner of Vesta who embezzled Exchange Funds, Terzakis did not make a claim to Continental on the 2004 Vesta Policy for the amounts taken. (RLB Decl., ¶ 10.)

30. Robert Estupinian and Ginny Estupinian had a 49% membership interest in Vesta through their ownership of Mutual Vision. Robert Estupinian had knowledge of the transfers of Exchange Funds to Terzakis, because he authorized Ye to make the transfers to Terzakis before Ye made them. As 49% owners of Vesta, neither Robert nor Ginny Estupinian made a claim to Continental on the 2004 Vesta Policy, during the 2004 Vesta Policy period, for the amounts stolen by Terzakis. (RLB Decl, ¶ 11.)

**E. The Non-Wrongdoing Non-Executive Employees at Vesta Did Not Discover That Terzakis Had Stolen Exchange Funds and They Had Neither the Duty Nor the Authority to Make a Claim to Continental.**

31. If non-wrongdoing employees had perceived any illegality in the business affairs of Vesta, they would have shared their concerns with Ye. No employees complained to Ye about the transfers to Terzakis in 2004. (Ye Decl, ¶14.)

32. Terzakis and Estupinian were the only persons at Vesta authorized to make an insurance claim on behalf of Vesta. (Terzakis Decl.¶25; Ye Decl. ¶12.)

33. Susan Woo and Kristine Carlos, both non-executive employees at Vesta, perceived no illegality taking place at Vesta when employed at Vesta. If they had concluded that Terzakis or Estupinian were stealing Exchange Funds, they would have quit. (Woo Decl., ¶5; Carlos Decl., ¶8.)

**F. The Vesta Exchangers Did Not Know That Terzakis Had Stolen Their Exchange Funds.**

34. The Exchangers at Vesta did not know Terzakis took their Exchange Funds, and had no ability to discover Terzakis was using their Exchange Funds for his own purposes

pending their Exchange. The Vesta Exchangers were not given access to third party account statements showing the location and amount of their funds on deposit. As long as Vesta could close pending Exchanges with newly deposited Exchange Funds, the Exchangers had no way to discover that Terzakis had taken and used their money without their knowledge or consent. (Terzakis Decl., ¶8.)

35. The ultimate undoing of both Vesta and Excalibur in June of 2008 was a result of the misuse and misappropriation of Exchange Funds by both Estupinian and Terzakis. Using Exchange Funds for Terzakis' personal business instead of closing Exchanges created a deficit in the trust account which resulted in an operational Ponzi scheme at Vesta and Excalibur. The Ponzi scheme collapsed in June of 2008, when the deposits of new Exchangers became insufficient to meet the obligations of the existing Exchanges coming due, and Terzakis was unable to raise funds from other sources to close outstanding Exchanges. (Terzakis Decl., ¶3.)

### G. The Vesta Exchange Agreements Expressly Precluded Vesta From Transferring Exchange Funds Held in Trust by Vesta to Terzakis' Personal Accounts.

36. Pursuant to the Exchange Agreements, the money received by Vesta obligated Vesta to deposit the Exchange Funds into a "Qualified Exchange Trust." The language establishing a trust relationship between Vesta and each Exchanger is quoted below:

> INTERMEDIARY shall transfer the Relinquished Property to Purchaser in accordance with the terms and conditions of the Contract and INTERMEDIARY shall cause the net cash proceeds generated from such transfer . . . ("Exchange Estate") to be transferred irrevocably and contemporaneously from Purchaser to INTERMEDIARY and held by INTERMEDIARY in a **Qualified Exchange Trust** as defined in Paragraph 3(g) of this Agreement pursuant to and in accordance with the provisions of this Agreement. (¶3(a) of Ex. 3 to Ye Decl.) (Emphasis added.)
>
> * * *
>
> The Exchange Estate shall accrue interest at the rate of 2.00% simple interest beginning on the 1st day, but not exceeding the 180-day period after the close of escrow on the relinquished property. . . . The INTERMEDIARY will be entitled to any interest earned above the aforementioned rates as part of its exchange fee. (¶3(c) of Exhibit 3 to Ye Decl.).
>
> * * *

> In order to secure INTERMEDIARY'S obligations to purchase Replacement Property and deliver it to EXCHANGER, INTERMEDIARY shall deposit into an account ("**Qualified Exchange Trust**"), defined solely as such for purposes of Treasury Regulations 1.031(k)-1(g)(3), an amount equal to the Exchange Estate. EXCHANGER shall be the beneficiary of such trust but shall have no rights to the Exchange Estate other than those described in this Agreement. . . . The **Qualified Exchange** Trust shall be administered and managed in accordance with the terms of this Agreement. The parties intend that this trust shall be a **Qualified Exchange Trust** for purposes of Treasury Regulation 1.1031(k)-1(g)(3). (¶3(g) of Ex. 3 to Ye Decl.) (Emphasis added.)

37. The Exchange Funds deposited by each Exchanger were required to be deposited into a Qualified Exchange Trust, with Vesta as the trustee for each Vesta Exchanger. Although Vesta had the discretion (subject to the Prudent Investor Rule) to choose the financial institution and select the investments to be procured with the Exchange Funds, Vesta could not transfer trust funds out of the original (established) Qualified Exchange Trust into Vesta business accounts, or to Terzakis' personal accounts at other banks. (Ye Decl, Ex. 3; Terzakis Decl., Ex. 4.)

### H. Continental Agrees That Vesta Exchange Funds Are Held in Trust by Vesta.

38. In the Edward Okun bankruptcy litigation entitled *In re: The 1031 Tax Group, LLC,* U.S. Bankruptcy Court Case No. 07-11448 (MG), Continental acknowledged that Exchange Funds are held in trust, and that they must be segregated from the general assets of the QI and used exclusively to pay 1031 Exchanges. (RLB Decl., Ex. 5, ¶¶ 3 and 10.)

## VI.

## LEGAL ARGUMENT

### A. The $9.3 Million Transferred to Terzakis Constituted the Embezzlement of Exchange Funds.

#### 1. The Legal Duties of a QI While Acting as a Trustee of Exchange Funds.

Continental's view that Exchange Funds are held in trust is consistent with that of the courts. In two separate California bankruptcy court cases, one affirmed by the Ninth Circuit, courts examined exchange agreements, and, applying California's law on trusts, ruled that a

trust relationship was in fact created between Exchangers and QIs. *DeGroot v. Exchanged Titles, Inc.*, 159 B.R. 303, 306; 1993 Bankr. LEXIS 1436 (Bankr. C.D. Cal. 1993*); Siegel v. Boston (In re: Sale Guaranty Corp.)*, 220 B.R. 660, 668; 1998 Bankr. LEXIS 530 (Bankr. 9th Cir. 1998); aff'd by *Sigel v. Newman* (*In re Sale Guar. Corp*.), 199 F.3d 1375 (9th Cir. Cal. 2000).

A trustee is a fiduciary (Probate Code § 16323) which, by operation of law, owes certain duties to the beneficiaries of a trust, including: (i) the duty to abide by the terms of the instrument [the Exchange Agreement] creating the trust (Probate Code § 16000); (ii) the duty of undivided loyalty (Probate Codes §§ 16002 and 16004); (iii) the duty to seize control of and protect the trust res during the term of the trust (Probate Code § 16006); and (iv) the duty to designate trust property as belonging to the trust and to keep the trust property separate from other property not subject to the trust (the duty not to commingle) (Probate Code §16009).

**2. Terzakis Embezzled the Trust Funds.**

Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted. Cal. Penal Code §503. "The gist of the offense is the appropriation to the defendant's own use of property delivered to him for a specified purpose other than his own enjoyment of it," *People v. Parker*, 235 Cal. App. 2d 100,108-109 (Cal. App. 3d Dist. 1965). Embezzlement occurs where a relationship of trust and confidence exists between the defendant and another person, the defendant accepts property entrusted to him by the other person, and the defendant fraudulently appropriates or converts the property to his own use or purpose with the specific intent to deprive the other person of the property at least temporarily. *People v. Talbot*, 220 Cal. 3, 13-16 (Cal. 1934); *People v. Miller*, 188 Cal. App. 2d 156 (Cal. App. 2d Dist. 1961).

**B. Terzakis' Embezzlement of Trust Funds Is a Dishonest Act Covered Under the Policy.**

As the Court concluded in denying Continental's motion to dismiss,

> . . . the Policies provide coverage for the alleged losses caused by Terzakis and Estupinian's embezzlement of the original exchangers' funds. In particular, the Policies define "Covered

> Cause of Loss" to include dishonest acts committed by employees (and owners with regard to Section 1031 exchange funds) with the manifest intent to cause a loss and obtain a financial benefit. The Court finds that the "loss" alleged by Plaintiff is the embezzlement of the original exchangers' funds by Terzakis and Estupinian for their personal use, which allegedly occurred during the discovery period.

(RLB Dec., Ex. 1, p.7:17-8:11.)

**C. Terzakis and Estupinian Adversely Dominated Vesta, Which Tolled the Discovery of Loss by Vesta Until the Receiver Was Appointed.**

The transfer of $9.3 million in Exchange Funds by Vesta to Terzakis to make risky real estate investments for Terzakis' own account did not benefit Vesta or the Vesta Exchangers. The Vesta Exchangers took all the risk, and neither Vesta nor the Vesta Exchangers received any of the potential benefit. Terzakis, as the 51% owner of Vesta, was able to "borrow" the Exchange Funds because there was no human being in a position of power at Vesta to protect Vesta. Estupinian, as the 49% owner of Vesta, consented to the transfers to Terzakis, because Estupinian was also "borrowing" Exchange Funds to make his own illegal profits. (Ye Decl., Ex. 4.) Ye initially assisted the two principles of Vesta in their ongoing embezzlement because he was misled, then ultimately proved to be morally weak. The non-executive employees at Vesta did not perceive any illegality, were not authorized to question the actions of Terzakis, and they were also not authorized to make an insurance claim even if they had discovered a loss.

A corporation is a distinct legal entity, separate from either its shareholders or its corporate officers. See F.*D.I.C. v. O'Melveny & Myers*, 969 F.2d 744, 750 (9th Cir. 1992) ("*O' Melveny I*") (citation omitted), rev'd on other grounds, *O'Melveny & Meyers v. F.D.I.C.*, 512 U.S. 79 (1994), reaff'd on remand, *F.D.I.C. v. O'Melveny & Meyers*, 61 F.3d 17 (9th Cir. 1995). A corporate agent's knowledge will not be imputed to a corporation when he has no authority to bind the corporation relative to the fact or matter within his knowledge. Nor will a corporate agent's knowledge or conduct be imputed to a corporation if the agent is engaged in activity that is adverse to the interest of the corporation. See *O'Melveny I*, 969 F.2d at 750 (applying California law to analyze when conduct of an officer or shareholder is imputed to corporation).

When a corporation is owned and controlled by the same persons committing fraud against the corporation, the entity is deemed to be in a position similar to an incompetent person or a minor. The incapacitated entity is without legal capacity either to know or to act in relation to the fraud being committed against it by its principles. During the period of incapacity, courts toll the time for the corporation to discover a theft loss under a fidelity bond which covers owner theft when both owners are involved. *Admiralty Fund v. Peerless Insurance Co*., 143 Cal. App. 3d 379 (1983).

Because there were no employees at Vesta in positions of power at Vesta to question the propriety of the "loans" to Terzakis and Estupinian (the owners of Vesta), or to make a claim to Continental, there can be no requirement under the 2004 Vesta Policy that Vesta must diligently uncover this particular insurable loss. Before Vesta's due diligence to discover the loss is required to trump the thief's efforts to conceal the theft, the insurable loss must be employee theft as contrasted to owner theft when 100% of the owners are participating in the thefts. *Id.* at 385. Because both owners were the criminals, discovery by Vesta must be tolled. *Shields v. National Union Fire Insurance Co.*, 153 B.R. 677 (E.D. Penn, 1993).

**D. It Was Reasonable For Non-Wrongdoing Employees to Fail to Discover a Loss and Report a Claim to Continental.**

In most fidelity bond cases (as contrasted to this case), the insurer is contending that the insured did discover the dishonesty of the employee before the employee stole more money. The objective "discovery" of the prior thefts terminates coverage for the subsequent thefts by that same employee. To avoid the obvious destruction stemming from false claims, the U.S. Supreme Court in *American Surety Co. v. Pauly*, 170 U.S. 133, 147, 42 L. Ed. 977, 18 S.Ct. 552 (1898) held that mere suspicion was not enough for "discovery." The insured must know facts which would justify a careful and prudent man in charging another with fraud or dishonesty. Charging an employer or an employee with theft disrupts the fabric of the workplace and sets in motion investigations by governmental agencies and affected parties. If such a charge of theft is later determined to be incorrect, the charging party may be liable for defamation, slander, breach

of employment contract, or other tort claims. For such reasons, persons must be careful and cautious before asserting fraud or dishonesty. *Utica Mutual Ins. Co. v. Firemans Fund Ins. Co.*, 748 F. 2d 118, 123 (2d Cir. 1984).

Continental cannot argue that non-wrongdoing Vesta employees, with no authority to make a claim, concluded that thefts had occurred and were then required to act as whistleblowers, subjecting themselves to legal liability if their conclusions were not correct. As Woo and Carlos testified, if they had discovered that the loans were thefts, they would have simply quit, which is all the law requires in order to avoid aiding and abetting liability.

Continental itself contends there was no "loss" compensable under the 2004 Vesta Policy, so how can it argue that the Vesta employees should have discovered the loss and then made a claim. According to Continental, before a theft constitutes a loss there must be a failed exchange caused by the theft and not just the original theft. (Docket No. 15.) At a hearing, Continental made the argument to the Court as follows:

> Attorney Eileen Bower, for Continental, at the podium:
>
> "Assuming, for purposes of this motion, that there was, in fact, a Ponzi scheme going on during the time that the Continental policies were in effect, that still isn't sufficient to show that there was some sort of loss discovered during the Continental policy periods, because all that the plaintiffs here have alleged is that there was a theft. There was a misappropriation of funds; but they haven't alleged **and they can't show that there was any loss resulting from that theft back when the Continental policies were in effect**."

(Ex. 4 to RLB Dec., Reporter's Transcript, p. 8:5-13.) (Emphasis added.)

Continental lost this argument when the Court concluded that a theft is a covered loss at the time of the initial theft. As recently as March 21, 2012, Continental declared again that it "continues to maintain that no loss occurred during the relevant time frame for coverage to exist under the 2004 Policy Period." See Ex.6 to RLB Decl. (Continental's Responses to Dillon's Interrogatories.)

Continental now contends, in a 180° turn, that adverse domination does not apply to toll

Vesta's actual discovery because it "was possible" that certain Vesta employees (and others not employed at Vesta) could have discovered that the original thefts were compensable losses under the 2004 Policy. The problem with Continental's new argument is that actual "objective" discovery of the loss in 2004 by non-wrongdoing employees with authority to make a claim on behalf of Vesta would trigger coverage for Vesta, obviating the need for Vesta to establish adverse domination. The other problem with Continental's argument is that it is contrary to common sense and the law of agency.

The definition of "discovery of loss" in the 2004 Vesta Policy requires an objective, rather than subjective, analysis. The test is whether Vesta, acting as a reasonable person, would assume a loss has occurred based on the actual facts known to Vesta. The facts imputed to Vesta cannot come from Terzakis, Estupinian, or Ye. The facts imputed to Vesta from knowledge acquired by non-wrongdoing employees could only be facts obtained by employees with authority to bind Vesta relative to the facts obtained. Estupinian and Terzakis were the only two people at Vesta with authority to make an insurance claim. Facts obtained by others relative to issues of insurance coverage would not bind Vesta. RESTATEMENT OF THE LAW, AGENCY, §5.03 (imputation of notice of fact to principle), Volume 1, p. 359. See Illustration 21 on page 373 where knowledge material to an insurance claim obtained by the corporation's manager of risk management would be imputed to Vesta, but facts obtained by other rank-and-file employees with no duty to perfect an insurance claim on behalf of their employer would not be imputed to Vesta.

For Continental's argument to have any merit, Continental must rebut the presumption of non-discovery by Vesta due to adverse domination with admissible evidence that in 2004: (i) a non-wrongdoing employee at Vesta, acting beyond his or her job description, concluded that transfers of Exchange Funds to Terzakis constituted thefts, (this despite no exchange having failed, which Continental argues was necessary for a loss to occur under the policy); (ii) this hypothetical and hyperactive employee then disclosed this information to the highest ranking authorities at Vesta that could act on behalf of the entity – Terzakis and Estupinian; (iii) the

employee was not persuaded by Terzakis and Estupinian's claims that the transfers were legal pursuant to the discretionary language in the Exchange Agreement; and (iv) instead of quitting, the employee then had the ability and motive to go beyond his or her authority at Vesta to submit a theft claim to Continental but failed to do so; a theft claim that required disclosing confidential financial information obtained while employed at Vesta; a theft claim which implicated the hypothetical employee's superiors in serious crimes. This scenario did not occur. It was not possible or probable that this scenario could occur. Plaintiff is not required to prove the impossible. Continental must rebut the presumption of non-discovery due to adverse domination, and identify the employee it contends had the knowledge, ability, and motive to make a theft claim but failed to do so.

**E. Continental Must Rebut the Presumption That It Was Impossible for Non-Wrongdoing Employees at Vesta to Discover the Thefts and Make a Claim.**

Dillon has established that Terzakis, through B&B Sparco, was the sole manager of Vesta. Pursuant to California Corporations Code § 17154(b), Estupinian, as well as all other employees at Vesta, served at the pleasure of Terzakis. Terzakis and Estupinian were the only persons at Vesta with authority to make an insurance claim to Continental. Estupinian told employees at Vesta that Vesta was authorized to make loans to Terzakis and related entities to earn more interest. (Ye Decl. 13; Woo Decl. 4; Carlos Decl. 7.) Terzakis told his employees at Single Site in Chicago that borrowing was explicitly allowed in the 1031 QI business, and that his borrowing and investing of Vesta's Exchange Funds was all in the normal course of business in that industry. (Terzakis Decl., ¶ 10.)

Two tests have emerged with respect to the showing a plaintiff must make in order to establish "domination" of a corporation by its wrongdoers, and Dillon satisfies both. The more difficult test is the "Complete Domination Theory," where Dillon must show Vesta was subject to the "full, complete and exclusive control" by the directors or officers charged with the wrongdoing. In order to meet this more stringent test, Dillon must negate the possibility that an innocent and informed **stockholder or director** of Vesta was available to file a claim with

Continental. Terzakis and Estupinian were the only stockholders of Vesta, and Terzakis was the sole manager, or director of Vesta. There is no requirement for Dillon to negate the knowledge of rank and file employees. *Resolution Trust Corp. v. Franz*, 909 F. Supp 1128, 1136 (N.D. Ill. 1995). The other test is the majority rule in the United States, and it is called the "Majority Domination Theory." Under this second theory, Dillon must show that a numerical majority of the board members were the wrongdoers, because the existence of a culpable majority is so likely to preclude the corporation from filing a claim against the wrongdoers that tolling is justified. The two reasons for tolling when there is a majority of wrongdoers on the board are: (i) the culpable majority can control the flow of information and make misrepresentations to the minority; and (ii) it is unreasonable to expect the culpable majority to make a claim against themselves. *F.D.I.C. v. Dawson*, 4 F.3d 1303, 1310 (5th Cir. 1993); *F.D.I.C. v. Howse*, 736 F.Supp. 1437, 1441 (S.D. Tex. 1990). Though it is in the realm of possibility that a board of wrongdoing directors could bring a claim against themselves, the likelihood of such action is minute. *Hecht v. Resolution Trust Corp*., 333 Md. 324, 635 A.2d 394, 405-407 (Md. 1994).

Courts adopting the adverse domination doctrine hold that once the plaintiff establishes either complete or majority control over the corporation by the wrongdoers, a rebuttable presumption arises that knowledge of the injury to the corporation will not be available for the corporation to make a claim so long as the wrongdoers remain in control. The presumption may be rebutted, however, by evidence that someone other than the wrongdoing directors had knowledge of the claim, and both the ability and the motive to make a claim on the policy. *Resolution Trust Corp. v. Smith*, 872 F.Supp 805 (D. Or. 1995); *Hecht*, 333 Md. at 531, 635 A.2d at 408. Thus, the ability to act on knowledge of the wrong is just as important as the knowledge itself. See *California Union Insurance Co. v. American Diversified Savings Bank*, 948 F. 2d. 556 (9th Cir. 1991), where the court held that bank regulators overseeing the insolvent bank prior to takeover objectively discovered the theft by the two principles, so as to preclude equitable tolling based on adverse domination.

Here, it is undisputed that Terzakis and Estupinian were the only persons authorized to

file a claim with Continental until the Receiver was appointed. The other employees at Vesta (as well as at Single Site) were not authorized, and had no motive to make such a claim. The two employees interviewed by Dillon said they did not see anything that looked illegal, and if they had they would have simply quit. Continental must now rebut the presumption of non-discovery by Vesta and identify the non-wrongdoing employee whose knowledge is imputed to Vesta, based on the law of agency.

## VII.

## CONCLUSION

For the reasons stated above, the Receiver's Motion for Summary Judgment against Continental should be granted. Judgment should be entered against Continental for $5,000,000 on the 2004 Vesta policy, with prejudgment interest at 7% from November 1, 2010 to the date of entry of the Judgment.

DATED this 31st day of August, 2012 By: /s/ Robert L. Brace

Robert L. Brace, Esq., SBN. 122240
Michael P. Denver, Esq., SBN 199279
Peter L. Candy, Esq., SBN. 149976
**HOLLISTER & BRACE**
P.O. Box 630
Santa Barbara, CA 93102

Attorneys for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group LLC

## CERTIFICATE OF SERVICE

This document will be served by the Court via its CM/ECF system, thus pursuant to General Order 45, part IX, no Certificate of Service is necessary, except as to those parties not on the Court's electronic service list.[1] Plaintiff is informed and believes that all parties who have appeared to date have at least one of their attorneys on the electronic service list.

[1] Comment to Civil Local Rule 5-6.