Troutman Sanders LLP
Ryan C. Tuley (Cal. Bar No. 198249)
ryan.tuley@troutmansanders.com
5 Park Plaza, Suite 1400
Irvine, CA 92614-2545
Telephone: (949) 622-2700
Facsimile: (949) 622-2739

Troutman Sanders LLP
Eileen King Bower, *Pro Hac Vice*
eileen.bower@troutmansanders.com
Brian P. Cummings, *Pro Hac Vice*
brian.cummings@troutmansanders.com
55 West Monroe, Suite 3000
Chicago, IL 60603
Telephone: (312) 759-1920
Facsimile: (312) 759-1939

*Attorneys for Defendant Continental Casualty Company*

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC,

Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY, an Illinois corporation,

Defendant.

Case No. C 10-05238 JW

**DEFENDANT CONTINENTAL CASUALTY COMPANY'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date: October 15, 2012
Time: 9:00 a.m.
Ctrm: 15, 18th Floor

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT, on October 15, 2012 at 9:00 a.m., or as soon thereafter as the matter may be heard in courtroom 15 of the above-captioned Court, located at 450 Golden Gate Avenue, San Francisco CA 94102, Defendant Continental Casualty Company ("Continental") will and hereby does move this Court for an order granting it summary judgment with respect to the complaint of Plaintiff Thomas Dillon, as Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC ("Plaintiff"). This motion is made Pursuant to Rule 56 of the Federal Rules of Civil Procedure and applicable law.

Continental's Motion is based on this Notice of Motion and Motion, its Memorandum of Points and Authorities in support of the Motion, the concurrently filed Declaration of Eileen King Bower, the concurrently filed Evidentiary Appendix in Support of Continental Casualty Company's Motion for Summary Judgment, and the concurrently filed [Proposed] Order, and on all pleadings and papers filed in this action and any further matters this Court may consider at or before the hearing on this Motion.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Dated: August 31, 2012

Respectfully submitted,

TROUTMAN SANDERS LLP

By: /s/ Eileen King Bower
Ryan C. Tuley
Eileen King Bower
Brian P. Cummings

*Attorneys for Defendant Continental Casualty Company*

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1
II. BACKGROUND ..... 2
A. The Continental Policies at Issue ..... 2
B. The Alleged Loss ..... 4
1. Original Notice and Proof of Loss ..... 4
2. Complaint and Motion to Dismiss ..... 4
III. STATEMENT OF FACTS ..... 5
A. Vesta Strategies, LLC ..... 5
1. Creation and Ownership ..... 5
2. The QI Model That Allowed Terzakis To Take Loans ..... 6
3. Terzakis' Wealth and Role in the QIs ..... 7
4. No Effort was Made to Conceal Loans to Terzakis ..... 8
B. Excalibur 1031 Group, LLC ..... 10
C. The Failed Hoist and Phillips Exchanges ..... 10
D. All Vesta Clients Referred by Excalibur Were Paid By February 2008 ..... 11
E. Vesta's and Excalibur's Collapse ..... 11
IV. ARGUMENT ..... 12
A. Plaintiff's Requested Relief Would Violate Public Policy ..... 12
B. No Covered Loss Was Sustained During the Vesta Policy Period ..... 14
1. There is no evidence that Vesta Client Exchange Funds Were Loaned To Terzakis During the Vesta Policy Period ..... 15
2. Terzakis' Fraudulent Loans Did Not Result in a Loss During the Vesta Policy Period ..... 15
3. The Wrongdoers Did Not Have The "Manifest Intent" to Cause Vesta a Loss ..... 17
a. The Specific Intent Approach ..... 17
b. The Substantial Certainty Approach ..... 18
c. The Objective Standard ..... 19
C. Plaintiff Cannot Prove That Loss Was Discovered During Relevant Time Period and Adverse Domination Does Not Apply to this Case ..... 19
1. The Legal and Policy Justifications for Application of the Doctrine of Adverse Domination Are Absent in this Case ..... 20
a. The Requisite Element of Adversity is Missing ..... 21
b. The Nature of the 1031 Industry Precludes Any Actual Losses to Exchangers from Being Hidden for a Long-term Period ..... 22


TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

## TABLE OF CONTENTS
## (continued)

Page

2. Plaintiff Cannot Meet Its Factual Burden to Establish Adverse Domination ........ 23

D. Vesta Failed to Comply with Internal Controls Requirements ........ 25

E. Plaintiff Cannot Recover Under the Excalibur Policies ........ 26

V. CONCLUSION ........ 27

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Admiralty Fund v. Peerless Ins. Co.*,
143 Cal. App. 3d 379 (1983) .......... 19, 21, 22, 23

*Allstate Insurance Co. v. Gilbert*,
852 F.2d 449 (9th Cir. 1988) .......... 13

*Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*,
854 A.2d 378 (N.J. 2004) .......... 17, 18, 19

*Beal v. Smith*,
46 Cal. App. 271 (1920) .......... 20

*Burt v. Irvine Co.*
237 Cal. App. 2d 828 (1965) .......... 20

*California Union Insurance Co. v. American Diversified Sav. Bank*,
948 F.2d 556 (9th Cir. 1991) .......... 13, 14, 20, 23, 24

*Cenco, Inc. v. Seidman & Seidman*,
686 F.2d 449 (7th Cir. 1982) .......... 13

*Clemmer v. Hartford Insurance Co.*,
22 Cal. 3d 865 (1978) .......... 14

*Dalia Rashdan (Mohamed) v. Geissberger*,
No. C .......... 12

*Federal Deposit Ins. Co. v. Smith*,
980 P.2d 141 (Ore. 1999) .......... 20

*Federal Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.*,
942 F.2d 1032 (6th Cir. 1991) .......... 18

*Federal Deposit Insurance Corp. v. National Union Fire Insurance. Co.*,
57 Fed. Appx. 965 (3d Cir. 2003) .......... 17

*Fidelity Savings & LoanAss'n v. Aetna Life & Cas. Co.*,
647 F.2d 933 (9th Cir.1981) .......... 15, 16

*Fremont Reorganizing Corp. v. Federal Ins. Co.*,
No. SACV 09-01208, 2010 U.S. Dist. LEXIS 14675 (C.D. Cal. Jan. 5, 2012) (a copy is attached to the Appendix at Exhibit 18) .......... 15

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

**TABLE OF CONTENTS**
**(continued)**

**Page**

*General Analytics Corp. v. CNA Ins. Cos.*, 86 F.3d 51 (4th Cir. 1996) ..... 17

*Goomar v. Centennial Life Ins. Co.*, 855 F. Supp. 319 (S.D. Cal. 1994) ..... 14

*Issac Upham Co. v. United States Fidelity & Guar. Co.*, 59 Cal. App. 606 (1922) ..... 19

*J.C. Penney Cas. Ins. Co. v. M.K.*, 52 Cal. 3d 1009 (1991) ..... 14

*Karen Kane, Inc. v. Reliance Ins. Co.*, 202 F.3d 1180 (9th Cir. 2000) ..... 19

*Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873 (9th Cir. Cal. 1984) ..... 23

*Pacific-Southern Mortgage Trust Co. v. Ins. Co. of North America*, 166 Cal. App. 3d 703 (1985) ..... 15, 16

*Pan Pac. Retail Props. v. Gulf Ins. Co.*, 471 F.3d 961 (9th Cir. 2006) ..... 14

*Ryerson, Inc. v. Federal Ins. Co.*, 676 F.3d 610 (7th Cir. 2012) ..... 12

*Seidman & Seidman v. Gee*, 625 So.2d 1 (Dist. Ct. App. Fl. 1992) ..... 13

**STATUTES**

California Insurance Code section 533 ..... 13, 14

Internal Revenue Code 1031 ("1031 Exchange") ..... 3, 26

Investment Company Act of 1940 ..... 22, 23

**OTHER AUTHORITIES**

26 CFR § 1.1031(k)-1 ..... 6

26 CFR § 1.1031(k)-1(b)(2)(ii) ..... 3

26 CFR § 1.1031(k)-1(g)(4)(iii)(B) (2012) ..... 3

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

## TABLE OF CONTENTS
(continued)

**Page**

Federal Rule of Civil Procedure 56(a) .......... 12

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Continental Casualty Company ("Continental") submits the following Memorandum of Points and Authorities in support of its Motion for Summary Judgment as to the complaint of Plaintiff Thomas Dillon, as Receiver for Vesta Strategies, LLC ("Vesta") and Excalibur 1031 Group, LLC ("Excalibur").

## I. INTRODUCTION

In this action, Thomas Dillon, as Court-Appointed Receiver for Vesta and Excalibur (hereinafter "Plaintiff") seeks to recover from Continental under certain fidelity bonds, which provide employee dishonesty coverage. The policies at issue provide coverage for "loss" sustained and discovered during the relevant policy periods. Although Plaintiff agrees that the alleged "loss" was not discovered during the relevant time frame, he persists in his claim by invoking a theory of "adverse domination" based on the argument that John Terzakis ("Terzakis") and Robert Estupinian ("Estupinian"), the 100 percent owners of Vesta, so dominated that company that the loss could not have been discovered until the Plaintiff was appointed Receiver. The theory espoused by Plaintiff, however, is at odds with well established public policy, which prohibits an insured from obtaining insurance for the intentional acts of its alter ego.

As set forth below, even if public policy did not preclude recovery in this case – and it does – Plaintiff's adverse domination argument fails because he cannot meet the difficult burden of proving that it was impossible for "non-wrongdoing employees" to discover the alleged loss. While Plaintiff initially alleged that Terzakis and Estupinian operated Vesta as a hidden Ponzi scheme, the operation is more accurately described as a business model deliberately established as a line of credit for Terzakis that allowed him to take loans of exchanger funds for his real estate business. No attempt was made to hide the fact that Terzakis took such loans. Rather, they were documented, open, obvious and, therefore, easily discoverable by non-wrongdoing employees, perhaps most significantly, Ginny Hillig Estupinian, the person at Vesta who communicated with its brokers with respect to fidelity bond coverage. There are many additional reasons why Plaintiff's claim fails. Plaintiff cannot prove that the alleged loss falls within the insuring provisions of the policies because the facts do not support a finding that such loss was sustained

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

during the Vesta Policy period. Nor can Plaintiff prove that loss arose out of a "covered cause of loss," as the alleged wrongdoers did not "manifest intent" to cause a loss to the entity that they owned. Nor can Plaintiff show that Vesta failed to comply with policy provisions that required the insured to track individual client exchanger funds. Finally, while Plaintiff attempts to blur the distinction between Vesta and Excalibur, the facts reveal that Vesta did not fully own Excalibur until well after the Continental policies expired. In addition, there is simply no basis for finding coverage under Excalibur policies because that entity did not possess, hold or steal client exchange funds while the Continental policies were in effect. Excalibur served as a marketing arm for Vesta, and all clients referred from Excalibur to Vesta recovered their funds before Excalibur collapsed.

## II. BACKGROUND

### A. The Continental Policies at Issue

Plaintiff seeks coverage under four insurance policies issued by Continental, one issued to Vesta and three issued to Excalibur (collectively, the "Continental Policies"). Relevant provisions of the Continental Policies are in the record as follows: Crime Policy No. 267920538 (the "Vesta Policy") (Complaint, Dkt. No. 1 [hereinafter "App. Ex. 11"], EKB1249-64);[1] Crime Policy No. 268100958 (the "05 Excalibur Policy") (*Id.* at EKB1267-83); Commercial Crime Policy No. 268100958 (the "06 Excalibur Policy") (*Id.* at EKB1285-1302); Crime Pack Policy No. 268100958 (the "07 Excalibur Policy") (*Id.* at EKB1304-29.) The Vesta Policy was originally issued to "IAG 1031, LLC." (*Id.* at EKB1249-52.) The President of that company, Ginny Hillig, requested that the policy be amended to reflect a "name change." (E-mail from Ginny Hillig to Adam McDonough [March 10, 2004][hereinafter "App. Ex. 12"], EKB1367.) Pursuant to that request, on March 31, 2004, the policy was amended to list "Vesta Strategies, LLC" as the "named insured" on the Vesta Policy, effective January 9, 2004. (App. Ex. 11,

[1] For ease of reference, the entire Appendix has been consecutively paginated using the identifying mark EKB1 through EKB1854. Accordingly, cites to the Appendix will refer to the Appendix Exhibit number, as well as, to the extent necessary, specific pages within that Exhibit and any additional pinpoint citations.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

EKB1249.)[2] The relevant provisions of the Continental Policies (with the exception of the "named insured," policy period, and discovery of loss period) are the same in all material respects.

In sum, the Continental Policies provide first party crime coverage, *i.e.*, coverage to the named insured for loss of covered property, resulting from a covered cause of loss, defined to mean dishonesty or theft by an employee with manifest intent to cause loss to the named insured. (App. Ex. 11, EKB1249-64, 1267-83, 1285-1302, 1304-29.) The loss must be 1) sustained during the policy period; and 2) discovered during the policy period or an extended discovery period set forth in the particular policy. (*Id.* at EKB1255-56, 1271-72, 1290-91, 1310.) With respect to the Vesta Policy, a loss had to be discovered no later than **October 15, 2004**. (*Id.* at EKB1252, 1255-56.) For the 05 Excalibur Policy, the discovery cutoff was **October 15, 2005**. (*Id.* at EKB1267, 1271-72.) Finally, the 06 and 07 Excalibur Policies both required discovery of loss by **August 15, 2007**. (*Id.* at EKB1285, 1290-91, 1304, 1310.)

Additionally, each of the Continental Policies includes three endorsements relating to the business of being a qualified intermediary ("QI")[3] for a tax-deferred exchange of property intended to qualify under Internal Revenue Code 1031 ("1031 Exchange"). Specifically, Endorsement No. 1 modified the policies so that property covered would include property held in a financial institution account in a transaction involving the named insured as a QI for a 1031 Exchange, but the endorsement specifically stated that "this insurance is for [the insured's] benefit only. It provides no rights or benefits to any other person or organization." (App. Ex. 11, EKB1260, 1277); *see also* (*Id.* at EKB1300) (attaching the same provision, but at Endorsement FEA-2); (*Id.* at EKB1327) (attaching a comparable "Include Client Property" Endorsement). A

---

[2] The Plaintiff has not been appointed Receiver with respect to IAG 1031 LLC and is not seeking coverage under any policies issued to IAG 1031.

[3] A qualified intermediary is defined, in pertinent part, as a person who "[e]nters into a written agreement with the taxpayer (the 'exchange agreement') and, as required by the exchange agreement, acquires the relinquished property from the taxpayer, transfers the relinquished property, acquires the replacement property, and transfers the replacement property to the taxpayer." 26 CFR § 1.1031(k)-1(g)(4)(iii)(B) (2012). The exchange transaction must be completed within 180 days. 26 CFR § 1.1031(k)-1(b)(2)(ii).

second endorsement set forth "Internal Controls Requirements," which included certain underwriting requirements with which an insured must comply before recovering for a loss involving a 1031 Exchange, including, but not limited to, maintaining the proceeds from a single exchange transaction (specifically identified in some manner so as to provide a clear paper trail) in a financial institution account segregated from the insured's operating funds. (*Id.* at EKB1261, 1278, 1302.) (*See also Id.* at EKB1328)(including comparable "Conditions Precedent to Liability"). Finally, an endorsement entitled "Include Owners and Partners for Losses Involving Client Property" modified the policies, in pertinent part, so that the exclusion related to "Acts Committed by You or Your Partners" would not apply to losses involving the funds of client/exchangers while the insured was acting as a QI in a 1031 Exchange. (*Id.* at EKB1262, 1279, 1301.) (*See also Id.* at EKB1329)(including a comparable endorsement).

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

**B. <u>The Alleged Loss</u>**

**1. Original Notice and Proof of Loss**

Plaintiff was appointed receiver for Vesta and Excalibur on December 16, 2009. (App. Ex. 11, EKB1171, at ¶12.) He first submitted a notice of claim to Continental by letter dated February 13, 2010. (Receiver's Motion for Summary Judgment, Dkt. No. 62 [hereinafter "App. Ex. 13"], EKB1375); (June 11, 2010 Original Proof of Loss [hereinafter "App. Ex. 14"], EKB1400.) Subsequently, on June 11, 2010, he sent a Proof of Loss in which he continued to claim that Vesta and Excalibur were QIs owned and operated by Terzakis and Estupinian who first ventured together in the QI business with an entity named Investment Advantage Group, LLC ("IAG"). (App. Ex. 14, EKB1633-45.) According to the Plaintiff, Vesta and Excalibur were really fronts enabling Terzakis and Estupinian to continue a pattern of self-dealing and misappropriation of client trust assets. (*Id.*) Plaintiff identified sixteen Vesta clients, or "exchangers," who allegedly deposited money with Vesta between 6/29/2007 and 6/25/2008 totaling $11,649,822.54. (*Id.* at EKB1407.) He also identified two Excalibur exchangers. (*Id.* at EKB1409.) Continental denied Plaintiff's claim, and this lawsuit followed.

**2. Complaint and Motion to Dismiss**

On November 18, 2010, Plaintiff initiated this action against Continental for declaratory

judgment and breach of contract. (App. Ex. 11, EKB1194-95, at ¶¶66-74.) Plaintiff seeks to recover as damages amounts allegedly lost by the sixteen Vesta and two Excalibur exchangers who had previously been identified in Exhibits A and B to the June 11 Proof of Loss. (*Id.* at EKB1363-64.) Continental filed a motion to dismiss Plaintiff's Complaint, arguing that Plaintiff failed to state a claim under the Continental Policies because the alleged losses were not sustained or discovered during the relevant policy periods. (Continental's Motion to Dismiss, Dkt. No. 15 [hereinafter "App. Ex. 15"], EKB1668-87.) Plaintiff opposed the motion, arguing that there were "two distinct sets of thefts:" the first occurring during the Continental policy periods, causing an "increasing deficit in the Exchange Fund trust accounts" maintained by Vesta and Excalibur; and a second set of thefts involving newly deposited Exchanger money to fund older exchanges that could not fund because of the deficit in the trust accounts. (Opp. to Continental's Motion to Dismiss, Dkt. No. 28 [hereinafter "App. Ex. 16"], EKB1692.) The Court ultimately denied Continental's Motion to Dismiss, finding that Plaintiff's complaint sufficiently alleged a covered loss and the allegations, if true, alleged a theory of adverse domination that could equitably toll the discovery period in the policies until the Receiver was appointed. (July 14, 2011 Order Denying Continental's Motion to Dismiss, Dkt. No. 43 [hereinafter "App. Ex. 17"], EKB1716-28.) As set forth below, Plaintiff's theory of adverse domination and other grounds for recovery are not supported by the undisputed facts obtained through discovery.

## III. STATEMENT OF FACTS

### A. Vesta Strategies, LLC

#### 1. Creation and Ownership

Vesta was created on or about January 9, 2004 and was owned by Terzakis and Estupinian. (App. Ex. 11, EKB1172, at ¶13.) Robert Estupinian acted as the Chief Executive Officer of Vesta and ran the day-to-day operations of the company from California. (*Id.* at EKB1173, at ¶18); (Deposition of John Terzakis, June 5 and July 12, 2012 [hereinafter "App. Ex. 3"], EKB280, at 63:1-8.) Peter Ye was manager of operations and was eventually promoted to Vice President of Operations at Vesta. (Deposition of 30(b)(6) Designee Peter Ye, January 24-25, 2012 [hereinafter "App. Ex. 1"], EKB39, at 149:2-8.) Ye reported to Robert Estupinian as



TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

well as Ginny Hillig, President of Vesta, who eventually married Estupinian. (*Id.* at EKB27, at 100:11-101:1); (Deposition of Christian Benedetto, March 19, 2012 [hereinafter "App. Ex. 2"], EKB185, at 18:2-3.) Robert Estupinian, Ginny Hillig Estupinian and Peter Ye were signatories on Vesta bank accounts. (App. Ex. 3, EKB280, at 64:18-23.) Although Terzakis had an ownership interest in Vesta, he did not get involved in the day-to-day operations of the business. (*Id.* at EKB397, at 276:10-12.)

**2. The QI Model That Allowed Terzakis To Take Loans**

Vesta was at least the third iteration of a QI owned by Terzakis and Estupinian, who had both held ownership interests in IAG, which later became IAG 1031, LLC. (*Id.* at EKB271-72, at 29:11-32:11.) The purpose of a QI business was to take possession of and hold client exchanger funds so that the client/exchanger could avoid paying capital gains tax when buying and selling investment property. In order to take advantage of this tax benefit, the QI's client/exchanger could not take physical possession of proceeds from the original sale; rather, the client had to deposit those funds with a third party. The exchanger was required to find and purchase replacement property within 180 days of the original sale. A QI acted as the third-party which held client exchange funds during the 180 day period between the original sale and purchase of replacement property. *See, e.g.*, 26 CFR § 1.1031(k)-1.

The QI business model established at IAG was adopted by IAG 1031 and eventually implemented by Vesta. (App. Ex. 1, EKB28, at 103:9-19.) Peter Ye, Plaintiff's Rule 30(b)(6) witness, explained how the model worked. (*Id.* at EKB18-19, at 64:24-68:10); (*see also* Deposition of Peter Ye [in his Individual Capacity], July 11, 2012 [hereinafter "App. Ex. 4"], EKB503, at 59:1-61:23.) After an exchanger entered into an exchange contract with IAG 1031, the proceeds from the sale of an exchanger's investment property would be wired by the title company to the QI bank which, for IAG 1031, was either Borel Bank, Citibank or Bank of America. (App. Ex. 1, EKB19, at 66:22-67:25.) Initially, the exchanger's funds would be deposited into a "sub account" at the bank and assigned a number. (*Id.* at 68:1-19); (App. Ex. 4, EXB540, at 209:6-20.) The monies would then almost immediately be swept into a pooled checking account. (App. Ex. 4, EXB503, at 59:16-60:3.) Once the monies were swept into

Troutman Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92614-2545

pooled accounts, there was no way to identify an individual exchanger's monies. (*Id.*) Ye explained that Vesta did not open a bank account in its own name until August 2004. (*Id.* at EKB518, at 121:5-21.) To the extent Vesta took possession of client exchange funds prior to that time, monies were deposited into accounts in the name of IAG 1031. (*Id.*)

From time to time, Terzakis would take loans from the QIs. (App. Ex. 3, EKB271, at 28:5-7.) He would instruct either Estupinian or Ye to transfer funds from QI accounts into accounts that were either in Terzakis' name or that of one of his business entities. (*Id.* at EKB278, at 57:2-22); (App. Ex. 1, EKB37, at 139:24-140:19); (App. Ex. 4, EKB520, at 127:16-128:20); (Deposition Exhibit 58 [hereinafter "App. Ex. 10"], EKB1137.) Ye would then direct wire transfers from QI pooled accounts to Terzakis. (*Id.*)

When client redemptions were due (within 180 days of deposit), generally, monies from the pooled accounts would be wired to the title company handing the exchanger's transaction. (App. Ex. 1, EKB23-24, at 85:8-86:6.) If the pooled accounts did not have sufficient funds to close a transaction, at certain times, Terzakis would fund the transaction by wiring monies from his accounts to the title company for the exchanger. (App. Ex. 4, EKB505, at 66:1-9.)

**3. Terzakis' Wealth and Role in the QIs**

While Vesta operated out of California, Terzakis lived in the Chicago area and ran a successful real estate business, Single Site Solutions ("Single Site"), from Willowbrook, Illinois. (*See, e.g.*, App. Ex. 3, EKB397, at 276:2-12.) From the late 1990s through at least 2007, Terzakis had hundreds of millions of dollars in assets and his personal net worth was in excess of $43 million. (*Id.* at EKB317, at 212:7-213:13); (Deposition Exhibit 46 [hereinafter "App. Ex. 9"], EKB1113.) All of his assets were in real estate. (App. Ex. 3, EKB277, at 53:8-15.)

Terzakis confirmed that he had no involvement in daily business operations of Vesta and was not involved in its regular activities. For example, he was not a signatory on any of the Vesta or Excalibur bank accounts that held client funds. (App. Ex. 3, EKB280, at 63:18-22.) He did not make decisions regarding insurance. (*Id.* at EKB279, at 59:15-25.) In fact, Terzakis did not even know that Vesta had crime coverage, nor had he ever seen any of the Continental Policies, until sometime after he was indicted. (*Id.* at EKB313, at 194:1-195:2.) Terzakis understood that

Estupinian handled the daily business operations of the QIs, and he assumed that Ginny Hillig Estupinian was responsible for communicating with insurers on behalf of Vesta. (*Id.* at EKB280, at 63:6-8; EKB290-91, at 105:6-106:2.)

Terzakis became involved in and funded QIs because he saw QIs as a vehicle for financing his other real estate investments, and they allowed him to borrow exchange funds for his real estate investments without having to go to a bank or other financial institution. Terzakis testified:

> The only benefit I really got out of the ownership of this company [Vesta] other than all the money that I put in is that when I had short term needs for a credit facility, no different than going to a bank or anywhere else, I was able to borrow the funds from the company, pay them interest and it was a form of mezzanine financing.

(App. Ex. 3, EKB278, at 56:2-8.) From the inception of IAG through 2008, Terzakis took "loans" of exchanger funds from the QIs he owned, including Vesta. (*Id.* at EKB271, at 28:5-15; EKB278, at 56:12-25; EKB291, at 108:10-24.) Terzakis testified that he did not believe taking "loans" of exchanger funds was wrong until sometime in 2008 when the "legal issues" arose. (*Id.* at EKB271, at 27:7-24; EKB286, at 87:1-5.) He further testified that he intended to pay back all such loans. (*Id.* at EKB285, at 83:7-17.) In fact, Terzakis believes he has paid back millions of dollars per year to Vesta. (*Id.* at EKB304, at 159:3-25.) Terzakis plead guilty to criminal charges made against him in connection with exchanger funds he took from Vesta and Excalibur, and he now understands that he had no right to take loans of exchanger funds. (Deposition Exhibit 39 [hereinafter "App. Ex. 8"], at EKB1034-35.) He testified that he did know it was wrong or illegal to take loans of exchanger funds until approximately 2008. (App. Ex. 3, EKB271, at 27:7-24; EKB286, at 87:1-5; EKB310, at 185:2-15.)

**4. No Effort was Made to Conceal Loans to Terzakis**

Terzakis made no effort to conceal that he was taking loans of exchanger funds from Vesta. (*Id.* at EKB291, at 108:10-109:2.) In fact, he directed Ginny Heisserer, one of his employees at Single Site, to document every transaction and to create a paper trial of notes or

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

other memos or documents to memorialize the transactions.[4] (*Id.* at EKB286, at 87:6-25.) Terzakis contends that promissory notes were executed for most, if not all, loans. (*Id.* at EKB286-87, at 88:9-12, 91:1-7, 92:17-22.) Terzakis believes he paid back millions of dollars per year to Vesta. (*Id.* at EKB304, at 159:3-25.) He does not know exactly how much he paid, however, because many of the relevant accounting documents are either in the possession of the FBI or in his former Single Site office in Willowbrook to which he has been denied access. (*Id.* at EKB287, at 92:23-93:17; EKB294, at 118:18-119:19; EKB302, at 152:10-17.)

Single Site performed certain accounting functions for Vesta. (*Id.* at EKB288, at 94:4-19.) Single Site finance manager, Jeffrey Sondgeroth, was aware that Vesta exchanger funds were loaned to Terzakis and that Terzakis paid loans prior to 2007. (Deposition of Jeffrey Sondgeroth, Feb. 1, 2012 [hereinafter "App. Ex. 5"], EKB656, at 77:8-13; EKB692-93, at 113:5-114:9.) No attempt was made to hide from anyone at Vesta, including its President (Ginny Estupinian), the fact that he took loans of exchanger funds:

> [By Ms. Bower] Q: Did you feel the need to keep it – keep it a secret from Ginny [Estupinian] that you were taking loans of exchanger funds?
>
> [By Mr. Terzakis] A. A secret?
>
> Q. Correct.
>
> A. There was no secret about what I was doing anywhere, in my office, through documentation and tax returns.
>
> Q. This is something that everyone knew, everybody at Vesta and Single Site knew that – that you were taking loans of exchanger funds, right?
>
> A. Yes ma'am.
>
> Q. There was no attempt to try to hide it from anybody, right?
>
> A. Nope.
>
> Q. There was no attempt to hide it from Ginny Estupinian?
>
> A. Nope.

[4] Ms. Heisserer is now deceased and Terzakis testified that all of the documents reflecting loans and promissory notes were seized by the FBI and/or are still at the Single Site offices in Willowbrook. (App. Ex. 3, EKB294, at 121:1-13.)

(App. Ex. 3, EKB291, at 108:10-109:2.)

**B. Excalibur 1031 Group, LLC**

Vesta did not have a 100% ownership interest in Excalibur until February 2008, well after the Excalibur policies expired. (App. Ex. 11, EKB1172, at ¶14.); (*see also* App. Ex. 2, EKB189, at 36:14-19.) Excalibur was first formed on September 30, 2004 in Delaware and was owned by several entities, including Mutual Vision, LLC at 50% (Robert Estupinian as Managing Member) and Christian Benedetto, Jr. who held a 22.5% interest (held as Managing Director of Hopkins, Sampson & Brown Equities, LLC).[5] (App. Ex. 2, EKB186, at 24:17-25); (Deposition Exhibit 22 [hereinafter "App. Ex. 6"], at EKB761-62.)

Although Excalibur called itself a QI, it was created to be a marketing company for Vesta. (App. Ex. 2, EKB186, at 23:1-12; EKB195, at 59:16-60:11.) The operation was run from an office in New Jersey. (App. Ex. 11, EKB1172-73, at ¶15.) From its inception until February 2008, Excalibur never entered into contracts with exchangers and did not take possession of exchanger monies. (App. Ex. 2, EKB195-96, at 61:19-62:3.) Rather, Excalibur did marketing for Vesta and referred clients to Vesta. (*Id.* at EKB195, at 60:12-18.)

Vesta handled the details of the transactions and deposits of client exchange funds into accounts in the name of Vesta. Prior to the fall of 2007, Benedetto believed that Vesta deposited the exchange funds of clients referred by Excalibur into segregated sub accounts at Merrill Lynch. (*Id.* at EKB199-200, at 77:4-78:21, 81:11-21.) Those accounts were in the name of Vesta, not Excalibur. (*Id.* at 80:2-80:21.) Benedetto was not a signatory on those accounts. (*Id.* at EKB199, at 76:5-9; EKB200, at 80:15-18.)

**C. The Failed Hoist and Phillips Exchanges**

In fall of 2007, two exchanges that had been referred to Vesta by Excalibur, Hoist and Martin Phillips, did not fund on time because there were insufficient funds in the Merrill

---

[5] Kenneth Williams owned a 22.5% interest and Michael Rapf owned a 5% interest. (App. Ex. 6, at EKB761-62.) On September 30, 2004, Mutual Vision transferred its 50% interest in Excalibur to Vesta. (*Id.* at EKB762.) Rapf sold his shares to Williams on February 6, 2008, leaving Williams with a 27.5% ownership in Excalibur. (App. Ex. 11, EKB1172, at ¶14.) On February 8, 2008, both Hopkins, Sampson & Brown Equities, LLC and Williams sold their combined 50% interest to Vesta. (*Id.*) Thus, Excalibur was 100% owned by Vesta as of February 8, 2008. (*Id.*)



TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Accounts to pay them. (*Id.* at EKB189, at 34:22-25; EKB212, at 127:9-128:11.) Benedetto was shocked to learn that the monies for those exchangers were not in the Merrill Lynch accounts. (*Id.* at EKB212, at 128:3-129:15.) He retained an attorney to represent him (and later his entity Hopkins, Sampson and Brown LLC). (*Id.* at EKB216, at 142:11-143:2.) That attorney sent a letter to Terzakis, with a cc to Estupinian and Ye, identifying missing funds totaling $1,710,169.30 from additional customers, besides the Hoist and Phillips exchangers, who had been referred to Vesta by Excalibur. (*Id.* at EKB217, at 147:13-149:13); (Deposition Exhibit 31 [hereinafter "App. Ex. 7"], at EKB1002-03.) The letter threatened to take legal action if the funds were not returned as demanded. (App. Ex. 7, at EKB1002-03.) The attorney directed the demand letter to Terzakis because he was the money man – the one who gave personal guarantees. (App. Ex. 2, EKB217, at 149:7-19.) The Hoist and Phillips exchanges eventually funded, albeit belatedly. (*Id.* at EKB219, at 154:9-155:20.)

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

**D. <u>All Vesta Clients Referred by Excalibur Were Paid By February 2008</u>**

Ultimately, all other exchanges that had been referred to Vesta by Excalibur, still open as of October 15, 2007, as referenced in the letter from Benedetto's attorney to Terzakis, were paid everything to which they were entitled on time. (*Id.* at 155:21-156:25.) Excalibur did not take in any new referrals after Benedetto found out about the delayed Philips and Hoist exchanges. (*Id.* at 156:2-13.) Thus, the Excalibur referred exchanges were necessarily not funded with monies from new exchanges because there were no more new incoming exchanges. (*Id.* at 156:2-25.)

**E. <u>Vesta's and Excalibur's Collapse</u>**

The real estate market collapsed in or shortly before 2008. Because all of Terzakis' personal assets were in real estate, his personal net worth (comprised of real estate assets) plummeted, "overnight," and became negative very quickly. (App. Ex. 3, EKB277-78, at 53:8-54:22.) In late 2007, Sondgeroth, concerned that Terzakis would soon lose the ability to pay back monies owed to Vesta, advised Terzakis to "sell everything, liquidate everything." (App. Ex. 5, EKB613-14, at 34:25-35:8.) Terzakis refused. (*Id.*) Sondgeroth quit. (*Id.* at EKB613-15, at 34:25-36:5.) Vesta and Excalibur collapsed in July 2008. (App. Ex. 11, EKB1177-78, at ¶34.)

## IV. ARGUMENT

Under Federal Rule of Civil Procedure 56(a), summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Initially, therefore, the movant has the burden of "demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact." *Dalia Rashdan (Mohamed) v. Geissberger*, No. C 10-00634 SBA, 2012 U.S. Dist. LEXIS 75802, at *22 (N.D. Cal. May 30, 2012). As set forth below, summary judgment should be granted in favor of Continental because the Plaintiff cannot meet his burden of proving coverage based upon the undisputed facts.

### A. Plaintiff's Requested Relief Would Violate Public Policy

Plaintiff cannot recover under the Continental Policies without violating the public policy against insuring the willful wrongdoing of the insured. Courts have long observed the axiom that a thief cannot buy insurance against having to return money he stole. *See, e.g., Ryerson, Inc. v. Federal Ins. Co.*, 676 F.3d 610, 613 (7th Cir. 2012). As the Seventh Circuit rightly observed, "[n]o one writes such insurance…and no state would enforce such an insurance policy if it were written." *Id.* (internal citations omitted). Plaintiff alleges that Terzakis and Estupinian together owned 100% of Vesta. (App. Ex. 11, EKB1173, at ¶¶17-18.) According to the Plaintiff, Terzakis and Estupinian each "embezzled millions in client Exchange Funds," using Vesta as the vehicle for their criminal activity. (*Id.* at EKB1173, at ¶17; EKB1173-74, at ¶19; EKB1176, at ¶29.) Specifically, Plaintiff alleges that the "Thieves [Terzakis and Estupinian] formed Vesta and Excalibur to act as QIs for purposes of 1031 exchanges to enable them to engage in a pattern of self-dealing and misappropriation of client trust assets." (*Id.* at EKB1176, at ¶29.) Plaintiff now claims that the misappropriations were in the form of "loans" taken by Terzakis, which he contends resulted in a deficit in the Vesta trust accounts. As Terzakis testified, Vesta was created for the purpose of allowing him to take loans of client exchanger funds, which Terzakis admits were illegal. (*See* App. Ex. 3, EKB278, 56:2-8; EKB310, at 185:2-15.) Thus, the very purpose of Vesta – its entire reason for existence – was to serve as the engine powering the criminal

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

enterprise of Terzakis and Estupinian. Consequently, Vesta is the proverbial thief seeking to collect insurance against the results of its criminal enterprise.

Where the conduct of a corporate entity is inextricably intertwined with that of its principals, the two parties become one in the eyes of the law. In *Seidman & Seidman v. Gee*, 625 So.2d 1, 3 (Dist. Ct. App. Fl. 1992), the court was faced with similar circumstances and held that "the fraud committed by the managing director was not intended to loot the corporation, but instead was designed to turn the corporation into an 'engine of theft' against outsiders." Consequently, the court imputed the fraud of the managing director to the corporation. *See id.*; *see also Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 456 (7th Cir. 1982) (drawing a distinction between fraud on behalf of a corporation and fraud against it; the former was imputed to the entity itself). If, as Plaintiff alleges, Vesta was created as a tool of Terzakis and Estupinian's pattern of theft, this Court should follow the example of the *Seidman* case and impute this willful wrongdoing to Vesta.

Courts in California have also imputed the actions of owners to a corporate entity in the context of enforcing the public policy against an entity insuring for the willful misconduct of its dominant owners, or "alter ego." In *California Union Insurance Co. v. American Diversified Sav. Bank*, 948 F.2d 556, 566 (9th Cir. 1991), the Ninth Circuit considered whether a fidelity bond provided coverage for the defalcations of its sole owners and principal (but not sole) officers, who effectively controlled the operations of the company. The court upheld the denial of coverage, recognizing "a public policy against permitting a corporation to collect insurance for the defalcations of its alter ego." *Id.* (citing *Kerr v. Aetna Cas. & Sur. Co.*, 350 F.2d 146, 154-55 (4th Cir. 1965); *Employer's Admin. Servs., Inc. v. Hartford Accident and Indem. Co.*, 709 P.2d 559, 563-65 (Ariz. Ct. App. 1985)). The same public policy should apply to preclude Vesta from recovering under the Continental Policies for the defalcations of its alter egos, Terzakis and Estupinian.

This public policy prohibition is also reflected in California Insurance Code section 533, which states, "[a]n insurer is not liable for a loss caused by the willful act of the insured…" As the Ninth Circuit observed in *Allstate Insurance Co. v. Gilbert*, 852 F.2d 449, 451 (9th Cir. 1988),

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

"section 533 is a part of every insurance contract [issued in California] and is equivalent to an exclusionary clause in the contract itself." (internal citations omitted). The Plaintiff seeks to recover from Continental for loss allegedly caused by the willful acts of Terzakis and Estupinian, Vesta's alter ego. Thus, Section 533 applies to preclude coverage under the Continental Policies. Anticipating this problem, Plaintiff claims that coverage would not violate public policy because any money recovered "will not benefit Terzakis and Estupinian," but will instead go "solely to Exchangers who lost their Exchange Funds." (App. Ex. 11, EKB1186, at ¶¶ 51-52; EKB1189, at ¶55.) In *Clemmer v. Hartford Insurance Co.*, 22 Cal. 3d 865, 889-90 (1978), the California Supreme Court rejected such a proposed exception to Insurance Code section 533. The *Clemmer* court held that "Plaintiffs' contention that the innocent victims of intentional torts should be able to recover from an insurer without regard to the willfulness of the insured clearly runs contrary to the policy expressed in Insurance Code section 533." *Id.*; *see also California Union Ins.*, 948 F.2d at 566 (rejecting the argument that the alter ego doctrine does not apply if the wrongdoers do no benefit); *J.C. Penney Cas. Ins. Co. v. M.K.*, 52 Cal. 3d 1009, 1028-29 (1991)(upholding denial of coverage on Section 533 grounds even though an innocent victim of child molestation would have benefitted). Thus, Plaintiff's claim that the policy articulated in Section 533 does not apply because only the innocent victims will recover is incorrect.

Plaintiff's theory of recovery is based on a principal that that would violate public policy. For this reason alone, Continental's motion should be granted.

**B. <u>No Covered Loss Was Sustained During the Vesta Policy Period</u>**

Even if Plaintiff's theory of recovery did not violate public policy – and it does – Plaintiff cannot meet his burden of proof with respect to the threshold issue, *i.e.*, whether Vesta sustained a covered loss during the Vesta Policy period. In an insurance coverage action, the party seeking to recover under the policy has the burden to prove that the claim falls within the basic scope of coverage. *See Pan Pac. Retail Props. v. Gulf Ins. Co.*, 471 F.3d 961, 970 (9th Cir. 2006); *see also Goomar v. Centennial Life Ins. Co.*, 855 F. Supp. 319, 326 (S.D. Cal. 1994) ("In insurance disputes the burden is on the insured to prove all facts necessary to show that his claim falls within the terms and conditions of coverage."). The Vesta Policy was in effect from January 9,

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

2004 through August 15, 2004. Plaintiff now claims that monies taken on loan by Terzakis during that time frame constitute "loss" under the Vesta Policy. Plaintiff's claim fails because he cannot prove that (1) Vesta client exchange funds were taken on loan during the Vesta Policy period; and (2) Terzakis' loans would result in an immediate loss to Vesta.

**1. There is no evidence that Vesta Client Exchange Funds Were Loaned To Terzakis During the Vesta Policy Period**

Although Vesta was created in January 2004, it did not open any bank accounts in its own name until August 2004. (App. Ex. 4, EKB518, at 121:5-21.) To the extent Vesta took possession of client exchange funds while the Vesta Policy was in effect, the monies would have been deposited and commingled with IAG 1031 exchange funds in bank accounts held by IAG 1031. (*Id.* at EKB503, at 60:9-61:23.) As Peter Ye testified, there would be no way to determine if any monies wired to Terzakis during the Vesta Policy period were monies deposited while IAG 1031 acted as a QI or whether such monies were deposited while Vesta acted as a QI. (*Id.* at 61:7-23.) Because Terzakis and Estupinian failed to make any effort to separate the business and bank accounts of IAG 1031 and Vesta, at least during the time the Vesta Policy was in effect, there is simply no evidence to support the finding that monies held by the named insured, Vesta, were loaned to Terzakis while the Vesta Policy was in effect.

**2. Terzakis' Fraudulent Loans Did Not Result in a Loss During the Vesta Policy Period**

Even if Plaintiff had evidence to meet his burden of proving that Vesta exchanger funds were in fact wired and loaned to Terzakis during the Vesta Policy period, he cannot demonstrate that such loans constituted a loss during the Vesta Policy period. Where the loss resulted from a fraudulent loan, courts do not simply assume that the loss occurred simultaneously with the fraudulent act. *See Pacific-Southern Mortgage Trust Co. v. Ins. Co. of North America*, 166 Cal. App. 3d 703, 701-11 (1985); *Fidelity Savings & LoanAss'n v. Aetna Life & Cas. Co.*, 647 F.2d 933, 936-37 (9th Cir.1981); *see also Fremont Reorganizing Corp. v. Federal Ins. Co.*, No. SACV 09-01208, 2010 U.S. Dist. LEXIS 14675, at *13, 15-16 (C.D. Cal. Jan. 5, 2012) (finding that losses from fraudulent loans did not occur until the loans failed)(a copy is attached to the Appendix at Exhibit 18). In *Pacific-Southern*, the court considered when a loss occurred for

purposes of coverage under a fidelity bond with terms similar to the Vesta Policy. *Pacific-Southern Mort. Trust*, 166 Cal. App. 3d at 707-709. The loss in that case was caused by a defaulted loan that the insured made because of fraudulent misrepresentations by the insured's president. *Id.* The court acknowledged that the general rules provided that the loss occurred at the same time as the dishonest acts, but noted that this rule did not make sense in the loan context. *See id.* at 710. The court further explained that, "in the case of a secured loan made because of fraudulent misrepresentations, the fraud and the loss do not necessarily occur at the same time. The loss may occur much later or *not at all*…" *Id.* (Emphasis in original). By the unambiguous terms of the fidelity bond in *Pacific-Southern*, coverage is triggered by the discovery of an actual loss, not merely a potential loss. *Id.* at 711. Likewise, even if Plaintiff could establish that Terzakis took loans of Vesta exchange funds while the Vesta Policy was in effect, such loans, at most, constituted a potential loss that might materialize or might not, depending on whether Terzakis had sufficient funds to pay back the loans.

In other words, loss cannot be discovered until it actually occurs. The *Fidelity Savings & Loan* case involved the loss of a customer's deposit, where a bank president's dishonest loans led to the bank's insolvency. 647 F.2d at 936-37. The Ninth Circuit concluded that, under California law, the loss could not have been discovered until it became clear that the bank was in a state of "hopeless and irretrievable insolvency," and could not reopen to repay the off the depositor. *Id.* at 936. Applying the same reasoning to this case, Terzakis was hardly in a state of hopeless and irretrievable insolvency when he took loans of exchange funds in 2004. With a net worth in excess of $43 million, he had more than enough assets to pay the loans at that time. (App. Ex. 3, EKB316, at 208:19-24; EKB317, at 212:7-213:13); (App. Ex. 9, EKB1113.) Any loss resulting from loans taken during the Vesta Policy could not have been sustained until Terzakis was unable to pay them, well after the Vesta Policy expired. Thus, Vesta could not have sustained a loss during the Vesta Policy period.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

**3. The Wrongdoers Did Not Have The "Manifest Intent" to Cause Vesta a Loss**

Plaintiff's theory also fails because he cannot prove that the alleged loss arose out of a covered cause of loss, which requires that the offending employee manifest intent to cause the named insured (Vesta) to sustain a loss. (*See* App. Ex. 11, EKB1259.) While no court in California or the Ninth Circuit has analyzed the meaning of "manifest intent" in this context, courts in other jurisdictions have generally applied one of three approaches when analyzing manifest intent: the specific intent approach, the substantial certainty approach, and the objective standard. *Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*, 854 A.2d 378, 389 (N.J. 2004). Under any of these three tests, the evidence indicates the wrongdoers in this case did not manifest intent to cause Vesta a loss.

**a. The Specific Intent Approach**

Under the specific intent test (adopted in the Second, Third, Fourth, and Fifth Circuits), the focus is "'whether the actor in question specifically intended the resulting loss to the employer in question.'" *Auto Lenders Acceptance Corp.*, 854 A.2d at 389-90. In *General Analytics Corp. v. CNA Ins. Cos.*, 86 F.3d 51, 54 (4th Cir. 1996), the Fourth Circuit applied the specific intent test to a similar CNA policy to the policies at issue in this case. The court stated that "[b]ecause employee dishonesty policies like CNA Insurance's require proof that the employee have acted to accomplish a particular purpose, they require that the insured establish a specific intent, analogous to that required by the criminal law. Thus, if a dishonest act has the *un*intended effect of causing a loss to the employer or providing a benefit to the employee, the act is not covered by the policy." *Id.* (emphasis in original). Likewise, in *Federal Deposit Insurance Corp. v. National Union Fire Insurance. Co.*, 57 Fed. Appx. 965, 967 (3d Cir. 2003), the Third Circuit noted that "the term 'manifest intent' requires the insured to demonstrate that it was the offending employee's purpose or desire to obtain financial benefit for himself or a third party, and to cause the insured to sustain a loss."

As a threshold matter, it is illogical that Terzakis or Estupinian intended to cause a loss to their own company. Rather, because they owned Vesta, it logically follows that they would have wanted Vesta to profit rather than suffer a loss. Under such circumstances, courts have

acknowledged that "it [i]s highly unlikely that [the employee] had the 'manifest intent' to cause a significant injury to an entity in which he had a major financial stake." *Federal Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1037 (6th Cir. 1991). *See also Investors Trading Corp.*, 2004 U.S. Dist. LEXIS 25906, at *4 ("where the employee's manifest intent is to make money, not to cause the employer to lose money, the operative language of the fidelity bond is not invoked"). Given their ownership stake in the company, therefore, there is a logical presumption that neither Terzakis nor Estupinian intended to cause Vesta a loss. Moreover, Terzakis testified that he intended to pay back the funds he borrowed from the exchange accounts at Vesta. (*See, e.g.*, App. Ex. 3, EKB285, at 83:7-17, 85:10-21.) His testimony in that regard is corroborated by evidence that he did, in fact, make substantial interest payments to Vesta and meticulously documented each loan he took. (*Id.* at EKB293, at 117:1-22; EKB310, at 184:19-24) (describing his interest payments); (*see also Id.* at EKB286, at 87:6-21) (describing the accounting of the loans). In *Shoemaker v. Lumbermans Mutual Casualty Co.*, the court relied in part upon an employee's executed affidavit in which he denied having intent to cause the insured a loss. 176 F. Supp. 2d 449, 455 (W.D. Pa. 2001). Here, the evidence of Terzakis' lack of manifest intent is much greater. Terzakis' express and demonstrated intention was to ***repay*** the borrowed Exchange Funds. While he clearly sought a benefit for himself, it is evident that he never manifested the intent for Vesta to incur a loss. Thus, Plaintiff cannot establish manifest intent under the specific intent approach.

**b. The Substantial Certainty Approach**

If the Court elects not to apply the specific intent approach, the other commonly applied standard is the substantial certainty approach. *See Auto Lenders*, 854 A.2d at 390. This "'standard is satisfied either by proof of the employee's desire to cause a loss or by proof that the loss was 'substantially certain' to result.'" *Id.* (internal citation omitted) (emphasis in original). Plaintiff cannot establish manifest intent to cause a loss under this approach either. As set forth above, Terzakis had the subjective intent to repay the loans. Moreover, there was no substantial certainty that the loans to Terzakis would cause a loss to Vesta – *i.e.*, not be repaid when they were taken. Throughout 2004 and until at least 2006, John Terzakis' net worth was approximately

$43 million. (App. Ex. 3, EKB317, at 212:7-213:13); (App. Ex. 9, EKB1113.) During the Vesta Policy period, therefore, Terzakis had the financial means to repay every penny of the exchange funds he had taken. The reduction in Terzakis assets' was far from a substantial certainty; it was caused by a sudden and catastrophic collapse in the real estate market. (App. Ex. 3, EKB277-78, at 53:16-54:17); (App. Ex. 11, EKB1177-78, at ¶ 34) (alleging that the failure of Vesta ultimately occurred only with the "cooling of the real estate market."). Thus, based on the undisputed facts, the alleged wrongdoers did not manifest intent to cause Vesta a loss.

**c. The Objective Standard**

The objective test "focus[es] on the natural consequences of an actor's conduct ... but d[oes] not necessarily focus on the actor's actual state of mind." *Auto Lenders* 854 A.2d at 389. This test has been rejected by most courts as wholly disregarding the employee's internal mental state, thus flying in the face of the drafter's very purpose for having added the "manifest intent" language in the first place. *Id.* Even under the objective standard, however, Terzakis and Estupinian did not manifest intent to cause Vesta a loss during the period in which the Vesta Policy was in effect. As stated above, Terzakis' net worth at this time exceeded $43 million, far exceeding the amount he owed Vesta. (App. Ex. 3, EKB317, at 212:7-213:13); (App. Ex. 9, EKB1113.) During the Vesta Policy period, therefore, the natural consequences of Terzakis' actions were that Vesta would be repaid out of Terzakis' vast wealth.

**C. <u>Plaintiff Cannot Prove That Loss Was Discovered During Relevant Time Period and Adverse Domination Does Not Apply to this Case</u>**

Even if Plaintiff had evidence of a covered loss, it cannot show that Vesta discovered that loss during the discovery period. Courts in California have "long recognized the validity of discovery of loss provisions in fidelity insurance policies." *Admiralty Fund v. Peerless Ins. Co.*, 143 Cal. App. 3d 379, 384 (1983) (citing *F.S. Smithers & Co., Inc. v. Federal Ins. Co.*, 631 F.2d 1364, 1367 (9th Cir. 1980) (interpreting California law); *Issac Upham Co. v. United States Fidelity & Guar. Co.*, 59 Cal. App. 606, 608 (1922); *see also Karen Kane, Inc. v. Reliance Ins. Co.*, 202 F.3d 1180, 1190 (9th Cir. 2000) (recognizing that discovery of loss provisions are generally valid and strictly enforceable). As the *Admiralty Fund* court noted, "[g]enerally, the



TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

courts have strictly enforced such provisions so that neither difficulty in discovering insured losses nor employee concealment excuse the insured's performance." 143 Cal. App. 3d at 384. Only under certain circumstances may this general rule be set aside. *California Union Ins. Co. v. American Diversified Savings Bank*, 948 F.2d 556, 565 (9th Cir. 1991) (interpreting California law). As the Court has already ruled, moreover, the losses for which the Plaintiff seeks coverage were not discovered within the allotted timeframe. (App. Ex. 17, EKB1723-24.) Accordingly, the only way for the Plaintiff to prevail is if the Court takes the extraordinary step of setting aside the policy terms by tolling the discovery periods through an unprecedented extension of the doctrine of adverse domination.

Extending adverse domination to this case is inappropriate for two main reasons. First, as set forth below, the legal and policy justifications for adverse domination are missing here. Second, Plaintiff survived Continental's motion to dismiss basis on a theory of adverse domination supported by the allegations of his Complaint relating to a "hidden Ponzi scheme." Plaintiff's new theory of loss, based on allegedly fraudulent loans, was not hidden or undisclosed and easily could have been discovered by non-wrongdoing employees.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

### 1. The Legal and Policy Justifications for Application of the Doctrine of Adverse Domination Are Absent in this Case

This case does fit within the narrow scope of the adverse domination doctrine. Traditionally, courts have applied adverse domination to toll the statute of limitations for claims by shareholders against wrongdoing directors or officers of a corporation. *See, e.g., Burt v. Irvine Co.* 237 Cal. App. 2d 828, 867-68 (1965); *Beal v. Smith*, 46 Cal. App. 271, 279 (1920); *see also Federal Deposit Ins. Co. v. Smith*, 980 P.2d 141, 144 (Ore. 1999). In cases in which directors or officers who control the corporation act adversely to the corporation and for their own benefit, under certain circumstances, courts have applied the adverse domination doctrine tolls the statute of limitations for claims by a corporation against its directors and/or officers. *Federal Deposit Ins. Co. v. Smith*, 980 P.2d at 144. The reasoning is that if the officers and directors control, or "dominate," the corporation, it is impossible for the corporation to bring an action against the directors so long as they remain in power. *Id.* A director could breach his fiduciary duties

without recourse, so long as the director kept his position in the company for the duration of the statute of limitations period. Thus, the purpose of adverse domination is to permit a corporation to have recourse against former officers and directors who acted adversely to the corporation's interests. Critical factors upon which previous courts have justified the application of adverse domination are not only missing in this case, but are affirmatively precluded under the present circumstances.

**a. The Requisite Element of Adversity is Missing**

A fundamental factor underlying previous applications of the doctrine of adverse domination has always been ***adversity*** between the wrongdoers and the affected company (or, more precisely, its owners or shareholders). For example, the only California case in which adverse domination was applied to toll a discovery period of a fidelity bond policy, *Admiralty Fund*, involved mutual fund shareholders asserting the doctrine based on the malfeasance of certain officers of the fund. The court in *Admiralty Fund* concluded that adverse domination should be applied in large part because the nature of the mutual fund created a position of adversity between the shareholders that owned the fund and the officers that controlled the daily operations. 143 Cal. App. 3d. at 388. As the court stated, "[i]f in fact the dishonest president and other high ranking officers controlled the Funds' operations to such an extent as to preclude discovery, the tolling of a discovery-of-loss provision should be considered." *Id.* at 389. Simply put, adverse domination has only been applied in California when the allegedly dominant wrongdoers and the owners were adverse – *i.e.*, not the same people.

By contrast, the alleged wrongdoers in this case, Terzakis and Estupinian, owned 100% of Vesta. (App. Ex. 11, EKB1172, at ¶13.) There was no adversity between Terzakis and Estupinian on the one hand and Vesta on the other. Rather, the owners and the alleged wrongdoers are identical. Because there was no adversity between the owners and the wrongdoers, there can be no adverse domination.

While Terzakis and Estupinian may well have been adverse to the client exchangers, that fact is not material to this analysis, as the exchangers are not analogous to the shareholders in *Admiralty*. Unlike the shareholders in *Admiralty*, who owned the fund and therefore were parties

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

to the fidelity policies at issue, the exchangers are third parties, not owners of Vesta, and had no right to pursue a claim under the Vesta Policy. In fact, the Vesta Policy explicitly states that it conveys no rights to third parties. (App. Ex. 11, EKB1260.) The shareholders in *Admiralty* would have lost the right to pursue a claim but for the application of adverse domination. *Admiralty*, 143 Cal. App. 3d at 387-88. In contrast, the exchangers never had a right to pursue a claim under the Continental Policies in the first place. Extending the doctrine in this case would ignore the very language of the policies which clearly state that they provide no benefit the third-parties. Neither *Admiralty* nor any other authority supports such a result.

**b. The Nature of the 1031 Industry Precludes Any Actual Losses to Exchangers from Being Hidden for a Long-term Period**

As set forth above, the logic justifying adverse domination breaks down if it is applied to benefit non-owners of the supposedly dominated entity. Even setting this problem aside, however, another key policy reason for applying adverse domination fails to translate to the 1031 industry. Specifically, losses to funds earmarked for a 1031 exchange would necessarily be discovered relatively quickly. In *Admiralty*, the court gave weight to the fact that the defalcating officers had the inherent ability to conceal losses arising from fraud flowing from their management of the fund. *Admiralty*, 143 Cal. App. 3d at 388-89. Because the officers had control over the Fund's assets for an indefinite period, the shareholders could not have discovered losses due to dishonesty "until the wrongdoers relinquished control of the Funds' [sic] operations." *Id.* The court also found support for its decision in the Investment Company Act of 1940, which requires "investment companies at all times to maintain fidelity insurance against losses due to employee dishonesty. *Id.* at 389.

In contrast, the nature of the 1031 exchange industry does not pose the same risk of losses remaining hidden indefinitely. 1031 exchanges must close within 180 days. (App. Ex. 11, EKB1174-75, at ¶24.) Thus, unlike mutual fund shareholders, individual exchangers would be in a position to discover if their monies were lost or misappropriated within 6 months of deposit. In other words, if the exchanger's money was not returned within 180 days of deposit, as required by Section 1031, the exchanger would know about it. In addition, no statutory regulation like the

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Investment Company Act of 1940 applies to the 1031 industry. The *Admiralty* court explained that applying adverse domination to extend the discovery period of a fidelity bond is appropriate only where the "claimant has no opportunity to perform a condition precedent to asserting a right to recover." *Admiralty*, 143 Cal. App. 3d at 387. The exchangers were not insureds, and therefore were not in a position to perform a condition precedent to coverage. But even if the exchangers could assert rights under the Continental Policies, the nature of the 1031 industry dictates that if any exchangers had suffered losses during time the Continental Policies were in effect, that they would have had ample opportunity to discover those losses within 180 days. This is yet another reason why adverse domination is inappropriate in this context.

**2. Plaintiff Cannot Meet Its Factual Burden to Establish Adverse Domination**

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Even if adverse domination was potentially appropriate under these circumstances – and it is not – the record conclusively demonstrates that Plaintiff cannot satisfy its burden of meeting the legal standard for adverse domination. In *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir. Cal. 1984), the Ninth Circuit adopted the "complete domination" standard as the appropriate test for applying adverse domination. Under that test, the Plaintiff must show "full, complete and exclusive control in the directors or officers charged." *Id.* In *Mosesian*, where the Plaintiff was seeking to toll a statute of limitations, the Ninth Circuit further explained that to meet the test, "the plaintiff must effectively negate the possibility that an informed stockholder or director could have induced the corporation to sue." *Id.* Notably, the burden is on the party invoking the adverse domination doctrine to prove such discovery was impossible. *See California Union*, 948 F.2d at 565; *see also Mosesian*, 727 F.2d at 879.

As the Ninth Circuit recognized in *California Union*, the adverse domination exception to the strict enforcement of discovery clauses in insurance policies only applies "under certain circumstances." *California Union*, 948 F.2d at 565. It is not enough for the Plaintiff to show that no employee could have prevented the losses in question, nor that no employee actually appreciated the legal significance of the dishonest acts which caused the loss. Rather, the Plaintiff must provide evidence that precludes even the possibility that "there were non-

wrongdoing employees who could have discovered the losses." *Id.* (emphasis added). Like the plaintiff in *California Union*, Plaintiff cannot meet that requirement.

Here, Plaintiff's alleged loss, which non-wrongdoing employees were supposedly precluded from discovering, was the unauthorized loans of exchange funds taken by Terzakis. (App. Ex. 16, EKB1692.) To prevail, therefore, Plaintiff must demonstrate that Terzakis and Estupinian exercised such full, complete, and exclusive control over Vesta that they made it impossible for any non-wrongdoing employee to discover Terzakis' loans of exchange funds. Such a showing is impossible based on the facts of this case.

Because Terzakis' loans of exchange funds was such a routine part of the normal operations of Vesta, Plaintiff's argument that discovery of these loans was impossible does not stand up to the slightest of scrutiny. The undisputed facts show that Terzakis' loans were not, and could not, have been hidden from non-wrongdoing employees. (App. Ex. 3, EKB291, at 108:10-109:2.) Rather, the loans were made, documented, and serviced openly and within view of the company at large. (*Id.*) Thus, many Vesta employees could have discovered the alleged "loss." In particular, Ginny Estupinian was a non-wrongdoing employee who could have discovered the illicit transfers of exchange funds by the other principals of Vesta. During the discovery period of the Vesta Policy, Ginny Estupinian, then known Ginny Hillig, was the President of Vesta. (*Id.* at EKB290, at 105:13-15.) As President of Vesta, Ginny Estupinian had authority to make a claim to Continental if she had discovered the loans that the Plaintiff argues constitute loss. Terzakis identified Ms. Estupinian as the person responsible for such insurance matters:

> [By Ms. Bower] Q: And as President of Vesta, did you understand she [Ginny Estupinian] had certain duties and responsibilities with respect to Vesta?
> [By Mr. Terzakis] A: Surely.
> Q: Did you understand that her duties and responsibilities included signing applications for insurance on behalf of Vesta?
> A: I would assume so, yes.
> Q: And her duties and responsibilities included communicating with insurance brokers on behalf of Vesta?
> A: I would—would agree with that too.

(*Id.* at EKB290-91, at 105:16-106:2.)[6] If Ms. Estupinian had authority to fill out insurance

[6] In an email dated March 10, 2004, Ginny Hillig also notified Adam McDonough, the insurance



TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

applications and communicate with insurance brokers on Vesta's behalf, she certainly had the ability to report a potential claim to Continental on behalf of Vesta.

In addition, Plaintiff admits that Ms. Estupinian was a signatory on QI bank accounts, including the Borel Bank accounts Vesta used to hold the initial deposits of exchange funds. (Pl. Response to Continental's Requests for Admissions [hereinafter "App. Ex. 20"], EKB1761, at ln. 21-27; EKB1762, at ln. 1-3.) Thus, Ms. Estupinian had every means and opportunity to discover that transfers of exchange funds were occurring. Moreover, Plaintiff admits that Ms. Estupinian had access to the exchange agreements, (*id.* at EKB1762, at ln. 4-8), which he contends did not permit the transfer of exchange funds. (App. Ex. 13, EKB1390, at ¶37.) Thus, Ms. Estupinian had every means and opportunity to discover that the transfers of exchange funds were not permitted. Plaintiff alleges these transfers constituted the losses for which he asserts coverage under the Continental Policies. (App. Ex. 11, EKB1169-70, at ¶8.) The undisputed facts simply cannot support a finding that it was impossible for non-wrongdoing employees to discover the alleged loss, his theory of adverse domination fails.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

**D. <u>Vesta Failed to Comply with Internal Controls Requirements</u>**

Plaintiff's claims against Continental also fail because Vesta failed to comply with the internal controls requirements set forth in the Vesta Policy. For purposes of this motion, Continental directs the Court's attention specifically to the following requirement:

> Proceeds from the relinquished property or properties of a single exchange transaction will be held in a financial institution account segregated from the intermediary's operating funds, ***and each single exchange transaction shall be identified by a specific file number or like tracking tool so as to provide a clear paper trail for each transaction or series of related transactions.***

(App. Ex. 11, EKB1261) (emphasis added). Vesta unquestionably failed to maintain a clear paper trail for each single exchange transaction. Indeed, this failure is the essence of the financial scheme that Plaintiff alleges took place. In the Complaint, Plaintiff states that clients' deposits "were initially placed into segregated accounts opened for the specific purpose of receiving a

---

broker, of the "name change" of IAG 1031, LLC to Vesta and held herself out as Vesta's contact person for this insurance issue. (App. Ex. 12, EKB1367.) (*See also* App. Ex. 19, EKB1753-55.)

client's individual exchange funds" and asserts that this practice satisfied the condition in the Vesta Policy. (*Id.* at EKB1176-77, at ¶31.) But in the very same paragraph, Plaintiff goes on to acknowledge that the segregated accounts were a mere sham used "to mislead clients" in believing their "money was safe" and to "conceal the Ponzi scheme." (*Id.*) Exchange funds only stayed in the individual accounts momentarily before being swept into a "pooled 'wire account.'" (*Id.* at EKB1177, at ¶32.) Once in the pooled account, no clear paper trail was possible, as each client's deposit was commingled with other clients' deposits as well as "lulling payment" made back into the pooled account. (*See id.*) As Peter Ye explained, throughout the Vesta Policy period, the pooled account held an indistinguishable mixture of both IAG 1031 exchange funds and Vesta exchange funds. (App. Ex. 4, EKB503, at 60:17-61:24.) Rather than maintain a clear paper trail, Vesta did the opposite, obscuring the path of each client's funds in order to conceal the ongoing scheme. (App. Ex. 11, EKB1177, at ¶32.) Because Vesta failed to comply with the internal controls requirement, it cannot recover under the Vesta Policy.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

### E. <u>**Plaintiff Cannot Recover Under the Excalibur Policies**</u>

All of the reasons why Plaintiff cannot recover under the Vesta Policy apply to the Excalibur Policies with equal force. Even if these problems are set aside, however, Plaintiff's claims for coverage under the Excalibur Policies fail for other reasons. The "Include Client Property" Endorsement to the Excalibur Policies states that the "property covered under this insurance is limited to property: (a) that you own or hold; or (b) for which you are legally liable; or (c) held in a financial institution account in a transaction involving you as a qualified intermediary for a tax-deferred exchange of property intended to qualify under Internal Revenue Code 1031." (App. Ex. 11, EKB1277; EKB1300); (*see also Id.* at EKB1327)(attaching a comparable "Include Client Property" Endorsement). The Policies define "you" as the named insured set forth in the Declarations. (*Id.*) For the Excalibur Policies, therefore, "you" means Excalibur, not Vesta. During the time that the Excalibur Policies were in effect, Excalibur was a marketing arm and did not hold exchange funds as a qualified intermediary. (App. Ex. 2, EKB186, at 23:1-12; EKB195-96, 59:16-60:11, 61:19-62:3.) It cannot, therefore, claim coverage under its policies for losses of Vesta clients' exchange funds.

Even if Plaintiff were to somehow argue that the Excalibur Policies should cover Vesta clients referred by Excalibur, Plaintiff's claims under the Excalibur Policies still fail because all of the referral clients were repaid. (*Id.* at EKB219, at 155:6-156:25.) Excalibur did not take in any new referrals after Benedetto found out about the delayed Hoist and Phillips exchanges. (*Id.* at 156:9-14.) Thus, the Excalibur-referred exchanges were not funded with monies from new exchanges. (*Id.* at 156:2-25). Plaintiff cannot demonstrate any "deficit" in an Excalibur client trust account at the time the Excalibur Policies were in effect. Excalibur suffered no loss for which Continental owes any coverage.

## V. CONCLUSION

For the forgoing reasons, Continental Casualty Company respectfully requests that this Honorable Court grant its motion for summary judgment and enter an order dismissing the Plaintiff's claims with prejudice.[7]

Dated: August 31, 2012

Respectfully submitted,

TROUTMAN SANDERS LLP

BY: /s/ Eileen King Bower
Ryan C. Tuley
Eileen King Bower
Brian P. Cummings
*Attorneys for Defendant Continental Casualty Company*

[7] Pursuant to the Court's August 7, 2012 Order (Dkt. No. 74), Continental was granted permission to file a brief of up to 30 pages in support of its motion for summary judgment.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545