Robert L. Brace, SBN 122240
Email: rlbrace@hbsb.com
Michael P. Denver, SBN 199279
Email: mpdenver@hbsb.com
Peter L. Candy, SBN 149976
Email: pcandy@hbsb.com
**HOLLISTER & BRACE**
P.O. Box 630
Santa Barbara, CA 93102
Telephone: (805) 963-6711
Facsimile: (805) 965-0329

Attorneys for Thomas Dillon, as Court-Appointed
Receiver for Vesta Strategies, LLC
and Excalibur 1031 Group LLC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC<br><br>Plaintiff,<br><br>vs.<br><br>CONTINENTAL CASUALTY COMPANY, an Illinois corporation.<br><br>Defendant | **Case No.: C 10-5238-LHK**<br>**Related Case No.: C 09-2388-JW (Closed)**<br><br>**THE VESTA RECEIVER'S OPPOSITION TO CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT ON THE 2004 POLICY ISSUED TO VESTA**<br><br>**Hearing Date: December 20, 2012**<br>**Time: 1:30p.m.**<br>**Location: CR 8, 4th Floor** |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................................ ii

I. SUMMARY OF ARGUMENT ........................................................................ 2

II. ARGUMENT.................................................................................................. 4

A. The District Court Has Already Ruled That Enforcement of the 2004 Vesta Policy Will Not Violate Public Policy. ................................................... 4

B. The Legal Doctrine of Alter Ego Liability Is Not a Defense to Enforcement of a Contract Entered Into With an Entity...................................... 12

C. The Success of the Ponzi Scheme Is Not a Defense to Coverage. ........................ 13

D. A Covered Loss of Vesta Exchange Funds Was Sustained During the 2004 Vesta Policy Period. Vesta client Exchange Funds were stolen by: (i) the transfers to Terzakis; or (ii) the Transfers to Close Other Exchanges................. 15

E. The Fraudulent Transfers of Exchange Funds to Terzakis Constituted the Theft, Embezzlement, and Conversion of Trust Funds…………………….……17

(i) Terzakis' Proclaimed Ignorance of the Law is No Defense to the Crimes He Committed. ......................................................... 18

(ii) Terzakis' Intent to Repay Vesta is Irrelevant to the "Dishonesty" of the Crimes He Admitted Committing ...................................................... 18

(iii) Terzakis Lied to His Employees That the Transfers to Him Were Legal and Terzakis Lied to the Banks About His $43 Million. ............. 20

(iv) The $9.3 Million in "Loans" From Vesta to Terzakis Were Not Authorized or Documented and There Was No Security. The Loss Occurred the Moment the Money Was Embezzled by Terzakis....……………….…....21

F. Adverse Domination of Vesta by Terzakis and Estupinian Tolled the Period of Time for Vesta to Discover the Loss on the 2004 Vesta Policy until Dillon Was Appointed the Receiver of Vesta. ................................................................ 22

(i) The Element of Adversity Between the Thieving Owners and Vesta is Obvious ............................................................................................ 22

(ii) Dillon Has Met His Factual Burden to Establish Adverse Domination…...23

G. Vesta Complied With the Internal Controls Requirements………………………24

(i) Stealing the Money Does Not Vitiate Coverage For Owner Theft…………24

(ii) Vesta Assigned An Individual Exchange Number to Each Exchange So As to Provide a Clear Paper Trail For Each Transaction.................. …..24

III. CONCLUSION......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Admiralty Fund v. Peerless Inc. Co.*,
143 Cal. App. 3d 379 (1983) ....................................................................9 fn 6, 22

*Anita Hunter, et al. v. Citibank, N.A.*,
2010 U.S. Dist. LEXIS 61912 (2010)..............................................................5 fn 3

*Berg & Berg Enterprises, LLC v. Boyle*,
178 Cal. App. 4th 1020 (2009) ..................................................................... 22

*California Union Insurance Co. v. American Diversified Sav. Bank*,
948 F. 2d 556 (9th Cir. 1991) ..................................................... 4, 8, 9, 10, 23, 24

*Cahaly v. Benistar Property Exchange Trust Co.*,
68 Mass. App. Ct. 668, N.E. 2d 548 (Mass. App. 2007) .................................... 18

*Cook v. The 1031 Exchange Corp.*,
29 Va. Cir. 302 (1992) .................................................................................. 18

*Dos Pueblos Ranch & Improv. v. Ellis*,
8 Cal. 2d 217 (1937). ..................................................................................... 12

*FDIC v. O'Melveny & Meyers*,
969 F. 2d 244 (1992) …………………………………………………………..…….23

*First Thrift of Los Angeles v. Pacific Indemnity Co.*,
95 Cal. App. 2d 460, 462 (Cal. 2nd Dist. Ct. App. 1949) ................................... 21

*Fremont Reorganizing Corp. v. Federal Ins. Co.*,
No. SACV 09-01208, 2010 U.S. Dist. LEXIS 14675 (C.D Cal. Jan. 5, 2012) .................... 21

*In re: Nation-Wide Exchange Services*,
291 B.R. 131 (2003)........................................................................................ 18

*In re: The 1031 Tax Group, LLC*,
U.S.B.C. S.D.N.Y. Case No. 07-11448 (MG) ..................................................5 fn 3

*Manty v. Miller & Holmes, Inc. (In re Nation-Wide Exch. Servs.)*,
291 B.R. 131 Bankr. D. Minn. 2003) ...........................................................13 fn 7

*McHale v. Boulder Capital, LLC*,
439 B.R. 47; 2010 Bankr. LEXIS 2612; 53 Bankr. Ct. Dec. 180 (S.D.N.Y. 2010)... 5, 13, 22

*McHale v. Citibank, N.A.*,
420 B.R. 178 (2009)....................5 fn 3

*Mesler v. Bragg Management Co.*,
39 Cal. 3d 290 (1985) ....................12

*Miners' Ditch Company v. Zellerbach*,
37 Cal. 543 (1869) ....................22

*Mosesian v. Peat, Marwick, Mitchell & Co.*,
727 F.2d 873 (9th Cir. Cal. 1984)....................23

*Pacific-Southern Mrtg. Trust Co. v. Insurance Co. of No. America*,
166 Cal. 3d 703, 710 (1985) ....................21

*People v. Burns*,
75 Cal. 627 (1888) ....................4 fn 2, 18

*People v. Talbot*,
220 Cal. 3 (1934) ....................18-19

*State of Washington v. Grimes*,
111 Wn. App. 544; 46 P. 3d 801 (2002)....................18, 21

*Taxel v. Surnow (In re San Diego Realty Exch.)*,
132 B.R. 424 (Bankr. S.D. Cal. 1991)....................13 fn 7

*U.S. v. Carpenter*,
405 F. Supp. 2d. 85 (2005) ....................17

*U.S. v. Davies*,
380 F. 3d. 329 (2004)....................18

*United States v. Edward Okun*,
2009 U.S. Dist. LEXIS 12421 (E.D. VA. 2009) ....................5 fn 3, 18

**Statutes**

Cal. Penal Code §§ 484 and 503....................18-19

California Insurance Code § 533 ....................6, 7

Penal Code Section 7 ....................18

Plaintiff Thomas A. Dillon ("Dillon"), the Federal Court-appointed Receiver for Vesta Strategies, LLC ("Vesta") hereby opposes the Motion for Summary Judgment filed by Defendant Continental Casualty Company ("Continental") on the 2004 insurance policy issued to Vesta by Continental (the "2004 Vesta Policy"). In support of his opposition, Dillon incorporates the law and facts asserted in the Receiver's Motion for Summary Judgment on the 2004 Policy Issued to Vesta by Continental Casualty Company (Dkt. No. 75), as well as the following declarations previously submitted in support of the Receiver's motion:

- the Declaration of Robert L. Brace ("Brace Decl.," Dkt. No. 75-1);
- the Declaration of John Terzakis ("Terzakis Decl.," Dkt. No. 76);
- the Declaration of Peter Ye ("Ye Decl.," Dkt. No.77);
- the Declaration of Kristine Carlos ("Carlos Decl.," Dkt. No.78); and
- the Declaration of Susan Woo ("Woo Decl.," Dkt. No.79).

In further support of his opposition and in further support of his own Motion for Summary Judgment, Dillon also submits:

- the Supplemental Declaration of Robert L. Brace ("Supp. Brace Decl.");
- the Declaration of Bill Carling ("Carling Decl.");
- the Supplemental Declaration of Peter Ye ("Supp. Ye Decl."); and
- the Supplemental Declaration of John Terzakis ("Supp. Terzakis Decl.").

This opposition is further supported by all pleadings and papers in the Court's file, and such other oral argument as will be made at the time of the hearing on the motion.

# I.

# SUMMARY OF ARGUMENT

John Terzakis ("Terzakis"), Robert Estupinian ("Estupinian") and Peter Ye ("Ye") have pled guilty to federal crimes arising out of their operation of Vesta Strategies, LLC ("Vesta"), and Excalibur 1031 Group, LLC ("Excalibur"). Terzakis was sentenced to seven years in federal prison for stealing over $20 million in Exchange Funds as the owner of Vesta and Excalibur. Estupinian and Ye are to be sentenced in the coming weeks. Thomas A. Dillon ("Dillon") is the court-appointed Receiver for Vesta, and this opposition concerns Vesta. Continental Casualty Company ("Continental") issued a $5 million dollar insurance policy to Vesta, in which Continental agreed to pay Vesta if its owners stole funds deposited with Vesta by IRC §1031 Exchangers ("Exchange Funds"). Terzakis, with the assistance of Estupinian and Ye, stole $9.3 million in Exchange Funds during the period of the 2004 Vesta policy (the "2004 Vesta Policy" or the "Policy"). Continental should pay Vesta $5 million because the Receiver has proven owner theft of Exchange Funds.

The 2004 Vesta Policy is a discovery-of-loss policy, meaning Vesta was required to discover the thefts during the policy period. Judge Ware ruled that Vesta's obligation to discover the loss was tolled until Dillon was appointed the Receiver, if Dillon proved Terzakis and Estupinian adversely dominated Vesta. Dillon has proven adverse domination of Vesta by Terzakis and Estupinian, the owners of Vesta.

Continental's argument that enforcement of the 2004 Vesta Policy would be against public policy has already been rejected. Continental's argument that alter ego liability is a defense to coverage is not supported by any case law. It would be inequitable not to enforce the contract because Vesta, as a small qualified intermediary (or "QI") incorporated as an LLC, was the intended market for the Policy, and owner theft was the assumed risk. (Supp. Brace Decl.,

Ex. 2, RLB100-113, at 98:25-100:10; Exs. 3 and 4; RLB115-121.)[1]

Continental's claim that the theft of Exchange Funds must be discovered within 180 days is contrary to admissions made by its own employee to the public. (Supp. Brace Decl., Ex. 5, RLB126.) The fact that some Exchange Funds out of the $9.3 million stolen by Terzakis may have been derived from Exchangers doing business with IAG 1031 (the predecessor to Vesta) is of no moment, because Vesta was "involved" in these Exchanges as the operative QI, which triggers coverage under the QI endorsements to the Policy. The Supplemental Declaration of Peter Ye accompanying this memorandum establishes the source of funds used to pay Terzakis the $9.3 million. $500,000 came from IAG 1031 Exchangers who made their deposits at IAG 1031 prior to January 9, 2004. $8,860,000 out of the $9,360,000 in transfers to Terzakis came from funds deposited after Vesta took over as the operating QI on January 9, 2004. Out of the $8,860,000, $1,950,000 came from Lake Plaza, LLC, an IAG 1031 Exchanger who deposited in March 2004, and $614,000 came from Michael S. Walker ("Walker"), an IAG 1031 Exchanger who did not deposit until June 14, 2004. The remaining $6,296,000 came from various Vesta Exchangers. (Supp. Ye Decl., ¶¶ 15-28.)

All of the $9.3 million in transfers to Terzakis were accomplished by Ye as an employee of Vesta, the insured in control of the Exchange Funds and "involved" in the IRC § 1031 Exchanges. The grant of coverage only requires "involvement" in an Exchange by a QI. Vesta acted as the principal for its Exchanges and as the agent for the IAG 1031 Exchanges. In both roles, Vesta was covered. Limiting the theft claim to only Vesta Exchange Funds results in a $6,296,000 theft loss, which is above the $5,000,000 policy limit. To gild the lily, Exhibit 11 to Ye's Supplemental Declaration establishes another $5,739,291.61 in Ponzi scheme thefts of Vesta Exchange Funds during the 2004 Policy period. (Supp. Ye Decl., Ex. 11, PY 110-PY111.)

---

[1] For ease of reference, cites to exhibits to the declarations will include the exhibit number, the paginated numbers within that exhibit (preceded by the identifying initials of the declarant), and pinpoint references, when necessary. Please note that references to exhibits to the Supplemental Declarations of Robert L. Brace and Peter Ye are numbered as RLB 96-RLB166 and PY31-PY177. References to exhibits to the prior declarations (Dkt. 75-1 and 77, respectively) are numbered RLB1-RLB93 and PY1-PY30.

Continental's claim that Terzakis' thefts are not "dishonest acts" is inconsistent with reality. Continental would not make such an absurd argument if Terzakis had stolen its money. Terzakis' taking of trust funds to invest in real estate on his own account is a crime and is dishonest. Terzakis' use of trust funds to perpetuate a Ponzi scheme is dishonest. Terzakis hid his thefts by telling his employees they were "loans" authorized by the Exchange Agreements and custom in the industry. The $9.3 million in "loans" were not documented and there was no security (Supp. Brace Decl., Ex. 7, RLB134.). Terzakis' thefts were adverse to Vesta. Terzakis and Estupinian adversely dominated Vesta.

A trial is not needed. The Court can rule on the papers submitted. Continental's Motion for Summary Judgment should be denied. Dillon's motion should be granted, and a $5 million judgment entered against Continental.

## II.

## ARGUMENT

### A. The District Court Has Already Ruled That Enforcement of the 2004 Vesta Policy Will Not Violate Public Policy.

Continental makes a formerly-rejected legal argument that it would be against public policy for the Court to enforce the insurance contract because Terzakis and Estupinian were "willful wrongdoers,"[2] dishonest owners, and the "alter egos" of Vesta. Vesta was the insured QI doing business as a limited liability company. Continental cites to *California Union Insurance Co. v. American Diversified Sav. Bank*, 948 F. 2d 556 (9th Cir. 1991) and argues that the thieves' bad acts are imputed to Vesta. According to Continental, Vesta is the thief and it cannot buy insurance to cover for its own thefts. However, the money was stolen from Vesta and Vesta did not receive any of the stolen money. Judge Ware denied the Receiver's initial contention that the thefts of Exchange Funds were "discovered" by Vesta contemporaneously

---

[2] Continental then turns its argument 180 degrees, contending that Terzakis' thefts were not "dishonest acts" because Terzakis did not know that taking Exchange Funds was illegal. Ignorance of the law is no excuse. *People v. Burns*, 75 Cal. 627 (1888). Dillon has one position and it does not change - Terzakis was a thief and his thefts are covered under the Policy issued by Continental to the LLC.

with the actual takings of Terzakis and Estupinian. The foundation for this observation was that knowledge of the bad acts of Terzakis and Estupinian was not imputed to Vesta until the appointment of Dillon as Receiver.

Judge Ware also ruled that the 2004 Vesta Policy expressly covered theft of Exchange Funds by the owners of Vesta. The theft of Exchange Funds by dishonest owners in control of Vesta (the risk assumed) is not a defense. Continental does not claim that Vesta committed fraud at the inception of the contract, which would be a potential defense.

Enforcement of the 2004 Vesta Policy by Dillon as the Receiver for Vesta will not benefit Terzakis or Estupinian, the thieves. The money paid by Continental will be isolated from the general estate of Vesta, used to recharge the trust account, and paid by the Receiver on a *pro-rata* basis solely to the Exchangers who lost their Exchange Funds at the end of the Ponzi scheme. Recharging the trust and paying the beneficiaries of the trust is exactly what Continental demanded in the Okun IRC § 1031 Ponzi Scheme Litigation.[3]

In the Okun IRC § 1031 Ponzi Scheme Litigation, Continental filed a limited objection to a Motion to Transfer Interests and Assets for the Benefit of Bankrupt Estates which is attached as Exhibit 5 to the Declaration of Robert L. Brace. (RLB36-45.) In Exhibit 5, Continental made it clear to the bankruptcy Judge that Exchange Funds: (i) are held in trust; (ii) are not property of the debtor QI to use to pay general creditors; (iii) cannot be commingled with the QI debtors' operating funds; and that (iv) Exchange Funds, or their equivalents (such as insurance proceeds), must be earmarked and used exclusively for the benefit of the Exchangers. Dillon agrees with Continental's argument in Exhibit 5. (RLB36-45.) The money paid by Continental to Dillon will be earmarked as trust funds and used exclusively for the benefit of the Vesta Exchangers. Insurance Code § 533 is not implicated.

---

[3] See the bankruptcy case entitled *In re: The 1031 Tax Group, LLC*, U.S.B.C. S.D.N.Y. Case No. 07-11448 (MG). This litigation is hereinafter referred to as the "Okun IRC § 1031 Ponzi Scheme Litigation." For background information on the Okun 1031 Ponzi scheme, see *McHale v. Boulder Capital, LLC*, 439 B.R. 47 (2010); *McHale v. Citibank, N.A.*, 420 B.R. 178 (2009); *United States v. Edward Okun*, 2009 U.S. Dist. LEXIS 12421 (2009); and *Anita Hunter, et al. v. Citibank, N.A.*, 2010 U.S. Dist. LEXIS 61912 (2010).

Christopher Barr, an underwriter at United States Fire Insurance Company ("U.S. Fire"), an insurer that issued a similar policy to Vesta (and paid Dillon in the related matter of *United States Fire Insurance Company v. Vesta Strategies, LLC,* Case No. C 09-2388-JW) testified that when U.S. Fire paid for the theft of client funds, U.S. Fire, as the surety, could sue the thieves (Terzakis and Estupinian), but client funds held in trust by the QI would be protected from the insurer's subrogation rights. Chris Barr explained how the policy works, and why enforcement does not violate public policy:

**Testimony of Christopher Barr, Underwriter at U.S. Fire**

> **Question by Brace:** Well, tell me your understanding of how [the surety subrogation clause] would work if the owner steals some client funds.
>
> **Answer by Barr:** If a loss occurs that is covered . . . we would have the right, which we under many circumstances would not have, to seek recovery against our own insured.
>
> **Q.** So if [the owners of Vesta] steal $100,000, and you have to pay $100,000, you get to go after [Vesta] for the $100,000?
>
> **A.** If they had $100,000, we have the right to try and get it.
>
> **Q.** But that would not include going after trust assets of [Vesta], which are the assets of the other depositors, isn't that right?
>
> **A.** That's true. This is an indemnity policy, and any payment by us under the policy would immediately flow to a Category C property [client funds], and we would not be able to attach that to recover the loss that we had paid to create the balance in that bank account. So, yes, that would be outside of our reach.
>
> **Q.** A clear distinction in your mind between [Vesta's] property and the clients of [Vesta's] property?
>
> **A.** . . . what it is attempting to do is to create that distinction . . . What we are trying to do here is establish a clear distinction, whatever the tax legalities of the situation are, that this property has to be ring fenced and treated like client property, whatever the legal niceties say. And we will also abide by that when it comes to applying the exclusion and when it comes to recoveries.

**Q.** So [the owners of Vesta] steals $100,000, and [Vesta] makes a claim under the policy. Your check from U.S. Fire goes into the [Vesta] general account or goes directly to the client or goes where?

**A.** There are obviously some steps that have to be taken to make sure that we're not essentially paying the loss to the guy who stole the money in the first place.

**Q**. . . And so the goal of U.S. Fire would not be to pay the thieving party?

**A.** Exactly.

(Supp. Brace Decl., Ex.1, RLB95-98, at 163:11-165:23.)

Lockton Insurance Brokers ("Lockton") sold the subject policy to Vesta. Adam McDonough ("McDonough") of Lockton, a co-drafter of the Tax Deferred Exchange Endorsements, agrees with Barr that coverage for theft of client funds does not violate public policy because the intent of the policy was to protect the Exchange Funds, and not the thieves (Terzakis and Estupinian) who stole the money.

**Testimony of Adam McDonough of Lockton Insurance Brokers**

**Question by Brace**: What's your interpretation of the regulation [California Insurance Code § 533]?

**Answer by McDonough:** That an individual cannot expect to be indemnified by an insurance policy if that individual commits a wrongful act, an illegal act.

**Q.** Did that insurance rule ever come into discussion with Continental or any of these other carriers with regards to insuring owner theft of client funds?

**A.** I don't believe so.

**Q.** And as you sit here today, you don't think there's any relationship between the two?

**A.** I don't see a conflict.

**Q.** And why don't you see a conflict?

**A.** We weren't seeking to protect the owner or a bad actor. We were seeking to protect the victims of the bad actor.

**Q.** Who would be who?

**A.** Among others, it would have been the exchange customers.

(Supp. Brace Decl., Ex. 2, at 163:2-164:4.)

Judge Ware agreed with U.S. Fire and Lockton by ruling that enforcement of the 2004 Vesta Policy by Dillon will not benefit Terzakis or Estupinian, the thieving owners of Vesta, because the money paid will be isolated from the QI's general estate, used to recharge the trust account, and paid on a *pro-rata* basis solely to Exchangers who lost their Exchange Funds at Vesta. His Order is attached to the Declaration of Robert L. Brace as **Exhibit 2**.[4] Judge Ware also ruled that Terzakis and Estupinian's knowledge of their own misappropriation of client funds was not imputed to Vesta.[5]

The District Court rejected the application of *California Union* because the 2004 Vesta Policy was intentionally drafted by Continental to cover the theft of Exchange Funds by the principals of Vesta, as contrasted to "employee theft." Judge Ware ruled that:

> "Based on the . . . terms of the Policies, the Court finds that the Policies provide coverage for the alleged losses caused by Terzakis and Estupinian's embezzlement of the original exchangers' funds. In particular, the Policies define "Covered Cause of Loss" to include dishonest acts committed by employees (and owners with regard to Section 1031 exchange funds). . ."

(Brace Decl., Ex. 1 RLB8.)

---

[4] Judge Ware ruled that: "In this case, the general policy that one should not be permitted to take advantage of his or her own wrong is not implicated by Counter-Claimant's adverse domination allegations. Should Counter-Claimant receive funds under the Policies for loss caused by Terzakis and Estupinian, Counter-Claimant is charged with maintaining a common fund for the payment of Vesta's creditors, including the exchangers from whom Terzakis and Estupinian stole. Thus, the Court finds that allowing recovery in this case will not provide Terzakis and Estupinian with the opportunity to take advantage of their own wrongdoing." (Brace Decl., Ex. 2, RLB 26.)

[5] "The Court finds that Plaintiff has not sufficiently alleged "discovery" [by Vesta] under the Policies based on Terzakis and Estupinian's knowledge of their own wrongdoing. Plaintiff cites no authority for the proposition that a wrongdoer's knowledge of his or her own bad acts constitutes discovery [by Vesta] under a commercial crime policy. Moreover, if an owner's knowledge of his or her own wrongdoing constituted "discovery" under a policy similar to those at issue here, the loss discovery provision would be effectively read out of the contract. Thus the Court finds that Plaintiff's allegations regarding Terzakis and Estupinian's knowledge of their own misappropriation of client funds is not sufficient to allege "discovery" of a compensable loss by Vesta and Excalibur during the discovery period of the Policies." (Brace Decl., Ex. 1, RLB10).

> **"As a result, in this case, any embezzlement of Section 1031 exchange funds by company principles was expressly covered by the Policies."**

(Brace Decl., Ex. 2, RLB26.) (Emphasis added.)

In *California Union*, the District Court denied coverage under a fidelity bond covering "employee theft" because, in part,[6] Mr. Sahni and Mr. Day (the 100% owners of the bank) controlled the insured and were not "employees." The fidelity bond issued to American Diversified Bank in the *California Union* case was not intended by the insurer to cover the fraud and dishonesty of men who were, in effect, the sole stockholders of a closely held corporation. *California Union*, supra at 566. Vesta's policy is the opposite.

As set out in the deposition testimony of McDonough, he drafted the QI endorsements to provide coverage for owner theft of client Exchange Funds so that small insured QIs could compete with large title insurers. The coverage was intended by Continental to be sold to QIs operated as small closely-held corporations or limited liability companies. Denying coverage for owner theft because the owners controlled the small LLC would make the insurance illusory. McDonough's testimony regarding Vesta being the intended insured and owner theft the assumed risk is provided in the Supplemental Declaration of Robert L. Brace as Exhibit 2. McDonough's testimony on the expanded scope of the risk assumed by Continental is also set out in Exhibit 2.

The key endorsement drafted by McDonough of Lockton and Lori Davern of Continental granting coverage for the theft of Exchange Funds by the owners of the small QI is set out in its entirety below:

---

[6] As an additional basis for denying coverage, the court in *California Union* did not allow for equitable tolling under *Admiralty Fund v. Peerless Inc. Co.*, 143 Cal. App. 3d 379. 384 (1983) because American Diversified Bank was being supervised by the Federal Savings and Loan Insurance Corporation at the time of the thefts by Mr. Sahni and Mr. Day.

**ENDORSEMENT NO. <u>3</u>**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

**INCLUDE OWNERS AND PARTNERS**

**FOR LOSSES INVOLVING CLIENT PROPERTY**

**PROVISIONS:**

> **1. GENERAL EXCLUSION A. 1.** Acts Committed by **You** or **Your Partners** will not apply to losses involving the funds of client/exchangers while the Insured is acting as a qualified intermediary in a tax-deferred exchange of property intended to qualify under Internal Revenue Code 1031. (Emphasis added)
>
> **2.** In addition to any other rights we have under the law or this policy, it is understood and agreed that any loss paid as well as any fees, costs or expenses incurred by us as a result of the extension of coverage in Provision 1, above, will be subject to all rights of recovery that we, as **surety** in this undertaking of Employee Dishonesty coverage, may have against you and your partners. (Emphasis added.)

The Continental policy issued to Vesta was not a standard commercial crime policy covering "employee theft," like the policy discussed in *California Union*. The Tax-Deferred Exchange Endorsements expanded coverage to protect Exchange Funds from theft by the owners of the QI. The insured risk is not limited to the situation where an errant employee penetrates the financial protections implemented by the employer to protect his/her own money or money owed to others. Endorsement No. 3 expands the scope of coverage to include protection of Exchange Funds belonging to clients of the QI from the intentional acts of theft and embezzlement by those persons in control of the QI.

The third endorsement (which **"INCLUDES OWNERS AND PARTNERS FOR LOSSES INVOLVING CLIENT PROPERTY"**) grants coverage for "any loss resulting from any dishonest or criminal act committed by you or any of your partners . . .". "You " in the policy refers to the named insured, Vesta. Continental issued a clarification of the definition of "you" in the policy to include Terzakis and Estupinian, the majority owners of Vesta. A letter dated October 3, 2001 from Lori Davern of Continental to Margaret McDonnell is reproduced below and it provides that the "you" in the Tax-Deferred Exchange

Endorsement, expands the definition of "you" in the policy to include the "owners" of Vesta, so long as the theft involves Exchange Funds. According to Continental, the "owners" of Vesta are to include persons or entities with "a majority controlling interest in the company." Terzakis owned the controlling interest in B&B Sparco Properties ("B&B Sparco") and B&B Sparco owned 51% of the shares of Vesta. Estupinian owned a minority interest in Vesta (49%) through his membership ownership of Mutual Vision, LLC. Estupinian was in collusion with Terzakis, so they are both considered majority owners of Vesta and each a "you" under the policy.

**Letter from Lori Davern of Continental to Margaret McDonnell**
**Explaining the Intent of the Tax-Deferred Exchange Endorsement**

CNA

Three Embarcadero Center Suite 1350
San Francisco CA 94111

Lori J. Davern
Assistant Vice President
Corporate Fidelity
Telephone 415-733-6443
Facsimile 415-733-6432
Internet Lori.Davern@CNA.com

October 3, 2001

Margaret McDonnell
1031 Corp., Inc.
2089 East High Street, Suite B
Pottstown, PA 19464

Re: FEA Fidelity Bond Program
Forms and Endorsements

Dear Ms. McDonnell:

This letter serves to provide further clarification as to the intent of our "Include Owners and Partners For Losses Involving Client Property" endorsement issued in connection with the referenced insurance program.

In this endorsement we refer to "You and Your Partners". "You" means owners with a majority controlling interest in the company.

The intent of this endorsement is to cover the owners for losses involving client funds. This Endorsement does not provide coverage for majority owners involved in losses of the insured company's own funds.

Best regards,

Lori J. Davern
Assistant Vice President

COPY

cc: Adam McDonough, Willis

Lockton, the insurance producer who sold the policy to Vesta, issued Evidences of Insurance ("EOIs") which describe the coverage issued to Vesta by Continental (Supp. Brace Decl., Ex. 3, RLB115-118.). The EOIs unambiguously state without disclaimer, reservation or hesitation that Vesta is protected by a:

> **"Fidelity Bond [which] insures against losses resulting from dishonest acts, such as embezzlement, conversion, fraud, theft, etc., by. . . the insured's employees, partners and owners against the insured's clients."**

(Supp. RLB. Decl., Ex. 3, RLB115.) (Emphasis added.)

The EOIs are consistent with the description of coverage in response to the question **"What's covered?"** as set out in Exhibit 4 to the Supplemental Declaration of Robert L. Brace:

> **"What's Covered? Losses you sustain resulting from dishonest acts of your employees, or losses your clients sustain resulting from dishonest acts of your employees, partners or owners."**

(Supp. Brace Decl., Ex. 4, RLB121.)

### B. The Legal Doctrine of Alter Ego Liability Is Not a Defense to Enforcement of a Contract Entered Into With an Entity.

Continental calls Vesta the "alter ego" of Terzakis and Estupinian and contends that this convenient conclusion creates a defense to Vesta's breach of contract case. The doctrine of alter ego liability has never been used by a defendant against a plaintiff trying to enforce a contract. *Dos Pueblos Ranch & Improv. v. Ellis*, 8 Cal. 2d 217 (1937). In California, a plaintiff may impose liability on the owners of a corporation if the owners disrespected the separateness between themselves and the corporation.

Piercing the corporate veil is an equitable remedy for a plaintiff which does not dissolve the corporation or eliminate its existence for other purposes. *Mesler v. Bragg Management Co.*, 39 Cal. 3d 290 (1985). Alter ego liability is not a valid defense to the enforcement of a contract. Fraud in the inception is a defense. Continental does not contend that Vesta committed fraud on the application to obtain the 2004 Vesta Policy. The Policy was marketed to small closely-held

corporations and LLCs acting as QIs holding Exchange Funds. There would be no "inequitable result" if this contract was enforced against Continental, because Vesta was the target market and owner theft was the assumed risk.

Continental is not a plaintiff suing Estupinian or Terzakis to recover for debts owed by Vesta. Dillon is not piercing Vesta's corporate veil, but is enforcing Vesta's contractual rights as a legal entity that contracted with Continental. The District Court upheld the corporate status of Vesta when it ruled that the knowledge of the thefts by Terzakis and Estupinian was not imputed to Vesta.

**C. The Success of the Ponzi Scheme Is Not a Defense to Coverage.**

Continental contends that the nature of the IRC § 1031 Exchange industry precludes theft losses from being hidden, because an Exchange period can only last for 180 days. According to Continental, the theft of Exchange Funds must be discovered within 180 days. Continental's factual contention is without any evidentiary support, is inconsistent with its own admissions, is contrary to the Declarations of Ye and Terzakis, and is at direct odds with the facts as set out in the Okun IRC § 1031 Ponzi Scheme Litigation. Continental has not created a factual dispute on this issue.

Kevin Donohue ("Donohue") of Continental produced an article entitled "Protecting Your Escrow Funds from Theft," describing an IRC § 1031 Ponzi scheme.[7] Donohue proclaims, as does Terzakis, that an IRC § 1031 Ponzi scheme could continue as long as the real estate market remained hot. Donohue, of Continental, said:

---

[7] Qualified Intermediaries who pay older exchanges with after-acquired funds when the trust is in a deficit operate a Ponzi scheme. See *Taxel v. Surnow (In re San Diego Realty Exch.)*, 132 B.R. 424 (Bankr. S.D. Cal. 1991), rev'd to determine the existence of an express trust, 1994 U.S. App. LEXIS 10317 (9th Cir. Cal. May 2, 1994). Even when an exchange business does not start out as a Ponzi scheme "once [the company] mismanaged and converted the funds of some clients, and kept taking in the business and assets of others, it quickly became that." *Manty v. Miller & Holmes, Inc. (In re Nation-Wide Exch. Servs.)*, 291 B.R. 131, 149 n. 20 (Bankr. D. Minn. 2003) (stating that the case could be termed a resulting Ponzi scheme or Ponzi scheme by performance). In the context of 1031 Exchanges, when newly deposited Exchange Funds are used to pay old Exchanges because there is a deficit in the trust account, a Ponzi scheme presumption applies so that any transfers made in the course of the Ponzi scheme are presumed to have been made for no purpose other than to hinder, delay or defraud creditors. *McHale v. Boulder Capital, LLC*, 439 B.R. 47; 2010 Bankr. LEXIS 2612; 53 Bankr. Ct. Dec. 180 (S.D.N.Y. 2010).

> "Normally, there is some inherent protection from such a massive theft of escrow funds since a potential fraud is discovered immediately the very first time a buyer's escrow funds are unavailable for a real estate closing. This [IRC § 1031 Ponzi] scheme was able to escape detection for almost three years because the hot real estate market brought enough new funds to ABC to allow them to use new funds to meet the closings of buyers whose funds they had stolen. The inevitable downturn in the real estate market lead to the discovery of the fraud, which is known as a "Ponzi Scheme."

(Supp. Brace Decl., Ex. 5, RLB126, ¶ 5.)

Terzakis' admissions are in accord with Donohue's article issued on behalf of Continental. There is no conflict in the evidence for the parties to sit through a trial. Terzakis was running a Ponzi scheme, which he hid from 2004 to 2008. Excerpts from Terzakis' deposition are attached to the Supplemental Declaration of Robert L. Brace as Exhibit 6.

**Testimony of John Terzakis**

> **Question by Brace**. And so when you're going along in time and space with Vesta, from 2004 until its collapse in June of 2008, and there's a deficit in the trust account, a hole in the trust account, it's true, sir, is it not, that you were using new exchangers' deposits from new clients to fund old exchanges which couldn't fund because those monies were missing?
>
> **Answer by Terzakis**. That's correct.
>
> **Q.** And the exchanger clients of Vesta and Excalibur didn't know that, did they? They didn't know that their money was not going to be held in a qualified trust, but in fact was going to be either used by you to fund real estate or used by Mr. Estupinian for his lavish lifestyle, or to fund old exchanges which couldn't fund because you had already taken that money?
>
> **A.** That is very true.
>
> **Q.** And that would be an operational Ponzi scheme under your analysis?
>
> **A.** Yes, sir.

(Supp. Brace Decl., Ex. 6, RLB130-RLB131, at 287:9-288:2.)

**D. A Covered Loss of Vesta Exchange Funds Was Sustained During the 2004 Vesta Policy Period. Vesta Client Exchange Funds Were Stolen by: (i) the Transfers to Terzakis; and (ii) the Transfers to Close Other Exchanges.**

IAG 1031 was the predecessor QI to Vesta and the original named insured under the 2004 Vesta Policy. Vesta started business on January 9, 2004 and became the named insured on January 9, 2004. When Vesta started business, IAG 1031 stopped doing business. To the extent that Vesta was "involved" with IAG 1031 Exchanges, it did so as the agent of IAG 1031. The 2004 Vesta Policy period terminated on August 15, 2004 – approximately eight months after Vesta started as a QI. IRC § 1031 Exchanges take no longer than 180 days, or six months. Continental agrees. (Dkt. No.80, p. 6.)

IAG 1031 deposited Exchange Funds at Borel Private Bank and Trust ("Borel Bank") in California. IAG 1031 Exchange Funds were deposited into separate segregated sub-accounts. When Vesta started on January 9, 2004, for the majority of its Exchanges, it used the IAG 1031 account at Borel Bank to deposit Exchange Funds belonging to Vesta Exchangers. So, from January 9, 2004 to August 2004, Vesta deposited Vesta Exchanger Exchange Funds in the IAG 1031 accounts at Borel Bank. (Supp. Terzakis Decl., ¶2; Supp. Ye Decl., ¶ 6.)

Dillon has established and Continental has not refuted that the following transfers of Exchange Funds were made out of trust, and in violation of the Exchange Agreements, to Terzakis:

(*See chart on following page.*)

**Illegal Transfers Out of Borel Bank by Terzakis, Robert Estupinian, and Ye**

| Date | Amount | Wire Transfer from Accounts at Borel Bank to the following: | Use of Funds | |
|---|---|---|---|---|
| 1/21/2004 | $500,000.00 | Parkway Bank & Trust Company<br>Account Name: IAG / UIT<br>Account No.: 311650 | Internal Transfer to Single Site Solutions at Parkway Bank #..6437<br>Internal Transfers to Midwest Properties at Parkway Bank #..0800<br>1/29/04: Check No. 4211566 to David H. Malcom<br>Total Withdrawals = | $15,000.00<br>$471,000.00<br>$9,305.55<br>$495,305.55 |
| 3/2/2004 | $1,950,000.00 | Bank One, Chicago<br>Account No.: 643618663<br>Account Name: Midwest Properties | Total of Both Transfers to Midwest Properties at Bank One = $4,400,000.00<br>Wires Out to Midwest Properties at Parkway Bank #..0800<br>Wire Out to John D Terzakis Personal Account<br>Miscellaneous Charges<br>Wire Out to Marathon Ashland Petroleum<br>Wire Out to Janice Martin<br>Wire Out to Infant Welfare Society of Chicago<br>Total Withdrawals = | <br>$742,000.00<br>$1,870,000.00<br>$811,695.14<br>$56,140.68<br>$13,825.40<br>$900,000.00<br>$4,393,661.22 |
| 3/22/2004 | $2,450,000.00 | | | |
| 4/16/2004 | $11,300.00<br>$348,700.00 | Parkway Bank & Trust Company<br>Account Name: IAG / UIT<br>Account No.: 311650 | Check No. 4211692 to David H. Malcom<br>Check No. 4211694 to David H. Malcom<br>Total Withdrawals = | $348,000.00<br>$7,764.00<br>$355,764.00 |
| 4/26/2004 | $1,175,000.00 | Parkway Bank & Trust Company<br>Account Name: IAG / UIT<br>Account No.: 311650 | Internal Transfers to Midwest Properties at Parkway Bank #..0800<br>Internal Transfer to Single Site Solutions at Parkway Bank #..6437<br>Total Withdrawals = | $750,000.00<br>$400,000.00<br>$1,150,000.00 |
| 5/11/2004 | $1,475,000.00 | Parkway Bank & Trust Company<br>Account Name: Single Site Solutions<br>Account No.: 326437 | Internal Transfers to Midwest Properties at Parkway Bank #..0800<br>Wire Out to Lasalle Bank, Chicago Title & Trust for Mark Hunt<br>Wire Out to Harris Bank for Synergy Payroll<br>Total Withdrawals = | $60,000.00<br>$1,244,000.00<br>$170,113.17<br>$1,474,113.17 |
| 5/25/2004 | $625,000.00 | Parkway Bank & Trust Company<br>Account Name: Single Site Solutions<br>Account No.: 326437 | Internal Transfers to Midwest Properties at Parkway Bank #..0800<br>Wire Out to Bank One Chicago for Real Estate Venture Corp<br>Wire Out to Harris Bank for Synergy Payroll<br>Total Withdrawals = | $391,000.00<br>$92,500.00<br>$153,658.28<br>$637,158.28 |
| 6/24/2004 | $825,000.00 | Parkway Bank & Trust Company<br>Account Name: Single Site Solutions<br>Account No.: 326437 | Internal Transfer From Single Site to John D. Terzakis at Parkway Bank Account #..7712 | $820,000.00 |
| **Total Theft of Vesta Exchange Funds During the 2004 Continental Policy Period: $9,360,000.00** | | | | |

(Terzakis Decl.¶¶ 12-21 and Ye Decl. ¶¶ 5-8.)

Continental contends, however, that some portion of the $9,360,000 stolen by Terzakis may have included Exchange Funds deposited by IAG 1031 Exchangers prior to January 9, 2004, and therefore Dillon is unable to prove any claim on behalf of Vesta. Continental insured IAG 1031 for owner theft claims from August 15, 2003 to January 9, 2004 and Vesta from January 9, 2004 to August 15, 2004.

Dillon concedes that $500,000 of the $9,360,000 transferred to Terzakis consisted of Exchange Funds deposited by IAG 1031 Exchangers prior to January 9, 2004. Dillon concedes that $1,950,000 came from Lake Plaza, LLC, an IAG 1031 Exchanger who contracted with IAG 1031 before January 9, 2004 and deposited its funds on March 2, 2004. Dillon concedes that $614,000 came from Michael Walker, an IAG 1031 Exchanger who deposited his funds on June 14, 2004. The remaining $6,296,000 out of the $9.3 million transferred to Terzakis came from Vesta Exchangers, and $6,296,000 exceeds the policy limits.

IAG 1031 stopped doing business on January 9, 2004 and Vesta took over as the insured QI responsible for completing the IAG 1031 Exchanges as the agent for IAG 1031. Vesta was

the principal on its own Exchanges. When Peter Ye made the $9.3 million in transfers to Terzakis, he did so as an employee of Vesta because IAG 1031 was no longer in business. There is no distinction in coverage under the Policy for Vesta acting as the principal on its own contracts and Vesta acting as the agent for IAG 1031 performing IAG 1031's Exchange Agreements.

Finally, as set out in Exhibit 11 to the Supplemental Declaration of Peter Ye, Dillon has established another $5,739,291.61 in Ponzi scheme thefts of Vesta Exchange Funds during the 2004 Policy period. These moneys were taken out of the sub-accounts set up at Borel Bank for specific Vesta Exchangers and used to fund the Exchanges of other Exchangers, which could not fund because their money was missing. Just as taking Vesta Exchange Funds to invest in real estate acquired in the name of Terzakis was the theft of Exchange Funds, taking Vesta Exchange Funds deposited into specific sub-accounts to close other Exchanges is also theft of Exchange Funds. Both thefts would be covered under the 2004 Vesta Policy.

### E. The Fraudulent Transfers of Exchange Funds to Terzakis Constituted the Theft, Embezzlement, and Conversion of Trust Funds.

Terzakis, Estupinian and Ye have all pled guilty to violating federal wire fraud and money laundering statutes out of their operation of Vesta. The United States' Sentencing Memorandum for Terzakis is attached to the Supplemental Declaration of Robert L. Brace as **Exhibit 7**. Continental concedes that the transfer of $9.3 million in Exchange Funds to Terzakis was committed with the "manifest intent" of Terzakis to obtain financial benefit solely for Terzakis. Continental contends, however, that the transfer of trust funds to the personal account of the owner of the corporate trustee, for speculative investment in his own real estate, without the knowledge and consent of the beneficiaries, was not a "dishonest act." **Read that sentence again**. The 2004 Vesta Policy does not define "dishonest acts." The Court can take judicial notice that theft, fraud, embezzlement and the conversion of trust assets are considered "dishonest acts" by all citizens, except Continental. Even Terzakis and Ye admit they stole the money by telling lies and using interstate wires.

Continental argues that Terzakis' theft, fraud, embezzlement and conversion did not rise

to the level of a "dishonest act" because Terzakis had no "manifest intent" to cause Vesta a loss. According to Continental, Terzakis did not intend to cause Vesta a loss because Terzakis: (i) did not know that the transfers were illegal; (ii) always intended to someday return the money; (iii) had the money to pay Vesta until the real estate market crashed; (iv) caused his agents to account for the transfers, so he must be honest; and (v) owned Vesta, so, by implication, Terzakis did not want to hurt Vesta. The facts asserted do not rise to the level of a triable issue of fact.

**(i) Terzakis' Proclaimed Ignorance of the Law is No Defense to the Crimes He Committed.**

The word "knowing" for actual knowledge does not require any knowledge of the unlawfulness of an act. A murderer is guilty of homicide even if he did not know killing was a crime. Pursuant to Penal Code section 7, the word "knowingly" imports only a knowledge that the facts exist which are proscribed by the law. Ignorance of the law is no excuse. Terzakis' claim that he did not know taking trust funds was unlawful is no defense because he knew he took trust funds deposited at Vesta without the Exchangers' consent. *People v. Burns*, 75 Cal. 627 (1888).

Borrowing trust funds in breach of the terms of the trust and without the consent from the equitable owners is called embezzlement, larceny and fraud. See Cal. Penal Code §§ 484 and 503; *People v. Talbot*, 220 Cal. 3, 13-16 (Cal. 1934); *State of Washington v. Grimes*, 46 P.3d 801 (Wash App. 2002); *U.S. v. Carpenter*, 405 F. Supp. 2d. 85 (2005); *U.S. v. Davies*, 380 F. 3d. 329 (2004); *United States v. Edward Okun*, 2009 U.S. Dist. LEXIS 12421 (E.D. VA. 2009). In the civil context, it is called conversion and fraud. *Cook v. The 1031 Exchange Corp.*, 29 Va. Cir. 302 (1992); *In re: Nation-Wide Exchange Services*, 291 B.R. 131 (2003); *Cahaly v. Benistar Property Exchange Trust Co.*, 68 Mass. App. Ct. 668, 864 N.E. 2d 548, 559 (Mass. App. 2007).

**(ii) Terzakis' Intent to Repay Vesta is Irrelevant to the "Dishonesty" of the Crimes He Admitted Committing.**

Larceny by trick or device is codified in California Penal Code § 484. Embezzlement is

defined in California Penal Code § 503 as the fraudulent appropriation of property by a person to whom it has been entrusted. The offence of larceny requires intent to convert at the time possession is transferred. Embezzlement occurs when one receives possession of money in trust and after receipt converts the money for his own use.

In *People v. Talbot*, 220 Cal. 3 (1934), the California Supreme Court rejected Mr. Talbot's arguments proffered to overturn his embezzlement conviction. Talbot argued that as the President of Atlantic Richfield Oil Co. he intended to repay his employer the money he had taken, that he had the financial ability to make restitution, and that the employer's money was openly transferred to Talbot without concealment. These are the same facts that Continental claims are applicable to Terzakis, and which this Court should then conclude defeat Vesta's contract claim as a matter of law.

However, the California Supreme Court in *Talbot* ruled that the crime of embezzlement occurs "immediately" upon the breach of trust. When the money is converted, the crime of embezzlement is committed. Even if Talbot wanted to restore the property at a later time, such a fact would not constitute a defense to embezzlement. According to the California Supreme Court:

> An officer or agent of a corporation cannot take money of the corporation which is entrusted to him, or which comes into his possession by virtue of his office or agency, and use it even temporarily for his personal benefit and **avoid criminal responsibility by calling it a loan**. The law calls such a transaction a wrongful conversion, from which a fraudulent intent can be inferred. *Talbot*, at 14.

In an IRC § 1031 Ponzi scheme case similar to Vesta's, Ted J. Grimes, ("Grimes"), the owner of a small QI, was convicted of embezzlement of IRC § 1031 Exchange Funds. On appeal, Grimes argued it was improper to exclude evidence of his repayment and attempts to repay. The appellate court affirmed Grimes' conviction because repayment is not a defense to theft by embezzlement or deception. *State of Washington v. Grimes*, 111 Wn. App. 544; 46 P. 3d 801 (2002). The exchange agreements used by Grimes, like the ones used by Terzakis, said the QI must use the Exchange Funds received from the sale of relinquished property to acquire

the replacement property. Grimes was not authorized to make and take loans of Exchange Funds. Grimes' unauthorized use constituted theft the minute the funds were disbursed, regardless of any claimed intent to repay. The same legal rules apply to Terzakis. In most theft cases, the thief claims he took the money only temporarily and intended to put it back. According to Continental, it was just bad timing for Vesta that Terzakis got caught before his opportunity arose to return the money. If Terzakis had taken Continental's money, it would not be making this argument.

**(iii) Terzakis Lied to His Employees That the Transfers to Him Were Legal and Terzakis Lied to the Banks About His $43 Million.**

Continental claims that Terzakis was not "dishonest" because he accounted for the "loans" and had $43 million on reserve to pay Vesta back. The Court can see that the $23 million in Exchange Funds loaned to Terzakis (Terzakis Decl., Ex. 9.) were not included as liabilities in Terzakis' financial statement sent to the banks, which is attached as Exhibit 9 to Eileen Bower's Declaration. The Court should also conclude that Terzakis concealed his thefts by telling employees the "loans" were "allowed in the QI business, and that borrowing and investing Exchange Funds were all in the normal course of business in that industry." (Terzakis Decl., ¶10.)

Terzakis' dishonesty can also be seen in Exhibit 8 attached to the Declaration of Robert L. Brace, which is a complaint filed by two Exchangers against Terzakis. Continental produced the document to Dillon in this litigation. (Brace Decl., Ex. 8, RLB62-RLB90). Exhibit 8 was filed on December 26, 2002 by Anthony B. Leuin and Jean L. Bertrand doing business at Investment Advantage Group – a predecessor QI to Vesta. In the complaint, the two Exchangers accuse Terzakis of fraud, deceit and conversion of trust assets after Terzakis stole $1 million of their Exchange Funds. Exhibit 9 to the Declaration of Robert L. Brace shows that Continental declined the claim submitted by these two Exchangers with prejudice because Terzakis failed to pursue the QI's rights to obtain reimbursement; to do so would implicate Terzakis in a crime because he would have to answer the questions asked by Continental in

Exhibit 7. (Brace Decl., RLB58-RLB60.) Terzakis was able to pay Mr. Leuin and Ms. Bertrand off with Exchange Funds stolen from other Exchangers. Terzakis' contention that he believed his loans in 2004 were legal is not to be believed. However, as demonstrated above, Terzakis' belief is irrelevant to the factual determination that his acts were illegal, "dishonest," and a covered cause of loss under the Policy.

**(iv) The $9.3 Million in "Loans" from Vesta to Terzakis Were Not Authorized or Documented, and There Was No Security. The Loss Occurred the Moment the Money Was Embezzled by Terzakis.**

Continental submits to the Court a copy of *Fremont Reorganizing Corp. v. Federal Ins. Co.*, No. SACV 09-01208, 2010 U.S. Dist. LEXIS 14675 (C.D Cal. Jan. 5, 2012) (hereinafter, "Fremont Reorganizing") and argues that the loss to Vesta of the $9.3 million did not occur until the "loans" to Terzakis failed. The District Court has already rejected this argument.

The Fremont Reorganizing case dealt with authorized loans made by a Signature Holding Group that were secured by real property and sold to third parties. The Court concluded that most of the losses did not occur upon disbursement but upon default, and they were not direct losses because the loans were sold. The Court did conclude there were immediate losses at the moment of disbursement if there was no security for the loans, citing *Pacific-Southern Mrtg. Trust Co. v. Insurance Co. of No. America*, 166 Cal. 3d 703, 710 (1985) and *First Thrift of Los Angeles v. Pacific Indemnity Co.*, 95 Cal. App. 2d 460, 462 (Cal. 2nd Dist. Ct. App. 1949).

Dillon's case is not about authorized loans made by a lender to third parties with false facts supplied by culpable employees. Vesta, a QI, was not a lender and only "authorized to carry on any lawful business or activity which may be conducted by a limited liability company." (Terzakis Decl., Ex. 5.) Vesta was not authorized to loan Exchange Funds, because such loans would constitute the theft, embezzlement, and conversion of Exchange Funds the moment the transfers occurred. As set out in Exhibit 7 to the Supplemental Declaration of Robert L. Brace, there were no notes and there was no security transferred to Vesta for the $9.3 million transferred to Terzakis. (Supp. RLB Decl., Ex. 7, RLB136.) The Fremont Reorganizing

case is not applicable because the transfers were not loans, and, to the extent it *is* relevant, there was no security, so the loss to Vesta occurred upon disbursement in 2004.

### F. Adverse Domination of Vesta by Terzakis and Estupinian Tolled the Period of Time for Vesta to Discover the Loss on the 2004 Vesta Policy until Dillon Was Appointed the Receiver of Vesta.

#### (i) The Element of Adversity Is Obvious.

Continental contends that the corporate insureds in *Admiralty Fund v. Peerless Inc. Co.*, 143 Cal. App. 3d 379 (1983) were entitled to tolling because there were innocent shareholders but Vesta is not entitled to this equitable relief because Terzakis and Estupinian were Vesta's sole owners. According to Continental, there was no "adversity" because Vesta was the "proverbial thief" that is now "seeking to collect insurance against the results of its own criminal enterprise." (Dkt. 80, p. 13.)

Vesta had legal title to the Exchange Funds deposited at Vesta, and these funds were stolen from Vesta. The crimes committed did not benefit Vesta. The transfers to Terzakis were illegal, *ultra vires* acts, which could not be authorized or ratified by Vesta. *Miners' Ditch Company v. Zellerbach*, 37 Cal. 543 (1869). The transfers to Terzakis were fraudulent conveyances which injured Vesta and its creditors [*McHale v. Boulder Capital, LLC,* 439 B.R. 47, 2010 Bankr. LEXIS 2612 (S.D.N.Y. 2010)], rendering Vesta insolvent. Vesta's officers owed fiduciary duties directly to Vesta's creditors (the Exchangers) as if they were the innocent shareholders in *Admiralty Fund*. *Berg & Berg Enterprises, LLC v. Boyle,* 178 Cal. App. 4th 1020 (2009). There is no rational reason to allow tolling in *Admiralty Fund* and not in the case at bar.

Continental's absurd claim that Vesta "benefitted" from the thefts is unsupported, unsupportable and contrary to common sense. The Ninth Circuit rejected the imputation of the bad acts (again) of Mr. Sahni and Mr. Day onto the Receiver for American Diversified Bank because:

> "Disaster, not benefit, accrued to ADSB through the malfeasance of Sahni, Day and Pope." *FDIC v. O'Melveny & Meyers*, 969 F. 2d 244, 750 (1992).

Disaster, not benefit, accrued to Vesta through the malfeasance of Terzakis and Estupinian. Nothing Terzakis did could be characterized as benefitting Vesta. A trial is not needed.

**(ii) Dillon Has Met His Factual Burden to Establish Adverse Domination.**

Continental cites *Mosesian v. Peat, Marwick, Mitchell & Co*., 727 F.2d 873, 879 (9th Cir. Cal. 1984) to argue that tolling occurs only when there is "complete domination," which means Dillon must negate the possibility that an informed **stockholder** or **director** of Vesta could have induced Vesta to make a claim. Dillon has met this burden by establishing that the sole shareholders of Vesta were the thieves who would never tender and prosecute a claim for their own thefts. Terzakis, as the "sole manager," served in the capacity as a "director" and he was not about to prosecute a theft claim for Vesta against Continental. For proof, see Exhibit 9 to the Declaration of Robert L. Brace (RLB 93.)

Continental cites *California Union*, 948 F. 2d at 565, to argue that Dillon's burden is much greater than "complete domination," as he must now prove there were no innocent employees who could have discovered the loss, regardless of their job duties and placement in the chain of command. If the Court requires, Dillon can put all rank and file employees of Vesta, including the receptionist, on the stand. They will say they did not see a crime, and if they had, they would have quit. (Woo Decl.¶5; Carlos Decl.¶8.) Terzakis and Ye's Declarations saying they stole the money, concealed the thefts through lies, and did not make a claim for their own thefts should be enough.

Continental's identification of Ginny Estupinian as the innocent employee who discovered the thefts is misplaced. Ginny Estupinian (the girlfriend and then wife of Robert Estupinian) was fully aware of the transfers of Exchange Funds to Terzakis, received her own transfers of Exchange Funds, and invoked the Fifth Amendment privilege not to incriminate herself at her deposition. (Supp. Brace Decl., Ex. 8, RLB143-159.) Ginny Estupinian is not an

innocent employee at Vesta with both the ability and motive to make a claim. (Supp. Ye Decl., Exs. 15 and 16, PY170-178.)

The court in *California Union* did not allow equitable tolling because the insured, American Diversified Bank, was being supervised by regulators at the same time Mr. Sahni and Mr. Day were stealing the money. Ginny Estupinian is not the same as, or anything close to, a government regulator. Dillon has established adverse domination under *Moseian* and *California Union.*

### G. Vesta Complied With the Internal Controls Requirements.

#### (i) Stealing the Money Does Not Vitiate Coverage for Owner Theft.

Continental concedes that Vesta initially deposited client funds in segregated accounts, but because the money was then stolen by Terzakis, there is no coverage for owner theft. This interpretation makes the policy illusory. Adam McDonough, the drafter of the endorsement, disagrees with Continental:

**Testimony of Adam McDonough of Lockton**

> **Question by Brace**. The fact that I'm taking those assets out of that [initial] account and buying dope or real estate or whatever with those funds doesn't -- that does not, in your mind, vitiate coverage itself?
>
> **Answer by McDonough**. Not in my mind.
>
> **Q**. As long as the money was originally deposited in a segregated account, you've satisfied that condition?
>
> **A.** In my mind, that's correct.

(Supp. Brace Decl., Ex. 2; RLB99-RLB113, at 105:13-106:5.)

#### (ii) Vesta Assigned An Individual Exchange Number to Each Exchange So As to Provide a Clear Paper Trail For Each Transaction.

Vesta complied with the plain meaning of the condition by initially depositing the Exchange Funds into segregated accounts. Each Exchange was assigned a number and Vesta maintained a clear paper trail accounting for each transaction. Vesta and Terzakis also kept

detailed records of the transfers to and from Terzakis. Vesta knew at all times the location of the Exchange Funds, including the amounts on deposit at the banks and the amounts transferred to Terzakis. Vesta knew at all times the amounts transferred to Vesta by the Exchangers and amounts owed to each Exchanger. (Supp. Ye Decl., ¶ 31; Supp. Terzakis Decl., ¶ 7.)

## III. CONCLUSION

Dillon's Motion for Summary Judgment should be granted and Continental's motion should be denied. A judgment for $5 million should be entered against Continental on behalf of Dillon, as the Receiver for Vesta. The judgment should include an award of pre-judgment interest from the date Dillon filed the complaint.

DATED: October 9, 2012

Respectfully submitted,

By: /s/ Robert L. Brace

Robert L. Brace, Esq., SBN. 122240
Michael P. Denver, Esq., SBN 199279
Peter L. Candy, Esq., SBN. 149976
**HOLLISTER & BRACE**
P.O. Box 630
Santa Barbara, CA 93102

Attorneys for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group LLC