Robert L. Brace, SBN 122240
Email: rlbrace@hbsb.com
Michael P. Denver, SBN 199279
Email: mpdenver@hbsb.com
Peter L. Candy, SBN 149976
Email: pcandy@hbsb.com
**HOLLISTER & BRACE**
P.O. Box 630
Santa Barbara, CA 93102
Telephone: (805) 963-6711
Facsimile: (805) 965-0329

Attorneys for Thomas Dillon, as Court-Appointed
Receiver for Excalibur Strategies, LLC
and Excalibur 1031 Group LLC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THOMAS DILLON, as Court-Appointed Receiver for Excalibur Strategies, LLC and Excalibur 1031 Group, LLC<br><br>Plaintiff,<br>vs.<br><br>CONTINENTAL CASUALTY COMPANY, an Illinois corporation.<br><br>Defendant | **Case No.: C 10-5238-LHK**<br>**Related Case No.: C 09-2388-JW (Closed)**<br><br>**THE EXCALIBUR RECEIVER'S OPPOSITION TO CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT ON THE 2006 AND 2007 POLICIES ISSUED TO EXCALIBUR**<br><br>**Hearing Date: December 20, 2012**<br>**Time: 1:30p.m.**<br>**Location: CR 8, 4th Floor** |

# TABLE OF CONTENTS


I. SUMMARY OF ARGUMENT ..... 2

II. UNDISPUTED FACTS ..... 3

III. ARGUMENT ..... 7

A. The Excalibur Policies Cover Theft of Exchange Funds By the Owners of Excalibur ..... 7

B. The Theft of Excalibur Exchange Funds During the Periods of the Excalibur Policies Was Not Cured By Terzakis. ..... 9

C. Dillon Can Recover Under the Excalibur Policies. ..... 9

D. A Triable Issue of Fact May Exist on the Adverse Domination o Excalibur by Benedetto ..... 10

IV. CONCLUSION ..... 13

Plaintiff Thomas A. Dillon ("Dillon"), the Federal Court-appointed Receiver for Excalibur 1031 Group, LLC ("Excalibur") hereby opposes the Motion for Summary Judgment filed by Defendant Continental Casualty Company ("Continental") on the 2006 and 2007 insurance policies issued to Excalibur by Continental (the "2006 Excalibur Policy" and the "2007 Excalibur Policy" and collectively, the "Excalibur Policies."). In support of his opposition, Dillon incorporates the law and facts asserted in the Vesta Receiver's Motion for Summary Judgment (Dkt. No. 75), as well as the declarations previously submitted in support of the Receiver's motion on the 2004 Vesta Policy:

- the Declaration of Robert L. Brace ("Brace Decl.," Dkt. No. 75-1);
- the Declaration of John Terzakis ("Terzakis Decl.," Dkt. No. 76);
- the Declaration of Peter Ye ("Ye Decl.," Dkt. No.77);
- the Declaration of Kristine Carlos ("Carlos Decl.," Dkt. No.78); and
- the Declaration of Susan Woo ("Woo Decl.," Dkt. No.79).

In further support of his opposition to Continental's refusal to pay on the Excalibur Policies, Dillon incorporates his Opposition to Continental's Motion for Summary Judgment (Dkt. 91) and:

- the Supplemental Declaration of Robert L. Brace (Dkt. 92);
- the Declaration of Bill Carling (Dkt. 93);
- the Supplemental Declaration of Peter Ye (Dkt. 96); and
- the Supplemental Declaration of John Terzakis (Dkt. 97).

To further the record on his Opposition to Continental's Motion on the Excalibur Policies, Dillon submits the Declaration of Robert L. Brace, which will be referred to as the "Brace Excalibur Declaration."

# I.

# SUMMARY OF ARGUMENT

Continental Casualty Company ("Continental") insured Excalibur 1031 Group, LLC ("Excalibur") for owner theft of client Exchange Funds during the 2006 and 2007 Policy periods. The two policies were for $2,500,000 a piece. These contracts of insurance are in addition to the 2004 Vesta Policy discussed in other briefs.

During the 2006 Excalibur Policy period, John Terzakis ("Terzakis"), as an owner of Excalibur, stole $2,200,000 of Exchange Funds deposited by Excalibur Exchangers. During the 2007 Excalibur Policy period, Terzakis stole another $3,180,000. Because each policy has a limit of $2,500,000, Continental is liable to Excalibur for $4,700,000. The Receiver for Excalibur will use this money to repay the Excalibur Exchangers who lost $11 million upon the collapse of Excalibur. The Excalibur Exchangers are different claimants than the Vesta Exchangers, who also lost $11 million.

The Excalibur Policies issued by Continental cover the theft of Exchange Funds as long as Excalibur was "involved" in the IRC §1031 Exchange transaction and the money was deposited in a financial institution. There is no requirement that the Exchange Funds have to be deposited in an account in the name of Excalibur. Excalibur was "involved" because it solicited IRC § 1031 Exchange clients to use Vesta Strategies, LLC as the qualified intermediary ("QI"). The fact that the Exchange Funds stolen by Terzakis were deposited into accounts at Merrill Lynch controlled by Vesta is not a defense to payment on the Excalibur Policies.

Continental's contention that Terzakis cured his thefts of Excalibur Exchanger Exchange Funds by funding and closing all of the Excalibur Exchanges existing as of October 2007 is no defense, because Terzakis stole the money to fund those Exchanges, as well as the Exchanges from which he stole Exchange Funds during the Policy periods. Continental does not receive credit for Terzakis' Ponzi scheme thefts, as such thefts do not recharge the trust.

A trial is not needed on coverage interpretation or proof of loss. A trial may be necessary on the adverse domination of Excalibur by Christian Benedetto ("Benedetto"), another person who owned Excalibur with Terzakis and Robert Estupinian ("Estupinian"). It is Dillon's contention that Benedetto was not an innocent owner, but a person acting adverse to Excalibur; an owner who was not inclined to make a theft claim, in order to protect himself from criminal prosecution and civil liability.

Continental's motion to terminate the litigation without a trial should be denied.

## II.

## UNDISPUTED FACTS

1. Excalibur was first formed as an LLC on September 30, 2004 in Delaware. From late 2004 to February 2008, Excalibur was owned 50% by Vesta and 50% by Christian Benedetto ("Benedetto") and several other investors (collectively referred to as the "Benedetto Investors"). In February 2008, the Benedetto Investors' 50% interest was transferred to Vesta, which then owned 100% of Excalibur. Vesta was owned by John Terzakis ("Terzakis") and Robert Estupinian ("Estupinian"). (Continental's Motion, Dkt. 80, pp.5 and 10.)

2. Excalibur was a marketing company for Vesta on the East Coast. Vesta was located in San Jose, on the West Coast. Excalibur would solicit IRC § 1031 Exchange clients to use Vesta for their Exchanges. Excalibur clients would enter into an Exchange Agreement with Vesta, receive a sequential Exchange number from Vesta, and have their Exchange Funds deposited into a Vesta account held at Merrill Lynch in New Jersey (Dkt. 80, p. 10.)

3. Excalibur and Vesta entered into a partnership agreement, whereby the profits generated from the fees earned on Excalibur Exchanger clients would be shared 50/50 between Vesta and Excalibur. Other than marketing Vesta to the Excalibur clients' the Benedetto Investors delegated substantially all operational control over the Excalibur Exchanges and Excalibur Exchange Funds to Vesta. (Dkt. 80, p.10.)

4. Richard Vaill ("Vaill") worked at Excalibur from October 2004 to June 2008. Vaill perceived the Exchangers he referred to Vesta as "Excalibur Exchangers" and he believed that Excalibur had the obligation to ensure that each Excalibur Exchanger's Exchange was completed by Vesta, as Vaill had represented it would be completed by Vesta. (Brace Excalibur Decl., Ex. 2.)

5. In the fall of 2007, two Excalibur Exchanges that had been referred to Vesta by Excalibur (the Hoist and Phillips Exchanges) did not fund on time. Benedetto was shocked to learn the money on deposit at Merrill was missing, and he hired a lawyer to sue Terzakis - unless the two delayed Exchanges and all other existing Excalibur Exchanges were funded and completed. Benedetto instructed Vaill to stop soliciting new Excalibur Exchangers. The Benedetto Investors sold their interest in Excalibur to Vesta in February 2008. (Dkt. 80, p. 11.)

6. After Terzakis obtained 100% control over Excalibur to the exclusion of Benedetto, Terzakis solicited two new Excalibur clients, Carteret Ventures LLC ("Carteret") and Supra Color Enterprises ("Supra Color") who entered into Exchange Agreements with Excalibur. The Carteret and Supra Color Exchanges failed. Carteret lost $11,229,766.55 and Supra Color lost $681,045.75. (Brace Excalibur Decl., ¶ 8.)

7. Continental issued to Excalibur a $2.5 million commercial crime policy, No. 268100958 (the "2006 Excalibur Policy") for the policy period of August 15, 2005 to August 15, 2006. (Dkt. 80, p. 2.) The 2006 Excalibur Policy contained the QI endorsements covering Excalibur for owner theft of Exchange Funds.

8. Continental issued to Excalibur a $2.5 million policy, No. 268100958 (the "2007 Excalibur Policy") for the policy period of August 15, 2006 to August 15, 2007. (Dkt. 80, p. 2.) The 2007 Excalibur Policy contained the same QI endorsements covering Excalibur for owner theft of Exchange Funds.

9. On July 6, 2006, during the policy period of the 2006 Excalibur Policy (August 15, 2005 to August 15, 2006), Terzakis stole $3,500,000 from two Excalibur Exchangers –George Molyneux ("Molyneux") and Michelle Barone ("Barone"), as depicted

below:

**Tracing of Terzakis' Theft of $3,500,000 from Molyneux and Barone During the 2006 Excalibur Policy Period**




(Brace Excalibur Decl., ¶12.)

10. On December 28, 2006, Terzakis repaid $1,300,000 to fund Molyneux's Exchange No. 7071. Other than this repayment of $1,300,000 by Terzakis, the business records reflect that the Molyneux and Barone Exchanges were closed with Exchange Funds deposited by other Vesta or Excalibur Exchangers. (Brace Excalibur Decl., ¶13.)

11. The net theft claim by Excalibur on the $2.5 million 2006 Excalibur Policy is $2,200,000 calculated as $3,500,000 - $1,300,000 = $2,200,000. (Brace Excalibur Decl., ¶14.)

12. On January 22, 2007, during the policy period of the 2007 Excalibur Policy

(August 15, 2006 to August 15, 2007), Terzakis stole $2,000,000 from two Excalibur Exchangers –Hou Shang Jahan and Ninth Ave. Equities, who deposited a total of $3,336,048.33 on January 19, 2007. Approximately $1 million of their money was also stolen to close other Exchanges pending at Vesta and Excalibur, as depicted below:

**Tracing of Terzakis' Theft of $2,000,000 from Shang Jahan and Ninth Ave. Equities During the 2007 Excalibur Policy Period**




(Brace Excalibur Decl., ¶15.)

13. On June 25, 2007, Terzakis repaid $750,000 to help close the Ninth Ave. Equities Exchange No. 7307, making a net loss to Excalibur on the $2 million January 2007 theft of $1,250,000. (Brace Excalibur Decl., ¶16.)

14. On May 2, 2007, during the 2007 Excalibur Policy period (August 15, 2006 to August 15, 2007), Terzakis stole $1,980,000 from the Hoist Exchange No. 7313, an Excalibur Exchanger who deposited $5,227,633. The remainder of Hoist's Exchange Funds were used to close other Exchanges at Vesta, pursuant to the Ponzi scheme. Ponzi scheme thefts are thefts covered by the Excalibur Policy. Although the Hoist Exchange of $5,227,633. (plus $2 million in hush money) was ultimately funded, the majority of the money used came from stolen Exchange Funds, so there is no credit to Continental for this $1,980,000 theft. (Brace Excalibur Decl., ¶17, and documents contained in Ex. 6.)

15. Combining the net theft of the Ninth Ave. Equities Exchange Funds of $1,250,000 with the theft of the Hoist Exchange Funds of $1,980,000, both during the 2007 Excalibur Policy period, results in a theft loss of $3,180,000, which exceeds the $2,500,000 policy limits. (Brace Excalibur Decl., ¶18.)

## III.

## ARGUMENT

### A. The Excalibur Policies Cover Theft of Exchange Funds By the Owners of Excalibur.

Estupinian and Terzakis owned 100% of Vesta and Vesta owned 50% of Excalibur during the policy periods of the Excalibur Policies –August 15, 2005 to August 15, 2007. The testimony of Christian Benedetto ("Benedetto"), an owner with others of 50% of Excalibur, establishes that it was Estupinian, as the CEO of Vesta, who ran the day-to-day operations of Excalibur because it was Vesta that entered into the Exchange Agreements, and it was Vesta that held the Exchange Funds in its Merrill Lynch account that belonged to the Excalibur Exchangers referred to Vesta by Excalibur.

It was Terzakis and Estupinian, as the 50% owners of Excalibur, who stole the Exchange Funds to the detriment of Excalibur. Lori Davern, of Continental, represented that coverage for owner theft was triggered only if the majority owner (51%) stole the funds as the owner.

Dillon contends that coverage exists for owner theft by the 50% owners of Excalibur, who had 100% control over the Exchange Funds. Because "majority owner" was not defined in the policy or the QI endorsements, Dillon's interpretation is reasonable, given the stated purpose of the Policies and the reasonable belief of the agents of the insured.

**Testimony of Christian Benedetto**

> **Question by Brace**. The fidelity bond ensures against losses resulting from dishonest acts, such as embezzlement, conversion, fraud, theft of the insured's employees against the insured, as well as the insured's employees, partners and owners against the insured's clients. Do you see that?
>
> **Answer by Benedetto**. Yes.
>
> **Q**. Is that description of coverage in this Lockton evidence of insurance consistent with your understanding of the coverage that was provided by Continental to Excalibur during the periods of time that Continental was the insurer on the risk?
>
> **A.** Yes.
>
> **Q.** All right. So it was your understanding and belief that if, in fact, Mr. Terzakis or Mr. Estupinian, as owners of Excalibur, stole exchange funds, that there would be, in fact, coverage under the policy; isn't that true?
>
> **A.** Yes.
>
> * * * *
>
> **Question by Brace**. And what would be the purpose of sending the evidence of insurance to these potential clients?
>
> **Answer by Benedetto**. They probably would not have given us business without it.
>
> **Q.** So the purpose would be to convince them that the funds were safe while at Excalibur because you had this insurance?
>
> **A.** Yes. You could say that.

(Brace Excalibur Decl., ¶ 19.)

**B. The Thefts of Excalibur Exchange Funds During the Periods of the Excalibur Policies Was Not Cured By Terzakis.**

Continental contends that after the Exchanges of Excalibur Exchangers Hoist and Phillips failed in October 2007, Benedetto insisted that all existing Excalibur Exchanges be closed before he would sell the remaining 50% of Excalibur to Terzakis. According to Continental, because the Excalibur Exchanges existing in October 2007 were closed, there can be no theft claim for Terzakis' prior thefts of Excalibur Exchange Funds.

The problem with Continental's argument is that Terzakis used Exchange Funds stolen from other Vesta Exchangers to fund the Exchanges of the Excalibur clients, from whom he also stole Exchange Funds. Continental wants credit on its clear contractual liability from Terzakis' operation of a Ponzi scheme. This defense to payment argument made by Continental is a ratification of the criminal enterprise conducted by Terzakis and Estupinian. It would be inequitable for the Court to accept the argument, because it would unjustly enrich Continental.

Terzakis' thefts of Excalibur Exchanger Exchange Funds, as set forth above, occurred during each Excalibur Policy period. Terzakis repaid some of the money for his thefts, for which Continental gets credit. Continental should not, however, receive credit for repayments with Exchange Funds stolen from Vesta Exchangers.

**C. Dillon Can Recover Under the Excalibur Policies.**

There are two Excalibur Exchangers that had a total of $11,910,812.30 in lost Exchange Funds upon the collapse of Excalibur in June of 2008. Continental contends that Excalibur cannot recover for the thefts by Terzakis occurring in 2006 and 2007 because it was Vesta who entered into the Exchange Agreements with the clients referred to Vesta by Excalibur, and it was Vesta that "held" the Exchange Funds in its account at Merrill Lynch. But the clear meaning of the grant of coverage is not so limited. The "Include Client Property" endorsement to the Excalibur Policies states that the:

> ". . . property covered under this insurance is limited to property: (a) that you own or hold; or (b) for which you are legally liable; or (c) held in a

> financial institution account in a transaction involving you as a qualified intermediary.

Dillon agrees that Excalibur did not "hold" the Exchange Funds because Vesta performed the holding for the Excalibur clients. Excalibur's partner, Vesta, physically held the Exchange Funds in the Merrill Lynch account. But Excalibur, as an insured entity, was legally liable for making its referrals to Excalibur. Excalibur's other owner, Christian Benedetto, believed he could go to jail for Terzakis' thefts of Excalibur Exchange Funds. Richard Vaill testified that he believed he was responsible to his Excalibur clients to make sure their Exchanges closed, as he had promised. Finally, Excalibur was (without dispute) a qualified intermediary, and Excalibur was "involved" in each IRC § 1031 Exchange transaction that it solicited for Vesta. Excalibur is covered under the Policies for the theft of Exchange Funds by the owners of Excalibur.

### D. A Triable Issue of Fact May Exist on the Adverse Domination of Excalibur by Benedetto.

Dillon did not file a motion for summary judgment on the Excalibur Policies because Excalibur was owned 50% by the Benedetto Investors. Christian Benedetto was in a position of power at Excalibur with apparent motive and incentive to make a theft claim to Continental before the end of the discovery of loss period on August 15, 2007.

It is Dillon's contention, however, that adverse domination applied to Excalibur (just like it did to Vesta) until Dillon was appointed as the Receiver for Excalibur. Dillon contends that Benedetto was not an innocent shareholder or director of Excalibur who would compel Excalibur to make a claim to Continental. The evidence reveals that Benedetto discovered the Terzakis thefts when the Hoist and Phillips Exchanges failed in October 2007. After Benedetto's discovery, he sold Excalibur to Terzakis, the known thief, and received parcels of land in South Carolina purchased with stolen Exchange Funds. After Benedetto discovered the thefts, he did nothing to ensure that the Excalibur Exchanges in existence in October 2007 were funded with clean money contributed by Terzakis, and not with Exchange Funds stolen from Vesta Exchangers (EKB229, Benedetto Dep., at 196:3-197:23.).

Benedetto's lawyers told him that before he could sell to Terzakis, he had to run off the existing Exchanges at Excalibur and make sure he did not participate in a Ponzi scheme. Benedetto did nothing to ensure that Excalibur's assets equaled its liabilities, as he describes below:

**Testimony of Christian Benedetto**

**Question by Brace**. Your lawyer said that you needed to run off Excalibur after October of 2007. And in doing so, you had to make sure that you didn't convert other exchangers' exchange funds to pay outstanding obligations. Is that right?

**Answer by Benedetto**. Yes.

**Q**. And you said that Mr. Terzakis had told you that he was raising funds from friends and family to pay off these exchangers?

**A.** Yes. While he did an investigation as to where the money went.

**Q.** And your testimony is after, after October of 2007, you never, ever saw an account statement from Merrill showing the assets on deposit at Merrill; is that right?

**A**. Up until recently, that is correct.

**Q**. And, in fact, you saw no bank documents from any bank or Excalibur which identify the amount of assets on deposit at a financial institute; is that right?

**A**. Correct.

**Q.** And it was your impression that Excalibur exchange funds were not used to pay outstanding Excalibur exchanges in existence between October and February because no new Excalibur exchangers were solicited and entered into contracts with Excalibur; is that right?

**A**. Yes.

**Q.** Do you know if during that time frame, October 2007 to February of 2008, if Vesta continued in business and Vesta continued to solicit new exchanges?

**A.** I do not believe they did.

> **Q.** Well, do you know about Maria Del Carmen Illanzo [Alonso] who deposited $485,000 with Vesta on November 13th, 2007?
>
> **A.** I do not.
> **Q**. Do you know about Michael and Joyce Simmons who deposited $1,959,597.95 on November 9, 2007?
>
> **A.** I do not.
>
> **Q.** And how about Bob Spagnola who deposited $132,000 in January of 2008?
>
> **A**. I do not.
>
> **Q**. And you didn't know about Chris Waller [Walsh] who entered into a contract with Vesta and deposited $2,037,198 on November 14th, 2007; is that right?
>
> **A**. That is also correct. .
>
> **Q.** And did you know about the Erin Thrash (ph) exchange in January 2008 when she entered into a relationship with Vesta and deposited approximately $3,000,000?
>
> **A**. I did not.
>
> **Q**. And you have no idea if any of these people's monies were used to pay outstanding Excalibur obligations; isn't that right?
>
> **A**. How would I, if I didn't know they came in?
>
> **Q**. That's right

(EKB229, Benedetto Dep, at 195:16-197:24.)

Also, it was Benedetto who referred Carteret to Excalibur in 2008, after knowing about the Terzakis thefts in October 2007 (EKB222, Benedetto Dep., at 166:15-22.), and Carteret lost $11,229,766.55. It is Dillon's contention that even if Benedetto had discovered the thefts of Excalibur Exchange Funds prior to the end of the August 15, 2007 discovery-of-loss period, Benedetto still would have done what he did, which included failing to make a claim to Continental, to keep himself out of jail. Excalibur was adversely dominated by Terzakis, Estupinian, and Benedetto.

## IV.

## CONCLUSION

For the above reasons, Continental's Motion for Summary Judgment on the 2006-2007 Excalibur Policies should be denied.

Respectfully submitted,

DATED: October 9, 2012 By: /s/ Robert L. Brace

Robert L. Brace, Esq., SBN. 122240
Michael P. Denver, Esq., SBN 199279
Peter L. Candy, Esq., SBN. 149976
**HOLLISTER & BRACE**
P.O. Box 630
Santa Barbara, CA 93102

Attorneys for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group LLC