Robert L. Brace, SBN 122240
Email: rlbrace@hbsb.com
Michael P. Denver, SBN 199279
Email: mpdenver@hbsb.com
Peter L. Candy, SBN 149976
Email: pcandy@hbsb.com
**HOLLISTER & BRACE**
P.O. Box 630
Santa Barbara, CA 93102
Telephone: (805) 963-6711
Facsimile: (805) 965-0329

Attorneys for Thomas Dillon, as Court-Appointed
Receiver for Vesta Strategies, LLC
and Excalibur 1031 Group LLC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC<br><br>Plaintiff,<br><br>vs.<br><br>CONTINENTAL CASUALTY COMPANY, an Illinois corporation.<br><br>Defendant | **Case No.: C 10-5238-LHK**<br>**Related Case No.: C 09-2388-JW (Closed)**<br><br>**THE VESTA RECEIVER'S RESPONSE TO CONTINENTAL'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON THE 2004 POLICY ISSUED TO VESTA**<br><br>**Hearing Date: February 14, 2013**<br>**Time: 1:30 p.m.**<br>**Location: CR 8, 4th Floor** |

Plaintiff Thomas A. Dillon ("Dillon"), the Federal Court-appointed Receiver for Vesta Strategies, LLC ("Vesta") submits this response to Continental Casualty Company's ("Continental") Opposition to Dillon's Motion for Summary Judgment on the 2004 Vesta Policy. Dillon incorporates his Motion (Dkt. No. 75) and his Opposition (Dkt. 91).

## I.

## ARGUMENT

### 1. Terzakis and Estupinian Exercised Exclusive Domination and Control Over Vesta.

Continental would deny its own existence to avoid paying the Vesta Receiver's claim. Continental wants a trial to determine if John Terzakis ("Terzakis") was the majority owner of Vesta. Terzakis was the 51% owner. Dillon did not "misquote" the language in the Vesta Operating Agreement. The Vesta Operating Agreement said Vesta would be operated by the "member so designated." Dillon produced the document "designating" B&B Sparco as the managing member of Vesta. The document was filed by Robert Estupinian ("Estupinian"), as the CEO of Vesta, with the California Secretary of State. The document is now attached hereto as Exhibit 1 with the "designation" of Terzakis highlighted in yellow. The document "designating" Terzakis was included in Dillon's Motion as Ex. 5 to Terzakis' Declaration (See Dkt. No. 76-5, page 9 of 10.)

Continental produces to the Court another version of the Vesta Operating Agreement, and argues that Estupinian, through his ownership of Mutual Vision, LLC, was the 51% owner of Vesta and Terzakis, through B&B Sparco, was only a 49% owner. Because of the 2% factual conflict, Continental says Dillon has no case, or a trial is needed to resolve the discrepancy.

First, Ye testified that the version of the operating agreement granting B&B Sparco only a 49% interest was a forgery prepared by Estupinian in his effort to prevent his termination by Terzakis on December 3, 2007. (See Dkt. 81, Ex. 4, pp. EKB498-500, Ye Deposition.) In the indictment of Terzakis and Estupinian, the U.S. Government alleges that Terzakis, through

B&B Sparco, was the 51% owner of Vesta, (Dkt. 76-1, pages 2 and 3 of Indictment). Both Terzakis and Estupinian pled guilty to these charges. (Dkt. 76-1, page 2 of 3; Dkt. 76-6, page 2 of 2). In the United States Sentencing Memorandum (Dkt. 92-7, page 8 of 10), the United States sought to impose leadership enhancements on Terzakis by contending (as does Dillon) that:

> "There can be no serious dispute that defendant Terzakis was the organizer or leader of the fraud underlying his counts of conviction. Terzakis was at the top of the organizational chart for Vesta and Single Site Solutions. He reported to no one, and all reported to him. By virtue of his controlling interest, he was able to force Estupinian from the company . . . lastly, to understand that Terzakis was the boss throughout, one only need to follow the money. Even while Estupinian was running Vesta as the Chief Executive Officer, Terzakis had the ability to control Vesta's finances, and Terzakis exercised that ability with impunity."

(Dkt. 92-7, RLB140-141.) .[1]

Second, Terzakis admits in his declaration he owned 51% of Vesta (Dkt. 76, page 2 of 11 and 3 of 11) and Ye testified in his declaration that Estupinian, as the 49% owner, authorized and directed Ye to transfer the $9.3 in Exchange Funds to Terzakis. (Dkt. 77, page 3 of 9). Regardless of who owned what, 100% of the owners of Vesta were involved in the thefts. Continental's contractual liability does not hinge on who owned 51% versus who owned 49%. The alleged 2% conflict over ownership is of no moment.

**2. The Existence of Ginny Estupinian Does Not Save Continental.**

Dillon accepts as true that Ginny Estupinian performed the physical tasks at Vesta outlined by Continental on page 7 of its opposition. Ginny Estupinian ("Ginny") was an owner of Vesta through her fractional ownership of Mutual Vision, LLC and marriage to Robert Estupinian. Ginny was also a signer on accounts containing Exchange Funds with online access to account information. She also oversaw the process of receiving Exchange Funds. In addition, Ginny Estupinian was a beneficiary of the $12 million in transfers of Exchange Funds to Vesta

---

[1] To sentence Terzakis to the maximum time in prison, the Government used Terzakis' Declaration filed in this case (Dkt. 76) against him. The veracity of Terzakis' admission of his own thefts cannot be legitimately questioned by Continental.

Capital Advisors (Dkt. 77-4, page 2 of 2). Ginny knew about the transfers to Terzakis (Dkt. 96-16, page 2 of 2) and she refused to testify at her deposition, invoking her Fifth Amendment privilege not to incriminate herself. (Dkt. 92-8, pages 2 to 17.)

To establish adverse domination, Dillon must negate the possibility that an informed and innocent stockholder or director of Vesta could have induced Vesta to make a claim to Continental. Dillon contends that an innocent stockholder or employee would not take the Fifth Amendment.

Under *Resolution Trust Corp. v. Smith*, 872 F. Supp. 805 (D. Or. 1985), and *Hecht v. Resolution Trust Corp*., 333 Md. 324, 635 A. 2d 294, 405-407 (Md. 1994), the burden must shift to Continental to establish that Ginny Estupinian (with her knowledge) had both the ability and motive to make a claim on the Policy. Continental is unable to meet the burden because Ginny Estupinian knew of the thefts and received benefit from them, and she will not testify at our trial. Based on the undisputed evidence, the Court can rule that Ginny Estupinian: (i) is not an innocent shareholder or officer of Vesta; (ii) did not have the motive to confess a crime committed by her husband with her knowledge and participation; and (iii) did not have the power to overcome the orders of Terzakis and Estupinian because she was under their control as their subordinate.

**3. Continental Offers No Evidence to Refute the Admissions from the Criminals That They Stole the Money During the Period of the 2004 Vesta Policy**.

Exhibit 2 to Ye's declaration is his own documented reconciliation of the transfers of Exchange Funds to and from Terzakis starting March 2, 2004 and ending October 5, 2007. The transfers to Terzakis were thefts which Ye admits he performed - thefts for which Ye and Terzakis are going to prison. Ye stated in his declaration that Exhibit 2 was to the best of his recollection accurate. (Dkt. 77, page 4 of 9). Ye testified at his deposition that Exhibit 2 was accurate. Continental cites to ambiguous testimony it knows misstates Ye's admissions made against his own self-interest. Continental is contending that the thefts did not occur. Ye's testimony is quoted in full below:

**Testimony of Peter Ye**

**Question by Bower**. I just asked you about certain transactions that were not included in Exhibit Number 2. **Do you still believe that Exhibit Number 2 is an accurate reflection** of the accounting inflows and outflows of Exchange Funds to and from Terzakis except for a January 1, 2004 transfer?

**Answer by Ye**. Yes, it is.

**Q.** But it doesn't include all of the transfers, does it?

**A.** Correct. It is **inaccurate** for the period for March 2, 2004, I guess, until 10/4/2007.

(EKB000505. Ye Depo, p. 68:10-29) (Emphasis added.)

Dillon submits Ye's second supplemental declaration which explains, again, that Exhibit 2 is accurate for the period of March 2, 2004 to October 4, 2007. Exhibit 2 is "incomplete" because it excludes transfers prior to March 2, 2004, and transfers after October 4, 2007. Exhibit 2 is not inaccurate as to the transfers it does cover. Exhibit 2 (attached hereto) does not list known transfers to Terzakis prior to March 2, because Ye did not start preparing Exhibit 2 until March 2, 2004, when told to do so by Estupinian (EKB000504, Ye Depo., 62:15-63:7). Exhibit 2 did not list transfers after October 4, 2007, because those transfers were contained on another document, which is Ye's deposition Exhibit 67 and which is also attached hereto. Ye testified that Exhibit 67 is a continuation of Exhibit 2 covering transfers to and from Terzakis from March 2, 2004 through May 28, 2008. (EKB000541-542, Ye Depo., p. 213:20 - 215:9.)

Continental contends that Vesta has no theft claim under the 2004 Vesta Policy because some of the money may have consisted of Exchange Funds deposited by IAG 1031 Exchangers. Continental contends Exhibit 2 and Exhibit 67 are of no evidentiary value because they do not identify the "source of the funds" being transferred to Terzakis even though the criminals admit the source was Exchange Funds, and there is no evidence to the contrary. In Ye's supplemental declaration (Dkt. 96), Dillon attached Ye's own directives to Borel Private Bank & Trust ("Borel Bank"), which now identifies the source of the funds. Ye and Terzakis (as well as Dillon's counsel) made no distinction between IAG 1031 Exchanger Exchange Funds and Vesta

Exchanger Exchange Funds because it was Ye and Terzakis at Vesta who were stealing the money; IAG 1031 was no longer in business.

Ye's emails to Borel Bank and the Borel Bank records reflect that Continental's contention was in part true. Some of the $9.3 million transferred to Terzakis by Ye, as an employee of Vesta, consisted of IAG 1031 Exchanger Exchange Funds. Out of the $9.3 million, Dillon concedes that the following funds belonged to the following IAG 1031 Exchangers:

| **Sub-Acct. #** | **Exchange #** | **IAG Exchanger Name** | **Amount** |
|---|---|---|---|
| 31699016 | 5624 | NAI-IPC Holdings | $260,073 |
| 31648616 | 5613 | Grutchfield | $177,048 |
| 31619216 | 5596 | Lake Plaza, LLC | $1,950,000 |
| 31653216 | 5617 | Walker | $614,000 |
| | | **TOTAL:** | **$3,001,121** |

However, Dillon's concession provides no legal relief to Continental. The 2004 Vesta Policy covers the theft of Exchange Funds by the owners of Vesta, as long as Vesta is "involved" in the IRC § 1031 Exchange transaction when the funds are stolen out of a financial institution. There is no requirement imposed by Continental in the Policy that Vesta had to be the original contracting qualified intermediary ("QI"). Vesta could perform physical and financial tasks for other contracting QIs and still have insurance coverage. There is also no requirement in the 2004 Vesta Policy that the Exchange Funds had to be deposited at a financial institution in the name of Vesta. Vesta only had to be "involved" in the transaction, and the owners of Vesta had to steal the funds out of a financial institution. Vesta was "involved" in the transaction, because it was completing the existing Exchanges entered into by clients of IAG 1031. Continental's new claim that the Exchange Funds stolen by Terzakis had to be Vesta Exchanger Exchange Funds is another bad faith effort to fabricate a defense.

Assume Vesta takes over the job of completing existing IAG 1031 Exchanges. Assume the theft of Grutchfield's Exchange Funds of $177,048 on January 21, 2004, as being part of the

source of the $500,000 transfer to Terzakis. Then assume the Ponzi scheme stops. Grutchfield's Exchange with IAG 1031 fails because the money is missing and Vesta, the "involved" QI, submits a claim to Continental for the $177,048 theft by Terzakis. There would be no defense to coverage for Continental.

The owners of Vesta stole Grutchfield's $177,048. Vesta is responsible because Ye of Vesta, transferred Grutchfield's money to Terzakis. IAG 1031 would be contractually liable, but Vesta would also be liable because it was the operating QI whose employee initiated the January 25, 2004 transfer to Terzakis. Vesta has coverage because it was "involved" in the IRC § 1031 Exchange transaction.

The fact that Grutchfield's Exchange closed, as well as the other IAG 1031 Exchanges listed above, with money stolen from later depositing Vesta Exchangers, is not a legally cognizable defense. In fact, stealing Vesta Exchange Funds to close IAG 1031 Exchanges is an additional theft covered under the policy.

**Testimony by Terzakis**

> **Question by Brace:** So the extent there was a deficit in the IAG 1031 LLC trust account, that deficit was made up by exchangers who were depositing their exchange funds with Vesta; is that right?
>
> **Answer by Terzakis:** Correct.

(EK000414, Terzakis Depo., p.345:8-12)

### 4. Continental's Strawman Has Not Been Identified and Dillon Laid a Foundation for the 2004 Exchange Agreements.

Continental must identify an innocent person at Vesta with knowledge of the thefts, and the power and motive to make a claim. Dillon appreciates that Susan Woo and Kristine Carlos (a/k/a/ Kristine Cangco) would have gone to the police if they had proof of any illegal activity taking place at Vesta. The moral strength of these two employees is not questioned, but they had no knowledge, no duty to acquire the knowledge, and no further duty to make a claim.

Ye believes he destroyed the Vesta Exchange Agreements used in 2004 as old documents. (Dkt. 96, page 5 of 11, IP 13). See also Exhibit 3 attached hereto. Ye testified, however, that the Exchange Agreements used from 2000 through 2008 were basically the same form Exchange Agreements.

**Testimony of Peter Ye**

> **Question by Brace**. Did they [the Vesta Exchange Agreements] change dramatically as far as you were aware?
>
> **Answer by Ye**. No.
>
> **Q.** And did it always have the language that it was going to be held in a trust?
>
> **A.** Yes.
>
> **Q.** And it always had the language that the Exchange Funds were supposed to be deposited in a financial institution?
>
> **A.** Yes.
>
> **Q.** So as far as you're aware, being Peter Ye, working there throughout the iterations of the QI, that you used basically the same Exchange Agreement which stated that the Exchange estate was the Exchange Funds and they were to be deposited in a qualified exchange trust; is that correct?
>
> **A.** Correct.

(EKB000528-529, Ye Depo., p. 161:8-163:17.)

To corroborate Ye's testimony, compare the March 28, 2002 Exchange Agreement used by Investment Advantage Group which was produced to Dillon by Continental (Dkt. 75-9, pages 20 to 37 of 30) with the Vesta and Excalibur Exchange Agreements used in February and April of 2008 (Dkt. 76-3 and 76-4). They are all nearly identical except for the identity of the contracting QI. They all create a Qualified Exchange Trust, require the deposit of Exchange Funds in a financial institution and mandate that the Exchange Estate created for each

Exchanger be used to purchase the Exchanger's replacement property or be returned. Regrettably for Continental, none of them allow for owner theft of Exchange Funds.

**5. No Persons Other Than Terzakis and Estupinian Had the Authority to Prosecute a Claim for Vesta Against Continental.**

There is no dispute in the evidence on which to have a trial. Ginny Estupinian worked for Terzakis, was the girlfriend and then wife of Robert Estupinian, and knew about the thefts. She was not innocent, and had no authority to disregard the directives of either Terzakis or Estupinian. Continental **knew in 2003** that Terzakis and Estupinian would not prosecute a theft claim because a theft claim was made to Continental by Anthony Leuin and Jean Bertrand when Terzakis stole their money. The claim was closed by Continental, "with prejudice," because neither Terzakis or Estupinian would prosecute the claim (Dkt. 75-10, page 2 of 2).

Terzakis and Estupinian would not prosecute the theft claims because to do so they had to file a police report and give Continental a "detailed description of how the money or property was taken." (Dkt. 75-8, page 3 of 3.)

But for equitable tolling with proof of adverse domination, Continental would never have to pay on its insurance coverage for owner theft of Exchange Funds. Continental knew the thieving owners would not implicate themselves by seeking reimbursement from Continental. Continental knew that as long as the real estate market remained "hot," thieving owners would operate a Ponzi scheme by settling old claims with new money (Dkt. 92-5, page 5 of 6). Continental knew specifically that Terzakis and Estupinian would never submit a claim, but would settle their disputes with victimized Exchangers.

Continental knew in 2003 that Terzakis stole Exchange Funds from Leuin and Bertrand but refused to prove up a theft claim. A year earlier, in 2002, Continental knew that Terzakis and Estupinian stole $4.3 million from Portola Investments ("Portola"), another Exchanger doing business with Investment Advantage Group. Portola made a claim to Continental which it denied – "Denial Base on Defalcation." Continental's employee Michael Leest talked to Estupinian about the theft and was assured by Estupinian that IAG would not seek any

contribution from Continental. The denial letter, attached hereto as Ex. 4, is quoted in part below:

**Leest of Continental Talking to Estupinian in 2002 About Portola:**

> ". . . it was made clear based on our conversation of today that IAG did not wish to the Company to get involved with the [Portola] Claim nor was IAG seeking any contribution under the Policy for the above referenced matter. It's further understood that IAG was prepared to enter into a settlement agreement with the plaintiff today . . ."

Why would Investment Advantage Group waive its rights to coverage for owner theft of Portola's Exchange Funds after Portola sued Investment Advantage Group, Terzakis and Estupinian for conversion? Because Terzakis and Estupinian adversely dominated the QI and to seek coverage would implicate them in the theft. The same holds true at Vesta, and Continental knew it when it issued the 2004 Policy to Vesta. Ironically, payments to Portola with Vesta Exchange Funds is now part of Dillon's theft claim against Continental. (Dkt. 96-8, page 4 of 4.)

Enforcement of the Policy by the Receiver for Vesta will not violate public policy; the opposite is true. The failure of the Court to enforce the Policy would promote an insurance scam committed by Continental. Continental's market was small QIs operated as closely-held corporation or LLCs. The risk assumed was owner theft. An owner who steals will not make a claim. An owner who steals will conceal the theft from his or her employees. Once a deficit in the trust account is created by the theft, the scheme will collapse unless new money is used to close older Exchanges. Continental's reliance on the temporary success of IRC §1031 Ponzi schemes to defeat its knowing contractual obligations should not be countenanced by the Court.

///

///

///

## II.

## CONCLUSION

A trial is not needed. The Court has the facts. The operative facts are not in dispute. Continental insured Vesta for owner theft of Exchange Funds. The criminals have testified they stole the money during the period of the 2004 Vesta Policy. The owners of Vesta did not make a claim, because to do so would reveal their thefts. The criminals controlled Vesta, so Vesta could not make a claim until Dillon was appointed as Receiver. Judgment in favor of the Receiver should be entered.

DATED: October 16, 2012

Respectfully submitted,

By: /s/ Robert L. Brace

Robert L. Brace, Esq., SBN. 122240
Michael P. Denver, Esq., SBN 199279
Peter L. Candy, Esq., SBN. 149976
**HOLLISTER & BRACE**
P.O. Box 630
Santa Barbara, CA 93102

Attorneys for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group LLC