Troutman Sanders LLP
Ryan C. Tuley (Cal. Bar No. 198249)
ryan.tuley@troutmansanders.com
5 Park Plaza, Suite 1400
Irvine, CA 92614-2545
Telephone: (949) 622-2700
Facsimile: (949) 622-2739

Troutman Sanders LLP
Eileen King Bower, *Pro Hac Vice*
eileen.bower@troutmansanders.com
Brian P. Cummings, *Pro Hac Vice*
brian.cummings@troutmansanders.com
55 West Monroe, Suite 3000
Chicago, IL 60603
Telephone: (312) 759-1920
Facsimile: (312) 759-1939

*Attorneys for Defendant Continental Casualty Company*

Troutman Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92614-2545

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC,

Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY, an Illinois corporation,

Defendant.

Case No. C 10-05238 LHK

**DEFENDANT CONTINENTAL CASUALTY COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Date: February 14, 2013
Time: 1:30 p.m.
Ctrm: 8, 4th Floor

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. LEGAL STANDARD ..... 2

III. PLAINTIFF'S OPPOSITION IS ENTIRELY DEVOID OF ADMISSIBLE EVIDENCE OR COHERENT ARGUMENTS ..... 2

A. The Original Deposition Transcripts for the Depositions Purportedly Attached As Exhibits 1 and 2 to Brace's Supplement Declaration Contain No Reference to Vesta ..... 3

1. The Deposition Testimony of Christopher Barr ..... 4

2. The Deposition Testimony of Adam McDonough ..... 8

B. The Supplemental Declarations Are Sham Affidavits ..... 9

C. Continental Does Not Condone Terzakis' Behavior or Crimes ..... 13

IV. PLAINTIFF'S OTHER ARGUMENTS RELATING TO VESTA AND EXCALIBUR HAVE NO MERIT ..... 14

V. CONCLUSION ..... 15


TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACL Technologies, Inc. v. Northbrook Prop. & Cas. Ins. Co.*,
17 Cal. App. 4th 1773 (1993) .................... 3

*Bank of the West v. Sup. Ct.*,
2 Cal. 4th 1254 (1992) .................... 3

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................... 2

*Combs v. Rockwell Int'l Corp.*,
927 F.2d 486 (9th Cir. 1991) .................... 1

*Groupion, LLC v. Groupon, Inc.*,
No. C 11-00870 JSW, 2012 U.S. Dist. LEXIS 65772 (N.D. Cal. May 8, 2012) .................... 2

*M.M. v. Lafayette Sch. Dist.*,
Nos. CV 09-4624 & 10-04223 SI, 2012 U.S. Dist. LEXIS 15631 (N.D. Cal. Feb. 9, 2012) .................... 2

*Yeager v. Bowlin*,
2012 U.S. App. LEXIS 18970 (9th Cir. Sept. 10, 2012) .................... 9, 12

**STATUTES**

Cal. Civ. Code §§ 1638-1639 .................... 3

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Defendant Continental Casualty Company ("Continental") submits the following Reply in support of its Motion for Summary Judgment in connection with the complaint of Plaintiff Thomas Dillon, as Receiver for Vesta Strategies, LLC ("Vesta") and Excalibur 1031 Group, LLC ("Excalibur").

## I. INTRODUCTION

If Plaintiff's claims had merit, proving them would be a far less complicated task than he has made it. Instead of simply responding to the arguments set forth in Continental Casualty Company's Motion for Summary Judgment (the "Continental Motion") or attempting to refute the undisputed facts contained therein with a brief that conforms with Federal and Local Rules of Civil Procedure, Plaintiff submitted two separate briefs in Opposition to the single Continental Motion (collectively, "Plaintiff's Opposition"). Plaintiff's Opposition briefs, which together exceed the page limit allowed, are filled with misleading and inadmissible evidence, including sham affidavits supported, in part, by documents that Plaintiff fails to show have been produced to Continental in this case. Even more disturbing is Plaintiff's inclusion of two deposition transcripts attached to the Supplemental Declaration of Robert L. Brace (counsel for Plaintiff) ("RLB Supp. Dec.") which were not taken in this case and made no mention of the Vesta policy at issue. As explained below, a comparison of the deposition transcripts attached to RLB Supp. Dec. as Exhibits 1 and 2 with the certified copies obtained by Continental (attached hereto as Exhibits 1 and 2 to the Supplemental Declaration of Eileen King Bower ("EKB Supp. Dec.")) reveals that the transcripts attached to Attorney Brace's declaration appear to have been doctored to add references to "Vesta" that do not appear in the original transcripts. The only purpose Plaintiff could have in submitting such altered transcripts would be to mislead the Court into believing that those two witnesses testified about the Vesta policy at issue when clearly they had not. If the Court determines that these transcripts were doctored, Continental requests that the Court consider issuing the appropriate sanctions against Plaintiff, a court-appointed receiver, and his counsel.[1] When the altered evidence, misleading statements, and sham declarations are

[1] The Court clearly has discretion to issue a range of sanctions, including dismissal of Plaintiff's complaint with prejudice. *Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 489 (9th Cir.

removed from Plaintiff's Opposition papers, very little remains. As discussed below, any remaining arguments are clearly refuted by the evidence that is actually before this Court and the applicable law discussed in Continental's Motion and Continental's Opposition to Plaintiff's Motion for Summary Judgment on the 2004 Vesta Policy. Continental therefore respectfully requests that its motion for summary judgment be granted.

## II. LEGAL STANDARD

In order to meet his burden, Plaintiff, as "the non-moving party[,] must 'identify with reasonable particularity the evidence that precludes summary judgment.'" *Groupion, LLC v. Groupon, Inc.*, No. C 11-00870 JSW, 2012 U.S. Dist. LEXIS 65772, at *4 (N.D. Cal. May 8, 2012) (internal citation omitted). The non-moving party "must take care adequately to point a court to the evidence precluding summary judgment because a court is 'not required to comb the record to find some reason to deny a motion for summary judgment.'" *Id.* (internal citation omitted). Indeed, "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *M.M. v. Lafayette Sch. Dist.*, Nos. CV 09-4624 & 10-04223 SI, 2012 U.S. Dist. LEXIS 15631, at *15 (N.D. Cal. Feb. 9, 2012). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Groupion*, 2012 U.S. Dist. LEXIS 65772, at *5. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). As Plaintiff has failed to demonstrate that any facts material to resolving the legal arguments at issue are in dispute, summary judgment must be granted in Continental's favor.

## III. PLAINTIFF'S OPPOSITION IS ENTIRELY DEVOID OF ADMISSIBLE EVIDENCE OR COHERENT ARGUMENTS

Plaintiff, faced with having neither law nor facts on his side, has filed an opposition riddled with blatant mischaracterizations, unauthenticated exhibits, and sham affidavits. As set

---

1991) (affirming dismissal of an action, pursuant to Rule 11 and the court's inherent powers, where the plaintiff, after permitting his lawyer to materially alter the plaintiff's deposition transcript, swore under penalty of perjury that he had reviewed the transcript and made the corrections personally). At a minimum, Continental requests that Plaintiff be ordered to pay costs it has incurred in obtaining certified copies of the deposition transcripts attached as Exhibits 1 and 2 to the Bower Supp. Dec.

forth below, Plaintiff has failed to offer any credible, admissible evidence to meet his burden of proof in this case.

Instead, Plaintiff relies upon irrelevant and inadmissible extrinsic evidence of the meaning of Continental policies at issue in this case. It is axiomatic that extrinsic evidence cannot be used to interpret an insurance policy that is clear and explicit. *Bank of the West v. Sup. Ct.*, 2 Cal. 4th 1254, 1264 (1992); see also Cal. Civ. Code §§ 1638-1639. In other words, where a policy is clear and explicit, its terms govern. *Bank of the West*, 2 Cal. 4th at 1264. *See also ACL Technologies, Inc. v. Northbrook Prop. & Cas. Ins. Co.,* 17 Cal. App. 4th 1773, 1790–91 (1993) ("the drafting history argument is inconsistent with the rules of insurance contract interpretation"—there needs to be a "showing of ambiguity before extrinsic evidence may be admitted"). Plaintiff has made no showing (or even attempted to show) that a material term in the Continental policies is ambiguous. Thus, the Court must look to the plain meaning of the contract terms themselves.

### A. <u>The Original Deposition Transcripts for the Depositions Purportedly Attached As Exhibits 1 and 2 to Brace's Supplement Declaration Contain No Reference to Vesta</u>

Plaintiff makes an ill-fated attempt to refute Continental's argument that public policy prohibits recovery in this case by relying on deposition testimony attached to Brace's Supplemental Declaration. Specifically, Plaintiff argues that the testimony of two individuals, Christopher Barr and Adam McDonough, shows that Continental intended to provide insurance coverage for thefts by the 100% owners of the insured. Even if Plaintiff offered credible evidence to support such a claim, and he does not, this Court could not enforce the insurance contracts as Plaintiff suggests, as such a construction would violate public policy. (*See, e.g.,* Continental Mot., at 12-14.) Notably, however, the transcripts attached as RLB Supp. Dec, Exs 1 and 2 do not support his claim because neither witness was deposed in this case, neither testified about the Vesta policy at issue, and the transcripts appear to have been altered to include references to Vesta that were never included in the original transcripts.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

### 1. The Deposition Testimony of Christopher Barr

Plaintiff's counsel, Mr. Brace, filed a supplemental declaration with this Court to which he attached, as Exhibit 1, purported excerpts from the deposition of Christopher Barr. (Dkt. No. 92.) Barr, an underwriter at United States Fire Insurance Company ("U.S. Fire") (not a party to this case), was apparently questioned in an entirely different proceeding regarding a U.S. Fire policy issued to an entity in a case involving Southwest Exchange. Notably, RLB Supp. Dec. does not attach a copy of the U.S. Fire policy, nor does Plaintiff's Opposition attempt to explain how Barr's testimony would apply to any policy at issue in this case. Instead, Brace distorts the deposition to create the false impression that the U.S. Fire and Vesta insurance policies are interchangeable. This is perhaps most clearly demonstrated by the fact that the supposedly authentic deposition transcript cover page attached as Exhibit 1 to RLB Supp. Dec. has been altered on its face. As filed with this Court, the cover page of Exhibit 1 to RLB Supp. Dec. has a notation stating that U.S. Fire "(Issued Policy to Vesta Similar to Continental's)." This parenthetical is in an all-caps typeface that is identical to the other text on the page. As it seamlessly blends in with the original text, the notation appears authentic, thus adding credence to the notion that the deposition was in some way related to Vesta. However, an examination of the certified copy of the deposition transcript, which Continental was forced to order at its own expense, demonstrates that this impression is utterly false. (*See* EKB Supp. Dec. Exs. 1-2.) The reference to Vesta, included without explanation in Brace Supp. Dec. Ex. 1, simply does not exist in the certified transcript. The only explanation for such a tactic is that Plaintiff intended to mislead the Court into believing that the Barr deposition was actually taken in connection with the Vesta policy. Attorney Brace, who participated in the Barr deposition, clearly knows this impression is false. (RLB Supp. Dec. ¶ 2.)

Because it is clear that the deposition title page attached as Exhibit 1 to RLB Supp. Dec. is not genuine, there is no assurance that the remaining portions of the transcript attached are accurate. Moreover, Plaintiff cites to a disingenuous version of Barr's testimony as if it were an accurate portrayal. Under penalty of perjury, Attorney Brace attests that "[t]he questions posed and answers given below are accurate transcriptions" of the Barr deposition. (RLB Supp. Dec. ¶

2.) Yet he then proceeds to provide, in both his declaration and Plaintiff's Opposition, a retyped excerpt of testimony in which he substitutes, without explanation, the name "Vesta" for that of the actual insured that was being discussed during the deposition, Southwest Exchange. (RLB Supp. Dec. ¶ 2; Pl.'s Opp., at 6-7.) In so doing, Attorney Brace attempts to create the false impression that the cited deposition testimony actually pertained to Vesta when, in fact, Vesta had nothing to do with that action and was never mentioned in the actual deposition of Barr. Perhaps even more egregious, however, is that the excerpt is far from an "accurate transcription" of Barr's testimony. Indeed, Brace uses brackets and ellipses where convenient, thus attempting to create the illusion that any omission or modifications to the text have been documented in accordance with the rules of The Bluebook. However, a side-by-side comparison between the retyped excerpt and the transcript at RLB Supp. Dec., Ex. 1 demonstrates that Brace has omitted, without brackets, ellipses, or explanation, significant passages from Barr's testimony; passages that explicitly undermine the very points that Brace attempts to use Barr's deposition to make:

| **Transcript as Cited in RLB Supp. Dec. ¶ 2 and Pl.'s Opp., at 6-7** | **Transcript Attached as RLB Supp. Dec. Ex. 1** |
|---|---|
| **Question by Brace:** Well, tell me your understanding of how [the surety subrogation clause] would work if the owner steals some client funds.<br><br>**Answer by Barr:** If a loss occurs that is covered . . . we would have the right, which we under many circumstances would not have, to seek recovery against our own insured.<br><br>**Q.** So if [the owners of Vesta] steal $100,000, and you have to pay $100,000, you get to go after [Vesta] for the $100,000?<br><br>**A.** If they had $100,000, we have the right to try and get it.<br><br>**Q.** But that would not include going after trust assets of [Vesta], which are the assets of the other depositors, isn't that right? | **Question by Brace:** Well, tell me your understanding of how paragraph 3 would work if the owner steals some client funds.<br><br>**Answer by Barr:** If a loss occurs that is covered because of the action of two, that is the deletion of the exclusion, is covered under the policy, we would have the right, which we under many circumstances would not have, to seek recovery against our own insured.<br><br>**Q**. So if Southwest steals $100,000, and you have to pay $100,000, you get to go after Southwest for the $100,000?<br><br>**A.** If they had $100,000, we have the right to go and try and get it.<br><br>**Q**. But that would not include going after trust assets of Southwest Exchange, which are the assets of the other depositors; isn't that right? |



TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

| | |
|---|---|
| **A.** That's true. This is an indemnity policy, and any payment by us under the policy would immediately flow to a Category C property [client funds], and we would not be able to attach that to recover the loss that we had paid to create the balance in that bank account. So, yes, that would be outside of our reach. | **A**. That's true. This is an indemnity policy, and any payment by us under the policy would immediately flow to a Category C property, and we would not be able to attach that to recover the loss that we had paid to create the balance in that bank account. So, yes, that would be outside of our reach. |
| **Q.** A clear distinction in your mind between [Vesta's] property and the clients of [Vesta's] property? | **Q**. A clear distinction in your mind between Southwest Exchange's property and the clients of Southwest's property? |
| **A.** . . . what it is attempting to do is to create that distinction . . . What we are trying to do here is establish a clear distinction, whatever the tax legalities of the situation are, that this property has to be ring fenced and treated like client property, whatever the legal niceties say. And we will also abide by that when it comes to applying the exclusion and when it comes to recoveries. | **A**. ***Well, what this endorsement is attempting to do, and I'm not going to characterize it as either being very well done or not, but*** what it is attempting to do is to create that distinction. ***Because in the ordinary course of business for a qualified intermediary, the funds, once they flow into the custody of the qualified intermediary, are, more or less, his or hers to do what they want to with. I think Nevada may be an exception. But that's generally the case.*** What we are trying to do here is establish a clear distinction, whatever the tax legalities of the situation are, that this property has to be ring fenced and treated like client property, whatever the legal niceties say. And we will also abide by that when it comes to applying the exclusion and when it comes to recoveries. |
| **Q.** So [the owners of Vesta] steals $100,000, and [Vesta] makes a claim under the policy. Your check from U.S. Fire goes into the [Vesta] general account or goes directly to the client or goes where? | **Q**. Okay. So Southwest Exchange steals $100,000, and makes a claim under the policy. Your check from U.S. Fire goes into the Southwest Exchange general account or goes directly to the client or goes where? |
| **A.** There are obviously some steps that have to be taken to make sure that we're not essentially paying the loss to the guy who stole the money in the first place. | **A**. ***That's a hypothetical I cannot answer. At that point there are a lot of facts that come into play. When you say Southwest commits the act, who? Does it survive the commission of the act? Is it in receivership?*** There are obviously some steps that have to be taken to make sure that we're not essentially paying the loss to the guy who stole the money in the first place. |
| **Q**. . . And so the goal of U.S. Fire would not be to pay the thieving party? | **Q**. Right. And so the goal of U.S. Fire would not be to pay the thieving party? |
| **A.** Exactly. | **A**. Exactly. ***But on the other hand, for example – and this comes into play with law firms, for example. If one partner commits the theft, that…*** |



TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

(*Compare* RLB Supp. Dec. ¶ 2 and Pl.'s Opp., at 6-7, ***with*** RLB Supp. Dec. Ex. 1, at 163:11-165:23 [emphasis added].)

The last omission is particularly worthy of highlighting. There, Mr. Brace abruptly ends his quotation as if Barr merely answers "[e]xactly," ostensibly agreeing wholeheartedly with the question asked. However, as RLB Supp. Dec. Ex. 1 demonstrates, Barr's answer by no means ended there. Indeed, Barr continued to state: "[b]ut on the other hand, for example – and this comes into play with law firms, for example. If one partner commits the theft, that [. . .]" And at this point, mid-answer, the Exhibit abruptly ends. Not only did Brace omit this text from his quote, he did not provide the remainder of Barr's answer in RLB Supp. Dec. Ex. 1; an answer which, if included in its entirety, appears to address and undermine Plaintiff's argument that "[d]enying coverage for owner theft because the owners controlled the small LLC would make the insurance illusory." (Pl.'s Opp., at 9.) Although RLB Supp. Dec. Ex. 1 is incomplete, Barr was seemingly in the process of outlining the precise situation in which coverage would be found under the policy at issue, thus demonstrating how such insurance is not illusory. In fact, the certified copy of the transcript confirms that this was indeed what Barr was explaining. His complete answer was as follows:

> **Q**. Right. And so the goal of U.S. Fire would not be to pay the thieving party?
>
> **A**. Exactly. But on the other hand, for example – and this comes into play with law firms, for example. If one partner commits the theft, ***<u>that does not preclude other partners from recovering the proceeds.</u>***
>
> **Q**. If one partner was to steal out of the trust fund and the other partners made it up, you'd still have coverage under the policy?
>
> **A**. ***<u>That the other innocent partners would still have coverage under the policy</u>***.

(*See* EKB Supp. Dec. Ex. 1 at 165:21-166:7) (emphasis added). Here, the Vesta policy did not provide "illusory" coverage because the exclusion for theft by owners was removed from the policy. Rather, the policy could provide coverage for a claim involving owner theft in a situation where innocent owners were not involved in the theft. As he has done before, Plaintiff once again handpicks those facts that benefit his position and manipulates or disregards the rest.

Troutman Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92614-2545

**2. The Deposition Testimony of Adam McDonough**

Perhaps even more offensive is Plaintiff's use of the deposition testimony of Adam McDonough. (RLB Supp. Dec. Ex. 2.) As with Barr, Attorney Brace presents portions of a supposedly genuine transcript from a deposition taken in connection with a different case. Once again, this unauthenticated copy includes a cover page that contains additional text not included in the certified copy of the transcript. And once again, this addition to the transcript is masqueraded as original content by being placed directly underneath the deponent's name, in an identical font and type size, this time not even offset by parentheses. (*See* RLB Supp. Dec. Ex. 2) (adding to the cover page, after the name of the deponent, Adam McDonough, the phrase "of Lockton Insurance Brokers Co-Drafter of Tax-Deferred Exchange Endorsements in 2004 Vesta Policy"). Accordingly, the deposition cover page at RLB Supp. Dec. Ex. 2 disingenuously alludes to a relationship with Vesta that was not actually at issue during the deposition cited. Nonetheless, the deposition attached as RLB Supp. Dec. Ex. 2 simply does not pertain to the Vesta policy at issue.

Beyond the glaring offense of offering what appears to be a doctored exhibit, Plaintiff goes even further by wholly misrepresenting the content of McDonough's testimony. To begin, Plaintiff transcribes a portion of the McDonough testimony but omits, without reference or ellipses, a question and answer related to intentional acts. (*Compare* Pl.'s Opp., at 7, *with* RLB Supp. Dec. Ex. 2, at 163:2-13). Additionally, without the use of brackets to demonstrate a change, Plaintiff replaces the name CNA, as used in the deposition, with "Continental," the specific party to this action, seemingly to give a stronger appearance that the deposition of McDonough related to this matter. (*Id.*)[2] Beyond omitting a few lines from his transcription of the testimony, Plaintiff even goes so far as to disingenuously portray the deposition transcript as if it directly discussed Vesta and the Vesta Policy at issue. Despite the fact that the testimony

[2] Plaintiff states that Lockton "sold the subject policy to Vesta." (Pl.'s Opp., at 7.) Besides the fact that this is an inaccurate depiction of the broker-insured relationship, it was actually Willis Insurance Services, and not Lockton, who had a hand in procuring the Vesta Policy. (Willis was the broker for the policy when the insured was IAG 1031. Making Vesta the insured on that policy was considered a name change.) (*See, e.g.*, Dkt. No. 1-1, at 54-57.)



TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

does no such thing and that McDonough does not once reference Vesta or the Vesta Policy, Plaintiff expressly states:

> As set out in the deposition testimony of McDonough, he drafted the QI endorsements to provide coverage for owner theft of client Exchange Funds so that small insured QIs could compete with large title insurers. The coverage was intended by Continental to be sold to QIs operated as small closely-held corporations or limited liability companies. Denying coverage for owner theft because the owners controlled the small LLC would make the insurance illusory. ***McDonough's testimony regarding Vesta being the intended insured and owner theft the assumed risk is provided in the Supplemental Declaration of Robert L. Brace as Exhibit 2. McDonough's testimony on the expanded scope of the risk assumed by Continental is also set out in Exhibit 2.***

(Pl.'s Opp., at 9) (emphasis added). Plaintiff's statements can only be read as an attempt to mislead the Court in to believing that McDonough's deposition was taken in this action or in connection to the Vesta policy. (*See also* RLB Supp. Dec. ¶ 3) ("According to McDonough, Vesta, as an LLC, was the intended market and owner theft was the assumed risk.") That, however, is simply not the case.

### B. The Supplemental Declarations Are Sham Affidavits

Plaintiff has repeatedly asserted that Terzakis embezzled $9.3 million of Vesta exchanger funds during the 2004 Vesta Policy period, but he lacks any admissible evidence demonstrating that Vesta exchangers actually deposited any monies with Vesta during that time frame or that monies allegedly transferred to Terzakis originated from accounts holding Vesta exchange funds. (*See, e.g.,* Continental Mot., at 14-15.) (*See also* Continental Opp. to Pl.'s Mot. Summ. J., at 7-10.) In a desperate attempt to create a factual issue where none exists, Plaintiff relies on new "supplemental" declarations of Ye and Terzakis, as well as the declaration of a new witness, William Carling, to piece together a story that is simply not credible. In fact, the "supplemental" declarations of Ye and Terzakis directly contradict both their prior declarations and deposition testimony and are purportedly based on ill-described and questionable bank records. These new declarations are classic "sham affidavits" that should be stricken. *See, e.g., Yeager v. Bowlin,*

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

2012 U.S. App. LEXIS 18970, at *6-7 (9th Cir. Sept. 10, 2012) (noting that **"**a district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember.").

Most notably, in his deposition just a few months ago, Ye could not account for the source of the funds he allegedly wired to Terzakis in 2004. Nonetheless, a grand *deus ex machina* occurred after Ye was "informed by counsel to the Receiver for Vesta that Continental has raised an issue that some portion of the $9,360,000 transferred to Terzakis by me as an employee of Vesta may have included Exchange Funds deposited by IAG 1031 Exchangers prior to January 9, 2004." (Ye Supp. Dec. ¶ 8; *see also* Terzakis Supp. Dec. ¶ 4.) Suddenly, Ye has detailed insight and documentation to support Plaintiff's claims; insight and documentation that seemingly did not exist in the years preceding the Continental Motion, or during the three full days of Ye's deposition.

Ye now states that he can establish "with business records and bank documents, that $8,860,000 out of the $9,360,000 in transfers came from funds deposited after Vesta took over as the QI on January 9, 2004," Ye Supp. Dec. ¶ 8, yet during his July deposition he explicitly testified that he was not aware of any documentation that would reflect the source of funds he allegedly wired. Consequently, Ye testified that there is no way to know today the source of funds allegedly wired to Terzakis in 2004:

> [by Ms. Bower] Q: [. . .] So this document [Exhibit 2 to Ye's Declaration] does not reflect where the wires – where the money that you say was wired came from, does it?
>
> [By Mr. Ye] A.: Correct.
>
> Q. Is there any documentation that you maintain that would reflect the – the source of the funds you wired; in other words, where the wire originated from that you say is reflected on Exhibit 2?
>
> A. No.
>
> Q. So how do we know today where those monies came from?
>
> A. We don't.

(Ye Dep., at 65:8-20) (emphasis added). Moreover, Ye now states in his supplemental declaration that he "knew at all times the location of the Exchange Funds, including the amounts on deposit at

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

the banks and the amounts transferred to Terzakis," Ye Supp. Dec. ¶ 33, and that he previously "made no distinction between Exchange Funds deposited by IAG 1031 Exchangers versus Vesta Exchangers because when [he] made the transfers [he] was employed at Vesta, and IAG 1031 was no longer operating." (*Id.* at ¶ 7.) These statements paint a picture in which the distinction between Vesta and IAG funds could have been made if Ye so chose. Remarkably, however, during Ye's deposition he expressly acknowledged that in the early days of Vesta, in 2004, there would be no way to tell if monies in a pooled account were monies from IAG 1031 or Vesta exchangers. (*Id.* at 61:13-23.) Ye admitted that:

> Q. So as you sit here today, do you know if monies that you say were wired from Borel Bank accounts were monies that were from IAG 1031 exchangers or from Vesta exchangers in 2004?
>
> A. I don't.
>
> Q. There's really no way to tell that, is there?
>
> [Objection]
>
> Q. Well, there's no way to tell that by looking at this document [Exhibit to the Ye Dec.], is there?
>
> A. That's correct.
>
> Q. Because the funds were swept into a pooled account, there really would be no way to tell if monies that were wired out of the pooled account originated from IAG 1031 exchangers or from Vesta exchangers in 2004?
>
> A. Correct.

(Ye Dep., at 70:5-24.)

Significantly, Ye does not (and cannot) explain how he has developed this new knowledge about Vesta funds or how he is suddenly able to delineate transfers of funds that just a few months prior were deemed inexorably comingled. Ye fails to demonstrate or even mention why this supposed proof was not referenced earlier. Indeed, there are many documents attached to Ye's supplemental affidavit with no reference to bates numbers or other identifying factors that would indicate whether the documents were ever even produced in discovery.[3]

[3] In this case, Plaintiff has repeatedly failed to produce documents to Continental in a timely or coherent fashion. *See, e.g.*, Continental's Motion for a Protective Order or, Alternatively, Sanctions, Dkt. No. 56, filed against Plaintiff on March 5, 2012 and discussing therein Plaintiff's history of failing to properly abide by the rules of discovery.

Many of Ye's new assertions supposedly demonstrating the source of the transferred funds are premised on nothing more than mere assumptions about account numbers. (*See, e.g.*, Ye. Supp. Dec. ¶ 12) Specifically, Ye appears to be basing his determination of whether funds were from IAG or Vesta on whether an account number is greater or smaller than that of "Carling's client Timothy Schafer" who "was a Vesta Exchanger with Exchange # 5653." (*Id*.) Conveniently, however, significant supporting documentation is missing as "all of the 2003 Exchange Agreements for IAG 1031 and the 2004 Exchange Agreements for Vesta were destroyed at [Ye's] direction as old documents." (*Id*.)

Moreover, many of the assertions contained in Ye's supplemental declaration are merely premised on general guesses. (*See, e.g.*, Supp. Ye. Dec. ¶ 18 ["Because Lake Plaza's Exchange Funds were sent to Terzakis and used to close other Exchanges, ***we most likely*** closed Lake Plaza's Exchange #5596 with Exchange Funds deposited by later depositing Vesta Exchangers."]; *Id*. at ¶ 23 ["Exchanges 5685, 5686 and 5693 were satisfied after the April 12, 2004 transfers to Terzakis with funds that ***came, most likely, from new Vesta Exchangers'*** deposits."]) (emphasis added). In addition, Ye actually admits that the exhibits he relies upon have mistakes and that "there may be other mistakes, but the document is otherwise accurate." *Id.* at ¶ 10. Such assertions demonstrate that Ye's supplemental declaration is clearly a sham and it should be striken. The supplemental declaration of John Terzakis, which wholly relies upon Ye's declaration, is likewise a sham. (*See* Terzakis Supp. Dec. ¶ 4.)

These supplemental sham affidavits, another piece in a long line of unauthenticated and misleading documents designed to create the delusion that Plaintiff's arguments are supported by proof, should be disregarded. *See, e.g., Yeager*, 2012 U.S. App. LEXIS 18970, at *8 (holding that the district court's invocation of the sham affidavit rule to disregard the declaration was not an abuse of discretion where "the district court found that 'the disparity between the affidavit and deposition is so extreme that the court must regard the differences between the two as contradictions.' . . . The district court could reasonably conclude that no juror would believe [plaintiff's] weak explanation for his sudden ability to remember the answers to important questions about the critical issues of his lawsuit.").

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

### C. Continental Does Not Condone Terzakis' Behavior or Crimes

Plaintiff further tries to distract from the real facts and issues in this case by claiming that Continental is somehow condoning Terzakis' acts. Plaintiff does this by mischaracterizing Continental's arguments and by disingenuously opposing a position that Continental has never once claimed. Specifically, Plaintiff spends a great deal of time arguing against Continental's supposed assertion that Terzakis did not commit "dishonest acts." (*See, e.g*., Pl.'s Opp., at 4 n.2) ("Continental then turns its argument 180 degrees, contending that Terzakis' thefts were not 'dishonest acts' because Terzakis did not know that taking Exchange Funds was illegal.").

Conspicuously absent from Plaintiff's discussion, however, is any citation to Continental's brief. The reason citations are missing is simple: no such citations exist. Plaintiff distorts Continental's arguments regarding covered loss and manifest intent, which are essential elements to establishing a covered loss (requiring that the offending employee manifest intent to cause the named insured (Vesta) to sustain a loss) and repackages it as if Continental were somehow arguing that there was no dishonest act at issue. To the contrary, Continental expressly acknowledged that "Plaintiff cannot recover under the Continental Policies without violating the public policy against insuring ***the willful wrongdoing*** of the insured." (Continental Mot., at 12) (emphasis added). What Continental actually *did* argue was that there was not a covered loss at issue; particularly, that if a dishonest act has the unintended effect of causing a loss, then the act is not covered by the policy. (*See* Continental Mot., at 17-19.) Plaintiff's discussions of "dishonest acts" and "ignorance of the law," Pl.'s Opp., at 18, are nothing more than red herrings designed to distract the Court from Continental's sound argument that Plaintiff failed to prove the alleged wrongdoers had the requisite manifest intent for there to be a covered loss.

Unquestionably, Continental does not endorse, condone or otherwise approve of Terzakis' conduct. Continental's arguments are based on the policy language at issue and the facts. Plaintiff is seeking coverage under first party insurance policies issued to Vesta and Excalibur. As such, he stands in the shoes of those entities and must show that those entities sustained a covered loss within the meaning of the policies. The facts show that Terzakis, Ye and Robert Estupinian made no effort to properly establish a QI business for Vesta in early 2004. No bank

Troutman Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92614-2545

accounts were established in Vesta's name until many months after the entity was created, and there are no Vesta exchanger contracts in existence to show that Vesta actually took in exchanger funds in 2004. The unsubstantiated statements contained in sham supplemental affidavits do not create question of material fact. Plaintiff simply has no evidence to support a covered claim. Having failed to come forward with any credible, admissible evidence, Plaintiff cannot meet his burden of proof and his claims against Continental fail as a matter of law.

## IV. PLAINTIFF'S OTHER ARGUMENTS RELATING TO VESTA AND EXCALIBUR HAVE NO MERIT

Plaintiff wrongly asserts that the grant of coverage in the policies only requires that the Qualified Intermediary have been "involved" in an Exchange. (*See, e.g.*, Pl.'s Opp. on Excalibur, at 2.) This, however, is an inaccurate interpretation of the policies at issue. All of the policies at issue, including those issued to Excalibur, provide coverage to the named insured for loss of covered property, resulting from a Covered Cause of Loss. Covered Cause of Loss is defined to mean dishonesty or theft by an employee with the manifest intent to cause loss to the named insured. (Continental Mot., at 3). Here, Plaintiff grossly mischaracterizes the language of the policies by claiming that he must merely show that Excalibur had some involvement to obtain coverage. Clearly, Plaintiff must show much more, including that Excalibur sustained a loss. Because no exchanger funds were received by Excalibur during the Continental policy periods, it follows that Excalibur, the named insured on the Excalibur Policies at issue, could not sustain a loss of monies that it never held. During the time that the Excalibur Policies were in effect, Excalibur was a marketing arm of Vesta and did not hold exchange funds as a qualified intermediary. (*See* Continental Mot. At 26-27.) Excalibur cannot, therefore, claim coverage under its policies for alleged losses of Vesta client exchange funds.

Finally, Plaintiff raises no question of fact with respect to adverse domination for Excalibur by throwing out the suggestion that Excalibur may have been dominated by Christian Benedetto. First, Benedetto did not own 50% of Excalibur. He held a 22.5% interest when it was formed. (Continental Mot., at 10). There is no evidence to support a finding that he alone "dominated" Excalibur such that it was impossible for non-wrongdoing employees to discover a

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

loss. Plaintiff appears to argue that Benedetto should have done more in October 2007 when the Hoist and Phillips exchanges did not fund on time. In fact, Christian Benedetto explicitly testified that the fidelity bond carrier on the risk at that time was put on notice of a claim. (*See, e.g.*, Deposition of Christian Benedetto, March 19, 2012, at 129:118-131:4.) According to Benedetto, exchanger Marty Phillips "actually contacted the insurance company. Marty asked the, the first day, you know, for the -- if the exchange failed to fund at 2:00 o'clock, Marty was on the phone later in the afternoon, speaking California time, talking to the insurance carrier." (*Id.* at 129:18-23.) Soon thereafter, the insurance company spoke with Excalibur employee Rich Vaill directly. (*Id.* at 131:2-4.) This completely undermines any notion that Benedetto adversely dominated Excalibur in such a way that it was impossible to discover and report a loss to the insurer, as it is clear that a loss was, in fact, reported.

## V. <u>CONCLUSION</u>

For the foregoing reasons, as well as the arguments and undisputed facts set forth in both Continental's Motion for Summary Judgment, filed on August 31, 2012, and Continental's Opposition to Plaintiff's Motion for Summary Judgment on the 2004 Vesta Policy, filed on October 9, 2012, Continental Casualty Company respectfully requests that this Honorable Court grant its Motion for Summary Judgment and enter an Order dismissing the Plaintiff's claims with prejudice.

Dated: October 16, 2012

Respectfully submitted,

TROUTMAN SANDERS LLP

BY: /s/ Eileen King Bower
Ryan C. Tuley
Eileen King Bower
Brian P. Cummings
*Attorneys for Defendant Continental Casualty Company*