UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC,<br><br>            Plaintiff,<br><br>    v.<br><br>CONTINENTAL CASUALTY COMPANY, an Illinois corporation,<br><br>            Defendant. | Case No.: 5:10-CV-05238-EJD<br><br>**ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT** |

Presently before the Court are Defendant Continental Casualty Company's ("Continental") and Plaintiff Thomas Dillon's, as Court-Appointed Receiver for Vesta Strategies, LLC ("Vesta") and Excalibur 1031 Group, LLC ("Excalibur") (collectively, "Dillon"), cross motions for summary judgment. Dkt. Nos. 75 ("Dillon Motion"), 80 ("Continental Motion"). The Court found this matter suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b) and previously vacated the hearing. Having thoroughly reviewed the parties' submissions, the Court GRANTS the Continental Motion and DENIES the Dillon Motion.

**I.    Background**

In this action Dillon seeks to recover, under four insurance policies issued by Continental, losses suffered as a result of what was, in essence, a Ponzi scheme executed by Vesta and

1

Excalibur's owners, John Terzakis and Robert Estupinian, with the assistance of Peter Ye, Vesta's Vice President of Operations.

### A. Factual Background

#### 1. Vesta Strategies, LLC

Vesta was founded on or about January 9, 2004 as a two-member California limited liability company. Dkt. No. 97 ("Terzakis Supp. Decl.") ¶ 1; Compl. ¶ 13. Mr. Terzakis owned 51% of Vesta through B & B Sparco Properties. Id. The remaining 49% of Vesta was owned by Mr. Estupinian through Mutual Vision, LLC.[1] Compl. ¶ 13.

Mr. Terzakis was the manager of Vesta with "directorial capacity" over its affairs and Mr. Estupinian served as its Chief Executive Officer. Id. ¶¶ 17-18. Mr. Estupinian's wife, Ginny Estupinian, formerly Ginny Hillig, served as Vesta's President. App. Ex. 1, January 24, 2012 Deposition of Peter Ye ("Ye January Dep.") at 100:18-19. Mr. Ye served as Vesta's Vice President of Operations. Dkt. No. 77 ("Ye Decl.") ¶ 2.

Vesta promoted itself as a nationwide provider of 1031 exchange services. Compl. ¶ 14. Its business model involved accepting possession of funds from its clients—client exchangers—and holding those funds so that the client could avoid paying capital gains tax when buying and selling property. Ye Decl. ¶ 2. This technique was designed to take advantage of a provision of the tax code, Internal Revenue Code § 1031, that permits a party to defer the payment of capital gains of the purchase and sale of like kind property. Id.; 26 U.S.C. § 1031. Businesses like Vesta that hold client exchanger funds are referred to as Qualified Intermediaries ("QIs").

Vesta was actually the third iteration of a QI owned by Mr. Terzakis and Mr. Estupinian. In the early 2000's, the two became partners in a company called Investment Advantage Group ("IAG"). Terzakis Dep. at 23:1-21. IAG's name was changed to IAG 1031. Id. at 29:15-18. Finally, in January 2004, IAG 1031 became Vesta. Ye Decl. ¶ 2.

---

[1] Sometime after Vesta was formed, Ginny Estupinian, formerly Ginny Hillig, married Mr. Estupinian and acquired an interest in his share of Vesta.

2
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

### 2. Excalibur 1031 Group, LLC

In addition to Vesta, Mr. Terzakis and Mr. Estupinian had an interest in a company called Excalibur. Excalibur's ownership was shared by Vesta (50%), Christian Benedetto, Jr. (22.5%), Kenneth Williams (22.5%), and Michael Rapf (5%). App. Ex. 2, Deposition of Christian Benedetto, Jr. ("Benedetto Dep.") at 24:17-25.

The parties agree that, although Excalibur called itself a QI, Excalibur operated as Vesta's East Coast marketing company. Excalibur Opposition at 3, 7; Dillon Motion at 10. Excalibur would solicit new customers who would then be referred to Vesta. Id. Excalibur did not enter into any contracts with clients; rather all contracts were between the clients and Vesta. Id. Furthermore, Excalibur client funds would be deposited in Vesta's bank accounts at Merrill Lynch in New Jersey. Id.

### 3. Continental Policies

Vesta and Excalibur purchased insurance policies from Continental to ensure against losses relating to certain dishonest or criminal conduct. Continental issued a total of four policies to Vesta and Excalibur. Specifically, Continental issued one policy to Vesta in 2004, Compl. Ex. 4 ("Vesta Policy"), and three policies to Excalibur in 2004, 2005, and 2006, respectively, Compl. Exs. 5-7 ("Excalibur Policies"). For the purposes of the instant motion, the following aspects of the Vesta and Excalibur Policies (collectively, "Policies") are relevant:

- The Policies cover losses to Vesta and Excalibur resulting from employee dishonesty. Vesta Policy, Employee Dishonesty Coverage Form at 1; Compl. Ex. 5 ("First Excalibur Policy"), Employee Dishonesty Coverage Form at 1. The Vesta Policy covers losses up to $5,000,000. Vesta Policy, Crime Policy Declarations at 1. The Excalibur Policies covered losses up to $2,500,000. First Excalibur Policy, Crime Policy Declarations at 1.

- The property covered under the Policies includes not only losses to Vesta and Excalibur property, but also losses to "[c]lient [p]roperty." Vesta Policy, Endorsement No. 1; First Excalibur Policy, Endorsement No. 1. This includes property that: (1) Vesta or Excalibur "own[s] or hold[s]"; (2) is "legally liable" for; or (3) is "[h]eld in a financial institution account in a transaction involving [Vesta or Excalibur] as a qualified intermediary for a tax-deferred exchange of property intended to qualify under Internal Revenue code 1031." Id.

- Notwithstanding, the Policies' coverage of losses to client property, the Policies disclaim that they are for Vesta and Excalibur's "benefit only [and] provide[] no rights or benefits to any other person or organization." Vesta Policy, Crime General Provisions (Discovery

3
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

- Form) at 3; id., Endorsement No. 1; First Excalibur Policy, Crime General Provisions (Discovery Form) at 3; id., Endorsement No. 1.

- As used in the policies, "Employee Dishonesty . . . means . . . dishonest acts committed by an 'employee'." Vesta Policy, Employee Dishonest Coverage Form at 1; First Excalibur Policy, Employee Dishonest Coverage Form at 1. The employee must act "with the manifest intent to: (1) [c]ause [Vesta or Excalibur] to sustain loss; and also (2) [o]btain financial benefit . . . for . . . the employee." Id.

- While the employee dishonesty coverage offered by Continental would not ordinarily extend to acts committed by, or in collusion with, Vesta or Vesta's partners, the Policies were subject to a special exception. Specifically, the Policies were modified to cover "losses involving the funds of client/exchangers while [Vesta or Excalibur] [was] acting as a qualified intermediary in a tax-deferred exchange of property intended to qualify under Internal Revenue Code 1031" even where such losses are caused by Vesta or Vesta's partners. Vesta Policy, Endorsement No 3; First Excalibur Policy, Endorsement No. 3.

- The Policies include an internal controls requirement pursuant to which Vesta and Excalibur must maintain "[p]roceeds from the relinquished property or properties of a single exchange transaction . . . in a financial institution account segregated from the intermediary's operating funds." Vesta Policy, Endorsement No 1; First Excalibur Policy, Endorsement No. 1. Furthermore, "each single exchange transaction [must] be identified by a specific file number or like tracking tool so as to provide a clear paper trail for each exchange transaction or series of related exchange transactions." Id.

- The Policies are discovery of loss policies. Accordingly, the Policies only cover losses that are actually discovered within or shortly after the expiration of the coverage period. Vesta Policy, Crime General Provisions (Discovery Form) at 2; First Excalibur Policy, Crime General Provisions (Discovery Form) at 2. "Discovery occurs when [Vesta] first become[s] aware of facts [that] would cause a reasonable person to assume that a loss covered by [the] insurance has been or will be incurred . . . ." Id.

- The policy period for the Vesta Policy was August 15, 2003 to August 15, 2004. Vesta Policy, Policy Transaction Invoice. Under this policy, losses were required to be discovered by October 15, 2004. Vesta Policy, Crime General Provisions (Discovery Form) at 2. The policy period for the First Excalibur Policy was April 22, 2005 to August 15, 2005. First Vesta Policy, Crime Policy Declarations at 1. Under this policy, losses were required to be discovered by October 15, 2005. First Excalibur Policy, Crime General Provisions (Discovery Form) at 2. The policy period for the second Excalibur policy was August 15, 2005 to August 15, 2006. Compl. Ex. 6, Commercial Crime Policy at 2. The policy period for the third Excalibur policy was August 15, 2006 to August 15, 2007. Compl. Ex. 7, Crime Pack Policy Declarations at 1. Under both the second and third Excalibur Policies, losses were required to be discovered by August 15, 2007. Compl. Ex. 6, Crime General Provisions (Loss Sustained Form) at 2; Compl. Ex. 7, Crime Pack Policy Declarations at 5.

### 4. Transfers to Mr. Terzakis from Vesta

Dillon alleges that throughout Vesta's existence, Mr. Terzakis routinely stole Vesta's clients' funds to use in his real estate ventures. Indeed, Dillon alleges that Mr. Terzakis and Mr.

4
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

Estupinian formed Vesta for the express purpose of carrying out this scheme. Compl. ¶ 29 (alleging that Mr. Terzakis and Mr. Estupinian "formed Vesta and Excalibur . . . to enable them to engage in a pattern of self-dealing and misappropriation of client trust assets").

Mr. Terzakis, Mr. Estupinian, and Mr. Ye appear to have operated Vesta, in many respects, like a Ponzi scheme. After a client entered into an exchange contract with Vesta, the proceeds from the sale of the exchanger's investment property would be wired by the title company into a subaccount at Borel Bank, which Vesta would have assigned to the particular exchanger. App. Ex 4 ("Ye July Dep.") at 121:5-21; Ye January Dep. at 66:22-68:19. Notably, Vesta continued to use IAG 1031's accounts until approximately August 2004, when Vesta opened its own accounts. Ye July Dep. at 121:8-16. "[S]hortly after monies were deposited into the sub accounts, they [would be] . . . swept into [IAG 1031's] pooled account." Id. at 59:16-19.

From time to time, either Mr. Estupinian or Mr. Ye would transfer funds from Vesta/IAG 1031's bank accounts to non-Vesta accounts at Mr. Terzakis's request. Terzakis Dep. at 57:2-22; Ye January Dep. at 139:24-140:19; Ye July Dep. at 127:16-128:20. The parties dispute which accounts the funds were transferred from. Continental contends that the money was transferred to Mr. Terzakis from Vesta's pooled bank account, rather than from the subaccounts associated with individual customers, thus making it impossible to determine which clients' funds were transferred. Continental Motion at 7, 15; Ye July Dep. at 59:24-60:2 (stating that it was impossible to determine the source of funds once they were placed into the pooled account). However, Dillon contends that some of the transfers came from individual client subaccounts. Dkt. No. 96, Supplemental Declaration of Peter Ye ("Ye Supp. Decl.") Exs. 1-13.

When Vesta was required to transfer client funds to complete the purchase of replacement property, the required funds would usually be wired from Vesta's pooled bank account. Ye January Dep. at 85:8-24. Because client transactions were being closed using funds from the pooled account, funds received from new clients could be used to complete transactions for older clients whose funds had been transferred to Mr. Terzakis. In the event the pooled accounts did not

5
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

have sufficient funds to close a transaction, Mr. Terzakis might fund the transaction by wiring monies from his accounts to the title company for the exchanger. Ye July Dep. at 66:6-9.

Dillon contends that the funds transferred to Mr. Terzakis from the Borel Bank accounts between January 9, 2004 and August 15, 2004 (the end of the Vesta Policy period) amounted to $9,360,000. Dillon Motion at 2. Dillon contends that $6,296,999 of this amount came from Vesta as opposed to IAG 1031 clients. Dkt. No. 91 ("Vesta Opposition") at 16; Ye Supp. Decl. ¶¶ 7-28. Continental disputes Dillon's statement of the loss to Vesta clients, and asserts that Mr. Ye's declaration purporting to show that the transferred funds came from Vesta as opposed to IAG 1031 clients is a sham affidavit. Dkt. No. 103 ("Continental Reply") at 11.

### 5. Transfers to Mr. Terzakis from Excalibur

Dillon contends that, in July 2006, Mr. Terzakis took $3.5 million from two Excalibur exchangers, George Molyneux and Michelle Barone. Dkt. No. 98 ("Excalibur Opposition") at 4; Dkt. No. 99 ("Brace Excalibur Decl.") ¶ 12. Subsequently, on December 28, 2006, Mr. Terzakis repaid $1.3 million to fund the Molyneux exchange, which had a total value of $2.98 million. Brace Excalibur Decl. ¶ 13. Dillon contends that the remaining balance of the Molyneux and Barone exchanges, approximately $2.2 million, must have been paid using funds deposited by other Vesta or Excalibur exchangers. Id. Thus, Dillon contends there was a $2.2 million deficit in Excalibur's account at the end of 2006. Excalibur Opposition at 5.

Dillon contends that there were additional thefts in 2007. Specifically, Dillon contends that two Excalibur exchangers, Hou Shang Jahan and Ninth Ave. Equities, deposited approximately $3.3 million. Id. at 6. Approximately $2 million of this amount was transferred to Mr. Terzakis. Id. An additional $1 million was used to close a pending Vesta exchange and a pending Excalibur exchange. Id. Dillon contends that these transfers led to a loss of $1.25 million for Excalibur. Id.

Mr. Terzakis' transfers of Excalibur client funds were ultimately discovered by Mr. Benedetto as a result of two failed exchanges in 2007. Specifically, in the fall of 2007, two exchanges that had been referred to Vesta by Excalibur, the Hoist Realty and Martin Phillips exchanges, did not fund on time because there were insufficient funds in the Merrill Lynch bank

6
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

accounts to complete the transactions. Id. at 4. Mr. Benedetto was "shocked" to learn the funds belonging to Hoist and Martin Philips were not in the Merrill Lynch accounts. Bendetto Dep. at 128:3-129:15. Mr. Bendetto subsequently retained an attorney to represent him (and later Mr. Benedetto's entity, Hopkins, Sampson and Brown LLC). Id. at 142:11-143:2. Mr. Benedetto's attorney sent a letter to Mr. Terzakis, cc'ing Mr. Estupinian and Mr. Ye, identifying missing funds totaling $1,710,169.30 from additional Excalibur-referred clients besides Hoist and Phillips. App. Ex. 7. The letter threatened to take legal action if the funds were not returned as demanded. Id.

The Hoist and Phillips exchanges eventually funded, albeit belatedly. Bendetto Dep. at 154:9-155:20. All other exchanges pending before October 15, 2007 were also funded. Id. at 155:15-21 (Mr. Benedetto confirming that when he left the company, all client exchanges had been closed successfully). During his deposition, Mr. Benedetto testified that, while he was not sure of the source of the funds used to close the outstanding exchanges, the exchanges could not have been funded with money from new Excalibur clients as Excalibur ceased accepting new clients in October 2007, when the Phillips exchange failed. Id. at 156:2-25. Excalibur did not resume accepting new clients until February 2008, after Mr. Benedetto sold his interest in Excalibur to Vesta and left Excalibur. Id. at 156:2-25.

Dillon contends that Continental should receive "no credit" for the fact that all the Excalibur exchanges closed because the exchanges must have been closed with money stolen from Vesta clients. Excalibur Opposition at 7. Dillon states that the 2007 losses to Excalibur caused by the Hoist and Ninth Ave. exchanges were $3.18 million ($1.98 million from the Hoist exchange and $1.2 million from the Ninth Ave. exchange). Id.

### 6. Vesta and Excalibur Collapse

In late 2007, the real estate market collapsed and, as a result, Mr. Terzakis' assets, which were primarily in real estate, rapidly depreciated. Terzakis Dep. 53:4-25. As a result of the depreciation in the value of his real estate assets, Mr. Terzakis was unable to refinance those assets to fund transfers at Vesta and Excalibur. Terzakis Decl. 3. Eventually, the deposits received from new Vesta and Excalibur clients were no longer sufficient to meet the obligations of existing

7
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

clients, whose funds had been transferred to Mr. Terzakis. Id. Vesta and Excalibur ultimately collapsed in mid-2008. Terzakis Decl. 3.

Dillon states that when Vesta collapsed in 2008, it was unable to repay Vesta's clients approximately $11,462,247.94. Dillon Motion at 13. Dillon contends that this $11 million deficit was due in part to the approximately $9 million in funds Mr. Terzakis transferred from the Vesta/IAG 1031 bank account in 2004. Id.

### 7. Criminal Charges Against Mssrs. Terzakis, Estupinian, and Ye

In December 2009, indictments against Mr. Terzakis, Mr. Estupinian, and Mr. Ye were filed by the United States Attorney's Office. Terzakis Decl. Ex. 1; Ye Decl. Ex.5. The indictments charged Mr. Terzakis, Mr. Estupinian, and Mr. Ye with a variety of crimes including wire fraud, money laundering, and conspiracy to commit wire fraud and money laundering. Id. Mr. Terzakis, Mr. Estupinian, and Mr. Ye each pled guilty to wire fraud, money laundering, and conspiracy. Terzakis Decl. Exs. 1, 6; Ye Decl. Ex. 5 at 30.

## B. Procedural Background

Vesta's exchange clients initially sought to recover their losses in an action before Judge Ware, styled United States Fire Insurance Company v. Vesta Strategies, LLC ("Fire Insurance"), 5:09-CV-02388-JW. In this action, which was initiated by another insurer, United States Fire Insurance Company, Vesta's clients asserted a cross-claim against Continental for coverage under the Vesta Policy. Id., Dkt. No. 13. On November 30, 2009, Continental filed a motion to dismiss, contending that the exchange clients had no standing to pursue remedies under the Vesta Policy because they were not third-party beneficiaries of the Vesta Policy. Id., Dkt. No. 98.

On December 16, 2009, while Continental's motion to dismiss was pending, Mr. Dillon was appointed receiver for Vesta and Excalibur. Id., Dkt. No. 123. After being appointed receiver, Mr. Dillon submitted a notice of claim to Continental by letter dated February 13, 2010. Compl. Ex. 8 at 6. Mr. Dillon asserted that the losses resulting from the fraud were $20,330,868.29. App. Ex. 14 at 2. Continental denied Mr. Dillon's claim. Compl. Ex. 8 at 6.

1    On May 27, 2010, Judge Ware granted Continental's motion to dismiss, holding that Mr.
Dillon, as receiver for Vesta, and not the client exchangers, was the proper party to pursue the declaratory judgment and breach of contract claims against Continental.  5:09-CV-02388-JW, Dkt. No. 181 at 14.  Dillon initiated the instant action on November 18, 2010.  The case was assigned to Judge James Ware, who related this action to Fire Insurance.  Dkt. No. 5.

On January 26, 2011, Continental filed a motion to dismiss Dillon's complaint.  Dkt. No. 15.  The motion was denied by Judge Ware in an order dated July 14, 2011.  Dkt. No. 43.  On August 31, 2012, the parties filed the instant cross motions for summary judgment.  Dkt. Nos. 75, 80.  Several days later, on September 5, 2012, this case was reassigned to Judge Lucy Koh as a result of Judge Ware's retirement.  Dkt. No. 85.  Judge Koh held a hearing on the pending summary judgment motions, but before an order issued, Dillon filed a notice requesting that Judge Koh recuse herself from the action.  Dkt. No. 115.  Judge Koh thereafter recused herself and this matter was assigned to the undersigned.  See Dkt. Nos. 119, 120. The undersigned took the parties' pending cross-motions for summary judgment under submission on July 23, 2013 and now turns to the substance of those motions.  Dkt. No. 129.

## II.   Legal Standard

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party does not satisfy its initial burden, the nonmoving party has no obligation to produce anything and summary judgment must be denied. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102–03 (9th Cir. 2000).  On the other hand, if the moving party does meet this initial burden, the burden then shifts to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."

9
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324. The court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324. However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. See Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979). Instead, the nonmoving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c); see also Hal Roach Studios, Inc. v. Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1990).

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). However, where the nonmoving party will have the burden of proof at trial on a particular issue, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Provided there has been adequate time for discovery, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

### III. Discussion

#### A. Continental Motion

##### 1. Summary Judgment as to Vesta

###### a) Granting Vesta Coverage Would Violate Public Policy

Continental argues that summary judgment should be granted in its favor because "[Dillon] cannot recover under the [Vesta Policy] without violating the public policy against insuring the willful wrongdoing of the insured." Continental Motion at 12. Mr. Terzakis and Mr. Estupinian have each pled guilty to fraud and money laundering in the criminal cases connected to this matter. Continental contends that, because Mr. Terzakis and Mr. Estupinian were Vesta's sole owners, their fraudulent conduct may be imputed to Vesta. Id. Continental argues that public policy, as

10
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

reflected in California Insurance Code Section 533, would prohibit Mr. Terzakis and Mr. Estupinian from obtaining insurance for their fraudulent conduct. Id. Consequently, Continental contends that Section 533 also prohibits Vesta from being indemnified for its losses resulting from the fraud. The Court agrees.

### (1) Mr. Terzakis and Mr. Estupinian's Conduct was Willful

As a threshold matter, the Court must address whether Mr. Terzakis and Mr. Estupinian's conduct is insurable. An insurer is "not liable for a loss caused by the wilful act of the insured." Cal. Ins. Code § 533. This provision of the Insurance Code prohibits an insured from receiving indemnification for willful conduct, such as fraud. See Randi W. v. Muroc Joint Unified Sch. Dist., 14 Cal. 4th 1066, 1078 (1997) ("[W]e may assume that standard business liability insurance is available to cover instances of negligent misrepresentation or nondisclosure as alleged in count three of the complaint, but is not available for the fraud or intentional misconduct alleged in count four." (emphasis in original)).

Here, Dillon contends that Mr. Terzakis and Mr. Estupinian were the sole owners of Vesta and that both were responsible for embezzling millions of dollars from Vesta's clients. Particularly, Dillon contends that Mr. Terzakis and Mr. Estupinian operated Vesta as a "Ponzi scheme by convincing new 1031 Exchangers . . . to deposit their Exchange Funds so that Terzakis and Estupinian could take the money to pay off older Exchanges." Compl. ¶ 8. Dillon asserts that Mr. Terzakis and Mr. Estupinian "formed Vesta and Excalibur . . . to enable them to engage in a pattern of self-dealing and misappropriation of client trust assets." Id. ¶ 29. Dillon further asserts that Mr. Ye, Vesta's vice-president, while perhaps not initially aware of the fraud, eventually became a knowing participant in the fraud. Dillon Motion at 18. Likewise, Dillon states that Vesta's President, Ginny Estupinian "knew about the thefts . . . [and] was not innocent." Dillon Reply at 8. Moreover, Dillon submits evidence reflecting that Mr. Terzakis, Mr. Estupinian, and Mr. Ye each pled guilty to, inter alia, wire fraud charges. See Terzakis Decl. Exs. 1, 6; Ye Decl. Ex. 5 at 30. Given this overwhelming evidence, the court finds that the conduct at issue here is willful, and thus not insurable, within the meaning of Section 533.

11
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

### b) Mr. Terzakis and Mr. Estupinian's Conduct Should be Imputed to Vesta

Next, the court must determine whether Mr. Terzakis and Mr. Estupinian's conduct may be imputed to Vesta, thus precluding insurance coverage. The knowledge or conduct of a corporate officer, including fraud, may be imputed to that officer's corporation when the corporate officer is acting within the course of his employment. See, e.g., Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP, 133 Cal. App. 4th 658, 679 (2005) ("It is settled California law that '[k]nowledge of an officer of a corporation within the scope of his duties is imputed to the corporation.'"). A corporate officer acts within the course of his employment when the officer uses the corporation to perpetrate the fraud. See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 359 (3d Cir. 2001) (holding that "fraud… perpetrated by the Shapiro family took place in the course of their employment for" debtor corporations where William Shapiro was the "sole shareholder" of the corporations and the corporations "played a role in the fraudulent" activity). As discussed above, Mr. Terzakis and Mr. Estupinian were the sole owners of Vesta and architects of a Ponzi scheme that resulted in millions of dollars of loss for Vesta's clients. Mr. Ye and Ms. Estupinian, the only other Vesta officers identified by Dillon, assented to this fraud. Under these circumstances, the court finds that Mr. Terzakis and Mr. Estupinian plainly were acting within the course of their employment and moreover were using the corporation to perpetuate their fraudulent scheme.

To the extent Dillon contends that the adverse interest exception, which provides that a corporate officer's knowledge or actions will not be imputed to the corporation if the officer acts adversely to the corporation, applies, the Court disagrees. See, e.g. In re The Clothes Barn, Inc., No. 89-CV-3154 TEH, 1990 WL 42404, at *3 (N.D. Cal. Feb. 7, 1990) (holding that "[a]n officer's fraud may [not] be imputed to the corporation if the officer was acting… against[] the corporation's interest"). "The 'adverse interest' exception is itself subject to exception[s]." USACM Liquidating Trust v. Deloitte & Touche LLP, 764 F. Supp. 2d 1210, 1219-20 (D. Nev. 2011). One such exception exists where fraud is perpetrated by the sole owner of a corporation. For example,

in Peregrine, the Court held that where the "owner and sole person in control of [the company]" was also "one of the primary architects of the Ponzi scheme… his fraud [was] properly imputed to [the company]." Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP, 133 Cal. App. 4th 658, 679 (2005). Like in Peregrine, here Vesta's sole owners perpetrated the fraud at issue, and Vesta's only other officers assented to the scheme. Accordingly the court finds no basis on which to apply the adverse interest exception.

### (1) The Fact that any Insurance Proceeds Would be Paid to the Client Exchangers Does Not Persuade the Court to Reach a Different Conclusion

Dillon argues that, regardless of whether Mr. Terzakis, Mr. Estupinian, and Mr. Ye's actions are attributable to Vesta, Section 533 permits recovery in this case because the insurance proceeds will be used entirely to compensate the client exchangers, the victims of the wrong, for their losses. See Compl. ¶ 52 ("The money paid by CAN will be isolated from the general estates of Vesta and Excalibur, used to recharge the trust accounts, and paid on a pro-rata basis solely to the Exchangers who lost their Exchange Funds at the end of the Ponzi scheme."). The Court agrees with Dillon that the basic purpose of Section 533 is to ensure that "no one takes advantage of his own wrong." See Erlin-Lawler Enterprises, Inc. v. Fire Ins. Exch., 267 Cal. App. 2d 381, 385 (1968). However, Section 533 has been held to apply even where the recovery from the insurance company would be primarily for the benefit of the victim rather than the insured. See, e.g., Clemmer v. Hartford Ins. Co., 22 Cal. 3d 865, 889-90 (1978) ("Plaintiffs' contention that innocent victims of intentional torts should be able to recover from an insurer without regard to the willfulness of the insured clearly runs contrary to the policy expressed in Insurance Code section 533 . . . ."); J. C. Penney Cas. Ins. Co. v. M. K., 52 Cal. 3d 1009, 1014, 1028 (1991) (upholding denial of coverage on Section 533 grounds where insured molested child even though proceeds would have been used to fund $500,000 judgment in favor of the victim and his mother).[2]

---

[2] The Court notes that, in J.C. Penney, the California Supreme Court stated that its holding was "narrowly limited" to the question of whether the sexual molestation of a child was an act exempted from coverage under Section 533. Id. at 1028. The Court cautioned that it had not

13
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

Here, it cannot be said with certainty that any recovery would not go to benefit the perpetrators of the fraudulent scheme. Were Continental to pay the client exchangers' damages Mr. Terzakis, Mr. Estupinian, and Mr. Ye's liability to the exchangers would be reduced. Indeed, the Court has concerns that Mr. Terzakis and Mr. Ye may be cooperating with Dillon's efforts to recover from Continental as a means of persuading Dillon and the client exchangers not to attempt to recover from Mr. Terzakis, Mr. Estupinian, and Mr. Ye directly.

The Court observes that, were the Court to permit Dillon to recover, the Court would essentially be permitting corrupt corporate officers to take out criminal liability insurance, willfully violate the law, and then, in the event the wrongdoing is discovered, cover any losses to the victims with the insurance proceeds. Section 533 would not permit such a result. Moreover, permitting recovery in this case would essentially create an incentive for wronged victims to forgo holding the wrongdoers liable for their actions in exchange for the wrongdoers' cooperation in pursuing an action against the insurance company, which, as may be the case here, has deeper pockets than the wrongdoer. The implications of permitting recovery in this case are unsettling and, furthermore, are inconsistent with the spirit of Section 533.

### (2) The Law of the Case Doctrine Does Not Apply

Finally, the court rejects Dillon's contention that summary judgment should not be granted in Continental's favor on the Section 533 issue because Judge Ware has already concluded in <u>Fire Insurance</u> that the public policy exception does not apply. <u>Fire Insurance</u> was a distinct case from the instant action; accordingly the law of the case doctrine does not apply. Moreover, Continental had been dismissed from <u>Fire Insurance</u> when the motion to dismiss order was issued and thus could not be bound by that order. To the extent Judge Ware concluded that permitting recovery would not provide Mr. Terzakis and Mr. Estupinian with an opportunity to take advantage of their own wrongdoing, the Court disagrees for the reasons set forth above.

---

decided whether "other types of wrongdoing" were covered. Here, the Court does not cite <u>J.C. Penney</u> for the proposition that fraud is a type of wrongdoing which is exempted from coverage pursuant to Section 533. Rather, the Court cites <u>J.C. Penney</u> as support for the proposition that the fact that insurance proceeds will be used to benefit the victim rather than the insured does not defeat the application of Section 533.

Dillon also contends that this court should, like Judge Ware in Fire Insurance, find that California Union Ins. Co. v. Am. Diversified Sav. Bank does not apply in this case. 948 F.2d 556 (9th Cir. 1991). In California Union, the Ninth Circuit considered whether the district court had erred in concluding that Federal Savings and Loan Insurance Corporation ("FSLIC"), acting as conservator for American Diversified Savings Bank ("ADSB"), could recover, under fidelity bonds issued to ADSB, losses incurred by ADSB due to the "defalcations" of Ranbir Sahni and Lester Day. Sahni and Day were two of the principal officers and directors of ADSB and were also the bank's sole shareholders. The fidelity bonds in question provided coverage for losses caused by the dishonest or fraudulent conduct of FSLIC's employees. As Dillon points out, Judge Ware held that:

> In California Union, the Ninth Circuit held that the principal officers and directors of the defendant bank did not constitute "employees" as that term was defined in a fidelity insurance contract, in part due to the "public policy against permitting a corporation to collect insurance for the defalcations of its alter ego." 948 F.2d at 566. … Unlike the policy in California Union, the Tax-Deferred Exchange Endorsement of the Policies at issue expressly covers losses resulting from dishonest acts of the insured, Vesta, or its partners, Terzakis and Estupinian, involving Section 1031 exchange funds. As a result, in this case, any embezzlement of Section 1031 exchange funds by company principles was expressly covered by the Policies.

Id.

This case is indeed similar to Fire Insurance to the extent that the Vesta Policy expressly covered "dishonest or criminal act[s] committed by" Vesta (Vesta Policy, Discovery Form, at 1) "involving the funds of client/exchangors" (id., Endorsement No. 3). Nevertheless, the Court finds that California Union is applicable. The California Union court's decision indeed turned in large part on the determination that the sole shareholders who committed the fraud in that case were not covered as employees under the insurance policy. However, the court also remarked that coverage was not appropriate because of the "public policy against permitting a corporation to collect insurance for the defalcations of its alter ego." Id., 948 F.2d at 566. The court then proceeded to explicitly invoke Section 533. Id. Furthermore, the statements in California Union are consistent with the California Court of Appeal's decision in Peregrine, discussed in the previous section.

15
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

Accordingly, this Court follows California Union in concluding that Section 533 prohibits a corporation from recovering for fraud committed by its sole shareholder.

For the reasons set forth above, the Court finds, as a matter of law, that Dillon is not entitled to recover under the Vesta Policy. Accordingly, Continental's motion for summary judgment is granted as to Vesta.

### 2. Summary Judgment as to Excalibur

Continental also argues that summary judgment should be granted in its favor with respect to Excalibur because during the Excalibur Policy period (August 15, 2005 to August 15, 2007), Excalibur was merely Vesta's marketing arm and did not hold any client property. Continental Motion at 26. Continental argues that the Excalibur Policies only covered losses "to property: (a) that [Excalibur] own[ed] or [held]; (b) for which [Excalibur] was legally liable; or (c) [that was] held in a financial institution account in a transaction involving [Excalibur] as a qualified [1031] intermediary." Id. (quoting Excalibur Policies) ("Client Property Provision"). The Court agrees.

Dillon concedes that: (1) Excalibur was Vesta's East Coast "marketing company;" (2) Excalibur solicited new customers for Vesta; (3) Excalibur clients entered into exchange agreements with Vesta, but not with Excalibur; and (4) Excalibur client funds were deposited into a Vesta account held at Merrill Lynch in New Jersey. Excalibur Opposition at 3, 7. Dillon also concedes that all the funds belonging to Excalibur-obtained clients that were transferred to Mr. Terzakis were transferred from accounts held by Vesta. Id. at 5-7. Dillon agrees that Excalibur did not hold any exchange funds as described in subsection (a) of the Client Property Provision. Id. at 10.

Dillon nevertheless contends that the Excalibur policies covered Dillon because Excalibur was "legally liable" for losses suffered by clients who were initially solicited by Vesta. Id. Dillon argues that Christian Benedetto, Jr., one of Excalibur's owners in addition to Vesta, and Richard Vaill, an Excalibur employee, testified that they believed they were legally liable for any damage to Excalibur-obtained clients. Id. As an initial matter, Dillon does not cite to any portion of the record for these statements regarding Mr. Benedetto and Mr. Vaill's beliefs. Furthermore, even if

16
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

these individuals did believe they were liable, this liability is purely speculative. Dillon cites no evidence showing that Excalibur, Mr. Benedetto, or Mr. Vaill were ever held liable or will be held liable for losses to Excalibur-obtained exchange clients. Dillon also does not explain on what grounds they would be held liable given that the exchange contracts were with Vesta. Accordingly, the Court is not persuaded that Excalibur suffered a loss in the form of legal liability.

Dillon also argues that "Excalibur was (without dispute) a qualified intermediary, and Excalibur was 'involved' in each IRC § 1031 Exchange transaction it solicited for Vesta." Id. Dillon appears to be arguing that Excalibur qualifies for protection under subsection (c) of the Client Property Provision. However, Dillon again cites to no evidence in the record showing that Excalibur functioned as a qualified 1031 intermediary with respect to the clients it obtained for Vesta. The facts that these clients signed agreements with Vesta and that client funds were held by Vesta suggest that Vesta was the intermediary. Furthermore, Dillon has admitted that Excalibur was merely Vesta's "marketing company." Excalibur Opposition at 3. Accordingly, the Court concludes that Excalibur did not suffer any losses to property covered under the Client Property Provision.

Continental argues that it is entitled to summary judgment for the additional reason that all the Excalibur clients' exchanges were funded during the Excalibur Policy period, and accordingly there was no covered loss to any Excalibur client. Continental Motion at 25. Continental argues that these transactions could not have been funded with money from new Excalibur clients (i.e. the deficit during the Excalibur Policy period could not have simply been masked) because when Mr. Benedetto left the company in 2008 all pending client exchanges had been closed. Id.; see also App. Ex. 2 at 155:15-21 (Mr. Benedetto confirming that when he left the company, all client exchanges had been closed successfully). Dillon does not dispute that all Excalibur client exchanges were funded. Rather, Dillon contends that the Excalibur exchanges were closed using funds obtained from Vesta clients. Excalibur Opposition at 9.

The Court finds Continental's argument persuasive. There was no deficit in Excalibur's books at the end of the Excalibur Policy period. Accordingly, even if there was a loss to Vesta

17
Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT

clients, there was no loss covered under the Excalibur Policies. Vesta's remedies are against Mr. Terzakis and Mr. Estupinian with respect to these losses.

### B.     Dillon Motion

Dillon seeks summary judgment on issues relating to whether Mr. Terzakis embezzled funds from Vesta and whether the doctrine of adverse domination, which permits the tolling of the discovery period in discovery of loss insurance cases, is applicable. Having concluded that Dillon is precluded from recovering under the Vesta Policy, Dillon's motion for summary judgment must be DENIED as moot.

### IV.    Conclusion

For the reasons set forth above the Court GRANTS Continental's motion for summary judgment. Dillon's motion for summary judgment is DENIED as moot.

The clerk shall CLOSE the case upon entry of judgment.

**IT IS SO ORDERED.**

Dated: March 26, 2014



EDWARD J. DAVILA
United States District Judge

18

Case No.: 10-CV-5238-EJD
ORDER GRANTING CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT; DENYING DILLON'S MOTION FOR SUMMARY JUDGMENT AS MOOT