Robert L. Brace, SBN 122240
Email: RLBRACE@Rusty.Lawyer
1807 Santa Barbara Street
Santa Barbara, CA 93101
Telephone: (805) 845-8211
Cell Phone: (805) 886-8458

Attorney for Thomas Dillon, as Court-Appointed
Receiver for Vesta Strategies, LLC
and Excalibur 1031 Group LLC

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC<br><br>Plaintiff,<br><br>vs.<br><br>CONTINENTAL CASUALTY COMPANY, an Illinois corporation.<br><br>Defendant | **Case No.: 5:10-CV-05238-EJD**<br>**Related Case No.: 5:09-CV-02388-JW**<br><br>**THOMAS DILLON'S POST APPEAL MOTION FOR SUMMARY JUDGMENT ON THE 2004 POLICY**<br><br>**Hearing Date: February 2, 2017**<br>**Time: 9:00 a.m.**<br>**Location: CR 4, 5th Floor** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 2, 2017, at 9:00 a.m. or as soon thereafter as the matter may be heard before the Honorable Edward J. Davila, in the United States District Court located at 280 South 1st Street, San Jose, California, Plaintiff Thomas A. Dillon ("Dillon"), the court-appointed Receiver for Vesta Strategies, LLC ("Vesta") will move the Court to enter summary judgment on the claims asserted in the operative complaint (breach of contract and declaratory relief) pursuant to the 2004 Vesta Policy issued by Defendant Continental Casualty Company ("Continental"), hereinafter the "2004 Vesta Policy."

This motion is made pursuant to Federal Rule of Civil Procedure 56, and is based on: (i) this Notice of Motion; (ii) the Memorandum of Points and Authorities; (iii) the Separate Statement of Undisputed Facts with reference to supporting evidence; (iv) the 2 Post Appeal Declarations of Thomas A. Dillon and Peter C. Ye; (v) the Declarations of John Terzakis, Kristine Carlos, Susan Woo, and William Carling already on file with the court; (vi) the pleadings and declarations filed on behalf of Dillion in *United States Fire Insurance Company v. Vesta Strategies, LLC*, Case No. 5:09-cv-2388-JW ("U.S. Fire Matter") and *Thomas A. Dillon v. Murphy & Hourihane, LLC*, Case No. 5:14-cv-01908-BLF (the "Malpractice Action"); (vii) all other pleadings and papers in the Court's file in this case; and (viii) oral argument that is requested and that will be made by Dillon's counsel at the time of the hearing on the motion.

DATED this 28th day of October, 2016

Respectfully submitted,

/s/ Robert L. Brace
Robert L. Brace, Esq., SBN. 122240
Santa Barbara, CA 93101

Attorney for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group LLC

# TABLE OF CONTENTS


I. SUMMARY OF ARGUMENT ........................................................................ 1

II. RELEVANT PROCEDURAL HISTORY .................................................. 11

III. THE LEGAL STANDARD FOR GRANTING OR DENYING MOTIONS FOR SUMMARY JUDGMENT ........................................................................ 13

IV. LEGAL ARGUMENT ........................................................................ 14

A. The $9.3 Million Transferred to Terzakis by Ye with the Approval of Estupinian was the Embezzlement of Exchange Funds Under the Control of Vesta with the Manifest Intent to Cause a Covered Loss under the Policy……………………………14

B. Dillon Has Proven the Source of the $9,360,000 Stolen By Terzakis Came From Segregated Exchange Funds Deposited in Sub-Accounts at Borel Bank...16

C. Terzakis, Ye and Both Mr. and Mrs. Estupinian Adversley Dominated Vesta, Which Tolled the Discovery of Loss By Vesta Until the Receiver Was Appointed…...17

V. CONCLUSION ........................................................................ 22

# TABLE OF AUTHORITIES

**Cases** **Page No.**

*Admiralty Fund v. Peerless Insurance Co.*, 143 Cal. App. 3d 379 (1983) .......... 18

*California Union Insurance Co. v. American Diversified Sav. Bank*, 948 F. 2d 556 (9th Cir. 1991) .......... 18

*Mosesian v. Peat, Marwick, Mitchell & Co.*, 27 F.2d 873 (9th Cir. Cal. 1984) .......... 18

*People v. Miller*, 188 Cal. App. 2d 156 (Cal. App. 2d Dist. 1961) .......... 16

*People v. Parker*, 135 Cal. App. 2d 100 (Cal. App. 3d Dist. 1965) .......... 15

*People v. Talbot*, 220 Cal. 3 (1934) .......... 16

*Resolution Trust Corp. v. Franz*, 909 F. Supp 1128 (N.D. Ill. 1993) .......... 18

*Resolution Trust Corp. v. Smith*, 872 F.Supp 805 (D. Org. 1995) .......... 19

*Shields v. Union Fire Insurance Co.*, 153 B.R. 677 (E.D. Penn, 1993) .......... 19

**Statutes**

Cal. Penal Code §§ 484 .......... 16

Cal. Penal Code §503 .......... 15

Insurance Code § 533 .......... 1

Penal Code section 7 .......... 16

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I. SUMMARY OF ARGUMENT

Thomas A. Dillon ("Dillon") will assume judicial familiarity with the detailed facts of this insurance coverage case as set out in Docket 133, the Order Granting Continental's Motion for Summary Judgment. This post-appeal motion for summary judgment concerns the $5 million surety bond issued to Vesta Strategies, LLC ("Vesta") and not the $7,500,000 in bonds issued by Continental Casualty Company ("Continental") to Excalibur Group, LLC ("Excalibur"). The court concluded the $7,500,000 in bonds sold to Excalibur by Continental provided no coverage to Excalibur because Vesta acted as the actual contracting qualified intermediary ("QI") during the terms of the three policies while Excalibur was simply a marketing agent for Vesta referring clients to Vesta (Dkt. No. 133). Dillon did not appeal this decision.

**(i) Surety Coverage.** There is now no dispute that the policy issued to Vesta by Continental (the "2004 Vesta Policy") created a three party surety relationship that is exempt from Insurance Code § 533. Specifically, Endorsement 3 to the 2004 Vesta Policy, which extended coverage to thefts of client trust funds by Vesta and its owners, provides that Continental retains "all rights of recovery that (Continental) as surety in the undertaking…may have against" Vesta and its owners (emphasis added). Under the plain language reading of this provision, Continental has the right to file a subrogation claim against Vesta and its owners for any reimbursement paid under the policy to recharge the trust. For this reason, collecting under the policy by way of a judgment against Continental entered by this court will not reduce Vesta's or Vesta's owners' liability, and section 533 is not offended in any way (Dkt. No. 142).

Furthermore, the clause in Endorsement 1 to the 2004 Vesta Policy which provides that the subject insurance provides no rights or benefits to any other person or organization cannot, as a matter of law, be read into Endorsement 3 to prohibit Dillon from collecting on behalf of Vesta's clients in this action. To do so, as Continental has repeatedly tried to do in this case,

renders illusory the extension of coverage by Continental to thefts of exchange funds by Vesta and its owners (Dkt. No. 142).

There is no factual dispute that Dillon's legal interpretation of the policy as a surety bond covering owner theft of client exchange funds was correct. There is no dispute that Continental's post claim interpretation that enforcement violates the Insurance Code makes Continental's written promises in the policy illusory, as ruled by the Ninth Circuit (Dkt. No. 142). Illusory promises made by an institutional insurer for premiums paid should not be condoned. There is no factual dispute that the owners of Vesta stole exchange funds during the term of the 2004 Vesta Policy and there is coverage for Dillon as promised by Continental.

**(ii) Assistance from Terzakis and Ye was beneficial to the estate.** The court's concern that John Terzakis ("Terzakis") and Peter Ye ("Ye") may have been cooperating with Dillon's efforts to recover insurance proceeds from Continental as a "deep pocket" goes to the weight of the evidence presented by Dillon, but Dillon's evidence may not be disregarded. The thieves' declarations and deposition testimony admitting under penalty of perjury that they stole the money has been corroborated with business and bank records. The thieves' purported bias, without contrary evidence, does not create a triable issue of fact that they did not steal the money as they said they did. The thieves are in jail for stealing the money. Continental has provided no evidence that the thieves did not steal the money at the times and from the victims as they have declared they did.

The United States of America has criminal convictions with orders of restitution entered against Terzakis, Ye, and Estupinian. The district court's opinion that it was "unsettling" to the court that Dillon did not expend scarce receivership resources to obtain redundant and uncollectable civil judgments against the incarcerated thieves' conflicts with Dillon's perceived role as the court appointed receiver. As set out in Dillon's declaration, he has worked diligently, efficiently, tirelessly, and competently for over 6 long years to collect over $11 million for the estate from large and well defended institutional defendants. (Dillon Decl.¶¶ 1-16.) Dillon started with a zero asset estate. Through his sound guidance he has been able to distribute close

to $8 million to the Vesta and Excalibur exchanger victims fulfilling his perceived fiduciary duties as a receiver. *Id*.

Dillon is hesitant to apologize to the court for using the voluntary assistance of Terzakis and Ye to account for the amounts and timing of their own thefts - thefts which have been independently proven by verified bank records. Forensic accounting is extremely expensive in long running Ponzi scheme cases involving multiple entities and a multitude of bank accounts. Dillon started with no assets in the receivership estate to hire expensive forensic accounts. The help by Terzakis and Ye in describing their own thefts and the ultimate disposition of those same stolen funds, and then directing Dillon's lawyers to the myriad of bank documents which corroborated their stories has been a substantial contributing factor to the success of Dillon's multiple recoveries to date. (Dillon Decl. ¶24.) Whatever the motives have been for Terzakis and Ye to decide to assist Dillon in his litigation, there was no agreement, whatsoever, between Dillon and these thieves. The court's stated concern to the contrary was not based on any fact or facts known to Dillon. Unsubstantiated speculation about some non-existent cooperation agreement negatively affecting the receiver's ability to collect assets for the estate should play no role in the adjudication of motions for summary judgment, especially without a hearing to discuss the concern.

**(iii) Terzakis stole $9.3 million**. Consistent with keeping focused on the facts, there is no factual dispute about the exact source of funds stolen by Terzakis, Estupinian and Ye. Vesta started in business on the same day the 2004 Vesta Policy was changed from insuring IAG 1031, LLC ("IAG 1031") to insuring Vesta- January 9, 2004. (Dillon Decl. Ex. 3.) The 2004 Vesta Policy period ran from August 15, 2003 to August 15, 2004. From January 21, 2004 to June 24, 2004, within the policy time frame and in eight separate thefts, Terzakis stole $9,360,000 directly from sub-accounts at Borel Bank containing exchange funds; and not from some mystic "pooled account" containing money from unidentified and uninsurable sources. (Ye Decl. ¶¶ 6-41.) Continental's argument that Dillon has not proven the source of the stolen funds as being exchange funds under the control of Vesta while it was insured by Continental

does not create a triable issue of fact to set this matter for a trial. Argument by lawyers is not evidence.

For each separate theft, Ye's Declaration contains copies of Outgoing Domestic Wire Requests signed by Ye and faxed by Ye to Borel Bank to start each transfer. (Ye Decl. Exs. 1-12 and Ex. 67.) Ye's declaration then contains the actual Borel Bank statements for the sub-accounts where the money was transferred out of and on to Terzakis in Chicago to complete the transfer. *Id*. The Borel Bank records show the identification of each exchanger by name, their exchange number, their sub-account number, the date and amount of the receipt of their segregated exchange funds by Borel Bank, and the date and the amount of the segregated exchange funds transferred to Terzakis. The separate transfers testified to by Ye could be proven solely by the business records from the custodian of records for Borel Bank without Ye's testimony describing the mechanics he used to accomplish each theft. The source of the $9,360,000 in exchange funds transferred to Terzakis by Vesta's employee Peter C. Ye during the 2004 Vesta Policy has been proven regardless of the court's concern about Ye helping Dillon. There is no cognizable dispute on this planet about the amount or the source of these specific funds.

The use of the $9,360,000 by Terzakis, after his receipt, for his personal business affairs has also been proven with bank records from Terzakis' various entities that received the money and then disbursed it. Again there is no dispute about the use of these trust funds by Terzakis for personal business unrelated to closing 1031 Exchanges at Vesta or IAG 1031. (Terzakis Decl.¶¶ 13-22, Ex. 14.) Continental should pay.

Continental's argument that the $9,360,000 came out of a "pooled account" at Borel Bank containing exchange funds from multiple exchangers is proven false by the actual bank records which show the money came out of segregated sub-accounts. In addition, and more importantly, it would not be a valid defense to coverage if Vesta used a pooled account to hold trust funds from multiple exchangers. The use of pooled accounts was and still is common practice in the QI industry, Continental knows it, and its policies cover it. The 2004 Vesta Policy makes no distinction between a pooled trust account containing exchange funds from

multiple exchangers and sub-accounts containing exchange funds from each exchanger. This is another false argument proffered by Continental.

Continental's next false assertion to reduce Dillon's possible claim amount from $9,360,000 to $6,296,000 is because $3,064,000 out of the $9,360,000 belonged to exchangers who contracted with IAG 1031 (an insured), before the start of Vesta (an insured). This is a true undisputed fact to adjudicate as fact. But, the adjudicated fact has no bearing on coverage for the theft of the $3,064,000. As the court noted in Docket 133, Vesta was actually the third iteration of a QI owned by Terzakis and Estupinian. The first was Investment Advantage Group ("IAG"), the second was IAG 1031 ("IAG 1031"). Finally, in January 2004, IAG became Vesta. (Ye Decl.¶¶ 1-2 and 9-14.) Vesta used the existing IAG 1031 bank accounts at Borel Bank from January until August of 2004 to conduct its QI business. *Id*. This unusual fact does not provide a defense to coverage because the underwriters did not expect it to be able to exclude it.

The assets and liabilities of IAG 1031 were assumed by Vesta (Terzakis Decl. ¶6) and Vesta completed all of the pending exchanges at IAG 1031. (Ye Decl.¶¶10-12.) The change over from IAG 1031 to Vesta did not diminish, in any fashion, Vesta's coverage for Vesta's thefts of exchange funds that belonged to IAG 1031 exchangers.

There was no prohibition in the 2004 policy preventing QIs from assuming control over the business of other QIs. The only language in the policy remotely connected to the succession issue is found in Endorsement 2 containing the internal controls requirements as a condition to payment. The three FEA Endorsements are attached to this motion as **Exhibit 1** for ease of reference. Dillon contends that Endorsement 2 only applies to "employee theft" and not the owner theft surety coverage granted in Endorsement 3.

Notwithstanding, Provision 1(a) (1) of Endorsement 2 simply requires that "a written contractual agreement will be maintained between the Insured intermediary and each exchanger/client" stipulating to the manner in which the exchange funds are held and disbursed (emphasis added). As demonstrated in the record, IAG 1031 was an "Insured" from August 15, 2003 to January 9, 2004 (Dillon Decl. Ex. 3) and it had its own form contracts with each of its exchanger clients stipulating to the manner of receiving, holding and disbursing the exchange

funds. (Ye Decl. ¶¶ 11 and 43, and Ex. 12.) After January 9, 2004, Vesta was the "Insured" and it had its own form contracts with its clients covering the same basic issues required in Provision 1(a) (1) of Endorsement 2. *Id.* The undisputed fact that Vesta's owners and employees stole some IAG 1031 exchanger money plays no part on the issue of coverage as both were insureds under the policy.

In Docket 133, the district court ruled in favor of Continental cutting off its potential liability for $7,500,000 in coverage for Excalibur because Excalibur did not enter into exchange contracts with its clients but simply referred them to Vesta to act as the contracting QI. Vesta's thefts from exchangers who contracted with IAG 1031 are covered because IAG 1031 did contract with its clients and was an insured as required by Endorsement 2.

Continental's next argument contesting Vesta's compliance with Endorsement 2, Provision 1(a) (2) requires Continental to fabricate an interpretation of the language contained in its endorsement and to then proffer false facts. Continental claims that Vesta moved exchange funds into a "pooled account" at Borel Bank containing exchange funds from multiple Vesta exchangers and multiple IAG exchangers and it was from this pooled account that Terzakis stole the $9,360,000 (Dkt. 80, page 15). It has been proven without conflicting evidence that the $9,360,000 came from segregated sub-accounts. Continental then proceeds to claim that the "pooling" of IAG 1031 exchanger money with Vesta exchanger money into one account destroyed coverage because it violated Endorsement 2, Provision 1 (a) (1). According to Continental, the "pooling" meant that Vesta "failed to maintain a clear paper trail for each single exchange transaction" which is required for coverage by Continental (Dkt. 80 at page 32 of 34).

But, Endorsement 2, Provision 1(a) (1) drafted by Continental does not say what Continental is telling this court. The provision simply requires that "each exchange transaction shall be identified by a specific file number or like tracking tool so as to provide a clear paper trail for each exchange transaction…" It is undisputed that each exchange transaction got its own exchange number at IAG 1031 and Vesta complying with the actual articulated mandate in

Endorsement 2. (Ye Decl. ¶45.) The policy covers owner theft and Dillon has proven owner theft.

**(iii) Adverse domination.** The second issue for the court to consider as being resolvable on the papers is the adverse domination of Vesta by its owners which prevented Vesta from "discovering" the thefts and making a claim until Dillon's appointment as a fiduciary. The focus here being narrowly limited to the "discovery" of the thefts by Vesta as the term "discovery" is defined in the policy and not by generic agency law on imputation. At the urging of Continental, the district court has already ruled that "discovery" by the thieves' was not "discovery" by Vesta as the term "discovery" in the policy is reasonably interpreted to be given affect. (Dkt. No. 43.)

The court should estopp Continental from arguing that Vesta could have and should have discovered the loss in 2004 and made a claim. First, the court granted judgment in favor of Continental adopting its Insurance Code section 533 argument imputing the wrongdoers' willful acts to Vesta because of the sole actor doctrine. The sole actor doctrine arises (the exception to the exception) only when there is complete domination over an entity by its sole owners so that adverse actions by the purported agents against the principal do not prevent the pass through of the agents' knowledge and willful intent to the entity. The sole actor doctrine only arises when there is complete dominion over the entity destroying the separateness between the entity and its owners. The court's conclusion, proffered by Continental, that Vesta was dominated by its owners out of existence should apply to tolling Vesta's discovery of the loss until Dillon was appointed receiver.

In Continental's motion to dismiss (Dkt. 15, page 14 of 17) it argued that discovery by the thieves was not discovery under the policy so there was no discovery in 2004 which is required to trigger coverage. According to Continental "Losses Must Be Discovered by an Innocent Party" (*Id.*). The district court agreed with Continental but ruled that the period for discovery of the loss would be tolled until Dillon was appointed receiver if Dillon proved adverse domination of Vesta by the thieves in control of Vesta. (Dkt. 43 and Ex. 5 to the Dillon Decl.)

Unabashedly turning 180 degrees, Continental now tells the court as a proffered factual conclusion on the issue of adverse domination that Ginny Estupinian was the "innocent" President of Vesta with the authority, ability and motive to discover the thefts in 2004 and report the claim to Continental as soon as possible after her discovery (Dkt. No. 80, page 31 of 34). If this fact was the undisputed truth, Dillon would have had coverage for thefts in 2004 established in 2009 because discovery by Vesta would have occurred in 2004. Then the coverage issue before this court, at this time, would simply be whether a claim was made to Continental "as soon as possible" (Dillon Decl. Ex.3), which was after Dillon was appointed receiver.

It is not true that Ginny Estupinian was "innocent" and the court can make that factual conclusion now without a trial based on the undisputed facts asserted by Dillon in his papers. Even if the court ordered a trial on the issue of Ginny's knowledge and participation she would not attend. The trial would only consist of the evidence proffered in these papers because Ginny Estupinian has refused to testify asserting her rights under the Fifth Amendment not to incriminate herself. (Dillon Decl. Ex.6.)

Ginny Estupinian was not "innocent" and she adversely dominated Vesta with her husband precluding discovery by Vesta of her own thefts of trust funds and her participation in Terzakis' thefts. Dillon accepts as undisputed facts Continental's description of Ginny's role at Vesta as Continental sets forth in Docket No. 80, pages 31 and 32 of 34 except for the unsupported legal conclusion categorizing her as a "non-wrong doing employee" and that she was not married to Robert Estupinian during the entirety of 2004. The stipulated facts would be: (i) Ginny Estupinian was the President of Vesta in 2004; (ii) she filled out insurance applications, communicated with insurance brokers and had the apparent authority as President to make a claim to Continental on behalf of Vesta; (iii) it was Ginny Estupinian who notified Continental, through its agent, of the change in the name of the insured from IAG 1031 to Vesta under the 2004 Vesta Policy; (iv) Ginny was a signer on the Borel Bank accounts used by IAG 1031 and Vesta; and (v) Ginny had access to the exchange agreements which did not permit the

transfers of exchange funds out of trust to Terzakis or to an entity owned, in part, by Ginny Estupinian.

The additional undisputed evidence presented herein showing that Ginny was a thief working in unison with her husband to adversely dominate Vesta would be: (i) Ye worked with Ginny Estupinian for 8 years at IAG, IAG 1031, and Vesta (Ye Decl. ¶¶ 2-4 and 55); (ii) with her husband, Ginny owned Mutual Vision, LLC which owned 49% of Vesta (Dillon Decl. Ex. 9); (iii) with her husband, Ginny owned half of Vesta Capital Advisors, LLC ("VCA") (Dillon Decl. Ex. 9); (iv) from August 7, 2005 to March 15, 2007 VCA received over $11 million in stolen Vesta exchange funds (Dillon Decl. ¶ 31; Ye Decl. ¶ 52; Ex. 14); (vi) Ginny was a signor on the Borel account and had online access to the Borel Bank sub-accounts and could see the missing money (Ye Decl. ¶¶ 46, 53 and 54; Exs. 13 and 15); (vi) on October 25, 2004 she was informed of a $500,000 theft by Terzakis (Ye. Decl. ¶ 54; Ex.16); and (vii) Ye had conversations with Ginny about liquidity issues confronted by Vesta because exchange funds had been transferred to Terzakis (Ye Decl. ¶ 51).

Beyond her guilt being proven by being the recipient of $11.3 million in stolen trust funds, while Ginny Estupinian was employed at IAG she refused to make any claim to Continental to perfect IAG's coverage on behalf of two exchangers who had their money stolen by her husband and Terzakis. Based on claim records produced to Dillon by Continental in this litigation, it is undisputed that while Ginny Estupinian was employed at IAG, Portola Investments, LLC ("Portola") had $4.3 million in exchange funds stolen out of its account at IAG on August 31, 2001 and Anthony Leuin ("Leuin") had $1 million stolen out of his account at IAG in December of 2002. (Dillon Decl. ¶¶ 34-42.) The lawyers for Portola and Leuin knew about the advertised surety coverage for IAG and made claims to Continental because IAG refused to tender a claim for theft under the two surety bonds issued to IAG by Continental. Just like the Vesta case, Continental responded to the victims by claiming that IAG had to make the theft claim. As with Vesta, Continental claimed the exchangers were not beneficiaries under the three party bonds issued to IAG. Because IAG's principals (Ginny Estupinian, Robert Estupinian and John Terzakis) **refused** to make the claims to Continental as Continental had

expected they would not do, the surety denied the Portola and Leuin claims and closed the files. (Dillon Decl. ¶¶ 34-42; Exs. 11-16.)

Portola and Leuin ultimately got paid with exchange funds deposited by new exchangers pursuant to the Ponzi scheme to the benefit of Continental. (Terzakis Decl. ¶ 16.) And, Continental continued to issue its illusory policies to IAG 103, Vesta and the other members of the Federation of Exchange Accommodators for approximately $10,000 per policy. (Dillon Decl. Ex. 3.)

Ginny Estupinian was not innocent and she did not and would not make a claim to Continental in 2001, 2002, 2003, 2004 or ever. She even refused to testify about Dillon's claim at her deposition. To make a claim, the defalcating owner has to admit her guilt. The claims asserted by Dillon in this case could not be discovered or made until Dillon was appointed receiver. Proof of adverse domination over Vesta in *Dillon v. Continental* is the actual adverse domination over Vesta in *United States Fire Insurance Company v. Vesta*.

In the U.S. Fire Matter, the records reflect that after the collapse of Vesta in June of 2008 Terzakis maliciously destroyed $4 million in surety bond coverage by rescinding two surety policies in exchange for $40,000 in refunded premiums to pay his lawyers. Trading $4 million in insurance set aside for exchange creditors for $40,000 to pay Terzakis' lawyers is the ultimate in adverse domination and should end the enquiry here. (Dillon Decl. ¶¶ 32-33; Ex. 10.) Terzakis' rescission of the two U.S. Fire policies resulted in a diminished settlement from U.S. Fire (*Id.*) and the proximate cause for the legal malpractice case the receiver filed entitled *Dillon v. Murphy & Hourihane*, case No. 5:14-cv-01908-BLF heard by Judge Freeman (hereinafter the "Malpractice Action") . The Malpractice Action, was based solely on the adverse domination of Vesta by Terzakis and his lawyers concerning the two surety bonds (identical to the subject 2004 Vesta Policy) issued to Vesta by U.S. Fire. (Dillon Decl.¶ 33.)

In conclusion, there were $9,360,000 in owner thefts during the 2004 Vesta Policy which is a surety bond covering owner theft of client funds. Vesta complied with all requirements set out in the contract. Dillion made a claim immediately after being appointed receiver. No person at Vesta in a position of authority would have made such a claim. All of

the people involved in the thefts would not make such a claim which would, by its very terms, implicate themselves in the thefts. Continental knew this paradigm and made money off it until Dillon was appointed receiver. The equities are in Dillon's favor to toll the discovery of loss.

## II. RELEVANT PROCEDURAL HISTORY

In the related action styled as *United States Fire Insurance Company v. Vesta Strategies, LLC*, Case No. C-09-02388-JW, the Vesta exchangers who suffered the theft loss of their money ("exchange funds") sued Continental (Dkt. No.13 in U.S. Fire Matter) for $5 million in surety coverage. Continental filed a motion to dismiss (Dkt. No. 98 in U.S. Fire Matter), contending that the Vesta exchangers had no standing to bring such a claim and that Vesta, the insured, was the only person who could enforce the policy. The district court agreed and dismissed the Vesta exchangers' case. In response, the Vesta exchangers sought the appointment of Dillon to act as the receiver of Vesta for the benefit of the 1031 exchangers whose $20 million in exchange funds had been stolen by the owners of Vesta. (Dkt. No. 75 in U.S. Fire Matter). The Court granted the exchangers' request and appointed Dillon as receiver (Dkt. No. 123 in U.S. Fire Matter).

Dillon made a claim against Continental for coverage under the 2004 Vesta Policy. A copy of the policy in dispute is attached to the Post Appeal Declaration of Thomas A. Dillon ("Dillon Decl.") as Exhibit 3 and as Exhibit 10 to the Declaration of John Terzakis ("Terzakis Decl.") found in the court's file at docket 76-10, pages 1 to 17. The surety Endorsement 3 is found at page 13 of 17 of Dkt. Nos. 76-10 and is attached to this motion as Exhibit 1 with the other applicable endorsements. Continental denied the claim.

On November 1, 2010, Dillon filed a complaint (Dkt. No. 1) against Continental seeking from the Court: (i) a declaration that there was coverage for Vesta under the 2004 Vesta Policy for the theft of exchange funds by Terzakis, with the help of Robert Estupinian and Peter Ye, during the August 15, 2003 to August 15, 2004 policy period; and (ii) entry of a judgment declaring the policy enforceable by Dillon and ordering Continental to pay breach of contract damages of $5,000,000 to Dillon, plus pre-judgment interest from the date of filing the complaint.

Dillon alleged that in 2004 Terzakis, as an owner of Vesta, with the help of Estupinian and Ye, stole millions of exchange funds on deposit with Vesta in a series of thefts during the 2004 policy period. Thereafter, the thieves ran a Ponzi scheme by paying older exchanges, which could not fund because their money was stolen, with exchange funds deposited by new exchangers. Dillon alleged further that: (i) the trust res consisting of exchange funds held in trust by Vesta as an express trustee was injured by the millions in thefts; (ii) Terzakis never repaid Vesta to recharge the trust; (iii) after June 24, 2004, the Vesta trust assets (exchange funds) versus trust liabilities (what was owed to ascertainable exchanger beneficiaries) remained in a deficit position exceeding the $5,000,000 policy limits; and (iv) when Vesta collapsed in June of 2008, the deficit in the trust created by these thefts during the 2004 Vesta Policy caused, in part, Vesta's inability to fund approximately $20 million 1031 exchanges pending at the time of its collapse.

Dillon alleged further that the $5,000,000 to be paid by Continental will be used to partially recharge the deficit in the trust to fund the 1031 exchanges of the ascertainable beneficiaries, whose claims remained unpaid at the termination of Vesta. The money will not be paid to Terzakis or Estupinian as the owners of Vesta, or Ye the defalcating employee of Vesta. Dillon then alleged that his lawsuit filed on November 1, 2010 was timely because Estupinian and Terzakis adversely dominated Vesta, to its detriment, until Dillon was appointed as Receiver on December 16, 2009.

On January 26, 2011, Continental filed a motion to dismiss Dillon's complaint (Dkt. No. 15) contending that the losses suffered by the 1031 exchangers when Vesta finally collapsed in June of 2008 (who's claims had now been dismissed by Continental's motion) were not loses sustained in 2004. According to Continental, for there to be a loss covered under the policy there had to be a failed exchange during the policy period even though the exchangers do not have standing to assert such a claim. Because there were no failed exchanges in 2004 there was no loss covered under the policy to be discovered in 2004. In addition, Continental claimed "Losses Must be Discovered By An Innocent Party" (Dkt. No. 15, page 14 of 17) so the only

persons at Vesta who could conceivably discover a loss for Vesta in 2004 were innocent employees and not the thieves who stole the money.

On July 14, 2011, the district court denied Continental's motion to dismiss and ruled that the loss by embezzlement of the original exchangers' funds which allegedly occurred during the 2004 discovery period was a covered loss under the policy. These thefts in 2004 created a deficit in the exchange account that was concealed by the continuous repayment of previous exchangers with the funds from new exchangers. The concealed deficit was exposed when the scheme collapsed in 2008 which "merely identified the ultimate damage caused by the original loss." (Dkt. No. 43 at page 8 of 13). The court also ruled that knowledge by Terzakis and Estupinian of their own thefts was not discovery by Vesta, but discovery of the loss by Vesta would be equitably tolled until Dillon was appointed Receiver if he proved adverse domination of Vesta by its thieving owners. A copy of the order is attached as Exhibit 5 to the declaration of Dillon. The district court's order (Dkt. No. 43) sets forth the law in this case against Continental that proven thefts in 2004 are covered losses under the policy.

Dillon and Continental both filed motions for summary judgment with supporting evidence. Dillon submitted the Declarations of Terzakis and Ye who have been charged, convicted, sentenced, and incarcerated for their crimes arising out of the theft of exchange funds. Both witnesses established that $9.3 million in Exchange Funds were stolen by Terzakis from January 2004 to late June 2004 during the term of the 2004 Vesta Policy. Terzakis never repaid these moneys and when Vesta collapsed in 2008 it owed over $20 million to exchangers

Dillon also submitted evidence that Terzakis and Estupinian, the owners of Vesta, were acting adverse to Vesta by stealing trust money. As the owners of Vesta they were in control of Vesta and they would never submit a theft claim to Continental for the benefit of Vesta because to do so would implicate themselves in a crime. The only time a claim could be made was after Vesta collapsed and Dillon was appointed Receiver.

Continental made various arguments against coverage, including that the policy it issued to Vesta, if it was enforced by the court, would violate the Insurance Code which precludes intentional wrong doers from buying insurance to cover themselves for intentional acts if the

payment by the insurer would benefit the wrongdoers. The district court agreed and granted Continentals' motion for summary judgment on the grounds that enforcement would violate public policy. The judgment was appealed, reversed and remanded. The Ninth Circuit concluded that Endorsement 3 to the 2004 Vesta Policy created a surety bond which could be enforced by Dillon in this action on behalf of the exchangers with unfunded exchanges without violating public policy.

## III. THE LEGAL STANDARD FOR GRANTING OR DENYING MOTIONS FOR SUMMARY JUDGMENT

Dillon adopts and incorporates by reference the legal standard for granting or denying motions for summary judgment recited by the district court in Docket 133.

## IV. LEGAL ARGUMENT

### A. The $9.3 Million Transferred to Terzakis by Ye with the Approval of Estupinian was the Embezzlement of Exchange Funds Under the Control of Vesta with the Manifest Intent to Cause a Covered Loss under the Policy.

According to Continental in its original motion for summary judgment (Dkt. No. 80), Terzakis did not have the "manifest intent" to cause a covered loss to trigger coverage because: (i) Terzakis did not know that the transfers were illegal; (ii) Terzakis always intended to someday return the money; (iii) Terzakis had the money to repay Vesta until the real estate market crashed in 2007- after the policy term; (iv) Terzakis caused his employees at Single Site Solutions in Chicago to account for the "loans", so Terzakis must be honest because everybody knew that he was "borrowing" the money; and (v) Terzakis owned Vesta, so, by implication, Terzakis did not want to act adverse to Vesta. Continental's characterization of Terzakis' behavior as benign excusable neglect is entirely contrary to Continental's Insurance Code § 533 argument that he had the willful intent to cause the loss which was adopted by the district court in order to dismiss the case in favor of Continental. The court should put an end to the constant conflicting positions repeatedly asserted by this institutional insurer.

By following Continental's legal analysis the district court was required to make certain findings of fact based on the evidence before it which should be fixed in place, notwithstanding

the remand. To rule on the application of the Insurance Code § 533 the court rightfully concluded that given the "overwhelming evidence, the court finds that the conduct at issue here is willful…" (Dkt. No. 133, page 11 of 18), that Terzakis and Estupinian "were using the corporation to perpetuate their fraudulent scheme" (Dkt. No. 133, page 12 of 18), that "Mr. Terzakis and Mr. Estupinian were the sole owners of Vesta and architects of a Ponzi scheme that resulted in millions of dollars of loss for Vesta's clients" (Dkt. No. 133 at page 12 of 18) and that "Mr. Ye and Ms. Estupinian, the only other Vesta officers identified by Dillon, assented to this fraud." *Id.*

The district court went on to impute the willful conduct of Estupinian, Terzakis, Ye and Ginny Estupinian to Vesta based on the application of the sole actor doctrine exception to the adverse interest exception to the imputation of an agents knowledge and willful acts to an entity. To apply the exception to the exception the court first concluded that Vesta was solely owned and dominated by all the wrongdoers. (Dkt. No. 133, at page 13 to 18.) The courts conclusion that the sole actor doctrine exception applied to the adverse interest exception to agency imputation is, by logic, a finding by this court that Vesta was completely dominated by its wrongdoers. The court's prior factual finding in favor of Continental's public policy argument is now a finding in favor of Dillon on the issue of adverse domination to toll the "discovery" of loss (as "discovery" is defined in the policy) until Dillon was appointed receiver. It is undisputed that there were no fiduciaries in place inside Vesta who could act on behalf of Vesta to protect Vesta from the wrongdoers in control of Vesta.

On the issue of "manifest intent" to cause a covered loss, Continental must have forgotten that the district court already concluded that proof by Dillon of the embezzlement of exchange funds by Terzakis and Estupinian is a covered cause of loss. The court concluded in denying Continental's motion to dismiss:

> . . . the Policies provide coverage for the alleged losses caused by Terzakis and Estupinian's embezzlement of the original exchangers' funds. In particular, the Policies define "Covered Cause of Loss" to include dishonest acts committed by employees (and owners with regard to Section 1031 exchange funds) with the manifest intent to cause a loss and obtain a financial benefit. The Court finds that the

> "loss" alleged by Plaintiff is the embezzlement of the original exchangers' funds by Terzakis and Estupinian for their personal use, which allegedly occurred during the discovery period. (Dkt. No. 43.)

Terzakis, Estupinian and Ye were charged and convicted for violating federal crimes much more serious than embezzlement, but they still embezzled exchange funds. The Vesta exchange agreements said the exchange funds were held by Vesta in an express trust. (Ye Decl. Ex. 12.) Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted. Cal. Penal Code §503. "The gist of the offense is the appropriation to the defendant's own use of property delivered to him for a specified purpose other than his own enjoyment of it." *People v. Parker*, 235 Cal. App. 2d 100,108-109 (Cal. App. 3d Dist. 1965). Embezzlement occurs where a relationship of trust and confidence exists between the defendant and another person, the defendant accepts property entrusted to him by the other person, and the defendant fraudulently appropriates or converts the property to his own use or purpose with the specific intent to deprive the other person of the property at least temporarily. *People v. Talbot*, 220 Cal. 3, 13-16 (Cal. 1934); *People v. Miller*, 188 Cal. App. 2d 156 (Cal. App. 2d Dist. 1961).

Terzakis' proclaimed ignorance of the law is no defense to the crimes he committed or to the surety coverage promised for these crimes. The word "knowing" for actual knowledge does not require any knowledge of the unlawfulness of an act. A murderer is guilty of murder even if he did not know killing was a crime. Pursuant to Penal Code section 7, the word "knowingly" imports only a knowledge that the facts exist which are proscribed by the law. Ignorance of the law is no excuse. Terzakis' claim that he did not know taking trust funds was unlawful is no defense to Continental because he knew he took trust funds deposited at Vesta without the exchangers' consent. *People v. Burns*, 75 Cal. 627 (1888).

Borrowing trust funds in breach of the terms of the trust and without the consent from the equitable owners is called embezzlement, larceny and fraud. See Cal. Penal Code §§ 484 and 503. Terzakis' intent to someday repay Vesta is also irrelevant to the "Dishonesty" of the crimes he admitted committing. In *People v. Talbot*, 220 Cal. 3 (1934), the California Supreme Court rejected Mr. Talbot's arguments proffered to overturn his embezzlement conviction.

Talbot argued that, as the President of Atlantic Richfield Oil Co., he intended to repay his employer the money he had taken, that he had the financial ability to make restitution, and that the employer's money was openly transferred to Talbot without concealment. These are the same facts that Continental claims are applicable to Terzakis, and which this Court should then conclude defeat Dillon's contract claim as a matter of law. However, the California Supreme Court in Talbot ruled that the crime of embezzlement occurs "immediately" upon the breach of trust. When the money is converted, the crime of embezzlement is committed.

**B. Dillon Has Proven the Source of the $9,360,000 Stolen by Terzakis Came From Segregated Exchange Funds Deposited in Sub-Accounts at Borel Bank.**

The 2004 Vesta Policy period ran from August 15, 2003 to August 15, 2004. From January 21, 2004 to June 24, 2004, within the policy time frame and in eight separate thefts, Terzakis stole $9,360,000 directly from sub-accounts at Borel Bank containing exchange funds; and not from some mystic "pooled account" containing money from unidentified and uninsurable sources. (Ye Decl. ¶¶ 6-42; Terzakis Decl. ¶¶ 12-24.) Continental's argument that Dillon has not proven the source of the stolen funds as being exchange funds under the control of Vesta while it was insured by Continental does not create a triable issue of fact to set this matter for a trial.

For each separate theft, Ye's Declaration contains copies of Outgoing Domestic Wire Requests signed by Ye and faxed by Ye to Borel Bank to start each transfer. Ye's declaration then contains the actual Borel Bank statements for the sub-accounts where the money was transferred out of and on to Terzakis in Chicago to complete the transfer. (Ye Decl. ¶¶ 6-24; Exs. 1-11 and 67.) The Borel Bank records show the identification of each exchanger by name, their exchange number, their sub-account number, the date and amount of the receipt of their segregated exchange funds by Borel Bank, and the date and the amount of the segregated exchange funds transferred to Terzakis. The separate transfers testified to by Ye could be proven solely by the business records from the custodian of records for Borel Bank without Ye's testimony describing the mechanics he used to accomplish each theft. The source of the $9,360,000 in exchange funds transferred to Terzakis by Vesta's employee Peter C. Ye during

the 2004 Vesta Policy has been proven regardless of the court's concern about Ye helping Dillon. There is no cognizable dispute on this planet about the amount or the source of these specific funds.

The use of the $9,360,000 by Terzakis, after his receipt, for his personal business affairs has also been proven with bank records from Terzakis' various entities that received the money and then disbursed it. Again there is no dispute about the use of these trust funds by Terzakis for personal business unrelated to closing 1031 Exchanges at Vesta or IAG 1031. (Terzakis Decl.¶¶ 12-24; Ex. 14.) Continental should pay.

**C. Terzakis, Ye and both Mr. and Mrs. Estupinian Adversely Dominated Vesta, Which Tolled the Discovery of Loss by Vesta Until the Receiver Was Appointed**.

When a corporation is owned and controlled by the same persons committing thefts against the corporation, the entity is deemed to be in a position similar to an incompetent person or a minor. The incapacitated entity is without legal capacity to "discover" or to act in relation to the fraud being committed against it by its principles. During the period of incapacity, courts toll the time for the corporation to discover a theft loss under a fidelity bond when the President and other high ranking officers who controlled the entity are the persons stealing the money. *Admiralty Fund v. Peerless Insurance Co*., 143 Cal. App. 3d 379 (1983).

Continental cites *Mosesian v. Peat, Marwick, Mitchell & Co*., 727 F.2d 873, 879 (9th Cir. Cal. 1984) in its original motion for summary judgment to argue that tolling occurs only when there is "complete domination," which means Dillon must negate the possibility that an informed stockholder or director of Vesta could have induced Vesta to make a claim. Dillon has met his burden by establishing that the sole shareholders of Vesta (Terzakis, Estupinian and Ginny Estupinian) were also the thieves who would never tender and prosecute a claim for their own thefts. Terzakis, as the "sole manager," served in the capacity as a "director" and he was not about to prosecute a theft claim for Vesta against Continental. (Terzakis Decl. Ex. 5, Vesta Operating Agreement.)

Like in *Peerless*, Robert Estupinian as the CEO and Ginny Estupinian as the President were high-ranking officers of Vesta and they would not make a claim to implicate themselves in

their assent to the transfers to Terzakis or their own, independent, thefts of exchange funds. Ye was the senior employee at Vesta in 2004 and, at this time, he was lied to about the propriety of transferring the funds out of trust so he was not in a position to perceive a loss and file a claim.

Continental cites *California Union Insurance Co. v. American Diversified Sav. Bank*, 948 F. 2d 556 (9th Cir. 1991), to argue that Dillon's burden is much greater than "complete domination," as he must now prove there were no innocent employees in existence at Vesta who could have discovered the loss, regardless of their job duties and placement in the chain of command. But this is not what the court ruled in *California Union* because the parties in that case agreed up front that "discovery" could take place while the policy was in effect only if an officer, director, general counsel, or some other person in a position of responsibility discovered the thefts.

There is no requirement for Dillon to negate the knowledge of rank and file employees. *Resolution Trust Corp. v. Franz*, 909 F. Supp 1128, 1136 (N.D. Ill. 1995). Dillon does not have to bring to a trial all rank and file employees of Vesta, including the janitor and the receptionist, to say they did not see a crime, and if they had, they would have quit. (Susan Woo Decl.¶5, [Dkt. No. 79]; Kristine Carlos Decl.¶8, [Dkt. No. 78]; William Carling Decl. ¶10 [Dkt. No. 93].)

Terzakis' Declarations saying he stole the money with the help of Estupinian, concealed the thefts through lies, and did not make a claim for his own thefts is enough. Once Dillon has presented evidence of complete domination the burden shifts to Continental to locate and identify an officer, director, or person in a position of power to discover and make a claim. Continental has to rebut the presumption of domination and prove the negative which it cannot do.

Courts adopting the adverse domination doctrine hold that once the plaintiff establishes either complete or majority control over the corporation by the wrongdoers, a rebuttable presumption arises that knowledge of the injury to the corporation will not be available for the corporation to make a claim so long as the wrongdoers remain in control. The presumption may be rebutted, however, by evidence that someone other than the wrongdoing directors and officers had knowledge of the claim, and both the ability and the motive to make a claim on the

policy. *Resolution Trust Corp. v. Smith*, 872 F.Supp 805 (D. Or. 1995). Thus, the ability to act on knowledge of the wrong is just as important as the knowledge itself. Because all three of the owners of Vesta were the criminals, discovery by Vesta must be tolled. *Shields v. National Union Fire Insurance Co*., 153 B.R. 677 (E.D. Penn, 1993).

Proof of prior successful adverse domination by Terzakis, Estupinian and Ginny Estupinian with the knowing assistance of Continental is proof of adverse domination in the case at bar. Continental produced documents in this litigation which show that it provided a surety bond to Investment Advantage Group, LLC ("IAG"), which was a predecessor QI to Vesta. As the records reflect and as the district court duly noted the first QI operated by Terzakis and Estupinian was IAG. The second QI was IAG 1031 and the third QI was Vesta. All three QI's were members of the Federation of Exchange Accommodators (" the FEA") and all acquired the insurance offered by Continental to the members of the FEA with the 3 endorsements transforming the employee dishonesty insurance into a surety bond covering owner theft. (Dillon Decl. Exs. 3 and 11-16.)

Attached to Dillon's Declaration as Exhibit 11 is a copy of the Continental Crime Policy Declaration page issued to IAG for policy no. 169790315 for $5 million in theft coverage with effective dates of August 15, 2001 to August 15, 2002, including the 3 FEA endorsements. Exhibit 11 was produced by Continental. The same 3 endorsements identified in Exhibit 11 also apply to the 2004 Vesta Policy (Dillon Decl. Ex. 3 and Ex. 1 attached hereto.) Attached as Exhibit 12 to Dillon's Declaration is a claim letter citing the surety policy no. 169790315 sent to Continental by a lawyer ("Hudak") for Portola Investments, LLC ("Portola"). Portola was an exchanger that used IAG. According to Hudak, on or about August 31, 2001 Portola lost $4,339,920 in exchange funds due to theft by persons at IAG. The letter discloses that Estupinian of IAG was deposed in the litigation filed by Portola against IAG, Estupinian and Terzakis. According to Hudak, Estupinian refused to divulge what happened to the $4.3 million at his deposition. The letter to Continental goes on to state that IAG "refused" to notify Continental of the Portola theft claim. In response to the insured's failure to perfect the claim with proper notice, Hudak was giving notice of the theft of his client's money and requesting

that Continental investigate the missing $4.3 million. Continental acknowledged that it received Hudak's letter and admitted it did insure IAG for theft. The response to Portola also included the typical bad faith disclaimer by Continental that the insurance it sold to IAG was only for the benefit of IAG and the policy did not confer any rights on Portola, as an exchanger, to make a claim or demand an investigation. (Dillon Decl. Exs. 11 and 12.)

In Continental's follow-up letter to Estupinian about the Portola theft claim of $4.3 million it was made clear to Continental that Estupinian was refusing to assert any claim against IAG's insurer for the stolen $4.3 million- "it was made clear (to Continental) based on our conversation today that IAG did not wish the Company to get involved with the Claim…" Estupinian told Continental he was settling Portola's case against IAG and as set out in the Terzakis Declaration it was the Vesta exchangers who paid for part of the Portola settlement with stolen funds pursuant to the Ponzi scheme. (Paragraph 16 of Terzakis Declaration, Dkt. 76, page 7 of 11).

Effective August 15, 2002 to August 15, 2003, Continental issued a new surety bond (policy No. 169901607) to IAG for $5 million in theft coverage, knowing that: (i) $4.3 million in Portola's Exchange Funds was missing at IAG, (ii) Portola was claiming the money was stolen by persons at IAG, (iii) Estupinian of IAG had been deposed and refused to disclose to Portola what happened to its money, and (iv) Estupinian would not assert a theft claim against Continental on the $5 million theft policy. The only logical inference to draw from reissuing a new $5 million policy to IAG was that Continental knew that the owners of a QI who stole exchange funds would never make a claim. Attached as Exhibit 14 to Dillon's Declaration is an invoice for the new policy and attached as Exhibit 15 is another theft claim sent to Continental by IAG Exchangers Anthony Leuin and Jean Bertrand (collectively "Leuin') contending their $1,014,786 in Exchange Funds on deposit with IAG were converted in or about December of 2002.

On February 28, 2003, Continental responded to the Leuin theft claim by requesting from IAG a sworn proof of loss with full disclosure about the theft of Leuin's $1 million. On

July 14, 2003, Continental denied the Leuin claim because "the Insured has chosen not to pursue this claim." Dillon Decl. Ex. 16.

Continental then issued the 2004 Vesta Policy to IAG 1031 and then Vesta as set out in Exhibit 3 to Dillon's Declaration with full knowledge and expectation that if thefts did occur, the owners of IAG 1031 and Vesta would never assert a claim. It is axiomatic that until the Ponzi schemes collapse and receivers are appointed no claims would ever be asserted by the owners of the insured QIs who misappropriated the exchange funds and adversely dominate the QI.

Additional evidence of actual adverse domination by Terzakis over Vesta is found in the U.S. Fire Matter files. There, the records reflect that after the collapse of Vesta in June of 2008, but before Dillon was appointed as a fiduciary in December 2009 to look out for Vesta, Terzakis maliciously destroyed $4 million in surety bond coverage by rescinding two surety policies in exchange for $40,000 in refunded premiums to pay his lawyers. Trading $4 million in insurance set aside for exchange creditors for $40,000 to pay Terzakis' lawyers is the ultimate mean spirited act of adverse domination and should end the enquiry here. (Dillon Decl. ¶¶ 2-33; Ex. 10.)

Terzakis' rescission of the two U.S. Fire policies resulted in a diminished settlement from U.S. Fire and the proximate cause for the legal malpractice case the receiver filed entitled *Dillon v. Murphy & Hourihane*, case No. 5:14-cv-01908-BLF heard by Judge Freeman (hereinafter the "Malpractice Action") . The Malpractice Action, was based solely on the adverse domination of Vesta by Terzakis and his lawyers concerning the two surety bonds (identical to the subject 2004 Vesta Policy) issued to Vesta by U.S. Fire. (*Id.*)

## V. CONCLUSION

Continental claimed the policy was not a surety bond which was false as a matter of law. Continental claimed the exchangers were not third party beneficiaries of the policy which was false as a matter of law. Continental claimed that 1031 exchanges had to fail at Vesta before there was a loss covered under the policy which was false as a matter of law. Continental claimed that Terzakis did not have the manifest intent to cause a dishonest act which was false

as a matter of fact and law, and diametrically opposed to Continental's section 533 argument that willful acts by Vesta's owners are excluded, which the court relied upon to issue a ruling in error. Continental claimed that "pooling" exchange funds in one account destroys coverage which is proven false by just reading the policy. Continental claimed the policy requires a "clear paper trail" when the policy just requires the assignment of a number to each exchange. Continental claimed that rank and file employees are to be considered when determining adverse domination which is false as a matter of law. Continental falsely claimed Ginny Estupinian was an innocent officer of Vesta with the ability, authority and motive to make a claim when Continental participated with her and Robert Estupinian in denying legitimate claims based on the Estupinian's repeated refusal to submit claims of theft to Continental.

Dillon has worked very hard and done a great job by starting with a zero asset estate and collecting over $11 million to distribute close to $8 million to victims of the Ponzi scheme. This is an easy case made difficult by a less than forthright defendant insurance company. In coverage cases, the task is to juxtapose the facts against the policy language. This case was made more difficult because the court must equitably toll the discovery of loss period to take into consideration that the thieves would never voluntarily confess. The equities are overwhelmingly in favor of enforcing the policy by entering a $5 million judgment.

DATED this 27th day of October, 2016

/s/ Robert L. Brace

Robert L. Brace, Esq., SBN. 122240
1807 Santa Barbara Street
Santa Barbara, CA 93101

Attorneys for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group LLC

**CERTIFICATE OF SERVICE**

This document will be served by the Court via its CM/ECF. No Certificate of Service is necessary, except as to those parties not on the Court's electronic service list. Plaintiff is informed and believes that all parties who have appeared to date have at least one of their attorneys on the electronic service list.