Robert L. Brace, SBN 122240
Email: RLBRACE@Rusty.Lawyer
1807 Santa Barbara Street
Santa Barbara, CA 93101
Telephone: (805) 845-8211
Cell Phone: (805) 965-0329

Attorney for Thomas Dillon, as Court-Appointed
Receiver for Vesta Strategies, LLC
and Excalibur 1031 Group LLC

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THOMAS A. DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC<br><br>Plaintiff,<br>vs.<br><br>CONTINENTAL CASUALTY COMPANY, an Illinois corporation.<br><br>Defendant | **Case No.: 5:10-CV-05238-EJD**<br><br>**Related Case No.: 5:09-CV-02388-JW**<br><br>**THOMAS A. DILLON'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON THE 2004 VESTA POLICY**<br><br>**Hearing Date: February 2, 2017**<br>**Time: 9:00 a.m.**<br>**Location: CR 4, 5th Floor** |

Thomas A. Dillon hereby submits the following Statement of Undisputed Facts in Support of his motion for summary judgment pursuant to the court's standing order on civil cases. Continental must admit each fact is true as undisputed or deny the truth of Dillon's asserted fact and support the denial with evidence.

**DILLON'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| Dillon's Claim of Breach of Contract | Dillon's Undisputed Facts/Supporting Evidence in Support | Continental's Response/Supporting Evidence |
|---|---|---|
| Continental Issued a $5,000,000 surety bond to Vesta For Owner Theft of Client Funds | For $9,261 paid in premiums and commissions, Continental issued Policy No. 267920538 (the "2004 Vesta Policy) to IAG 1031, LLC (the predecessor to Vesta), which was a surety bond covering owner theft of client funds for the benefit of exchangers.<br><br>Terzakis Decl. (Dkt. 76), Ex 10; Dillon Decl. Ex. 3; Dkt. 142. | |
| Formation of Vesta on January 9, 2004 | On January 9, 2004, Vesta Strategies, LLC was formed as a limited liability company to take over the assets and liabilities of the 1031 QI business of IAG 1031, LLC. Vesta was formed as a California limited liability company pursuant to California Corporation Code §17000, et seq.<br><br>Terzakis Decl., ¶¶ 4 -6 and Ex. 5. | |
| Continental insures Vesta on January 9, 2004 | Continental issued an endorsement on the 2004 Vesta Policy, naming Vesta Strategies, LLC as a named insured for theft of exchange funds discovered by Vesta from January 9, 2004 to October 15, 2004.<br><br>Terzakis Decl. (Dkt. 76), ¶ 11, Ex. 10; Dillon Decl. ¶18, Ex. 3. | |
| The 2004 Vesta Policy is a surety bond | The 2004 Vesta Policy is a surety bond that covers the theft of exchange funds by Vesta and by the employees, partners, and owners of Vesta for the benefit of the exchangers conducting business with Vesta.<br><br>Dkt. 142. | |

| | | |
|---|---|---|
| Ownership and ultimate control of Vesta by Terzakis | John Terzakis ("Terzakis") owned 100% of the shares of B&B Sparco Properties, Inc. ("B&B Sparco"), and B&B Sparco owned 51% of the membership interests in Vesta. B&B Sparco was listed as the sole manager of Vesta. Terzakis owned B&B Sparco, so Terzakis controlled Vesta through his ownership of B&B Sparco.<br><br>Terzakis Decl. (Dkt. 76), ¶4 and Ex. 5; Dillon Decl., ¶31 and Ex. 9: Ye Decl. ¶3. | |
| Terzakis was the managing member of Vesta pursuant to the Vesta Operating Agreement | The Vesta Operating Agreement provided that Terzakis had exclusive dominion and control over Vesta as the majority owner of Vesta, and Vesta employees owed no duty or obligation to Vesta to question Terzakis' exercise of authority over Vesta.<br><br>Terzakis Decl. (Dkt. 76), Ex.5, and ¶¶ 3.3 and 3.4 in Ex. 5. | |
| Robert Estupinian and Ginny Estupinian owned 49% of Vesta and 50% of Vesta Capital Advisors | Robert Estupinian ("Estupinian") and Ginny Estupinian owned 100% of Mutual Vision, LLC, and Mutual Vision, LLC owned 49% of the membership interests in Vesta and a 50% interest in Vesta Capital Advisors, LLC ("VCA").<br><br>Terzakis Decl. (Dkt.76), ¶4; Dillon Decl. ¶31, Ex. 9; Ye Decl. ¶¶3 and 52-53. | |
| Terzakis, Estupinian and Ginny Estupinian owned 100% of Vesta | Together, the Estupinian's and Terzakis owned 100% of the membership interests in Vesta.<br>Terzakis Decl. (Dkt. 76), ¶4. | |
| Officers of Vesta in 2004 | In 2004, Estupinian was the Chief Operating Officer of Vesta and Ginny Estupinian was the President of Vesta. Ye was not an officer, but was Manager of Operations. Terzakis was not an officer but was the managing member.<br><br>Ye Decl., ¶¶2-4; Terzakis Decl.¶7. | |

| | | |
|---|---|---|
| At Vesta, Ginny Estupinian would follow the directives of her husband Robert Estupinian | During 2004, Peter Ye followed the directives of both Estupinian and Terzakis. Based on his years working in the QI businesses operated by Terzakis and the Estupinian's, Ye perceived that Ginny Estupinian followed the directives of Robert Estupinian. Although Ginny Estupinian was identified as the President of Vesta, she spent very little time working at Vesta.<br><br>Ye Decl., ¶¶ 4 and 55; Terzakis Decl. (Dkt. 76), ¶7. | |
| Innocent lower ranking employees were not in a position of power to help Vesta | During 2004, there were no employees at Vesta in a position of power at Vesta who could have acted on behalf of Vesta to prevent either Terzakis or Estupinian from using exchange funds for their personal investments.<br><br>Terzakis Decl. ¶4. | |
| In 2004, Ye followed directions from Terzakis and Estupinian because Estupinian lied to Ye | By 2004 Ye had become a senior employee at Vesta. Ye had knowledge of the transfers of Vesta exchange funds to Terzakis as they were made. Ye performed the physical tasks needed to effectuate the transfers. In 2004, Ye had no reason to question either the propriety or legality of transferring exchange funds to Mr. Terzakis, as Ye was directed to do so by his superiors (Estupinian and Terzakis), for what Ye believed to be investments. Ye was told by Estupinian that the exchange agreements gave Vesta the discretionary authority to invest the exchange funds as Estupinian saw fit, which Ye was told by Estupinian included lending the money to Terzakis.<br><br>Ye Decl. ¶42. | |
| No Vesta employees complained to Ye | In 2004, Ye was not made aware by any employee at Vesta that they concluded the | |

| | | |
|---|---|---|
| about the transfers to Terzakis or the transfers to Vesta Capital Advisors | transfers of exchange funds to Terzakis constituted thefts. In 2004, Vesta was able to close old exchanges pending at Vesta with new exchange funds deposited by new Vesta exchangers, so there was no reason for employees to be concerned.<br><br>Ye Decl. ¶50. | |
| Estupinian lies to other employees to conceal the thefts and they believe him | Kristine Carlos (a/k/a Kristine Cangco) was employed at Vesta in 2004 and asked Estupinian why Vesta was making a transfer of exchange funds out of the depository account for a purpose other than to close an exchange. Estupinian responded to Carlos by saying that the purpose was to earn more interest on the exchange funds pending the close of the exchanger's 1031 exchange. Carlos believed Estupinian.<br><br>Carlos Decl. (Dkt. 78), ¶7. | |
| Innocent employees at Vesta do not discover thefts | Carlos job duty included tracking exchange funds deposited by exchangers. Carlos followed the directions of her superiors at Vesta, and never questioned their ethics or business practices. Carlos never concluded that any transfer of exchange funds at Vesta was suspicious or illegal and if she had concluded her superiors were involved in criminal activity, she would have terminated her involvement.<br><br>Carlos Decl. (Dkt. 78), ¶¶6-8 and Ex. 1. | |
| Other innocent employees at Vesta do not discover the thefts | Susan Woo was employed at Vesta in 2004 and she too tracked the deposit of exchange funds. Woo followed the directives of Peter Ye and Robert Estupinian. Woo knew about transfers of exchange funds to Vesta Capital Advisors but was told it was to earn higher interest rates. If Woo had discovered that the owners of Vesta were engaged in illegal activity, she would have quit her job at Vesta. | |

| | | |
|---|---|---|
| | Woo Decl. (Dkt. 79), ¶¶ 1 to 6, Exs. 1 and 2. | |
| Only Estupinian and Terzakis could make a claim on insurance for Vesta and they would not make a claim. Discovery of the loss by Vesta must be tolled until Dillon's appointment. | During 2004, no employee at Vesta had the authority to make a claim on insurance coverage for Vesta. If such a claim were to be made on behalf of Vesta, the decision to make such a claim would have had to be made by Estupinian or Terzakis. Ginny Estupinian would not make an insurance claim for Vesta unless directed to do so by Estupinian.<br><br>Ye Decl., ¶55; Terzakis Decl.(Dkt. 76), ¶25 | |
| Terzakis guilty of federal crimes in connection with Vesta | In connection with his operation of Vesta, on February 23, 2012, Terzakis pled guilty to counts 1, 5 and 10 of his indictment: Conspiracy to Commit Wire Fraud, Wire Fraud, and Money Laundering.<br><br>Terzakis Decl. (Dkt 76), ¶1; Exs. 1 and 2. | |
| Ye guilty of federal crimes in connection with Vesta | Ye pled guilty to conspiracy, wire fraud and money laundering in connection with his employment at Vesta.<br><br>Ye Decl. ¶16 | |
| Estupinian guilty of federal crimes in connection with Vesta | Estupinian pled guilty to conspiracy, wire fraud and money laundering in connection with his ownership and employment at Vesta.<br><br>Terzakis Decl. (Dkt. 76) ¶5, Ex. 6. | |
| Ginny Estupinian takes 5th amendment on Dillon's case against Continental | Ginny Estupinian would not help Dillon prosecute his claim. At her deposition in this matter she refused to testify invoking her 5th Amendment right not to incriminate herself.<br><br>Dillon Decl., Ex. 6. | |

| | | |
|---|---|---|
| Ginny Estupinian knows about transfers to Terzakis | In 2004, Ginny Estupinian knew about transfers of exchange funds to Terzakis.<br><br>Ye Decl., ¶¶51 and 54, Exs. 15 and 16. | |
| Ginny Estupinian and Robert Estupinian received $11.3 million in embezzled exchange funds | Vesta Capital Advisors ("VCA") received $11,836,000 in stolen exchange funds belonging to Vesta exchangers. Ginny Estupinian and Robert Estupinian were owners of Mutual Vision, LLC which owned 49% of Vesta and 50% of Vesta Capital Advisors.<br><br>Dillon Dec. Ex. 9; Ye Decl. ¶52, Ex. 14. | |
| There was adverse domination of IAG with help from Continental | Continental issued a surety bond to IAG, Policy no. 169790315 for $5 million in theft coverage with effective dates of August 15, 2001 to August 15, 2002.<br><br>Dillon Decl. ¶35, Ex 11. | |
| There was adverse domination of IAG with help from Continental | Portola Investments, LLC ("Portola") was an Exchanger that used IAG. On August 31, 2001 Portola lost $4,339,920 in Exchange Funds due to theft by persons at IAG. Estupinian of IAG was deposed and refused to divulge what happened to the $4.3 million at his deposition. IAG "refused" to notify Continental of the Portola theft claim. Portola gave notice to Continental about the missing $4.3 million.<br><br>Dillon Decl. ¶ 36, Ex. 12 | |

| | | |
|---|---|---|
| There was adverse domination of IAG with help from Continental | Continental told Portola it was not a surety bond and Portola had no rights as a beneficiary of the bond. Continental denied the claim because "it was made clear (to Continental) based on our conversation today that IAG did not wish the Company to get involved with the Claim…").<br><br>Dillon Decl. ¶¶37 and 38, Exs. 12 and 13. | |
| Continental reissues policy to IAG knowing that owners of IAG who in fact embezzled exchange funds would not make a claim | Effective August 15, 2002 to August 15, 2003, Continental issued a new surety bond (policy No. 169901607) to IAG for $5 million in theft coverage, knowing that: i) $4.3 million in Portola's exchange funds was missing at IAG, ii) Portola was claiming the money was stolen by persons at IAG, iii) Estupinian of IAG had been deposed and refused to disclose to Portola what happened to its money, and iv) Estupinian would not assert a theft claim against Continental on the $5 million theft policy.<br><br>Dillon Decl. ¶¶34-39, Ex. 14. | |
| Leuin makes a theft claim on new policy issued to IAG by Continental | In January 2003, another embezzlement claim is sent to Continental's agent by IAG Exchangers Anthony Leuin and Jean Bertrand (collectively "Leuin') contending their $1,014,786 in exchange funds on deposit with IAG were converted in or about December of 2002.<br><br>Dillon Decl., Ex. 15. | |
| Continental denies the Leuin claim because IAG refused to make a claim | On February 28, 2003, Continental responded to the Leuin theft claim by requesting from IAG a sworn proof of loss with full disclosure about the theft of Leuin's $1 million. On July 14, 2003, Continental denied the Leuin claim because "the Insured has chosen not to pursue this claim." Dillon Decl., Ex 16 | |

| | | |
|---|---|---|
| After Ponzi scheme shut down, Terzakis does not make a theft claim but instead rescinds two bonds for return of premium | After the collapse of Vesta in June of 2008, Terzakis destroyed $4 million in potential surety bond coverage for Vesta for proven thefts during the policy periods by rescinding two bonds issued to Vesta by U.S. Fire in exchange for $40,000 in refunded premiums to pay his lawyers. Trading $4 million in insurance set aside for exchange creditors for $40,000 to pay Terzakis' lawyers is not good for Vesta or its creditors.<br><br>Dillon Decl. ¶¶ 28-32, Exs. 8 and 10. | |
| Terzakis rescission of the two U.S Fire surety bonds injured Vesta to the detriment of its exchange creditors who were owed $20 million | Terzakis' rescission of the two U.S. Fire policies resulted in a diminished settlement from U.S. Fire and was the proximate cause for the legal malpractice case the receiver filed entitled *Dillon v. Murphy & Hourihane*, case No.5:14-cv-01908-BLF. The legal malpractice action, was based on the adverse domination of Vesta by Terzakis and his lawyers by their malicious rescission of the two surety bonds (identical to the subject 2004 Vesta Policy) issued to Vesta by U.S. Fire.<br><br>Dillon Decl.¶ 32-33, Ex. 10. | |
| Embezzlement of **$500,000** on January 21, 2004 came from segregated sub-accounts | On January 21, 2004, Ye acting under direction from Terzakis and Estupinian caused $500,000.00 of Vesta controlled exchange funds to be wired from the Borel Bank accounts used by Vesta to the Investment advantage account No. 311650 at Parkway Bank. Ye faxed a signed Outgoing Domestic Wire Transfer request to Linda Manzon at Borel Bank dated January 21, 2004, directing her to transfer the $500,000 from the funds remaining, if any, in seven sub-accounts at Borel Bank which consisted of exchange funds deposited by IAG 1031 exchangers when IAG 1031 was the operating QI. Linda Manzon complied with his request. The | |

| | | |
|---|---|---|
| | majority of the funds used to pay Terzakis the $500,000 on January 21, 2004 came from IAG 1031 Exchangers' NAI-IPC Holdings ($260,073.20) and Grutchfield ($177,048.52), who deposited their funds on January 8, 2004 and January 5, 2004, respectively. Because Ye used their exchange funds to pay Terzakis, Vesta used the deposits of new clients at Vesta to close Exchanges #5624 and #5613. Terzakis received these trust funds and used this money for his own personal needs.<br><br>Ye Decl. ¶¶ 6-24; Ex. 2; Terzakis Decl. ¶¶13-14, Ex. 14. | |
| Embezzlement of **$1,950,000** on March 2, 2004 came from a segregated sub-account | On March 2, 2004, under direction from Terzakis and Estupinian, Ye caused $1,950,000.00 of Vesta controlled exchange funds to be wired from a Borel Bank account used by Vesta to the Midwest Properties account No. 643618663 at Bank One. Ye received an email from Terzakis' secretary directing the transfer. Ye faxed a signed Outgoing Domestic Wire Transfer request to Borel Bank dated March 2, 2004, directing the bank to transfer $1,950,000 to Terzakis' out of sub-account #31619216. Account #31619216 was Lake Plaza, LLC's sub-account. Lake Plaza was designated as Exchanger #5596. Lake Plaza contracted with IAG 1031 sometime prior to January 9, 2004. Lake Plaza's exchange funds of $2,243,461.03 were received by Ye at Vesta on March 2, 2004. On the same day, Ye transferred $1,950,000 out of the $2,243,461.093 to Terzakis at his Midwest Properties account at Bank One. Ye used the remainder of Lake Plaza' exchange funds to close other exchanges pending at Vesta. Terzakis received the money and used it for his personal needs.<br><br>Ye Decl. ¶¶ 6 to 26, Exs. 1, 3, 4 and 67; Terzakis Decl. ¶¶13-14, Ex. 14. | |

| | | |
|---|---|---|
| Embezzlement of **$2,450,000** on March 23, 2004 came from segregated sub-accounts | On March 23, 2004, under direction from Terzakis and Estupinian, Ye caused $2,450,000.00 of Vesta controlled Exchange Funds to be wired from the Borel Bank accounts used by Vesta to the Midwest Properties account No. 643618663 at Bank One. Ye faxed a signed Outgoing Domestic Wire request dated March 22, 2004 to Linda Manzon at Borel Bank directing the bank to wire transfer $2,450,000 out of two sub-account numbers 31821716 and 31826816. The bank complied with his request. Northern Trust was assigned exchange # 5666 by Ye and it sent $2,530,303.39 to Vesta which was deposited into the IAG 1031 account on March 2, 2004. On March 22, 2004, Ye transferred $2,336,563.21 (less interest earned of $1,021) of Northern Trust's money to Terzakis. Tribble was assigned Exchange #5670. Ye used $114,457.84 of Tribble's money, combined with Northern Trust's money, to complete the $2,450,000 theft. Terzakis received the money and spent it.<br><br>Ye Decl. ¶¶ 6 to 31, Exs. 1, 2, 5 and 67; Terzakis Decl. ¶15, Ex. 14. | |
| Embezzlement of **$360,000** on April 16, 2004 came from segregated sub-accounts | On April 16, 2004, under direction from Terzakis and Estupinian, in two separate transfers Ye caused $348,780.00 of Vesta controlled exchange funds to be wired from the Borel Bank accounts used by Vesta to the IAG account No. 311650 at Parkway Bank. The money came from three segregated sub-accounts containing only exchange funds. Terzakis received the money and spent it on paying IAG exchanger Portola settlement monies. Ye made another transfer on same day to Terzakis for $11,300 as shown in Ex. 67.<br><br>Ye Decl. ¶¶ 26 to 24 and 32-33, Exs. 1, 4, 6 and 67; Terzakis Decl. ¶16, Ex. 14. | |

| | | |
|---|---|---|
| The embezzlement of **$1,175,000** on April 26, 2004 came from one segregated sub-account | On April 26, 2004, under direction from Terzakis and Estupinian, Ye caused $1,175,000.00 of Vesta controlled exchange funds to be wired from the Borel Bank account used by Vesta to the IAG account No. 311650 at Parkway Bank. The money came from one segregated sub-account for Harris Bank containing only exchange funds. Terzakis received and spent the money on personal business. Ye executed the Outgoing Domestic Wire Transfer request instructing the bank on April 26, 2004 to transfer to Terzakis $1,175,000 and to get the money to make the transfer out of account #31814416, which was the sub-account created for the Vesta exchanger Harris Trust & Savings Bank ("Harris Trust'), with exchange #5659. Borel Bank complied with Ye's request.<br><br>The Harris Bank's exchange funds arrived at Vesta on March 18, 2004, and Ye disbursed $1,175,000 of those funds to Terzakis on April 26, 2004. Ye closed the Harris Bank exchange #5659 with other monies received from other Vesta exchangers.<br><br>Ye Decl.¶¶ 6 to 24 and 34 to 35, Exs. 1, 4, 7 and 67; Terzakis Decl. ¶17, Ex. 14. | |
| Embezzlement of **$1,475,000** on May 11, 2004 came from two segregated sub-accounts | On May 11, 2004, Ye caused $1,475,000.00 to be wired from the Borel Bank accounts used by Vesta to the Single Site Solutions account No. 326437 at Parkway Bank. The money came from two identified segregated sub-accounts containing only exchange funds. Terzakis received the money and spent it.<br><br>The money came from exchangers Tim Schafer and Alan Richards. Schafer's exchange number was 5653. Schafer's deposit of $3,129,139.18 came in on February 12, 2004 into sub-account number | |

| | | |
|---|---|---|
| | #318063. Ye used $963,646.09 of Schafer's exchange funds (less a $158.01 credit) to partially effect the transfer of $1,475,000. Alan Richards was exchanger #5673 with sub-account number 31829216. Ye used $511,511.92 of Richards' money to effect the $1,475,000 transfer to Terzakis on May 11, 2004.<br><br>Ye Decl. ¶¶ 6 to 23 and 36, Exs. 1, 4, 8 and 67; Terzakis Decl. (Dkt. 76), ¶18 and Ex. 14. | |
| Embezzlement of **$625,000** on May 25, 2004 came from one segregated sub-account | Ye faxed his signed Outgoing Domestic Wire request and sent it to the bank. The source of funds to make the May 25, 2004 transfer of $625,000 to Terzakis' Single Site Solutions came from Vesta Exchanger Eastwood Court with Exchange #5715 and sub-account #32038616. Eastwood Court deposited its $703,988.62 on May 5, 2004 with Vesta in a sub-account at Borel Bank. Ye used some of those same funds to pay Terzakis on May 25, 2004. Terzakis received and spent the money on personal business items.<br><br>Ye Decl. ¶¶6 to 23 and 37, Exs. 1, 4, 9 and 67; Terzakis Decl. ¶¶8 to 13 and 19, Ex. 14. | |
| Embezzlement of **$825,000** on June 24, 2004 came from two segregated sub-accounts | The source of funds to make the June 24, 20004 transfer of $825,000 to Terzakis came from the segregated sub-accounts of Vesta exchanger Hutchinson and IAG 1031 exchanger Walker. Hutchinson was a Vesta exchanger with exchange #5758 and sub-account #32195116. Ye used approximately $208,500 of Hutchinson's exchange Funds. Walker was an IAG 1031 exchanger with exchange #5617, whose money did not arrive at Vesta until June 14, 2004.<br><br>Ye used approximately $616,500 of Walker's funds, combined with | |

| | | |
|---|---|---|
| | Hutchinson's funds, to make the $825,000 transfer to Terzakis' Single Site Solutions.<br><br>Ye Decl. ¶¶ 6 to 23 and 38, Exs. 1, 4, 10 and 67: Terzakis Decl.¶¶8 to 13 and 20, Ex. 14. | |
| Terzakis never repaid the $9,360,000 embezzled from Vesta | During the 2004 policy period, Terzakis embezzled $9,360,000 and thereafter he never repaid Vesta. From June 24, 2004, until Vesta's collapse in June 2008, the deficit (trust assets minus trust liabilities) never fell below the $5,000,000 policy limit.<br><br>Terzakis Decl. ¶¶13, 21 and 22; Ye Decl. ¶¶ 6 to 41, Ex. 67. | |
| Vesta collapses in June 2008 owing over $20 million to exchangers. Damages owed by Vesta today are $10,954,763. Damages owed by Continental are $5millon, plus interest to pay exchangers first and then subrogees | When Vesta collapsed in June 2008, it could not repay Vesta exchangers over $11.4 million or Excalibur exchangers over $9.3 million. Through Dillon's efforts the liability of Vesta has been reduced to $4,454,768 in trust fund liability and $6,500,000 in subordinated subrogation liability to an insurer and law firm.<br><br>Dillon Decl. ¶¶1 to 15, Ex. 1; Terzakis Decl. ¶¶23 to 24; Ye Decl.¶2. | |
| The exchangers could not discover the thefts until their exchanges failed | The exchangers at Vesta did not know Terzakis and Estupinian took their exchange funds, and had no ability to discover the owners were using trust funds for their own purposes pending each exchange. The exchangers were not given access to third party account statements showing the location and amount of their funds on deposit. As long as Vesta could close pending exchanges with newly deposited exchange funds, the exchangers had no way to discover the owners of Vesta had taken and used their money without their | |

| | | |
|---|---|---|
| | knowledge or consent.<br><br>Terzakis Decl., ¶8. | |
| Internal control requirements in the 2004 Vesta Policy do not apply to owner theft | Endorsement 2, internal controls requirement, only applies only to "Employee Dishonesty" and not owner theft surety coverage provided in Endorsement 1 because the thieving owners can manipulate the internal controls to conceal their own theft.<br><br>Exhibit 1, attached to Motion; Dillon Decl. Ex.3. | |
| Vesta and IAG 1031 had written contracts | Vesta and IAG 1031 had written contracts maintained between the insured QI and each exchanger stipulating to the manner in which exchange funds were to be held and released by the QI.<br><br>Ye Decl. ¶43, Ex. 12. | |
| Vesta assigned each exchanger an exchange number | Each exchanger at IAG 1031 and Vesta was assigned an exchange number to track the exchange and the proceeds of the exchange.<br><br>Ye Decl. ¶¶ 11 to 18, 43, Ex. 1 to 14; Terzakis Supp. Decl. (Dkt 97), Exs. 1 and 2; Woo Decl. (79), ¶¶1 to 6, Exs. 1 and 2; Carlos Decl. (Dkt. 78), ¶¶1 to 8 and Exs. 1 and 2. | |
| Dual control over the exchange funds at Borel Bank was exercised in 2004 | The embezzlement of the $9.3 million during the term of the 2004 Vesta Policy was accomplished by Ye with the consent and direction from Terzakis and Estupinian. Terzakis was not a signer on the Borel Bank account. Terzakis' employees at Single Site Solutions were not signers on the account at Borel Bank.<br><br>Ye Decl. ¶¶46-49, Ex. 13. | |

| | | |
|---|---|---|
| Terzakis, a non-signer on the Borel Bank account, had daily account reconciliations performed by his accounting employees in Chicago | It was Terzakis purported intent to repay all of the exchange funds. Every dollar he borrowed was accounted for by his employees at Single Site Solutions. Terzakis' accounting department at Single Site (including Senior Accountant, Antoine Johnson, and the Controller, Timothy Cahill) were instructed to and did track the activity in the IAG1031/Vesta accounts on a daily basis. Terzakis instructed his employees at Single Site to maintain records of Vesta liabilities to exchangers, and to catalogue the flow of funds between Vesta and Terzakis. At all times Terzakis knew or could find out from Johnson or Cahill exactly how much he had borrowed, outstanding Vesta client liabilities, and current account balances. Employees at Single Site were aware of Terzakis' "borrowing" and if they complained he would tell them that borrowing was explicitly allowed in the QI business. Ye, Woo and Carlos were directed to and did send financial records to Single Site to account for the funds during 2004.<br><br>Terzakis Decl. (Dkt 76), ¶¶8, 9, and 10, Ex. 8; Terzakis Suppl. Decl. (Dkt. 97), ¶ 5, Exs. 1 and 2; Ye Decl. ¶¶ 17, 46 and 54, Ex. 1; Woo Del. (Dkt. 79), ¶¶1 to 6 and Exs. 1 and 2; Carlos Decl. (Dkt. 78), ¶¶1 to 8, Ex. 1. | |
| Continental breached the contract | Dillon filed a claim with Continental which was denied. Continental owes $5 million which it has not paid.<br><br>Dillon Decl. ¶¶18-42. | |

Attestation. I attest that the facts stated in this statement of undisputed facts are true and the evidence cited in support of the facts supports the facts as stated.

Dated October 27, 2016

/s/ Robert L. Brace
Robert L. Brace, Esq., SBN. 122240

Attorney for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group LLC

**CERTIFICATE OF SERVICE**

This document will be served by the Court via its CM/ECF system. No Certificate of Service is necessary, except as to those parties not on the Court's electronic service list. Plaintiff is informed and believes that all parties who have appeared to date have at least one of their attorneys on the electronic service list.