TROUTMAN SANDERS LLP
Eileen King Bower, *Pro Hac Vice*
eileen.bower@troutmansanders.com
55 West Monroe Street, Suite 3000
Chicago, IL 60603-5757
Telephone: 312.759.1920
Facsimile: 312.759.1939

TROUTMAN SANDERS LLP
Peter R. Lucier, Bar No. 246397
peter.lucier@troutmansanders.com
580 California Street, Suite 1100
San Francisco, CA 94104
Telephone: 415.477.5700
Facsimile: 415.477.5710

Attorneys for Defendant
CONTINENTAL CASUALTY COMPANY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC,

Plaintiff,

v.

Continental Casualty Company, an Illinois Corporation,

Defendant.

Case No. 5:10-CV-05238-EJD

**CONTINENTAL CASUALTY COMPANY'S CROSS-MOTION FOR SUMMARY JUDGMENT, OPPOSITION TO DILLON'S POST APPEAL MOTION FOR SUMMARY JUDGMENT ON THE 2004 POLICY AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date: March 30, 2017
Time: 9:00 a.m.
Location: Courtroom 4, 5th Floor
Judge: The Honorable Edward J. Davila

**CONTINENTAL CASUALTY COMPANY'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant, Continental Casualty Company ("Continental"), hereby moves this Court for an order granting it summary judgment with respect to the complaint of Plaintiff Thomas Dillon, as Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC. This motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure and applicable law. Continental's Cross-Motion is based on this Cross-Motion, its Memorandum of Points and Authorities in support of the Cross-Motion, the concurrently filed Declaration of Eileen King Bower, the concurrently filed Evidentiary Appendix in Support of Continental Casualty Company's Cross-Motion for Summary Judgment, the concurrently filed Continental Casualty Company's Separate Statement of Undisputed Material Facts, the concurrently filed Response to Thomas A. Dillon's Separate Statement of Undisputed Material Facts and the attached [Proposed] Order, and on all pleadings and papers filed in this action and any further matters this Court may consider at or before the hearing on this Motion.

Dated: December 23, 2016

Respectfully submitted,

TROUTMAN SANDERS LLP

By: /s/Eileen King Bower
Eileen King Bower, *Pro Hac Vice*
Peter R. Lucier, Bar No. 246397

*Attorneys for Defendant Continental Casualty Company*

# TABLE OF CONTENTS

Page(s)


I. STATEMENT OF THE CASE ........ 1
II. CONTINENTAL'S EVIDENTIARY OBJECTIONS ........ 2
A. Objections To Dillon's Separate Statement ........ 2
B. Objections To Evidence Proffered By Dillon ........ 3
1. The Newest Declaration of Peter Ye ........ 3
2. Objections to Declarations and Exhibits Relied on by Plaintiff ........ 4
III. SUMMARY OF ARGUMENT ........ 6
IV. STATEMENT OF RELEVANT FACTS ........ 8
A. Vesta Strategies, LLC ........ 8
B. Vesta's Business Model ........ 9
C. Terzakis' Wealth And Role In Vesta ........ 10
D. No Effort Was Made To Conceal Loans To Terzakis ........ 11
E. Vesta's Collapse ........ 11
F. The 2004 Vesta Policy ........ 11
V. RELEVANT LEGAL STANDARDS ........ 12
VI. ARGUMENT ........ 13
A. Continental Is Entitled To Summary Judgment Because Dillon Cannot Prove A Covered Loss Was Sustained During The 2004 Vesta Policy Period ........ 13
1. Dillon Fails to Establish That Alleged "Theft" of Client Exchange Funds in 2004 Resulted in the Loss at Issue ........ 13
2. The Loss at Issue Does Not Involve Any Exchanger Funds Deposited Before the Expiration Date of the 2004 Vesta Policy ........ 14
3. Terzakis' Fraudulent Loans Did Not Result in a Loss During the Vesta Policy Period ........ 15
B. Summary Judgment In Favor Of Continental Is Appropriate Because Dillon Cannot Prove That The Alleged Loss Was Discovered Before The Discovery Date ........ 16
1. California Courts Strictly Enforce Discovery of Loss Provisions ........ 16
2. Dillon Fails To Demonstrate That the Adverse Domination Doctrine Applies to Toll the Discovery Date ........ 17
a. The Legal and Policy Justifications for Application of the Doctrine of Adverse Domination Are Absent in this Case ........ 18
(1) The Requisite Element of Adversity is Missing ........ 18
(2) The Nature of the 1031 Industry Precludes Any Actual Losses to Exchangers from Being Hidden for a Long-Term Period ........ 19
b. Dillon Cannot Meet His Factual Burden to Establish Adverse Domination ........ 20

**TABLE OF CONTENTS**
**(continued)**


**Page**

C. As A Matter Of Law, Dillon Cannot Prove That The Wrongdoers Acted With The Manifest Intent To Harm Vesta ........ 22

D. As A Matter Of Law, Vesta Failed To Comply With Internal Controls Requirements........ 24

VII. CONCLUSION........ 25

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**


*Admiralty Fund v. Peerless Ins. Co.*,
143 Cal. App. 3d 379 (Cal. Ct. App. 1983) .......... 16, 17, 18, 19

*Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*,
854 A.2d 378 (N.J. 2004).......... 22

*Beal v. Smith*,
46 Cal. App. 271 (Cal. Ct. App. 1920) .......... 18

*Beyene v. Coleman Sec. Servs., Inc.*,
854 F.2d 1179 (9th Cir. 1988).......... 4

*Burt v. Irvine Co.*
237 Cal. App. 2d 828 (Cal. Ct. App. 1965) .......... 18

*Cal. Union Ins. Co. v. Am. Diversified Savings Bank*,
948 F.2d 556 (9th Cir. 1991).......... 17, 20, 21

*Chevron USA, Inc. v. Cayetano*,
224 F.3d 1030 (9th Cir. 2000).......... 13

*Dade v. DiGuglielmo*,
No. 08-217, 2008 U.S. Dist. LEXIS 113337 (E.D. Pa. Mar. 25, 2008).......... 20

*F.S. Smithers & Co., Inc. v. Federal Ins. Co.*,
631 F.2d 1364 (9th Cir. 1980).......... 16

*Fed. Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.*,
942 F.2d 1032 (6th Cir. 1991).......... 23

*Fidelity Savings & Loan Ass'n v. Aetna Life & Cas. Co.*,
647 F.2d 933 (9th Cir.1981).......... 15

*Investors Trading Corp. v. Fid. & Deposit Co. of Md.*,
No. 3:02-cv-2176, 2004 U.S. Dist. LEXIS 25906 (N.D. Tex. Dec. 22, 2004).......... 23

*Issac Upham Co. v. United States Fidelity & Guar. Co.*,
59 Cal. App. 606 (Cal. Ct. App. 1922) .......... 16

*Karen Kane, Inc. v. Reliance Ins. Co.*,
202 F.3d 1180 (9th Cir. 2000).......... 17

*Kennedy v. Allied Mut. Ins. Co.*,
952 F.2d 262 (9th Cir. 1991).......... 3

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*Mathew Enter. v. Chrysler Grp. LLC*,
No. 13-cv-04236-BLF, 2016 U.S. Dist. LEXIS 108693 (N.D. Cal. Aug. 2, 2016).................. 2

*Mosesian v. Peat, Marwick, Mitchell & Co.*,
727 F.2d 873 (9th Cir. 1984)........................................................................................ 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
135 S. Ct. 1318 (2015) .................................................................................................. 2

*Orr v. Bank of Am., NT & SA*,
285 F.3d 764 (9th Cir. 2002)........................................................................................... 4

*Pacific-Southern Mortgage Trust Co. v. Ins. Co. of N. Am.*,
166 Cal. App. 3d 703 (Cal. Ct. App. 1985) ................................................................. 15

*Reiffin v. Microsoft Corp.*,
270 F. Supp. 2d 1132 (N.D. Cal. 2003) .......................................................................... 4

*Rios v. Scottsdale Ins. Co.*,
119 Cal. App. 4th 1020 (Cal. Ct. App. 2004) ............................................................... 13

*Royal Globe Ins. Co. v. Whitaker*,
181 Cal. App. 3d 532 (Cal. Ct. App. 1986) ................................................................. 13

*Shoemaker v. Lumbermans Mutual Casualty Co.*
176 F. Supp. 2d 449, 455 (W.D. Pa. 2001)................................................................... 24

*Stuart v. UNUM Life Ins. Co. of Am.*,
217 F.3d 1145 (9th Cir. 2000).......................................................................................... 4

*Yeager v. Bowlin*,
693 F.3d 1076 (9th Cir. 2012)..................................................................................... 3, 4


**STATUTES**


California Insurance Code § 533.......................................................................................... 1

Internal Revenue Code 1031 ....................................................................................... passim


**OTHER AUTHORITIES**


26 C.F.R. § 1.1031(k)-1(g)(4) ............................................................................................. 9

FED. R. CIV. P. 56(a)........................................................................................................ 13

FED. R. CIV. P. 56(e)...................................................................................................... 4, 5

## TABLE OF AUTHORITIES
## (continued)


**Page**

FED. R. EVID. 602 ........ 4, 5

FED. R. EVID. 701 ........ 5

FED. R. EVID. 901(a) ........ 4, 5

FED. R. EVID. 901(b)(1) ........ 4

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant Continental Casualty Company ("Continental") hereby submits the following Memorandum of Points and Authorities in opposition to Plaintiff Thomas Dillon's ("Plaintiff" or "Dillon") Post Appeal Motion for Summary Judgment on the 2004 Policy ("Motion") and in support of its Cross-Motion for Summary Judgment ("Cross-Motion").

## I. STATEMENT OF THE CASE

This matter is before this Court on remand from the Ninth Circuit. In 2012, the parties filed cross-motions for summary judgment, in part, on the issue of whether a fidelity bond insurance policy issued by Continental to Vesta Strategies, Inc. ("Vesta") provides coverage for monies allegedly stolen by Vesta's owners. On March 26, 2014, this Court granted summary judgment in favor of Continental. Specifically, the Court held that allowing Vesta to recover for losses allegedly sustained as a result of the theft by its owners would violate California Insurance Code § 533, which provides in relevant part that an "insurer is not liable for a loss caused by the willful act of the insured." (ECF No. 133 [hereinafter "March 2014 Order"].) Although Continental had raised several alternative bases which would support summary judgment in its favor,[1] having concluded that § 533 was dispositive on the issue of recovery under the policy, this Court did not address these alternative bases for summary judgment.

Plaintiff appealed the March 2014 Order and argued, for the first time on appeal, that § 533 does not apply to surety contracts and that an endorsement to the policy at issue created a surety arrangement. On April 22, 2016, the Ninth Circuit issued a memorandum finding that the relevant policy endorsement created a surety relationship that is exempt from § 533 and reversed the March 2014 Order. The Ninth Circuit did not address any of the four additional bases upon which Continental moved for summary judgment and remanded the matter to this Court for further proceedings. (ECF No. 142 [hereinafter "Ninth Circuit Memorandum"].) The Ninth

[1] Continental moved for summary judgment based on the following additional arguments: 1) the loss alleged was not sustained or discovered during the 2004 Vesta Policy; 2) adverse domination did not apply such that the discovery period should be tolled; 3) Vesta owners did not act with "manifest intent" to cause a loss as required by the policy; and 4) Vesta failed to comply with the Internal Controls provisions of the policy.

Circuit Memorandum does not impact the Court's analysis of the issues raised by the parties in the instant cross-motions for summary judgment.

Dillon requested that the parties be allowed to "re-brief" the issues remaining for summary judgment and filed its "post appeal" motion for summary judgment on October 28, 2016 (ECF No. 148.) This brief serves as Continental's opposition to Dillon's Motion and as Continental's brief in support of its Cross-Motion.

## II. CONTINENTAL'S EVIDENTIARY OBJECTIONS[2]

### A. Objections To Dillon's Separate Statement

Dillon's Motion is supported by a Separate Statement of Undisputed Material Facts ("Separate Statement") that fails to comply with the explicit instructions contained in this Court's Standing Order for Civil Cases ("Standing Order"). Dillon's Separate Statement does not provide a "short and concise statement identifying each claim or defense" to which he contends there is no genuine issue to be tried. Standing Order, Section IV.B.1. Furthermore, the submission is replete with alleged "factual" averments that constitute improper argument, opinion or conclusions, rather than true undisputed facts. As the Supreme Court has noted, "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1325 (2015). This Court has chosen to strike portions of a party's separate statements of fact that contain impermissible argument, opinion or conclusions that do not constitute facts. *See, e.g.*, *Mathew Enter. v. Chrysler Grp. LLC*, No. 13-cv-04236-BLF, 2016 U.S. Dist. LEXIS 108693, at *4 n.3 (N.D. Cal. Aug. 2, 2016) (striking impermissible legal arguments). Here, Continental requests that this Court strike Dillon's Separate Statement in its entirety or, alternatively, strike the following as improper argument, opinion or conclusion: Fact 1, Fact 4, Fact 6, Fact 21, Fact 24, Fact 27, Fact 30, Fact 31, and Fact 48. Further, the first

---

[2] This Court's Standing Order regarding summary judgment provides that "[o]bjections to evidence shall be contained within the objecting party's brief and shall not be filed as a separate pleading." *See* District Judge Edward J. Davila Standing Order for Civil Cases, Section IV.D. Consistent with this preferred practice, Continental asserts its objections to Dillon's Separate Statement herein, as well as its objections to the evidence submitted by Dillon.

column of Dillon's Separate Statement is simply his own characterization of his particular factual averments; Continental objects to each of these statements as improper and requests that the Court not consider them as part of the record.

**B. <u>Objections To Evidence Proffered By Dillon</u>**

***1. The Newest Declaration of Peter Ye.***

In its pre-appeal summary judgment briefs, Continental argued that Dillon lacked any evidence to prove that Vesta owners took unauthorized loans or "thefts" of Vesta client exchange funds during the 2004 Vesta Policy period because Vesta failed to maintain any accurate records which would track client exchange deposits. (ECF No. 80 at p. 15.) In support of this position, Continental cited to the relevant portions of the deposition transcript of Peter Ye, Vesta's 30(b)(6) witness. (*Id.*) Dillon responded to Continental's argument with a number of supplemental Ye declarations that conflicted with Ye's deposition testimony. (*See* ECF Nos. 77, 96 and 102.) Now, Dillon's Separate Statement includes citations to what is the fifth iteration of the Declaration of Peter C. Ye, which *again* contradicts his deposition testimony and should be stricken as a "sham" declaration. (ECF Nos. 64, 77, 96, 102 and 151.)[3]

The general rule in the Ninth Circuit is that a "party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (internal citations and quotations omitted). As one court explained in the summary judgment context, the sham affidavit rule is necessary because "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (internal citations and quotations omitted).

Ye's prior deposition testimony is at odds with his most recent declaration. During his

[3] Notably, Dillon's Separate Statement is completely devoid of any record citation to the three different depositions taken of Ye during the course of discovery in this case. Curiously, Dillon does not cite to ***a single deposition*** taken of the declarants on whom he relies in support of his Motion. This is because many of the declarants' declarations, like Ye's Declaration, are contradicted by their deposition testimony.

deposition in July of 2012, Ye indicated that there was simply no way to know the source of the funds allegedly wired to Terzakis in 2004. (SUF[4] 40.) Ye also indicated under questioning that in 2004, Vesta's early days, there would be no way to tell if monies in a pooled account were monies from IAG 1031 or Vesta exchangers. (SUF 41.) Now, over a decade later, Ye purports to provide insight and documentation to support Dillon's claim that Terzakis embezzled $9.3 million of Vesta exchanger funds during the 2004 Vesta Policy period. (Ye Decl., ECF No. 151 at ¶¶ 6-8, 15-38.) Such assertions demonstrate that Ye's fifth declaration is clearly a sham and should be stricken. *See, e.g.*, *Yeager*, 693 F.3d at 1081 (holding that district court's invocation of sham affidavit rule was not abuse of discretion).

***2. Objections to Declarations and Exhibits Relied on by Plaintiff.***

Many of the declarations and exhibits proffered by Plaintiff in connection with his Motion are objectionable for various reasons under the Federal Rules of Evidence, Federal Rules of Civil Procedure and Northern District of California Civil Local Rule 7-5. A trial court may only consider admissible evidence in ruling on a motion for summary judgment. FED. R. CIV. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988). This includes proof that the witness has "personal knowledge" of the matters testified to in his or her declaration. FED. R. EVID. 602; *Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1154 (9th Cir. 2000). Exhibits must also be deemed "authentic." FED. R. EVID. 901(a). A document must be authenticated by a witness who wrote it, signed it, used it, or saw others do so. FED. R. EVID. 901(b)(1); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 n.8 (9th Cir. 2002). Similarly, the Northern District's Local Rules allow a court to disregard improperly supported materials and/or strike those materials. *Reiffin v. Microsoft Corp.*, 270 F. Supp. 2d 1132, 1144 (N.D. Cal. 2003) (noting that "[p]ursuant to Civ LR 7-5(b), the court may strike all or part of any declaration that fails to comply with the terms of Civ LR 7-5.").

Dillon now relies on declarations which include inadmissible testimony and exhibits that violate the most fundamental rules of evidence in the following ways:

---

[4] Citations to individual facts from Continental Casualty Company's Moving Separate Statement of Undisputed Materials Facts will be cited with the short form, "SUF __."

- Contain statements that are speculative conclusions rather than factual assertions and thus lack personal knowledge required by FED. R. EVID. 602 and fail to comply with FED. R. CIV. P. 56(e) and Local Rule 7-5, which require that a declaration be made on personal knowledge and show affirmatively that the declarant is competent to testify to the matters stated therein. *See, e.g.*, Dillon Decl., ECF No. 150 at ¶¶ 5, 27, 31, 32; Ye Decl., ECF No. 151 at ¶¶ 2-5, 16-17, 20-21, 28, 33, 36, 51-52, 54; Terzakis Decl., ECF No. 63 at ¶¶ 7, 24-25; Woo Decl., ECF No. 66 at ¶¶ 3-6; Carlos Decl., ECF No. 65 at ¶ 8.

- Constitute inadmissible lay opinion testimony. FED. R. EVID. 701. *See, e.g.*, Dillon Decl., ECF No. 150 at ¶¶ 5, 27, 31, 32; Terzakis Decl., ECF No. 63 at ¶ 4.

- Constitute improper conclusions and argument. Civil L.R. 7-5(b). *See, e.g.*, Dillon Decl., ECF No. 150 at ¶¶ 27, 31, 32; Ye Decl., ECF No. 151 at ¶¶ 2, 3, 4, 50-55; Woo Decl., ECF No. 66 at ¶¶ 4-5; Carlos Decl., ECF No. 65 at ¶ 8.

- Are not sufficiently authenticated by the declarants. FED. R. EVID. 901(a). *See, e.g.*, Ye Decl., ECF No. 151 at ¶ 52, Exh. 14.

Continental requests that these statements and exhibits be stricken and not considered by this Court in ruling on the parties' cross-motions for summary judgment.

## III. SUMMARY OF ARGUMENT

In this action, Dillon seeks to recover from Continental under a single fidelity bond providing employee dishonesty coverage, in effect from January 9, 2004 through August 15, 2004 (the "2004 Vesta Policy"). The 2004 Vesta Policy provides coverage for covered loss resulting from employee dishonesty. Significantly, the 2004 Vesta Policy only applies to loss discovered no later than October 15, 2004 (the "Discovery Date"). Here, the loss Dillon seeks to recover is directly tied to monies initially deposited with Vesta by various exchanger clients starting in June 2007 that were not returned to those clients within 180 days as promised. Dillon's Proof of Loss clearly identifies the transactions that form the basis of his claim, as reflected in the deposits below:[5]




These basic and undisputed facts reveal that the loss Dillon seeks to recover could not have been sustained or discovered during the 2004 Vesta Policy period. This is because the funds that comprise the alleged loss were not deposited with Vesta until years after the 2004 Vesta Policy expired. Because no loss took place during the 2004 Vesta Policy period, no loss could have been discovered on or before the Discovery Date, and Dillon's claim fails as a matter of law.

[5] The Timeline reflects examples of 2007 and 2008 deposits contained in Dillon's Proof of Loss. A complete listing of the deposits made in 2007 and 2008 is set forth in Dillon's Proof of Loss, App. Exh. 9 at APP 0777.

Dillon argues that Vesta's owners had been misappropriating client exchange funds for many years, and he devotes the majority of his Motion to trying to prove that Vesta owners committed "thefts" of client exchange funds totaling over $9 million while the 2004 Vesta Policy was in effect. As an initial matter, Dillon cannot prove this claim because he relies solely on the inadmissible evidence contained in the sham Ye Declaration. Moreover, the 2004 Vesta Policy does not provide coverage for "thefts" taking place during the policy period. Rather, the policy applies to ***covered loss*** resulting from employee dishonesty if the loss is discovered on or before the Discovery Date. Dillon's claim fails because he cannot demonstrate that alleged "thefts" of client funds in 2004 resulted in the loss at issue in this case. Here, the loss is directly tied to client exchange funds first deposited with Vesta in 2007 and 2008, years after the 2004 Vesta Policy expired. Vesta's owners could not have stolen those funds before they were deposited and, as a result, no loss could have been sustained or discovered by the Discovery Date.

In an attempt to fit the proverbial square peg into a round hole, Dillon advances a convoluted legal theory that is simply not supported by the facts or California law. First, in his complaint, Dillon contends that alleged "thefts" of client funds by Vesta in 2004 created some sort of "deficit" in a fictitious "trust res" that resulted in the loss at issue. He then goes on to argue that the Discovery Date should be equitably tolled because Vesta was adversely dominated by its owners and could not have discovered the "deficit" until Dillon was appointed Receiver. Both of these arguments fail as a matter of law.

With respect to Dillon's first contention, there are no facts demonstrating that a deficit was created in 2004. The undisputed facts confirm that Vesta's owners employed an illegal business model in which owner John Terzakis ("Terzakis") took unauthorized loans of client exchange funds and used them for his other real estate businesses. Vesta only held client exchange funds for 180 days. From its inception in 2004 through 2008, Vesta funded open exchanges with monies received from other client exchangers and/or with monies from owner Terzakis. While Terzakis' actions were not legal, they did not create a "deficit" at Vesta in 2004 because Terzakis had sufficient assets from his real estate businesses to fund any open client exchanges and he used his funds for that purpose. Because client funds had to be returned within

180 days of deposit, the notion that a deficit would be hidden or undiscoverable for years is ludicrous. Any type of deficit would have been easily discovered because client funds had to be returned within 180 days of deposit.

Dillon's second argument is similarly meritless and there is no basis for tolling the Discovery Date. There was no loss to discover prior to the Discovery Date, as the loss is directly tied to client exchange funds first deposited with Vesta in 2007 and 2008. Moreover, the legal and factual justifications that California courts have found fundamental to the application of adverse domination are absent in this case.

Finally, even if the facts supported the theory that Vesta was somehow adversely dominated – and they do not – tolling the Discovery Date does not provide Dillon with any basis for pursuing coverage under the 2004 Vesta Policy. Dillon has failed to prove that the alleged wrongdoers acted with the requisite "manifest intent" to cause a loss or that Vesta complied with the internal controls requirements of the 2004 Vesta Policy.

Rather than offering credible, admissible evidence to meet his burden of proof, Plaintiff takes aim at Continental, accusing it of being complicit in the "theft" of exchange funds (Dillon Mot., ECF No. 148 at p. 20) as well as condoning the actions of Terzakis, Robert Estupinian ("Estupinian") and Ye (*id.* at p. 14). These assertions are nothing more than red herrings meant to distract the Court from the real facts and issues in this case. Put simply, Plaintiff's Motion is a sideshow that does nothing to overcome the unavoidable truth that Plaintiff's claim fails as a matter of law.

## IV. STATEMENT OF RELEVANT FACTS[6]

### A. Vesta Strategies, LLC

Vesta was created on or about January 9, 2004 and was owned by Terzakis and Estupinian. (SUF 14, 15.) Estupinian acted as the Chief Executive Officer of Vesta and ran the day-to-day operations of the company from California with Ye and Ginny Hillig ("Hillig"). (SUF

[6] Plaintiff's Motion does not set forth a Statement of Relevant Facts. Instead, Dillon merely concedes this Court's "judicial familiarity with the detailed facts of this insurance coverage case as set out in Docket 133, the Order Granting Continental's Motion for Summary Judgment." (Dillon Mot., ECF No. 148 at p. 1.)

19, 28.) At the time of Vesta's creation in 2004, Ye was manager of operations. (SUF 22.) Eventually, Ye was promoted to Vice President of Operations at Vesta. (SUF 22.) Ye reported to Estupinian and Hillig, the President of Vesta, who eventually married Estupinian in November 2004. (SUF 20-21.) Estupinian, Hillig and Ye were signatories on Vesta bank accounts. (SUF 25.) Although Terzakis had an ownership interest in Vesta, he did not get involved in the day-to-day operations of the business. (SUF 28-29.)

**B. <u>Vesta's Business Model</u>**

Vesta was at least the third iteration of a Qualified Intermediary ("QI") owned by Terzakis and Estupinian, who had both held ownership interests in another QI, IAG, which later became IAG 1031 (SUF 18.) The purpose of a QI business is to take possession of and hold client exchanger funds so that the client/exchanger could avoid paying capital gains tax when buying and selling investment property pursuant to Section 1031 of the Internal Revenue Code ("Section 1031"). (SUF 34.) Section 1031 permits an owner of property to defer the capital gains tax that would be due upon sale, provided the proceeds (that is, the exchange funds) are timely applied to purchase "Replacement Property." 26 U.S.C. § 1031(a) (hereinafter "IRC"). Property owners seeking tax-deferred treatment have 180 days from the date of the sale of their "Relinquished Property" to identify a "Replacement Property" and close on the purchase. IRC § 1031(b)(3). In order to defer the tax, Exchangers are not permitted to take possession of sale proceeds, but instead must have a QI take possession of the exchange funds. 26 C.F.R. § 1.1031(k)-1(g)(4).

The QI business model established at IAG was adopted by IAG 1031 and eventually implemented by Vesta. (SUF 34.) Ye, Plaintiff's Rule 30(b)(6) witness, explained how the model worked. After an exchanger entered into an exchange contract with Vesta, the proceeds from the sale of the exchanger's investment property would be wired by the title company into a "sub account" at Borel Bank. (SUF 35-36.) Notably, Ye testified that Vesta continued to use IAG 1031's accounts at Borel Bank until approximately August 2004. (SUF 42.) Thus, to the extent Vesta took possession of client exchange funds prior to that time, monies were deposited into accounts in the name of IAG 1031. Shortly after being deposited into the sub account, the monies would almost immediately be swept into a pooled checking account. (SUF 38.) Once the

monies were swept into pooled accounts, there was no way to identify an individual exchanger's monies. (SUF 40.)

Terzakis admits that he misappropriated client exchange funds in a practice he described as taking "loans" from the exchange funds deposited with Vesta. (SUF 44, 52-53.) He would instruct either Estupinian or Ye to transfer funds from QI accounts into accounts that were either in Terzakis' name or that of one of his business entities. (SUF 45.) Ye would then direct wire transfers from QI pooled accounts to Terzakis. (SUF 46.)

When client redemptions were due – within 180 days of deposit – monies from the pooled accounts would be wired to the title company handling the exchanger's transaction. (SUF 47.) If the pooled accounts did not have sufficient funds to close a transaction, Terzakis would fund the transaction by wiring monies from his accounts to the title company for the exchanger. (SUF 48.)

### C. Terzakis' Wealth And Role In Vesta

While Vesta operated out of California, Terzakis lived in the Chicago area and ran a successful real estate business, Single Site Solutions ("Single Site"), from Willowbrook, Illinois. (SUF 27.) From the late 1990s through at least 2007, Terzakis had hundreds of millions of dollars in assets and his personal net worth was in excess of $43 million. (SUF 49.) All of his assets were in real estate. (SUF 50.)

In his deposition, Terzakis confirmed that he had no involvement in daily business operations of Vesta and was not involved in its regular activities. (SUF 28-29.) He understood that Estupinian, Hillig and Ye handled the daily business operations at Vesta, and he assumed that Hillig was responsible for communicating with insurers on behalf of Vesta. (SUF 28, 31.) Terzakis became involved in and funded QIs because he saw QIs as a form of "mezzanine financing" which allowed him to borrow exchange funds for his real estate investments without having to go to a bank or other financial institution. (SUF 52.) From the inception of IAG through 2008, Terzakis admitted that he took "loans" of exchanger funds from his QIs, including Vesta. (SUF 44.) Terzakis testified that he did not believe taking "loans" of exchanger funds was wrong until sometime in 2008 when the "legal issues" arose. (SUF 53.) He further testified that he intended to pay back all such loans and that he never intended to cause a loss to Vesta by

taking loans of exchange funds. (SUF 54-55.) In fact, Terzakis believes he paid back millions of dollars per year to Vesta in interest payments. (SUF 56, 58.)

**D. <u>No Effort Was Made To Conceal Loans To Terzakis</u>**

No effort was made to conceal that Terzakis was taking unauthorized loans of exchanger funds from Vesta. (SUF 59-61.) Terzakis stated that he directed Ginny Heisserer, one of his employees at Single Site, to document every transaction and to create a paper trail of notes or other memos or documents to memorialize the transactions. (SUF 62.) For example, Terzakis testified that a promissory note was prepared for "each and every" loan he took of exchanger funds from IAG and Vesta through at least 2005. (SUF 57.) Terzakis specifically discounted any notion that the loans of exchanger funds were concealed, noting that there was "no attempt to try to hide" loans of exchange funds "from Ginny [Hillig]" from the early 2000s through 2008 and that "everybody at Vesta and Single knew that [he was] taking loans of exchanger funds." (SUF 60-61.) Moreover, Kristine Carlos, a Vesta employee, testified that Estupinian voluntarily told her about the loans of exchanger funds to Terzakis. (SUF 63.)

**E. <u>Vesta's Collapse</u>**

The real estate market collapsed in or shortly before 2008. Because all of Terzakis' personal assets were in real estate, his personal net worth (comprised of real estate assets) plummeted "overnight" and became negative very quickly. (SUF 50-51.) Neither Vesta nor Terzakis had assets to fund open client exchangers monies, and Vesta collapsed in 2008. (SUF 64.) At that time, Vesta was unable to fund approximately $11 million in Vesta client exchange funds that had been deposited with Vesta in 2007 and 2008. (SUF 65.) Those amounts comprise the loss for which Dillon seeks recovery in this case. (SUF 65-66.) Specifically, Dillon's Proof of Loss identifies sixteen Vesta clients, or "exchangers," who allegedly deposited money with Vesta between 6/29/2007 and 6/25/2008 totaling $11,649,822.54. (SUF 65.)

**F. <u>The 2004 Vesta Policy</u>**

Plaintiff seeks coverage under the 2004 Vesta Policy. The 2004 Vesta Policy was originally issued to "IAG 1031, LLC." (SUF 1.) In March of 2010, pursuant to Hillig's request, the 2004 Vesta Policy was amended to list "Vesta Strategies, LLC" as the "named insured,"

effective January 9, 2004. (SUF 2.) The 2004 Vesta Policy provides first party crime coverage, *i.e.*, coverage to the named insured (Vesta) for loss to "covered property" resulting directly from a "covered cause of loss," defined to mean "Employee Dishonesty." (SUF 5.) "Employee Dishonesty" is defined to mean "dishonest acts committed by an 'employee,' . . . with the manifest intent to cause [Vesta] to sustain a loss." (SUF 6.) The 2004 Vesta Policy provides that Continental will pay for "loss that you sustained prior to the effective date of termination or cancellation of this insurance, which is discovered by you (Vesta) no later than 60 days from the date of the termination or cancellation." (SUF 10.) This means that the covered loss must be sustained by August 15, 2004 and discovered no later than October 15, 2004. (SUF 11.)

Additionally, the 2004 Vesta Policy includes three endorsements relating to the business of being a QI for a tax-deferred exchange of property intended to qualify under Internal Revenue Code 1031 ("1031 Exchange"). (SUF 7-9.) Specifically, Endorsement No. 1 modifies the policies so that property covered includes property held in a financial institution account of a transaction involving the named insured as a QI for a 1031 Exchange, but the endorsement specifically states that "this insurance is for [the insured's] benefit only. It provides no rights or benefits to any other person or organization." (SUF 7.) A second endorsement sets forth "Internal Controls Requirements," which includes certain requirements with which an insured must comply before recovering for a loss involving a 1031 Exchange, including, but not limited to, maintaining the proceeds from a single exchange transaction (specifically identified in some manner so as to provide a clear paper trail) in a financial institution account segregated from the insured's operating funds. (SUF 9.) Finally, an endorsement entitled "Include Owners and Partners for Losses Involving Client Property" modifies the policies, in pertinent part, so that the exclusion related to "Acts Committed by You or Your Partners" would not apply to losses involving the funds of client/exchangers while the insured was acting as a QI in a 1031 Exchange. (SUF 8.)

## V. <u>RELEVANT LEGAL STANDARDS</u>

Under Federal Rule of Civil Procedure 56(a), summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a). Where, as here, both parties move for summary judgment, the Court must evaluate each side's motion on its own merits and draw all inferences in favor of the non-moving party. *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000). The policyholder bears the initial burden of proving coverage under an insurance policy, and the insurer bears the burden to show that an otherwise covered claim falls within an exclusion. *Royal Globe Ins. Co. v. Whitaker*, 181 Cal. App. 3d 532, 537 (Cal. Ct. App. 1986). If the policyholder cannot make its threshold showing, then the insurer is entitled to summary disposition. *Rios v. Scottsdale Ins. Co.*, 119 Cal. App. 4th 1020, 1025-27 (Cal. Ct. App. 2004). As set forth below, summary judgment should be granted in favor of Continental because Dillon cannot meet his burden of proving coverage based on the undisputed facts.

## VI. ARGUMENT[7]

### A. Continental Is Entitled To Summary Judgment Because Dillon Cannot Prove A Covered Loss Was Sustained During The 2004 Vesta Policy Period

#### *1. Dillon Fails to Establish That Alleged "Theft" of Client Exchange Funds in 2004 Resulted in the Loss at Issue.*

Dillon contends that the sham Ye Declaration supports his claim that over $9 million in Vesta funds were stolen by Vesta's owners during the 2004 Vesta Policy period. This claim is simply not supported by the undisputed facts developed during discovery, and Ye's new sham Declaration is not admissible to contradict those facts. Moreover, Dillon fails to prove that any alleged "thefts" resulted in the loss at issue here or in any loss discovered on or before the Discovery Date.

As reflected in Continental's Separate Statement and Statement of Facts, Vesta commingled client exchange funds and allowed owner Terzakis to take unauthorized "loans" from those funds to use for his own real estate business. (SUF 38, 41, 42, 44.) Vesta's record keeping was so poor that it is impossible to now prove where client deposits made in 2004 were

---

[7] The points raised by Continental are alternative in nature. If this Court agrees with any of Continental's arguments, Continental is entitled to the entry of summary judgment in its favor on the claim contained in Dillon's Complaint.

funneled or how much Terzakis may have taken in unauthorized or fraudulent "loans" during that time. (SUF 35-41.) The undisputed facts reveal that, although Vesta was created in January 2004, it did not open any bank accounts in its own name until August 2004. (SUF 24.) To the extent Vesta took possession of client exchange funds while the 2004 Vesta Policy was in effect, the monies would have been deposited and commingled with IAG 1031 exchange funds in existing bank accounts held by IAG 1031. (SUF 23-24, 42.) As Ye testified, there would be no way to determine if any monies wired to Terzakis during the 2004 Vesta Policy period were monies deposited while IAG 1031 acted as a QI or whether such monies were deposited while Vesta acted as a QI. (SUF 40-41.) Because Terzakis and Estupinian failed to make any effort to separate the business and bank accounts of IAG 1031 and Vesta, at least during the time the 2004 Vesta Policy was in effect, there is simply no evidence to support how much Terzakis may have taken in fraudulent loans during the relevant time period. As a result, Dillon cannot demonstrate that a covered loss took place during the 2004 Vesta Policy period and his claim necessarily fails as a matter of law. Therefore, Continental is entitled to summary judgment in its favor.

#### ***2. The Loss at Issue Does Not Involve Any Exchanger Funds Deposited Before the Expiration Date of the 2004 Vesta Policy.***

While Dillon goes to great lengths to show that "thefts" of client exchanger funds took place during the 2004 Vesta Policy period, he fails to make the critical connection between such alleged "thefts" and the loss at issue. From its creation, Vesta relied on both the inflow of funds from new 1031 Exchanges as well as Terzakis' own personal wealth to fund the completion of existing 1031 Exchanges. (SUF 47-48.) As new clients continued to deposit funds and Terzakis had sufficient funds available when needed to complete a 1031 Exchange, Vesta was able to meet all of its existing 1031 Exchange obligations. It was not until 2008, when the real estate market came to halt, that Vesta was unable to secure new exchange proceeds and Terzakis' personal net worth rapidly depreciated such that open exchanges could not be funded. (SUF 47-48, 64.) Indeed, the first exchanger deposit Dillon seeks coverage for did not take place until June of 2007. (SUF 66.) These undisputed facts are fatal to Dillon's claim.

The 2004 Vesta Policy does not provide coverage for mere "thefts." Instead, the policy

only provides coverage for a "***covered loss***" resulting directly from a covered cause of loss (*e.g.*, employee dishonesty). (SUF 5.) In other words, the "thefts" alleged by Dillon could not, by themselves, constitute a loss. Thus, even if "thefts" took place during the 2004 Vesta Policy period (something Dillon is unable to prove with admissible evidence), coverage would only apply to loss ***resulting from*** such "thefts" and to the extent the loss was sustained during the 2004 Vesta Policy period and discovered before the Discovery Date. (SUF 1, 5, 10-11.) Here, the loss at issue is comprised of monies first deposited with Vesta in 2007 and 2008, thus making it impossible for Dillon to prove that loss of those monies was sustained and discovered before the Discovery Date. For this reason alone, Dillon's claim fails as a matter of law and summary judgment should be granted in favor of Continental.

***3. Terzakis' Fraudulent Loans Did Not Result in a Loss During the Vesta Policy Period.***

The fraudulent loans provided to Terzakis by Vesta do not constitute covered loss under the terms of the 2004 Vesta Policy. Courts in California and the Ninth Circuit have rejected the argument that a loss occurs when fraudulent loans are taken. Rather, a loss only results when the fraudulent loan is unable to be repaid. In other words, courts have rejected the notion that a loss occurs simultaneously with a fraudulent loan. *See, e.g., Fidelity Savings & Loan Ass'n v. Aetna Life & Cas. Co.*, 647 F.2d 933, 936-37 (9th Cir.1981) (finding fraudulent loans did not constitute loss because company was not in "hopeless and irretrievable insolvency"); *Pacific-Southern Mortgage Trust Co. v. Ins. Co. of N. Am.*, 166 Cal. App. 3d 703, 701-11 (Cal. Ct. App. 1985) (holding that a loan made by the insured because of fraudulent misrepresentations by the insured's president does not necessarily result in a loss under a fidelity bond when a potential loss may never materialize). The underlying reasoning inherent in these decisions is that the mere dispersal of a fraudulent loan does not constitute a loss under a fidelity bond policy because the loan may eventually be paid back and no loss would occur.

Applying the same reasoning to this case is appropriate based on the undisputed facts. Similar to the loans at issue in *Fidelity* and *Pacific-Southern*, Terzakis took unauthorized loans of exchanger funds from Vesta. (SUF 44.) Terzakis testified that promissory notes were prepared

for any loans taken during the 2004 Vesta Policy and that each loan was meticulously documented. (SUF 57-62.) Moreover, he made substantial interest payments to Vesta. (SUF 56, 58.) Terzakis was also hardly in a state of "hopeless and irretrievable insolvency" when he took loans of exchange funds. With a net worth in excess of $43 million, Terzakis had more than enough assets to pay the loans prior to the real estate markets demise, and he used his own funds when necessary to fund open client exchanges. (SUF 48-49.) When Terzakis misappropriated client funds in the form of unauthorized loans, no loss occurred unless or until Terzakis failed to pay them back. Any purported "thefts" of exchanger funds during the 2004 Vesta Policy did not result in a loss and certainly did not result in the loss at issue because there is no evidence to suggest that any client funds deposited with Vesta during the 2004 Vesta Policy period were unpaid. Therefore, Dillon is not able to prove that Vesta sustained a loss while the 2004 Vesta Policy was in effect and summary judgment should be entered in favor of Continental.

**B. Summary Judgment In Favor Of Continental Is Appropriate Because Dillon Cannot Prove That The Alleged Loss Was Discovered Before The Discovery Date**

As discussed above, Dillon is unable to prove that a covered loss occurred during the 2004 Vesta Policy period. Accordingly, whether a loss was "discovered" before the Discovery Date, or whether adverse domination should apply is moot because, without a covered loss, there would be nothing to discover and report to Continental. Nonetheless, Dillon's claim also fails because no loss was discovered before the 2004 Vesta Policy's Discovery Date.

***1. California Courts Strictly Enforce Discovery of Loss Provisions.***

Dillon has failed to make any showing that Vesta complied with the discovery of loss provision in the 2004 Vesta Policy. Courts in California have "long recognized the validity of discovery of loss provisions in fidelity insurance policies." *Admiralty Fund v. Peerless Ins. Co.*, 143 Cal. App. 3d 379, 384 (Cal. Ct. App. 1983) (citing *F.S. Smithers & Co., Inc. v. Federal Ins. Co.*, 631 F.2d 1364, 1367 (9th Cir. 1980) (applying California law)); *Issac Upham Co. v. United States Fidelity & Guar. Co.*, 59 Cal. App. 606, 608 (Cal. Ct. App. 1922). As this Court previously noted, these clauses are "strictly enforce[d] . . . so that neither difficulty in discovering insured losses nor employee concealment excuse the insured's performance." (ECF No. 43 at p.

10, App. Exh. 11, APP 1059); *see also Karen Kane, Inc. v. Reliance Ins. Co*., 202 F.3d 1180, 1190 (9th Cir. 2000) (applying California law and recognizing that discovery of loss provisions are generally valid and strictly enforceable).

Courts have justified the strict enforcement of these provisions on public policy grounds. *Admiralty Fund*, 143 Cal. App. 3d at 387. As further justification, courts have explained that discovery of loss provisions provide insurance companies with a degree of certainty with regard to their reserve needs, the ability to calculate premiums and encourage insureds to use due diligence to make their claims. *Id.* at 386. Only under the rarest of circumstances may this general rule be set aside. *Cal. Union Ins. Co. v. Am. Diversified Savings Bank*, 948 F.2d 556, 565 (9th Cir. 1991) (interpreting California law). Where, as here, the uncontroverted facts establish that the discovery of the loss for which the insured seeks coverage did not occur within the allotted timeframe, it is appropriate for the court to summarily rule in favor of the insurer. *See, e.g.*, *id.* at 564-65 (affirming summary resolution in favor of the fidelity insurer where record was devoid of evidence that a non-wrongdoing employee had knowledge of dishonest acts).

***2. Dillon Fails To Demonstrate That the Adverse Domination Doctrine Applies to Toll the Discovery Date.***

Tacitly conceding that he has no proof that anyone at Vesta ever discovered the loss before the Discovery Date, Dillon asks this Court to take the extraordinary step of setting aside the policy terms by tolling the Discovery Date through an unprecedented extension of the doctrine of adverse domination. Extending adverse domination to this case is inappropriate for two main reasons. First, as set forth below, the legal and policy justifications for adverse domination are missing here. Second, Dillon's theory is based on an argument that Vesta was adversely dominated such that "thefts" in the form of allegedly fraudulent loans could not be discovered by non-wrongdoing employees. The facts reveal that Vesta's business activities were not hidden or undisclosed and easily could have been discovered by non-wrongdoing employees during the relevant discovery period. As a result, Dillon is unable to toll the Discovery Date and summary judgment should be entered in favor of Continental.

a. *The Legal and Policy Justifications for Application of the Doctrine of Adverse Domination Are Absent in this Case.*

This case does fit within the narrow scope of the adverse domination doctrine. Traditionally, courts have applied adverse domination to toll the statute of limitations for claims by shareholders against wrongdoing directors or officers of a corporation. *See, e.g., Admiralty Fund*, 143 Cal. App. 3d at 388-89; *Burt v. Irvine Co.* 237 Cal. App. 2d 828, 867-68 (Cal. Ct. App. 1965); *Beal v. Smith*, 46 Cal. App. 271, 279 (Cal. Ct. App. 1920). The legal and policy underpinnings for the application of adverse domination focus on two major factors: (1) that the wrongdoers in question acted adversely to the company; and (2) the losses in question could remain hidden indefinitely from the claimants. The uncontroverted facts establish that these factors are not met.

(1) <u>The Requisite Element of Adversity is Missing.</u>

A fundamental factor underlying previous applications of the doctrine of adverse domination has always been ***adversity*** between the wrongdoers and the affected company (or, more precisely, its owners or shareholders). For example, the only California case in which a theory of adverse domination was found to even potentially apply to toll a discovery period of a fidelity bond policy, *Admiralty Fund*, involved mutual fund shareholders asserting the doctrine based on the malfeasance of certain officers of the fund. The court in *Admiralty Fund* concluded that adverse domination could be applied in large part because the nature of the mutual fund created a position of adversity between the shareholders that owned the fund and the officers that controlled the daily operations. 143 Cal. App. 3d. at 388. As the court stated, "[i]f in fact the dishonest president and other high ranking officers controlled the Funds' operations to such an extent as to preclude discovery, the tolling of a discovery-of-loss provision should be considered." *Id.* at 389. Put simply, adverse domination is only considered in California when the allegedly dominant wrongdoers and the owners were adverse – *i.e.*, not the same people.

By contrast, the alleged wrongdoers in this case, Terzakis and Estupinian, owned 100% of Vesta. (SUF 15-18.) There was no adversity between Terzakis and Estupinian on the one hand and Vesta on the other. Rather, the owners and the alleged wrongdoers are identical. Because

there was no adversity between the owners and the wrongdoers, there can be no adverse domination.

While Terzakis and Estupinian may well have been adverse to the client exchangers, that fact is not material to this analysis, as the exchangers are not analogous to the shareholders in *Admiralty*. Unlike the shareholders in *Admiralty*, who owned the fund and therefore were parties to the fidelity policies at issue, the exchangers here had no right to pursue a claim under the 2004 Vesta Policy. Indeed, the 2004 Vesta Policy expressly provides that it does not convey any rights to third parties. (SUF 7.) The shareholders in *Admiralty* would have lost the right to pursue a claim but for the application of adverse domination. *Admiralty*, 143 Cal. App. 3d at 387-88. In contrast, the exchangers never had a right to pursue a claim under the 2004 Vesta Policy in the first place. Extending the doctrine in this case would ignore the unambiguous language of the policy, which clearly provides no benefit the third-parties. Neither *Admiralty* nor any other authority supports such a result.

(2) The Nature of the 1031 Industry Precludes Any Actual Losses to Exchangers from Being Hidden for a Long-Term Period.

As explained, the logic for justifying application of the adverse domination doctrine breaks down if applied to benefit non-owners of the supposedly dominated entity. Setting this problem aside, other key principles supporting this doctrine reveal its inapplicability to the 1031 Exchange industry and, more specifically, this case. In *Admiralty*, the court gave weight to the fact that the defalcating officers had the inherent ability to conceal losses arising from fraud flowing from their management of the fund. *Admiralty*, 143 Cal. App. 3d at 388-89. Because the officers had control over the Fund's assets for an indefinite period, the shareholders could not have discovered losses due to dishonesty "until the wrongdoers relinquished control of the Funds' [sic] operations." *Id.*

In contrast, the nature of the 1031 Exchange industry does not pose the same risk of losses remaining hidden indefinitely. Under the Internal Revenue Code, 1031 Exchanges must close within 180 days. Thus, unlike mutual fund shareholders, individual exchangers would be in a position to discover if their monies were lost or misappropriated within six months of deposit. In

other words, if the exchanger's money was not returned within 180 days of deposit, as required by Section 1031, the exchanger would know about it. This is yet another reason why adverse domination is inappropriate in this context.

b. *Dillon Cannot Meet His Factual Burden to Establish Adverse Domination.*

Even if adverse domination was potentially appropriate under these circumstances – and it is not – the record conclusively demonstrates that Dillon cannot satisfy his burden of proof to establish adverse domination. Continental notes that Dillon's initial burden is to demonstrate that Vesta was adversely dominated ***prior to*** October 15, 2004—the end of the discovery of loss period. This is because a person's conduct cannot breathe new life into a discovery of loss period that has already ended. In the statute of limitations context, if a claimant is unable to show that the reason for tolling the statute of limitations occurred before the statute of limitations expired, a court cannot toll the limitations period because of after the fact conduct. *See, e.g., Dade v. DiGuglielmo*, No. 08-217, 2008 U.S. Dist. LEXIS 113337, at *8 (E.D. Pa. Mar. 25, 2008) (noting after the fact conduct cannot toll already expired statute of limitations period). This same reasoning applies equally to the discovery of loss period. Dillon then must demonstrate with admissible facts that Vesta continued to be adversely dominated so as to continue to toll the discovery of loss period. Here, the factual record before the Court fails to support such a finding and, as a result, Plaintiff's adverse domination claim fails as a matter of law.

The case law in California and the Ninth Circuit reveals that Dillon lacks the requisite facts to support his adverse domination claim. In *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir. 1984), the Ninth Circuit adopted the "complete domination" standard as the appropriate test for applying adverse domination. Under that test, Dillon must show "full, complete and exclusive control in the directors or officers charged." *Id*. In *California Union*, the Ninth Circuit recognized that the adverse domination exception to the usually strict enforcement of discovery clauses in insurance policies only applies "under certain circumstances." *California Union*, 948 F.2d at 565. Thus, it is not enough for Dillon to show that no employee could have prevented the losses in question, nor that no employee actually appreciated the legal significance

of the dishonest acts which caused the loss. Rather, Dillon must provide evidence that precludes even the possibility that "there were non-wrongdoing employees who could have discovered the losses." *Id*. (emphasis added). Like the plaintiff in *California Union*, Dillon cannot meet that requirement.

Here, Dillon's alleged loss, which non-wrongdoing employees were supposedly precluded from discovering, was the unauthorized loans of exchange funds taken by Terzakis. To prevail, Dillon must demonstrate that Terzakis and Estupinian exercised such full, complete, and exclusive control over Vesta that they made it impossible for any non-wrongdoing employee to discover Terzakis' loans of exchange funds. Such a showing is impossible based on the undisputed facts developed during the course of discovery in this case.[8]

Because Terzakis' loans of exchange funds was such a routine part of the normal operations of Vesta, Dillon's argument that discovery of these loans was impossible does not stand up to the slightest of scrutiny. The undisputed facts shows that Terzakis' loans were not, and could not, have been hidden from non-wrongdoing employees. The practice of borrowing exchange funds was made, documented, and serviced openly and within view of the company at large. (SUF 59-62.) In fact, Terzakis admitted that there was no attempt to hide the fact that he was taking loans of exchanger funds:

> [Ms. Bower]: Q. Did you feel the need to keep it - - keep it a secret from Ginny that you were taking loans of exchanger funds?
> [Mr. Terzakis]: A. A secret?
> Q. Correct.
> A. There was no secret about what I was doing anywhere, in my office, through documentations, tax returns.
> Q. This is something that everybody knew, everybody at Vesta and Single Site know that - - that you were taking loans of exchanger funds; right?
> A. Yes, ma'am.
> Q. There was no attempt to hide it from anybody; right?
> A. Nope.

(SUF 59.) Thus, Terzakis' deposition testimony makes clear that the transfers were open and

[8] In support of his adverse domination theory, Dillon makes the outrageous, ad hominem attack that Continental "knowingly assist[ed]" in Terzakis and Estupinian's adverse domination of Vesta. (Dillon Mot., ECF No. 148 at p. 20.) Of course, Dillon points to no facts to support this contention.

obvious to anyone in the company, and thus, anyone at Vesta could have discovered them. (SUF 61.) Indeed, at least one non-wrongdoing employee, Kristine Carlos, admitted to learning about the transfers of exchanger funds to Terzakis from Estupinian. (SUF 63.)

Because a non-wrongdoing employee could have discovered Vesta's alleged "thefts" during the 2004 Vesta Policy period or before the Discovery Date, Dillon's theory of adverse domination does not apply and the discovery of loss provisions must be strictly construed in favor of Continental. The undisputed facts simply cannot support a finding that it was impossible for non-wrongdoing employees to discover the alleged loss, and as a result Plaintiff's theory of adverse domination fails.

### C. <u>As A Matter Of Law, Dillon Cannot Prove That The Wrongdoers Acted With The Manifest Intent To Harm Vesta</u>

Continental is entitled to summary judgment for the additional reason that no reasonable juror could conclude that the wrongdoers acted with the requisite "manifest intent" to cause Vesta a loss. The 2004 Vesta Policy requires that, in order for there to be coverage, the employee act with the "manifest intent" to "cause [Vesta] to sustain loss." (SUF 6.) Therefore, to demonstrate there is coverage for the loss at issue, Dillon must prove that Terzakis obtained unauthorized loans during the 2004 Vesta Policy period with the "manifest intent" to cause Vesta to sustain a loss.

While no California court has analyzed the meaning of "manifest intent" in this context, courts in other jurisdictions have generally applied one of three approaches: the specific intent approach, the substantial certainty approach, and the objective standard. *Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*, 854 A.2d 378, 389 (N.J. 2004). The most favored test is the specific intent test (adopted in the Second, Third, Fourth, and Fifth Circuits), which focuses on "'whether the actor in question specifically intended the resulting loss to the employer in question.'" *Id*. at 389-90. If this Court elects not to apply the specific intent approach, the other commonly applied standard is the substantial certainty approach. *See id.* at 390. This "'standard is satisfied either by proof of the employee's desire to cause a loss or by proof that the loss was 'substantially certain' to result.'" *Id*. (internal citation omitted) (emphasis in original). Lastly,

the objective test, which is the least utilized by courts "focus[es] on the natural consequences of an actor's conduct ... but d[oes] not necessarily focus on the actor's actual state of mind." *Id.* at 389. Under any of these three tests, no reasonable juror could conclude that the wrongdoers in this case manifested intent to cause Vesta to sustain a loss.

As a threshold matter, it defeats logic to find that Vesta's co-owners, Terzakis or Estupinian, intended to cause a loss to their own company. Under such circumstances, courts have acknowledged that it is "highly unlikely that [the employee] had the 'manifest intent' to cause a significant injury to an entity in which he had a major financial stake." *Fed. Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1037 (6th Cir. 1991); *see also Investors Trading Corp. v. Fid. & Deposit Co. of Md.*, No. 3:02-cv-2176, 2004 U.S. Dist. LEXIS 25906, at *4 (N.D. Tex. Dec. 22, 2004) (finding that "where the employee's manifest intent is to make money, not to cause the employer to lose money, the operative language of the fidelity bond is not invoked"). Given their ownership stake in the company, there is a logical presumption that neither Terzakis nor Estupinian intended to cause Vesta a loss. Indeed, Terzakis explicitly testified that it was never his intent to cause a loss to Vesta by taking loans of exchange funds. (SUF 54.)

Moreover, Terzakis testified that he intended to pay back the funds he borrowed from the exchange accounts at Vesta. (SUF 55.) His testimony in that regard is corroborated by evidence that he did, in fact, make substantial payments to Vesta (including interest) and meticulously documented each loan. (SUF 56-58, 62.) In *Shoemaker v. Lumbermans Mutual Casualty Co.*, the court relied, in part, upon an employee's executed affidavit in which he denied having any intent to cause the insured a loss to hold that the "manifest intent" requirement in an employee dishonesty policy was not met. 176 F. Supp. 2d 449, 454-56 (W.D. Pa. 2001) (noting term "'intent' means 'purposefully,' *i.e.*, the employee must have acted 'with the <u>specific purpose, object or desire'</u> to cause the loss to the insured") (emphasis in original). Here, the undisputed evidence demonstrates that Terzakis did not have the requisite "specific purpose, object or desire" to cause a loss to Vesta. *Id.* Terzakis' express and demonstrated intention was to ***repay*** the borrowed Exchange Funds. (SUF 55-58, 62.) Moreover, throughout 2004 and until at least 2006,

Terzakis' net worth was approximately $43 million. (SUF 49.) Clearly, Terzakis had the financial means to repay every penny of the exchange funds he had taken during the 2004 Vesta Policy period.

There is simply no evidence in the present action that the wrongdoers had the "manifest intent" to "cause [Vesta] to sustain loss" during the 2004 Vesta policy period. Because Dillon is unable to establish the "manifest intent" requirement to coverage, Continental is entitled to summary judgment.

### D. <u>As A Matter Of Law, Vesta Failed To Comply With Internal Controls Requirements</u>

Finally, Dillon's claim against Continental fails because Vesta did not comply with the internal controls requirements set forth in the 2004 Vesta Policy, which provides in pertinent part as follows:

> Proceeds from the relinquished property or properties of a single exchange transaction will be held in a financial institution account segregated from the intermediary's operating funds, ***and each single exchange transaction shall be identified by a specific file number or like tracking tool so as to provide a clear paper trail for each transaction or series of related transactions.***

(SUF 9) (emphasis added).

Vesta unquestionably failed to maintain a clear paper trail for each single exchange transaction. Indeed, this failure is the essence of the financial scheme that Dillon alleges took place. In the Complaint, Dillon alleges that clients' deposits "were initially placed into segregated accounts opened for the specific purpose of receiving a client's individual exchange funds" and asserts that this practice satisfied the condition in the 2004 Vesta Policy. (App. Exh. 1, APP 0010-11 at ¶ 31.) In that same paragraph, however, Dillon acknowledges that the segregated accounts were a mere sham used "to mislead clients" in believing their "money was safe" and to "conceal the Ponzi scheme." (*Id.*) Exchange funds only stayed in the individual accounts momentarily before being swept into a "pooled 'wire account.'" (*Id.*, APP 0011 at ¶ 32.) Once in the pooled account, each client's deposit was commingled with other clients' deposits as well as "lulling payment" made back into the pooled account. (*Id.*) The testimony of Ye

comports with the allegations made in Dillon's Complaint, as he testified that exchanger's funds would initially be deposited into a sub-account at Vesta only to be quickly swept into a pooled account. (SUF 39.) As Ye explained, throughout the 2004 Vesta Policy period, the pooled account held an indistinguishable mixture of both IAG 1031 exchange funds and Vesta exchange funds. (SUF 40-41.) Thus, rather than maintain a clear paper trail, Vesta did the opposite by obscuring the path of each client's funds to conceal the ongoing scheme. Vesta also violated the Internal Controls Requirement by failing to require countersignatures for the release of funds related to 1031 exchangers. (SUF 43.) The 2004 Vesta Policy stated that a "[c]ountersignature [was] required for the release of all funds." (SUF 9.) In his 30(b)(6) deposition, Vesta's corporate representative Ye, testified that Vesta did not comply with this requirement. (SUF 43.) Because Vesta failed to comply with the Internal Controls Requirements as mandated under the policy, it cannot recover under the 2004 Vesta Policy.

## VII. CONCLUSION

Based on the foregoing, Continental respectfully requests that its Motion for Summary Judgment be granted and that Dillon's Motion for Summary Judgment be denied. Pursuant to Civil L.R. 7-2(c) and 5-1(g), Continental has attached a [Proposed] Order to this Cross-Motion.

Dated: December 23, 2016

Respectfully submitted,

TROUTMAN SANDERS LLP

By: /s/ Eileen King Bower
Eileen King Bower
Peter R. Lucier

*Attorneys for Defendant Continental Casualty Company*