TROUTMAN SANDERS LLP
Eileen King Bower, *Pro Hac Vice*
eileen.bower@troutmansanders.com
55 West Monroe Street, Suite 3000
Chicago, IL 60603-5757
Telephone: 312.759.1920
Facsimile: 312.759.1939

TROUTMAN SANDERS LLP
Peter R. Lucier, Bar No. 246397
peter.lucier@troutmansanders.com
580 California Street, Suite 1100
San Francisco, CA 94104
Telephone: 415.477.5700
Facsimile: 415.477.5710

Attorneys for Defendant
CONTINENTAL CASUALTY COMPANY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC,

Plaintiff,

v.

Continental Casualty Company, an Illinois Corporation,

Defendant.

Case No. 5:10-CV-05238-EJD

**CONTINENTAL CASUALTY COMPANY'S MOVING SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

Date: March 30, 2017
Time: 9:00 a.m.
Location: Courtroom 4, 5th Floor
Judge: The Honorable Edward J. Davila

Defendant Continental Casualty Company ("Continental") respectfully submits the following Moving Separate Statement in support of its Cross-Motion for Summary Judgment against plaintiff Thomas Dillon ("Dillon").

| Claim or Defense | Continental's Undisputed Facts/Supporting Evidence | Dillon's Response/Supporting Evidence |
|---|---|---|
| **Background Undisputed Facts Supporting Summary Judgment** | | |
| Relevant Provisions of the 2004 Vesta Policy | Fact 1. Continental issued Crime Policy No. 267920538 (the "2004 Vesta Policy) to IAG 1031, LLC for the Policy Period of August 15, 2003 to August 15, 2004.<br><br>Complaint, ECF No. 1, Exh. 4 [hereinafter "App. Exh. 1"], APP 0082-0099[1]; Dillon Decl., [ECF No. 150] at ¶ 18, Exh. 3. | |
| | Fact 2. On March 10, 2004, Ginny Hillig, submitted a request that the 2004 Vesta Policy be amended to reflect a "name change."<br><br>March 10, 2004 E-mail [hereinafter "App. Exh. 2"], APP 0200. | |
| | Fact 3. On March 31, 2004, Continental issued an endorsement on the 2004 Vesta Policy, naming Vesta Strategies, LLC as a "Named Insured" and listed the effective date as "1-9-04."<br><br>App. Exh. 1, APP 0083, Policy Change Discovery Form; Dillon Decl., Ex. 3, CNA 0225. | |
| | Fact 4. The 2004 Vesta Policy's Declarations Form indentifies one coverage form entitled "Employee Dishonest Coverage Form (Coverage | |

[1] For ease of reference, the entire Evidentiary Appendix has been consecutively paginated using the identifying mark APP 0001 through APP 1131. Accordingly, cites to the Appendix will refer to the Appendix Exhibit number, as well as, to the extent necessary, specific pages within that Exhibit and any additional pinpoint citations.

| | | |
|---|---|---|
| | Form A – Blanket" which provides for a "Limit of Insurance" of $5,000,000 and includes a $25,000 "Deductible Amount."<br><br>App. Exh. 1, APP 0086, 2004 Vesta Policy Declarations; Dillon Decl., Exh. 3, CNA 0229. | |
| **<u>Seventh Affirmative Defense</u>**<br>**No Covered Loss under the 2004 Vesta Policy** | Fact 5. The 2004 Vesta Policy provides:<br><br>**A. COVERAGE** – We will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered cause of Loss.<br>**1. Covered Property:** "Money," "securities," and "property other than money and securities."<br>**2. Covered Cause of Loss:** "Employee dishonesty." …<br><br>App. Exh. 1, APP 0093, Employee Dishonesty Coverage Form; Dillon Decl., Exh. 3, CNA 0236. | |
| **<u>Seventh Affirmative Defense</u>**<br>**No Covered Loss under the 2004 Vesta Policy** | Fact 6. The 2004 Vesta Policy defines "Employee Dishonesty" to mean "dishonest acts committed by an 'employee . . . with the manifest intent to: (1) [c]ause [Vesta] to sustain loss; and also (2) [o]btain financial benefit . . . for . . . the 'employee.'"<br><br>App. Exh. 1, APP 0093, Employee Dishonesty Coverage Form; Dillon Decl., Exh. 3, CNA 0236. | |
| **<u>Seventh Affirmative Defense</u>**<br>**No Covered Loss under the 2004 Vesta Policy** | Fact 7. By endorsement, the property covered under the 2004 Vesta Policy "is limited to property" that Vesta (1) "own[s] or hold[s]"; (2) is "legally liable" for; or (3) is "[h]eld in a financial institution account in a transaction involving you as a qualified intermediary for a tax-deferred exchange of property intended to qualify under Internal Revenue Code 1031. However, this insurance is for your | |

| | | |
|---|---|---|
| | benefit only. It provides no rights or benefits to any other person or organization."<br><br>App. Exh. 1, APP 0094, 2004 Vesta Policy, Endorsement No. 1; Dillon Decl., Exh. 3, CNA 0237. | |
| | Fact 8. By endorsement, the 2004 Vesta Policy's exclusion for "Acts Committed by You or Your Partners" will not apply to "losses involving the funds of client/exchangers while [Vesta] [was] acting as a qualified intermediary in a tax-deferred exchange of property intended to qualify under Internal Revenue Code 1031.<br><br>App. Exh. 1, APP 0096,2004 Vesta Policy, Endorsement No. 3; Dillon Decl., Exh. 3, CNA 0240. | |
| **<u>Fifth Affirmative Defense</u>**<br>**Failure to Comply with Internal Controls Requirements** | Fact 9. By endorsement, any payment under the 2004 Vesta Policy for "'Employee Dishonesty' involving a transaction intended to qualify as a tax-deferred exchange of property under Internal Revenue Code 1031 is conditioned upon the Insured's having complied with the following underwriting requirements:<br><br>**I.** A written contractual agreement will be maintained between the Insured intermediary and each exchanger/client stipulating the manner in which proceeds from the relinquished property will be held and subsequently released by the Insured Intermediary for use in acquiring replacement property.<br><br>**II.** Proceeds from the relinquished property or properties of a single exchange transaction will be held in a financial institution account segregated from the intermediary's operating funds and each single exchange | |

| | | |
|---|---|---|
| | transaction shall be identified by a specific file number or like tracking tool to provide a clear paper trail for each exchange transaction or series of related exchange transactions.<br><br>**III.** Countersignature is required for the release of all funds, or a monthly reconciliation of all accounts involving exchange transaction proceeds will be performed within two weeks of receipt of the account statement. Those reconciliations must be performed by an individual not authorized to deposit, withdraw or transfer funds from the account, or be reviewed by an outside CPA.<br><br>App. Exh. 1, APP 0095, 2004 Vesta Policy, Endorsement No. 2; Dillon Decl., Exh. 3, CNA 0238. | |
| **Sixth Affirmative Defense**<br>**Loss Not Discovered During Relevant Discovery Period** | Fact 10. The 2004 Vesta Policy contains the following General Condition:<br><br>**6. Extended Period to Discover Loss**: We will pay for loss that you sustained prior to the effective date of termination or cancellation of this insurance, which is discovered by you no later than 60 days from the date of that termination of cancellation.<br><br>App. Exh. 1, APP 0089, 2004 Vesta Policy, Crime General Provisions (Discovery Form); Dillon Decl., Exh. 3, CNA 0232-0233. | |
| **Sixth Affirmative Defense**<br>**Loss Not Discovered During Relevant Discovery Period** | Fact 11. October 15, 2004 is 60 days from the date that the 2004 Vesta Policy period ended.<br><br>App. Exh. 1, APP 0086, 2004 Vesta Policy Declarations; Dillon Decl., Exh. 3, CNA 0229. | |
| **Sixth Affirmative** | Fact 12. The 2004 Vesta Policy | |

| | | |
|---|---|---|
| **<u>Defense</u>** **Loss Not Discovered During Relevant Discovery Period** | provides that, "[d]iscovery occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this insurance has been or will be incurred . . . ."<br><br>App. Exh. 1, APP 0089, 2004 Vesta Policy, Crime General Provisions (Discovery Form); Dillon Decl., Exh. 3, CNA 0232. | |
| **<u>Seventh Affirmative Defense</u>** **No Covered Loss under the 2004 Vesta Policy** | Fact 13. The 2004 Vesta Policy contains the following General Condition:<br><br>"**14. Policy Period**: . . . b. [s]ubject to the Discovery of Loss condition, we will pay only for loss that you sustain through acts committed or events occurring at any time and discovered by you during the Policy Period."<br><br>App. Exh. 1, APP 0090, 2004 Vesta Policy, Crime General Provisions (Discovery Form); Dillon Decl., Exh. 3, CNA 0233. | |
| Relevant Background Facts Regarding Vesta's Creation, Ownership and Operations | Fact 14. Vesta was formed on or about January 9, 2004.<br><br>App. Exh. 4, APP 0424, ¶ 1.2; Terzakis Decl., [ECF No. 76] at Exh. 5, ¶ 1.2. | |
| | Fact 15. From January 9, 2004 to October 15, 2004, Vesta was solely owned by B&B Sparco and Mutual Vision LLC.<br><br>App. Exh. 4, APP 0425, ¶ 3.1; Terzakis Decl., Exh. 5, ¶ 3.1; App. Exh. 1, APP 0006, ¶ 13. | |
| | Fact 16. From January 9, 2004 to August 15, 2004, John Terzakis ("Terzakis") was the sole stockholder of B & B Sparco Properties.<br><br>Terzakis Decl. ¶ 4. | |
| | Fact 17. From January 9, 2004 to | |

| | | |
|---|---|---|
| | August 15, 2004, Robert Estupinian ("Estupinian") was the sole owner of Mutual Vision, LLC.<br><br>Terzakis Decl. ¶ 4. | |
| | Fact 18. Vesta was the third iteration of a qualified intermediary ("QI") owned by Terzakis and Estupinian who had both held ownership interests in IAG, which later became IAG 1031, LLC.<br><br>Deposition of John Terzakis, June 5 and July 12, 2012 [hereinafter "App. Exh. 3"], APP 0208-209 at 29:11-32:11. | |
| | Fact 19. Estupinian served as Vesta's Chief Executive Officer.<br><br>App. Exh. 1, APP 0007, ¶ 18; January 24-25, 2012 30(b)(6) Deposition of Peter Ye [hereinafter "App. Exh. 5"], APP 0455 at 100:11-19; Terzakis Decl. ¶ 7. | |
| | Fact 20. Ginny Hillig served as the President of Vesta.<br><br>App. Exh. 5, APP 0455 at 100:18-19. | |
| | Fact 21. Hillig and Estupinian married sometime in November of 2004.<br><br>Deposition of Ginny Estupinian [hereinafter "App. Exh. 16"], APP 1102 at 11:13-20. | |
| | Fact 22. When Vesta was founded in January 2004, Peter Ye ("Ye") was its manager of operations and was eventually promoted to Vice President of Operations at Vesta.<br><br>App. Exh. 5, APP 0455 at 99:12-14, APP 0467 at 149:2-8. | |
| | Fact 23. 1031 exchange funds Vesta received between January 9, 2004 and August 15, 2004 were deposited into accounts at Borel Bank.<br><br>Dillon's Response to Continental's First Set of Requests for Admission | |

| | | |
|---|---|---|
| | [hereinafter "App. Exh. 14"], APP 1074 at RFA No. 9. | |
| | Fact 24. Vesta did not open a bank account in its own name for the deposit of exchanger funds until August of 2004.<br><br>July 11, 2012 Deposition of Peter Ye [hereinafter "App. Exh. 6"], APP 0637-638 at 121:8-122:19; EastWest Bank Agreement, [hereinafter "App. Exh. 12"], APP 1063. | |
| | Fact 25. From January 9, 2004 to August 15, 2004, Estupinian, Hillig and Ye were signatories on the Borel Bank accounts used to deposit Vesta 1031 exchange funds.<br><br>App. Exh. 3, APP 0217 at 63:18-22, 64:18-23, APP 0228 at 106:3-22; App. Exh. 14, APP 1074-1075 at RFA No. 10. | |
| | Fact 26. From January 9, 2004 through the collapse of Vesta in 2008, Terzakis was not a signatory on Vesta bank accounts for exchanger funds.<br><br>App. Exh. 3, APP 0217 at 63:18-64:12, APP 0228 at 106:3-22. | |
| | Fact 27. Between January 9, 2004 and August 15, 2004, Terzakis owned and operated a real estate business, Single Site Solution, which was located in Willowbrook, Illinois.<br><br>App. Exh. 3, APP 0332 at 266:21-267:6, APP 0334 at 276:2-12. | |
| | Fact 28. According to Terzakis, Estupinian, Hillig and Ye handled the day-to-day operations of Vesta.<br><br>App. Exh. 3, APP 0217 at 63:14-17. | |
| | Fact 29. Vesta's Corporate Representative, Ye, and Terzakis testified that Terzakis was not involved in the day-to-day operations of Vesta. | |

| | | |
|---|---|---|
| | App. Exh. 5, APP 0438 at 32:13-15] App. Exh. 3, APP 0216 at 59:15-25, APP 0217 at 63:1-5, 63:18-22, APP 0334 at 276:10-12; App. Exh. 6, APP 0620 at 53:12-25, APP 0630 at 91:6-16. | |
| | Fact 30. Estupinian, Hillig and Ye were the signatories and had access to the exchange agreements entered into by Vesta from January 9, 2004 to August 15, 2007.<br><br>Ye Decl., ECF No. 151 at ¶ 43; App. Exh. 14, APP 1075 at RFA 11. | |
| | Fact 31. Terzakis testified that he believed Hillig was responsible for communication with insurers on behalf of Vesta.<br><br>App. Exh. 3, APP 0227 at 105:13-106:2. | |
| | Fact 32. Kristine Carlos (née Cangco) ("Carlos") was an exchange coordinator and exchange officer at Vesta between April of 2004 to September of 2006.<br><br>Carlos Decl., ECF No. 78 at ¶ 1. | |
| | Fact 33. While employed at Vesta, Carlos asked Estupinian "why Vesta was making a transfer of Exchange Funds out of the depository account for a purpose other than to close an Exchange or return the funds to the Exchanger."<br><br>Carlos Decl., [ECF No. 78 at ¶ 7. | |
| Relevant Facts Regarding The Qualified Intermediary Model That Allowed For Transfers to Terzakis | Fact 34. Vesta's business model involved accepting possession of funds from client exchangers and holding those funds so that the client exchanger could avoid paying capital gains tax when buying and selling property.<br><br>App. Exh. 1, APP 0008-0009, ¶ 24. | |

| | | |
|---|---|---|
| **<u>Fifth Affirmative Defense</u>** **Failure to Comply with Internal Controls Requirements** | Fact 35. After a client entered into an exchange agreement with Vesta, the proceeds from the sale of the exchanger's investment property would be wired by the title company into a subaccount at Borel Bank.<br><br>App. Exh. 5, APP 0446-447 at 64:24-68:19, APP 0456 at 103:9-19; App. Exh. 6, APP 0622 at 59:1-61:23, APP 0637 at 121:5-21. | |
| **<u>Fifth Affirmative Defense</u>** **Failure to Comply with Internal Controls Requirements** | Fact 36. Initially, the exchanger's funds would be deposited into a "sub-account" at Borel Bank.<br><br>App. Exh. 5, APP 0447 at 68:1-19; App. Exh. 6, APP 0659 at 209:6-20. | |
| **<u>Fifth Affirmative Defense</u>** **Failure to Comply with Internal Controls Requirements** | Fact 37. The sub-account did not identify the exchanger in any way.<br><br>App. Exh. 5, APP 0447 at 68:7-10, 106:6-10. | |
| **<u>Fifth Affirmative Defense</u>** **Failure to Comply with Internal Controls Requirements** | Fact 38. Quickly after being deposited into a sub-account, the monies would be swept into a pooled checking account.<br><br>App. Exh. 6, APP 0622 at 59:16-23, APP 0625 at 73:7-18. | |
| **<u>Fifth Affirmative Defense</u>** **Failure to Comply with Internal Controls Requirements** | Fact 39. Vesta's Corporate Representative testified that the business purpose of creating a sub account, depositing the exchanger's money in that account, and then immediately moving that money into Vesta's account was to mislead client exchangers into believing that their money was safe and segregated.<br><br>App. Exh. 5, APP 0546 at 294:3-12. *See also* App. Exh. 1, APP 0010-11 at ¶ 31. | |
| **<u>Fifth Affirmative Defense</u>** **Failure to Comply with Internal Controls** | Fact 40. Once the monies were swept into the pooled account, there was no way to identify an individual exchanger's monies in the pooled account. | |

| | | |
|---|---|---|
| **Requirements** | App. Exh. 5, APP 0456-457 at 105:20-106:20; App. Exh. 6, APP 0622 at 59:24-60:3, 60:17-61:23, APP 0624-625 at 69:24-70:9, APP 0625-626 at 73:7-74:18. | |
| **<u>Fifth Affirmative Defense</u>** **Failure to Comply with Internal Controls Requirements** | Fact 41. When Vesta was created, there was no attempt to segregate client exchange funds that were deposited by IAG 1031 from those that were deposited at Vesta.<br><br>App. Exh. 6, APP 0622 at 60:9-61:23, APP 0624 at 69:19-23. | |
| **<u>Fifth Affirmative Defense</u>** **Failure to Comply with Internal Controls Requirements** | Fact 42. Between its creation in January 9, 2004 and August 15, 2004, Vesta exclusively used the Borel Bank account that belonged to its predecessor IAG 1031 for the deposit of exchange funds.<br><br>App. Exh. 6, APP 0637-638 at 121:8-122:19, APP 0639 at 128:9-25; App. Exh. 14, APP 1074 at RFA No. 9. | |
| **<u>Fifth Affirmative Defense</u>** **Failure to Comply with Internal Controls Requirements** | Fact 43. Vesta's 30(b)(6) witness testified that there was no requirement for countersignatures for the release of exchanger funds at Vesta.<br><br>App. Exh. 5, APP 0467 at 147:25-149:1. | |
| **<u>Seventh Affirmative Defense</u>** **No Covered Loss under the 2004 Vesta Policy** | Fact 44. Terzakis would take loans from the QIs, including Vesta, for his real estate endeavors.<br><br>App. Exh. 3, APP 0208 at 28:5-15, APP 0215 at 56:13-15, APP 0228 at 108:10-24, APP 0334 at 276:23-277:12. | |
| | Fact 45. To facilitate these loans, Terzakis would instruct either Estupinian or Ye to transfer funds from QI accounts into accounts that were either in Terzakis' name or that of one of his business entities.<br><br>App. Exh. 3, APP 0215 at 57:2-22; App. Exh. 5, APP 0465 at 139:24-140:19; App. Exh. 6, APP 0639 at 127:16-128:20. | |

| | | |
|---|---|---|
| | Fact 46. Ye would then direct wire transfers from QI pooled accounts to Terzakis.<br><br>App. Exh. 3, APP 0215 at 57:2-22; App. Exh. 5, APP 0465 at 139:24-140:19; App. Exh. 6, APP 0639 at 127:16-128:1. | |
| **<u>Seventh Affirmative Defense</u>**<br>**No Covered Loss under the 2004 Vesta Policy** | Fact 47. When client redemptions were due, monies from the pooled accounts would be wired to the title company handling the exchanger's transaction.<br><br>App. Exh. 5, APP 0451-452 at 85:8-86:6. | |
| **<u>Seventh Affirmative Defense</u>**<br>**No Covered Loss under the 2004 Vesta Policy** | Fact 48. If the pooled accounts did not have sufficient funds to close a transaction, at certain times, Terzakis would fund the transaction by wiring monies from his account to the title company for the exchanger.<br><br>App. Exh. 5, APP 0466-0477 at 145:17-146:11, APP 0532 at 235:12-236:5; App. Exh. 6, APP 0624 at 66:1-9; Terzakis Decl., [ECF No. 76] at ¶¶ 3, 8. | |
| | Fact 49. From the late 1990s through at least 2007, Terzakis had hundreds of millions of dollars in assets and his personal net worth was in excess of $43 million.<br><br>App. Exh. 3, APP 0214 at 50:11-19, 52:8-53:1, APP 0254 at 212:7-213:13; Terzakis Personal Financial Statement [hereinafter "App. Exh. 10"], APP 1037-1049. | |
| | Fact 50. All of Terzakis' assets were in real estate.<br><br>App. Exh. 3, APP 0214 at 53:8-15. | |
| | Fact 51. When the real estate market collapsed in or shortly before 2008, Terzakis' net worth plummeted "overnight" and became negative quickly. | |

| | | |
|---|---|---|
| | App. Exh. 3, APP 0214-215 at 53:8-54:22. | |
| | Fact 52. Terzakis became involved in and funded QIs because he saw QIs as a form of "mezzanine financing" for his real estate investments and they allowed him to borrow exchange funds for his real estate investments without having to go to a bank or other financial institution.<br><br>App. Exh. 3, APP 0215 at 56:2-12. | |
| **Seventh Affirmative Defense**<br>**No Covered Loss under the 2004 Vesta Policy**<br>(no "manifest intent" to cause Vesta to suffer a loss) | Fact 53. Terzakis did not believe taking loans of exchanger funds was wrong or illegal until sometime in 2008 when his legal issues arose.<br><br>App. Exh. 3, APP 0208 at 27:7-24, APP 0221 at 78:21-79:6, APP 0223 at 87:1-5, APP 0228 at 109:16-19. | |
| **Seventh Affirmative Defense**<br>**No Covered Loss under the 2004 Vesta Policy**<br>(no "manifest intent" to cause Vesta to suffer a loss) | Fact 54. Terzakis testified that it was never his intent to cause a loss to Vesta by taking loans of exchange funds.<br><br>App. Exh. 3, APP 0369 at 417:16-18. | |
| **Seventh Affirmative Defense**<br>**No Covered Loss under the 2004 Vesta Policy**<br>(no "manifest intent" to cause Vesta to suffer a loss) | Fact 55. Terzakis intended to pay back all the loans he took from Vesta.<br><br>App. Exh. 3, APP 0222 at 83:7-17, APP 0227 at 104:10-16; Terzakis Decl., ECF No. 76 at ¶¶ 8-9. | |
| **Seventh Affirmative Defense**<br>**No Covered Loss under the 2004 Vesta Policy** | Fact 56. Terzakis paid back interest to Vesta on the loans he took of exchange funds.<br><br>App. Exh. 3, APP 0215 at 56:2-22; APP 0229 at 111:16-113:7, 175:13-176:12. | |
| **Seventh Affirmative Defense**<br>**No Covered Loss under the 2004 Vesta** | Fact 57. Terzakis testified that a promissory note was prepared for "each and every" loan he took of exchanger funds from IAG and Vesta through at | |

| | | |
|---|---|---|
| **Policy** | least 2005.<br><br>App. Exh. 3, APP 0223 at 88:9-12, APP 0224 at 91:1-7, 92:17-22, APP 0229 at 111:16-113:7; Terzakis Dep. Ex. 41 [hereinafter "App. Exh. 15"], APP 1079-1091. | |
| **<u>Seventh Affirmative Defense</u>**<br>**No Covered Loss under the 2004 Vesta Policy** | Fact 58. Terzakis believes he paid back millions of dollars per year to Vesta in interest.<br><br>App. Exh. 3, APP 0241 at 159:3-25. | |
| **<u>Sixth Affirmative Defense</u>**<br>**Loss Not Discovered During Relevant Discovery Period**<br>(Plaintiff's theory of adverse domination does not apply) | Fact 59. Terzakis made no effort to conceal or hide the fact that he was taking loans of exchanger funds from Vesta.<br><br>App. Exh. 3, APP 0224 at 92:17-22, APP 0228 at 108:10-24, 109:16-19, APP 0229 at111:16-113:7. | |
| **<u>Sixth Affirmative Defense</u>**<br>**Loss Not Discovered During Relevant Discovery Period**<br>(Plaintiff's theory of adverse domination does not apply) | Fact 60. Specifically, Terzakis testified that there was "no attempt to try to hide" loans of exchange funds "from Ginny Estupinian" from the early 2000s through 2008.<br><br>App. Exh. 3, APP 0228 at 108:25-109:19. | |
| **<u>Sixth Affirmative Defense</u>**<br>**Loss Not Discovered During Relevant Discovery Period**<br>(Plaintiff's theory of adverse domination does not apply) | Fact 61. Terzakis testified that "everybody at Vesta and Single Site knew that [he was] taking loans of exchanger funds."<br><br>App. Exh. 3, APP 0228 at 108:18-21. | |
| **<u>Sixth Affirmative Defense</u>**<br>**Loss Not Discovered During Relevant Discovery Period**<br>(Plaintiff's theory of adverse domination does not apply) | Fact 62. Terzakis directed Ginny Heisser, one of his employees at Single Site, to document every loan of exchanger funds to Single Site or one of his other entities.<br><br>App. Exh. 3, APP 0223 at 87:6-25, APP 0226 at 99:19-100:12, 101:13-15. | |
| **<u>Sixth Affirmative Defense</u>** | Fact 63. Estupinian did not try to hide the fact that loans were made to | |

| | | |
|---|---|---|
| **Loss Not Discovered During Relevant Discovery Period** (Plaintiff's theory of adverse domination does not apply) | Terzakis, instead he "voluntarily" explained to Carlos about the transfers of exchange funds.<br><br>App. Exh. 8, APP 0746 at 51:11-18. | |
| | Fact 64. Vesta collapsed in mid-2008, coincidental with the cooling of the real estate market. At that time Vesta did not have assets to fund open client exchanges.<br><br>App. Exh. 1, APP 0011-12, ¶ 34. | |
| | Fact 65. Dillon's June 2010 Proof of Loss identifies a total of $11,649,822.54 in Vesta exchange losses incurred between June 29, 2007 and June 25, 2008.<br><br>Dillon's Proof of Loss [hereinafter "App. Exh. 9"], APP 0777. | |
| **Sixth Affirmative Defense**<br>**Loss Not Discovered During Relevant Discovery Period** | Fact 66. The first exchanger loss Dillon seeks coverage for deposited money on June 29, 2007.<br><br>App. Exh. 9, APP 0777. | |

**ATTESTATION:**

I, Eileen King Bower, the undersigned counsel for Continental Casualty Company, attest that the evidence cited herein fairly and accurately supports the facts as asserted.

Dated: December 23, 2016

Respectfully submitted,

TROUTMAN SANDERS LLP

By: */s/ Eileen King Bower*
Eileen King Bower
Peter R. Lucier

Attorneys for Defendant
CONTINENTAL CASUALTY COMPANY