Robert L. Brace, SBN 122240
Email: RLBRACE@Rusty.Lawyer
1807 Santa Barbara Street
Santa Barbara, CA 93101
Telephone: (805) 845-8211
Cell Phone: (805) 886-8458

Attorney for Thomas Dillon, as Court-Appointed
Receiver for Vesta Strategies, LLC
and Excalibur 1031 Group LLC

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>CONTINENTAL CASUALTY COMPANY, an Illinois corporation,<br><br>Defendant. | **Case No.: 5:10-CV-05238-EJD**<br>**Related Case No.: 5:09-CV-02388-JW**<br><br>**THOMAS DILLON'S COMBINED REPLY/OPPOSITION ON POST-APPEAL MOTIONS FOR SUMMARY JUDGMENT ON THE 2004 VESTA POLICY**<br><br>**Hearing Date: May 4, 2017**<br>**Time: 9:00 a.m.**<br>**Location: CR 4, 5th Floor**<br>**Judge: Edward J. Davila** |

Plaintiff Thomas A. Dillon ("Dillon"), the court-appointed Receiver for Vesta Strategies, LLC ("Vesta") hereby replies to Defendant Continental Casualty Company's ("Continental") opposition to Dillon's motion for summary judgment on the claims asserted in the operative complaint (breach of contract and declaratory relief) and opposes Continental's motion for summary judgment on the same 2004 Vesta policy (the "Policy").

In support of the combined reply and opposition, Dillon files concurrently herewith a Response to Continental's Separate Statement of Undisputed Facts filed in support of its motion, a Supplemental Declaration of Thomas A. Dillon, and a Proposed Order.

DATED this 13th day of February, 2017

Respectfully submitted,

/s/ Robert L. Brace

Robert L. Brace, Esq.,
SBN. 122240
Santa Barbara, CA 93101

Richard Shore (*pro hac vice pending*)
GILBERT LLP
1100 New York Avenue, NW
Suite 700
Washington, DC 20005

*Attorneys for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group LLC*

# TABLE OF CONTENTS

**I. SUMMARY OF ARGUMENT** ..... 1

**II. COUNTERSTATEMENT OF FACTS** ..... 2

A. Undisputable bank records and Ye's testimony show that Terzakis embezzled $9.3 million directly from exchanger sub-accounts in 2004. ..... 2

B. Continental's suggestion that Terzakis did not own a majority of Vesta is based on a document that Continental knows to be forged. 4

C. Ginny Hillig-Estupinian was never an innocent fiduciary. ..... 4

D. Endorsement No. 3 created a surety obligation owed by Continental. ..... 5

E. Dillon's proffered witness statements and exhibits are admissible. . 5

**III. LEGAL ARGUMENT** ..... 6

A. Thefts by Terzakis and Estupinian are loss covered by the Policy.... 6

i. Vesta's loss occurred when Terzakis and Estupinian stole $9.3 million in exchange funds during the policy period....... 6

ii. In any event, the Policy does not require that loss occur during the policy period. ..... 8

B. Discovery of the loss was timely. ..... 9

C. Vesta's owners had the manifest intent to cause the loss. ..... 11

D. Vesta complied with the internal controls requirement. ..... 14

**IV. CONCLUSION** ..... 15

# TABLE OF AUTHORITIES

*Admiralty Fund v. Peerless Ins. Co.*,
143 Cal. App. 3d 379 (1983) .......... 9, 10, 11

*Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*,
181 N.J. 245 (2004) .......... 12, 13, 14

*Cal. Union Ins. Co. v. Am. Diversified Sav. Bank*,
948 F.2d 556 (9th Cir. 1991) .......... 10, 11

*FDIC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
205 F.3d 66 (2d Cir. 2000) .......... 12

*Fidelity Savings & Loan Ass'n v. Aetna Life & Casualty Co .*,
647 F.2d 933, 936 (9th Cir. 1981) .......... 8

*First Nat'l Bank of Louisville v. Lustig*,
961 F.2d 1162 (5th Cir. 1992) .......... 12

*In re Lloyd Sec., Inc.*,
153 B.R. 677 (E.D. Pa. 1993) .......... 12

*Mosesian v. Peat, Marwick, Mitchell & Co.*,
727 F.2d 873 (9th Cir. 1984) .......... 10, 11

*Pacific-Southern Mortgage Trust Co. v. Insurance Co. of North America*,
166 Cal. App. 3d 703, 710 (1985) .......... 7, 8

*Palp, Inc. v. Williamsburg Nat'l Ins. Co.*,
200 Cal. App. 4th 282 (2011) .......... 13

*People v. Talbot*,
220 Cal. 3 (1934) .......... 7,13

*PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*,
394 F.3d 761 (9th Cir. 2005) .......... 13

*In re San Diego Realty Exch., Inc.*,
No. 92-56526, 1994 WL 161646 (9th Cir. May 2, 1994) .......... 15

*Shoemaker v. Lumbermens Mut. Cas. Co.*,
176 F. Supp. 2d 449, 455 (W.D. Pa. 2001) .......... 13

*Smith v. Westland Life Ins. Co.*,
15 Cal. 3d 111 (1975) .......... 9

*State v. Grimes*,
111 Wash. App. 544 (2002) .......... 7, 13

*U.S. v. Jinian*,
725 F.3d 954 (9th Cir. 2013) .......... 12

*In re Waddell Jenmar Sec., Inc.*
No. 92-2158, 1993 WL 128018 (4th Cir. April 23, 1993) .......... 12

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. SUMMARY OF ARGUMENT

Dillon respectfully submits that summary judgment for Dillon should be granted and summary judgment for Continental should be denied.

First, Continental is wrong that loss did not occur during the policy period. The Court has already ruled that Vesta's losses occurred at the time of each theft, and incontrovertible bank records establish that the owners stole $9.3 million from exchanger accounts during the policy period. Ye's testimony explains and confirms that fact, and Continental's criticism of Ye's testimony as inconsistent is based on an incomplete and misleading quotation of his deposition. In any case, the Policy does not require loss during the policy period.

Second, Continental's contention that "discovery of loss" should not be tolled because some innocent employee could have submitted a claim is fantastical. Contrary to Continental's suggestions, Ginny Hillig-Estupinian was bound up in the criminal scheme and could not be expected to incriminate herself or her soon-to-be husband, as shown by her decision to repeatedly invoke her right against self-incrimination during deposition. And Continental cannot seriously contend that some other employee could have discovered the embezzlement, understood there was a covered loss, or submitted a claim: the uncontroverted evidence establishes that the thieving owners completely controlled Vesta and that Vesta's innocent employees were subordinates who did not appreciate Vesta's losses, had no power to act against their superiors, and had no responsibility or capacity to submit a claim.

Third, Continental's contention that the thieving owners were mere innocent borrowers from Vesta who did not have "manifest intent" to cause loss did not save the wrongdoers from jail time and does not relieve Continental of its coverage obligations here. This was not, as Continental contends, a "mezzanine financing" arrangement. The malefactors' guilty pleas to serious crimes, and the

inevitable consequences of their embezzlement, establish their "manifest intent" to cause loss to Vesta.

Fourth, Continental is plainly wrong that Vesta breached the Policy's "internal controls" requirement, which was fully satisfied by Vesta's clear paper trail, tracking of exchanger funds, countersignatures, and monthly reconciliations.

## II. COUNTERSTATEMENT OF FACTS

Continental's recent filings contain numerous incorrect or inaccurate statements. Dillon addresses these misstatements in detail in his Response to Continental's Separate Statement of Undisputed Facts and Supplemental Declaration, but also summarizes here certain particularly notable misstatements.

### A. Undisputable bank records and Ye's testimony show that Terzakis embezzled $9.3 million directly from exchanger sub-accounts in 2004.

Continental's filings mischaracterize snippets of Ye's deposition testimony in a baseless attempt to contradict bank statements detailing Terzakis's 2004 thefts from specific exchanger sub-accounts at Borel Bank containing client exchange funds. These bank statements show separate thefts from specific sub-accounts totaling $9,360,000. (Dkt. 158 at SUF 32–39.)[1] For each theft, a bank statement like the one below identifies the exchanger sub-account stolen from (here, Mr. Hutchinson's sub-account) and the date of theft (here, June 2004):

```
IAG 1031 LLC                                      BUSINESS MMA
E#5758/NAI-RONALD HUTCHINSON
900 E HAMILTON AVE #100                            6/30/04          2
CAMPBELL CA 95008

                                                               0032195116
                                                 1             BRANCH-001
-----------------------------------------------------------------------------
0032195116      SUMMARY FOR BUSINESS MMA
-----------------------------------------------------------------------------
                BEGINNING BALANCE            6/01/04                 .00
                DEPOSITS / MISC CREDITS          5            274,583.39
                WITHDRAWALS / MISC DEBITS        3            274,583.39
             ** ENDING BALANCE               6/30/04                 .00   **
```

[1] Dillon apologizes for failing to number his Separate Statement of Undisputed Facts ("SUF"), and will cite to Continental's Response to Thomas A. Dillon's Separate Statement of Undisputed Material Facts and adopt the numbering system set forth therein. (Dkt. 158.)

These contemporaneous bank statements are corroborated by Ye's consistent testimony and his spreadsheet summarizing each theft. (Dkt. 151 ¶23 ("All of the $9.3 million . . . came from the sub-accounts . . . at Borel Bank for each 1031 Exchanger."); APP. 0607–0697; Dkt. 151-2.)[2] But even standing alone, the bank statements establish this fact beyond peradventure.

Given this evidence, Continental's contentions that the $9.3 million stolen by Terzakis came from a "pooled account" and had no identifiable source are meritless. Rather than address the bank statements, Continental relies solely on its mischaracterizations of brief excerpts from Ye's July 11, 2012 deposition testimony. Namely, Continental says that "Ye indicated that there was simply no way to know the source of the funds allegedly wired to Terzakis in 2004." (Dkt. 155 at 4.) However, what Ye actually said—while discussing his spreadsheet summarizing each theft—was that client funds were initially put into sub-accounts *and then* "swept into a pooled account," and that once in *pooled* accounts there was "no way to tell if monies that were wired out of the pooled account originated from IAG 1031 exchangers or from Vesta exchangers" if one was "looking at [the spreadsheet]" alone. (APP. 0625.) Ye never contested that money stolen *before* entering the pooled accounts could be easily identified by bank statements.[3] Even if the owners typically swept funds into pooled accounts, that is irrelevant here, since this $9.3 million was embezzled directly from exchanger sub-accounts—as demonstrated by the bank statements. Ye's deposition (which did not discuss the bank statements) is thus fully consistent with the bank statements.

Thus, Continental's assertion that Ye's declaration is a sham is without merit, as is Continental's refusal to admit that Terzakis and Ye embezzled the

[2] Where possible, Dillon will cite to Continental's Evidentiary Appendix ("APP.") (Dkt. 156), identifying relevant portions by page range.

[3] Similarly, Ye never contested that the source of money in the pooled accounts could be identified using standard accounting techniques and documents beyond his spreadsheet.

money they say they did, when they say they did, and from where they say they did. Continental does not provide any contrary evidence, it only mischaracterizes Dillon's evidence or suggests without support that Dillon's evidence is unreliable. Dillon reaffirms Ye's testimony as consistent, honest, and truthful, with no substantive variance in the facts represented.

**B. Continental's suggestion that Terzakis did not own a majority of Vesta is based on a document that Continental knows to be forged.**

Continental states that Mutual Vision, LLC, owned 51% of Vesta and was its managing member, citing an unauthenticated version of a Vesta Operating Agreement. (APP. 0424–29.) In citing this document and disputing facts that establish Vesta's chain of command, Continental suggests that Terzakis was not the control person at Vesta. (Dkt. 158 at SUF 5–6.) This suggestion is not only contrary to the established record regarding Terzakis's ownership interest (Dkt. 76-5; Dkt. 150-10; APP. 0210–11; Dkt. 76 ¶4; Dkt. 151 ¶3.), it is based on a document that Continental knows is a forgery. (APP. 0211–12 ("I would say [there appear to be two versions of the Operating Agreement] for purposes of misrepresentation or some forgery or something going on here"); APP. 0615–18.)

**C. Ginny Hillig-Estupinian was never an innocent fiduciary.**

By February 5, 2004 (months before her marriage to fellow wrongdoer Robert Estupinian[4] and during the policy period), Ginny Hillig owned a stake in Vesta. In June 2004, she helped embezzle $1,256,150 of exchange funds to buy a residence with Estupinian, her romantic partner. (APP. 0549–50, 0664.) Long before the policy period, she had refused to pursue coverage from Continental for earlier theft claims because doing so would have disclosed criminal behavior by her and her partner. (Dkt. 148 at 9–10, 20–22.) Continental was aware of the earlier thefts but never asked why she did not make a claim and simply closed its

[4] Robert Estupinian is referred to as "Estupinian" and Ginny Hillig-Estupinian by her full name.

file. (*Id.*) When deposed in this action, she relied on the Fifth Amendment more than 50 times to avoid self-incrimination. (Dkt. 150-7.) In light of her own conduct and her relationship with another wrongdoer, Continental cannot credibly contend that Ginny Hillig-Estupinian was an innocent fiduciary working for the benefit of Vesta.

**D. Endorsement No. 3 created a surety obligation owed by Continental.**

In an effort to mischaracterize the applicable legal framework and evade its coverage obligations, Continental repeatedly misstates the nature of the coverage at issue, in contravention of the Policy's plain language and the Ninth Circuit's ruling. Endorsement 3 of the Policy describes Continental as "the surety in this undertaking," and the Ninth Circuit held that Endorsement No. 3 "created a surety relationship." (Dkt. 142 at 3.) Yet Continental persists in describing the Policy as a "fidelity bond" that is for Vesta's "benefit only."[5]

**E. Dillon's proffered witness statements and exhibits are admissible.**

Continental's objections to Dillon's evidence as speculative conclusions by witnesses without personal knowledge should be overruled. Dillon's evidence comes from the personal knowledge of those who embezzled exchange funds, witnessed the embezzlements, or had the task of filing the insurance claim to recover stolen funds. For example, paragraph 2 of Ye's declaration, objected to by Continental as speculative and lacking personal knowledge, is Ye's recounting of his own employment history. In this instance and throughout Dillon's submissions, the witnesses perceived the facts to which they have testified. Continental's evidentiary objections regarding lay opinion, argument, and insufficient authentication are similarly meritless.

[5] Continental's assertion that Dillon first contended that the Policy provides surety coverage on appeal is also meritless, and Continental knows it. Continental made the same assertion before the Ninth Circuit and Dillon cited numerous instances where his counsel had raised the issue in this Court, both orally and in writing. (Dkts. 1, 28, 91, 122.)

## III. LEGAL ARGUMENT

### A. Thefts by Terzakis and Estupinian are loss covered by the Policy.

The Policy requires Continental to "pay for loss of . . . Covered Property resulting directly from the Covered Cause of Loss." "Covered Property" includes exchange funds and "Covered Cause of Loss" includes "dishonest acts" by employees or owners. (Dkt. 150-4 at 15; APP. 1056–57.)

As discussed below, Continental must cover the owners' thefts because (1) the thefts, and Vesta's loss, occurred during the policy period, and (2) in any event, the Policy covers loss after the policy period, so long as the "discovery of loss" provision is satisfied, as it is here.

#### i. Vesta's loss occurred when Terzakis and Estupinian stole $9.3 million in exchange funds during the policy period.

As demonstrated above and in Dillon's opening brief, Terzakis and Estupinian unquestionably took $9,360,000 in exchange funds through dishonest acts and these thefts indisputably occurred during the policy period from exchanger sub-accounts. Continental's unsupported contentions that no evidence shows the timing, size, and source of the thefts are plainly contradicted by the Borel Bank statements and Ye's testimony. (Dkt. 155 at 13–14.)

This loss occurred upon the owners' thefts in 2004, during the policy period. This Court already has ruled that loss "is the embezzlement of the original exchangers' funds" which "created a deficit in Vesta . . . accounts that was concealed by the continuous repayment of previous exchangers with the funds of new exchangers," thereby creating "a concealed deficit in Vesta . . . accounts." (APP. 1057.) The collapse in 2008 that exposed the scheme "merely identified the ultimate damage caused by the original loss." (*Id.*) That loss still exists today to be satisfied, at least in part, by the Policy.

Continental attempts to circumvent this ruling and the uncontroverted facts by (1) arguing that the owners' Ponzi scheme somehow destroys the "connection"

between theft and loss, and (2) mischaracterizing the embezzled funds as "loans" and arguing that loss occurred when Terzakis failed to "repay" the "loans." (Dkt. 155 at 14–16.) Both arguments are meritless, as a matter of both fact and law.

First, as noted above, this Court already has ruled that the theft and the loss were one and the same, even though the Ponzi scheme allowed the owners to conceal Vesta's deficit for years. (APP. 1057.) Continental's assertions otherwise are not only contrary to this prior ruling; they effectively would preclude coverage for any Ponzi scheme under the Policy.

Second, taking exchange funds held in trust without the exchanger's consent is not "borrowing," it is "embezzlement" as a matter of law. (Dkt. 148 at 16–17.) A "loan" presupposes knowledge and consent by the lender with clear title to the property loaned to the borrower. (*Id.*) As the FBI found and as the government argued in its sentencing memorandum, the monies taken by the owners were thefts, not loans. (Dkt. 92-7.) Continental acknowledged as much when it previously argued that the owners were "thie[ves]" and their conduct was "willful wrongdoing." (Dkt. 80 at 12.) Moreover, evidence of repayment or intent of repayment is irrelevant once embezzlement occurs. *See, e.g., State v. Grimes*, 111 Wash. App. 544, 556 (2002) (theft of 1031 exchange funds by embezzlement is completed at time of conversion and evidence of repayment is irrelevant); *People v. Talbot*, 220 Cal. 3, 14 (1934) (officer "cannot take money of the corporation which is entrusted to him . . . and use it even temporarily for his personal benefit and avoid criminal responsibility by calling it a loan"). The wrongdoers' characterization of the thefts as "loans" did not save them from criminal convictions, substantial fines, and years in prison; and it does not relieve Continental of its coverage obligations here.

Continental's cases on this point are inapposite. In *Pacific-Southern Mortgage Trust Co. v. Insurance Co. of North America*, the court noted that while fraud and loss might not occur at the same time in the unique case of fraudulent

misrepresentation, "[u]nder the *general rule*" *applied to embezzlement* and other misconduct, "*loss occurs at the time of the dishonest acts* not when the insured is required to make good on the loss." 166 Cal. App. 3d 703, 710 (1985) (emphasis added). *Fidelity Savings & Loan Ass'n v. Aetna Life & Casualty Co.*, does not even concern the timing of loss, but rather whether loans granted after "bank officers had knowledge that the bank's liabilities were greater than its assets" were inherently fraudulent. 647 F.2d 933, 936 (9th Cir. 1981) (holding that loans are inherently fraudulent only when bank is in "hopeless and irretrievable insolvency"). In any case, whether fraudulent loans constitute thefts only when money is not repaid is irrelevant: Here, the wrongdoers did not borrow money under false pretenses, they stole it, during the policy period.

**ii. In any event, the Policy does not require that loss occur during the policy period.**

Additionally, the Policy does not require that "loss" occur during the policy period. Continental's suggestion that the Policy only covers "loss that you sustained prior to the effective date of termination or cancellation of this insurance" is incorrect, as that provision only applies to the Policy's extended reporting period, which is not at issue here. (Dkt. 150-4 at 11.) Rather, the Policy's only relevant temporal limitation—not quoted by Continental—is that Continental "will pay only for loss that [Vesta] sustain[s] through acts committed or events occurring at any time and discovered by [Vesta] during the Policy Period." (*Id.*) Under the Policy, "[d]iscovery occurs when [Vesta] first become[s] aware of facts which would cause a reasonable person to assume that a loss covered by this insurance has been *or will be* incurred, even though the exact amount or details of loss may not then be known." (*Id.* at 11 (emphasis added).) In other words, covered loss can occur or continue after the policy period.

Accordingly, Continental's contention that loss must occur during the policy period is contrary to the Policy's plain language.[6]

**B. Discovery of the loss was timely.**

The "discovery of loss" provision in a commercial crime policy is tolled when wrongdoers dominate the insured. *Admiralty Fund v. Peerless Ins. Co.*, 143 Cal. App. 3d 379, 385 (1983). In such situations, "there is no one to oversee those in charge, and so the concepts of diligence in uncovering an insurable loss and employee concealment are inapposite." *Id.* This tolling protects "minority interests such as . . . innocent investors," like the exchangers for whose benefit the Policy was created, marketed, and purchased. (APP. 1059.)[7]

The undisputed facts show that Vesta was wholly controlled by the persons perpetuating the criminal scheme. Vesta's owners and managers—namely Terzakis, Estupinian, Ye, and Hillig-Estupinian—were part of the scheme. (APP. 1052–53.) Employees' duties were defined by Estupinian. (Decl. of Susan Woo, Dkt. 79 ¶6 ("Woo Decl.") ("I followed the direction of my supervisors at Vesta, which included [Ye] and [Estupinian] . . . . [Estupinian] was the person I perceived as being in control over Vesta and its employees."); Decl. of Kristine Carlos, Dkt. 78 ¶6 ("Carlos Decl.") (same).) Estupinian's control was so pervasive that he even limited communications within Vesta. (APP. 0655 (Ye

---

[6] Additionally, the Policy does not require that the exchange funds be deposited initially with Vesta. Rather, the Policy covers property "held in a financial institution account in a transaction involving [Vesta] as a qualified intermediary . . . ." (Dkt. 150-4 at 11.) Vesta was "involve[ed]" in the transactions concerning funds deposited with IAG 1031 and then stolen by Vesta's owners because Vesta assumed control of IAG 1031's assets and handled such funds. (Dkt. 148 at 5.) The change over from IAG 1031 (an insured) to Vesta (an insured) did not diminish Vesta's coverage for thefts of exchange funds belonging to IAG 1031 exchangers. (*Id.*) If Continental wanted to limit coverage to only exchange funds that solely were invested with and handled by Vesta as qualified intermediary, it could easily have drafted the Policy that way. But it did not, and it cannot limit its coverage obligations as if it had. *See, e.g.*, *Smith v. Westland Life Ins. Co.*, 15 Cal. 3d 111, 120 (1975). In any event, more than $5 million in stolen exchange funds were invested directly with Vesta.

[7] This purpose is especially notable here, where Endorsement No. 3 expanded coverage "to protect client money from owner theft." (APP. 1052.)

was instructed by Estupinian "not to speak to [a sales manager] regarding the daily operations of the business" and "followed orders not to" reach out to others).) No employee, other than Ye (who was part of the conspiracy), was tasked with transferring exchange funds to Terzakis. The employees either accepted Estupinian's explanations that the transfers were legitimate or never questioned them. (Carlos Decl. ("I believed [Estupinian] and had no reason to question the validity of his response."); Woo Decl. ("I never questioned the transfers from Vesta to Vesta-related entities.").) None of the Vesta employees suspected that the transactions were illegal. (Woo Decl. ("I never concluded that any transfer I saw to Vesta-related entities was illegal or unethical."); Carlos Decl. (same); Dkt. 151 ¶50 (Ye stating that employees would have voiced concerns if they thought something was illegal).) Continental itself previously called the wrongdoers Vesta's "dominant owners" and its "alter ego," a position the Court adopted. (Dkt. 80 at 14; Dkt. 133 at 15.)

In response to this overwhelming evidence of domination, Continental argues that tolling requires Dillon to produce "evidence that precludes even the possibility that 'there were non-wrongdoing employees who could have discovered the losses.'" (Dkt. 155 at 21 (quoting *Cal. Union Ins. Co. v. Am. Diversified Sav. Bank*, 948 F.2d 556, 565 (9th Cir. 1991)).) This argument fails for two reasons. First, discovery under the Policy cannot be made by just any employee, but rather only by an owner or manager. This is because "discovery occurs when [Vesta] first become[s] aware" of relevant facts, (Dkt. 150-4 at 11), and Vesta, as an LLC, was managed and controlled by its owners and managers. (Dkt. 76-5 §3.3; Carlos Decl. ¶6.) Continental's cases acknowledge this requirement for discovery. *Cal. Union*, 948 F.2d at 563 (parties agreed that discovery could be made only by "an officer, director, general counsel or some other person in a position of responsibility"); *Admiralty Fund*, 143 Cal. App. 3d at 385 (tolling applies when "there is no one to oversee those in charge"); *Mosesian*

*v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir. 1984) (tolling applies where no "informed stockholder or director could have induced the corporation to sue").[8]

Second, discovery requires learning "facts showing that dishonest acts occurred" *and* "appreciat[ing] the significance of those facts," which non-wrongdoing employees here were incapable of doing, given the owners' domination. *Cal. Union*, 948 F.2d at 564. As noted above, non-wrongdoing employees had no appreciation that the transfers were either illegal or insured losses. Moreover, non-wrongdoing employees were clearly so controlled as to be precluded from acting against the wrongdoers' interests.[9]

Continental also incorrectly contends that there must be adversity between Vesta and its owners for "adverse domination" to toll the "discovery of loss" provision. But the court in *Admiralty Fund* did not discuss any adversity requirement; rather, it only discussed the incapacitation of the corporation by wrongdoer control. 143 Cal. App. 3d at 389. Regardless, there was adversity between Vesta and its owners. Terzakis and Estupinian took money that Vesta held in trust for exchangers, exposed Vesta to civil liability for their criminal conduct, imposed huge resulting costs on Vesta, and ultimately forced Vesta into receivership, for their own sole benefit. Continental cannot credibly contend that the wrongdoers' interests were not adverse to Vesta.

### C. Vesta's owners had the manifest intent to cause the loss.

In embezzling funds from Vesta, the wrongdoers acted "with the manifest intent" to "cause [Vesta] to sustain loss," as required by the Policy. (Dkt. 150-4 at

---

[8] Continental's cases not applying adverse domination are also inapposite because they lack the level of domination present here. *See Mosesian*, 727 F.2d 873 (district court found no evidence of domination); *Cal. Union*, 948 F.2d at 564 (domination not sufficient because federal regulators were investigating the insured during the misconduct).

[9] Continental's suggestion that the 180-day limits placed on 1031 exchanges would guarantee discovery by non-wrongdoers is similarly meritless, as it simply ignores that Vesta's loss was concealed by the Ponzi scheme.

15.)[10] The guilty pleas by Terzakis, Estupinian, and Ye for wire fraud, conspiracy, and money laundering establish, as a matter of law, specific intent to defraud Vesta. *See In re Waddell Jenmar Sec., Inc.* No. 92-2158, 1993 WL 128018, at *3 (4th Cir. April 23, 1993) (guilty pleas "clearly establish . . . manifest intent to defraud as defined under the bond standards"); *In re Lloyd Sec., Inc.*, 153 B.R. 677, 681 (E.D. Pa. 1993) (same); *First Nat'l Bank of Louisville v. Lustig*, 961 F.2d 1162, 1165 (5th Cir. 1992) ("embezzler always has a manifest intent"); *FDIC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 74 (2d Cir. 2000) ("[A]ctions that amount to embezzlement or embezzlement-like conduct establish a fidelity bond's manifest intent element as a matter of law."); *Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*, 181 N.J. 245, 271 (2004) ("pure embezzlement . . . plainly satisfy[ies] the manifest-intent requirement"); *U.S. v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) (wire fraud requires specific intent to defraud).

Despite the wrongdoers' guilty pleas and jail sentences, Continental disputes that Terzakis and Estupinian acted with "manifest intent." Each of Continental's contentions on this front are wrong on both the law and the facts.

First, Continental argues that it is "illogical" that Terzakis and Estupinian intended to cause loss to Vesta. But Continental did not think such a scenario "illogical" when it sold coverage that expressly and intentionally covers owner theft. Continental's argument would render the surety endorsement illusory because, in its view, owners could never intend to defraud their company.

Second, Continental again imagines each of Terzakis's thefts as a "loan" that he intended to repay. Taking a page from the wrongdoers' playbook, Continental even has the temerity to describe their criminal scheme as "mezzanine

---

[10] The Policy also requires "manifest intent" to "obtain financial benefit," but Continental does not dispute that the wrongdoers had the manifest intent to obtain financial benefits. (Dkt. 80 at 18 ("[Terzakis] clearly sought a benefit for himself").)

financing." (Dkt. 155 at 10.) As discussed above, these were not loans with interest due and repayment terms, and in any event any evidence of intent to repay is irrelevant once embezzlement occurs. *Talbot*, 220 Cal. at 14; *Grimes*, 111 Wash. App. at 556. Terzakis's testimony otherwise is irrelevant, as any reasonable person would have expected theft from Vesta to cause loss to Vesta. *Shoemaker v. Lumbermens Mut. Cas. Co.*, cited by Continental, actually supports this proposition—while that court found no evidence that the wrongdoer intended his theft from a client to harm his employer, it took as a given that he "intended to cause a loss" to the client from whom he stole. 176 F. Supp. 2d 449, 455 (W.D. Pa. 2001).

Third, Continental argues that this Court should predict that California would adopt the subjective-intent approach for determining "manifest intent," under which courts "try to determine whether the actor in question specifically intended the resulting loss to the employer in question." *Auto Lenders*, 181 N.J. at 264. Here, the wrongdoers' embezzlement of exchange funds held in trust by Vesta establishes manifest intent to cause Vesta a loss regardless of the standard applied. That said, the subjective-intent approach is the strictest of the three accepted standards for "manifest intent" and is inconsistent with both California law on interpreting insurance policies and the ordinary meaning of "manifest intent." Under California law, coverage-granting provisions drafted by insurers must be construed "broadly to afford the insured the greatest possible protection," while provisions that restrict coverage, as Continental contends the "manifest intent" requirement does, are construed narrowly. *Palp, Inc. v. Williamsburg Nat'l Ins. Co.*, 200 Cal. App. 4th 282, 290 (2011). This most restrictive reading of "manifest intent" is inconsistent with these policyholder protections and the requirement that "interpretive quandaries be resolved in favor of the insured and against the insurer." *PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 394 F.3d 761, 765 (9th Cir. 2005).

The two other accepted tests for "manifest intent" are far more compatible with California law and the plain meaning of the term "manifest." These tests are: (1) the objective test, which "focus[es] on the natural consequences of an actor's conduct . . . but d[oes] not necessarily focus on the actor's actual state of mind"; and (2) the substantial certainty test, which is "perhaps the most prevalent standard currently applied" and which "focuses in part upon the subjective state of mind of the actor to determine whether manifest intent was present in light of all surrounding circumstances." *Auto Lenders*, 181 N.J. at 263–64; *see also Intent*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Establishing manifest intent sufficient to trigger coverage does not require direct evidence that the employee intended the employer's loss. Even if the employee did not actively want that result, but the result was substantially certain to follow from the employee's conduct, the requisite intent will be inferred."). These tests are plainly satisfied here. Indeed, it is hard to imagine what would constitute "manifest intent" to cause harm if not embezzlement of millions of dollars held in trust.

**D. Vesta complied with the internal controls requirement.**

Continental argues that it was relieved of its coverage obligations because Vesta did not comply with the Policy's internal controls requirement, set forth in Endorsement 2, which provides that "each single exchange transaction . . . be identified by a specific file number or like tracking tool so as to provide a clear paper trail for each exchange transaction." (Dkt. 150-4 at 6.) Certainly the funds in the segregated accounts at Borel Bank from which the $9.3 million in exchanger funds were stolen satisfy this requirements. (Dkt. 96 at 5–9.) But Vesta further satisfied this requirement by providing a unique exchange number for each transaction, which is found in exchange agreements, account statements provided to exchangers, and internal bookkeeping documents. (Dkts. 84-1 at 14–101, 84-2 at 1–68 (exchange agreements); Dkts. 84-2 at 87–101, 84-3 at 1–27 (Vesta account statements); Dkt. 79-2 at 2–9 (e-mail from Susan Woo to Alma

Rivera including records of wire transfers each bearing an exchange number); Dkt. 97 at 4 (stating that each exchange was assigned a number and company practice was to maintain a paper trail including the illegal transfers out of Vesta).) As Ye stated, Vesta maintained a clear paper trail with exchange numbers and computerized accounting to track, at all times, how much was deposited, paid, and owed to each exchanger. (APP. 0654.) These facts belie Continental's flawed assertion that the pooled accounts prevented a clear paper trail. *See, e.g.*, *In re San Diego Realty Exch., Inc.*, No. 92-56526, 1994 WL 161646, at *3 (9th Cir. May 2, 1994) (applying the first-in, first-out rule to trace commingled exchange funds).

Vesta also complied with Endorsement No. 2's requirement for either "[c]ountersignature . . . for the release of all funds, *or* a monthly reconciliation of all accounts involving exchange transaction proceeds. . . . by an individual not authorized to deposit, withdraw or transfer funds from the account." (Dkt. 150-4 at 6 (emphasis added).) Vesta complied with the countersignature requirement because all funds transferred to Terzakis by Ye were approved by Terzakis and Estupinian. And even if Continental were correct that countersignatures were not obtained, that is irrelevant, since Continental does not contest that account reconciliations were performed at Single Site Solutions, that Terzakis's "loans" were not hidden, and that neither Terzakis nor Single Site were signers on the Borel Bank account, satisfying the second prong of this disjunctive requirement through monthly reconciliations. (Dkt. 155 at 18.)

## IV. CONCLUSION

Dillon respectfully submits that the Court should grant Dillon's motion for summary judgment and deny Continental's motion for summary judgment based on the findings and conclusions of law as set out in the proposed order filed concurrently herewith.

DATED this 13th day of February, 2017

Respectfully submitted,

/s/ Robert L. Brace

Robert L. Brace, Esq.,
SBN. 122240
Santa Barbara, CA 93101

Richard Shore (*pro hac vice pending*)
GILBERT LLP
1100 New York Avenue, NW
Suite 700
Washington, DC 20005

*Attorneys for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group LLC*

## CERTIFICATE OF SERVICE

This document will be served by the Court via its CM/ECF. No Certificate of Service is necessary, except as to those parties not on the Court's electronic service list. Plaintiff is informed and believes that all parties who have appeared to date have at least one of their attorneys on the electronic service list.