CLYDE & CO US LLP
Eileen King Bower, *Pro Hac Vice*
eileen.bower@clydeco.us
55 West Monroe Street, Suite 3000
Chicago, IL 60603-5757
Telephone: 312.635.6937
Facsimile: 312.635.6950

TROUTMAN SANDERS LLP
Peter R. Lucier, Bar No. 246397
peter.lucier@troutmansanders.com
580 California Street, Suite 1100
San Francisco, CA 94104
Telephone: 415.477.5700
Facsimile: 415.477.5710

Attorneys for Defendant
CONTINENTAL CASUALTY COMPANY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC and Excalibur 1031 Group, LLC,<br><br>Plaintiff,<br><br>v.<br><br>Continental Casualty Company, an Illinois Corporation,<br><br>Defendant. | Case No. 5:10-CV-05238-EJD<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CONTINENTAL CASUALTY COMPANY'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 4, 2017<br>Time: 9:00 a.m.<br>Location: Courtroom 4, 5th Floor<br>Judge: The Honorable Edward J. Davila |

## TABLE OF CONTENTS

Page(s)


I. INTRODUCTION ..... 1

II. PLAINTIFF'S RED HERRING STATEMENTS SHOULD BE IGNORED..... 1

III. CONTINENTAL'S EVIDENTIARY OBJECTIONS ..... 4

IV. ARGUMENT ..... 8

A. Tolling The Discovery Period Will Not Cure The Defect In Plaintiff's Claim Against Continental ..... 8

B. Even If Plaintiff Alleged A Covered Loss Within The 2004 Vesta Policy, This Court Should Not Toll The Policy's Discovery Period Under A Theory Of Adverse Domination..... 9

1. California Law Does Not Recognize Adverse Domination in This Context ..... 9

2. Plaintiff Fails to Meet His Factual Burden to Toll Discovery of Loss ..... 11

3. Applying Adverse Domination Would be Inappropriate Given the Existence of Coverage in Effect When the Loss Was Discovered ..... 12

C. Alleged Embezzlement Of Client's Exchange Funds Does Not Establish Manifest Intent To Cause Vesta To Sustain A Loss ..... 13

V. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Admiralty Fund v. Peerless Ins. Co.*,
143 Cal. App. 3d 379 (Cal. Ct. App. 1983) .................... 9, 10, 11

*Am. Employers' Ins. Co. v. Roundup Coal Mining Co.*,
73 F.2d 592 (8th Cir. 1934).................... 9

*Cal. Union Ins. Co. v. Am. Diversified Savings Bank*,
948 F.2d 556 (9th Cir. 1991).................... 10, 11

*Continental Bank, N.A. v. Aetna Cas. & Sur. Co.*,
626 N.Y.S.2d 385 (N.Y. App. Div. 1995) .................... 13, 14

*FDIC v. Oldenburg*,
34 F.3d 1529 (10th Cir. 1994).................... 9

*Fireman's Fund Ins. Co. v. Special Olympics Intern., Inc.*,
346 F.3d 259 (1st Cir. 2003) .................... 14

*Fletcher Jones Co. v. United Pac. Ins. Co.*,
181 Cal.App.2d 202 (Cal. Ct. App. 1960) .................... 9

*General Analytics Corp. v. CNA Ins. Companies*,
86 F.3d 51 (4th Cir. 1996).................... 14

*Karen Kane Inc. v. Reliance Ins. Co.*,
202 F.3d 1180 (9th Cir. 2000).................... 10

*Kennedy v. Allied Mutual Ins. Co.*,
952 F.2d 262 (9th Cir. 1991).................... 4

*Lynch Prop., Inc. v. Potomac Ins. Co. of Illinois*,
962 F.Supp. 956 (N.D. Tex. 1996).................... 13

*Municipal Securities, Inc. v. Ins. Co. of North America*,
829 F.2d 7 (6th Cir. 1987).................... 13

*People v. Talbot*,
220 Cal. 3 (Cal. 1934) .................... 9

*Shoemaker v. Lumbermens Mut. Cas. Co.*,
176 F. Supp. 2d 449 (W.D. Pa. 2001) .................... 13

*State v. Grimes*,
46 P.3d 801 (Wash. Ct. App. 2002) .................... 9

## TABLE OF AUTHORITIES
## (continued)

**PAGE(S)**

**STATUTES**

California Insurance Code § 533 ..... 2

Section 1031 of the Internal Revenue Code ..... 10

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Continental Casualty Company ("Continental") hereby submits the following Reply Memorandum of Points and Authorities in support of its Cross-Motion for Summary Judgment against Plaintiff Thomas Dillon ("Plaintiff" or "Dillon"), as Receiver for Vesta Strategies, LLC ("Vesta") and Excalibur 1031 Group, LLC.

## I. INTRODUCTION

In his Opposition, Plaintiff once again concedes the central argument underlying Continental's Cross-Motion – namely, that (1) the 2004 Vesta Policy insures a covered loss discovered no later than October 15, 2004 (the "Discovery Date"); and (2) Vesta's alleged losses were not discovered until 2008. Nevertheless, Plaintiff persists in his claims against Continental by arguing that the discovery period should be tolled due to the "adverse domination" of Vesta by its allegedly thieving principals. Plaintiff misses the mark. There is no basis for "tolling" the period of loss beyond the Discovery Date because the facts alleged by Plaintiff reveal that the loss at issue in this case did not take place until after the 2004 Vesta Policy expired. Moreover, the legal and factual justifications that California courts have found fundamental to the application of adverse domination are absent in this case. Because Plaintiff cannot meet his burden of proving discovery of a covered loss during the relevant policy under any circumstances, his claims against Continental must be dismissed.

## II. PLAINTIFF'S RED HERRING STATEMENTS SHOULD BE IGNORED

As a threshold matter, Continental will address in short order a number of statements made by Plaintiff in his Opposition that are nothing more than red herrings. Because Plaintiff does not advance any coherent argument in connection with these statements, they do nothing more than cloud the issues.

- **The loss must occur during the policy period**. The Discovery of Loss provision Plaintiff quotes[1] does not provide that a covered loss can occur after the policy period. The 2004

[1] "Discovery occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this insurance has been or will be incurred, even though the exact amount of details of loss may not then be known." Vesta 2004 Policy, ECF No. 156-1 at APP 0089.

Vesta Policy unambiguously provides, "[w]e will pay for loss that you sustained prior to the effective date of termination or cancellation of this insurance, which is discovered by you no later than 60 days from the date of that termination or cancellation." 2004 Vesta Policy, ECF No. 156-1 at APP 0089. The Policy further provides that Continental "will pay only for loss that you sustain through acts committed or events occurring at any time and discovered by you during the Policy Period." *Id*.

- **There are two versions of Vesta's Operating Agreement**. Continental does not dispute that Vesta was solely owned by B&B Sparco and Mutual Vision LLC, and that Terzakis was the sole owner of B&B Sparco. *See* Continental's Statement of Fact, ECF No. 157 at Fact Nos. 15 and 16. The purpose of Continental disputing Plaintiff's quotation of the Operating Agreement was to point out that "[t]wo different versions of the Operating Agreement of Vesta Strategies, LLC were produced during discovery." Continental's Response to Plaintiff's Separate Statement, ECF No. 158 at Fact No. 5. Plaintiff has failed to offer any admissible evidence to establish that any version of the Operating Agreement is accurate.
- **Endorsement 3's inclusion of the word "surety" has no bearing on the remaining issues**. Plaintiff has yet to explain or argue how Endorsement 3's inclusion of the word "surety" has any bearing on the remaining coverage issues. While the "surety" issue was relevant to the Ninth Circuit's decision of whether California Insurance Code § 533 applied, it has no impact to the coverage issues presented in this motion practice.
- **Continental does not condone Terzakis' behavior or crimes**. Plaintiff accuses Continental of "[t]aking a page from the wrongdoer's playbook" by imaging each of Terzakis' thefts as "loans" and describing the criminal scheme as "mezzanine financing." *See* Plaintiff's Opposition, ECF No. 162 at pp. 17-18. Plaintiff distorts Continental's arguments regarding covered loss and manifest intent, which are essential elements to establishing a covered loss, and repackages it as if Continental were somehow arguing that there was no dishonest act at issue. What Continental actually did argue was that there was not a covered loss at issue; particularly, that if a dishonest act has the unintended

effect of causing a loss, then the loss is not covered by the policy. Unquestionably, Continental does not endorse, condone or otherwise approve of Terzakis' conduct. Continental's arguments are based on the policy language at issue and the facts. Indeed, Continental purposely put quotations around the phrases *loan* and *mezzanine financing* in its Cross-Motion's Statement of Facts to signify that these phrases are how the wrongdoers described their actions. *See* Continental's Cross-Motion, ECF No. 155 at p. 17.

- **This Court has not ruled on the merits of whether Plaintiff has established a covered loss**. Plaintiff mischaracterizes this Court's prior Order on Continental's Motion to Dismiss as an actual dispositive resolution of the issue of whether Dillon can establish a loss during the relevant policy period. *See* Plaintiff's Opposition, ECF No. 162 at pp. 11-12. The Order merely addressed whether the allegations of the Complaint were sufficient to survive a motion to dismiss. *See* MTD Order, ECF No. 43 at p. 8 (finding that Plaintiff had "sufficiently alleged the occurrence of a covered loss during the discovery period"). The Court did not find that Plaintiff had actually proven his theory of loss. Indeed, as set forth in the Continental's Cross-Motion, the facts obtained during the course of discovery are inconsistent with the allegations of loss that allowed Plaintiff to survive Continental's Motion to Dismiss. *See* Continental's Cross-Motion, ECF No. 155 at pp. 22-23. Specifically, although Plaintiff alleged that Terzakis and Estupinian ran a hidden Ponzi scheme, the facts revealed that Terzakis agreed to fund Vesta so that he could use it as a form of "mezzanine financing," which would allow him to take loans of Exchangers Funds. The loans did not result in an immediate loss to Vesta. Further, California courts have recognized that improper "loans" did not constitute a loss unless or until there is an inability to pay. Terzakis had the ability to pay any loans taken during the 2004 Vesta Policy period. He became unable to pay in late 2007/2008 when his personal assets evaporated due to steep decline in the real estate market. Moreover, Plaintiff has not proven that the alleged "deficit" in 2008 can be traced to the transfer of Exchange Funds during the 2004 Vesta Policy period. The Ye Spreadsheet Plaintiff relies on as proof of his claim rebuts this. *See* Ye's Spreadsheet, ECF No. 151-2. Based on Ye's Spreadsheet,

between March 2, 2004 and May 28, 2008, Vesta transferred over $46 million to Terzakis and Terzakis transferred over $37 million back to Vesta. *Id*. Plaintiff has not shown how the $9 million deficit as of May 28, 2008 is due to funds Terzakis transferred from the Vesta/IAG 1031 bank account in 2004 versus the nearly $38 million misappropriated after the expiration of the Vesta 2004 Policy.

## III. CONTINENTAL'S EVIDENTIARY OBJECTIONS

If Plaintiff's claims had merit, proving them would be a far less complicated task than he has made it. Plaintiff has repeatedly asserted that Terzakis embezzled $9.3 million of Vesta Exchanger Funds during the 2004 Vesta Policy period, but he lacks any admissible evidence demonstrating that Vesta exchangers actually deposited any monies with Vesta during that time frame or that monies allegedly transferred to Terzakis originated from accounts holding Vesta Exchange Funds. Faced with having neither law nor facts on his side, Plaintiff continues to cite sham declarations and unauthenticated exhibits in an effort to piece together a story that is simply not credible.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mutual Ins. Co*., 952 F.2d 262, 266 (9th Cir. 1991). While this rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony, "sham" testimony that flatly contradicts earlier testimony in an attempt to "create" an issue of fact will not serve to avoid summary judgment. *Id*. at 267. Try as he might, Plaintiff cannot reconcile Ye's prior deposition testimony with his most recent declaration. In his Fifth Supplemental Declaration, Ye states that he relied on a spreadsheet attached as Exhibit 2, which he claims "lists the Exchange funds in control of Vesta that I, as an employee of Vesta, wired out to accounts in the names of Single Site Solutions, Midwest Properties, and Investment Advantage Group." Ye's Fifth Declaration, ECF No. 151 at ¶ 7. As detailed in Continental's Cross-Motion, the supplemental declaration of Ye **directly** contradict his prior deposition testimony, and is purportedly based on ill-described and questionable bank records. *Compare* Ye's **October 27, 2016** Fifth Declaration, ECF No. 151 at ¶ 23 ("From my review of the bank records at Borel

Bank, the Vesta and IAG 1031 business records, and my own recollection because I was there, I can identify the specific sources of the funds that I used to make the $9.3 million in transfers to Terzakis which are set forth at the beginning of the list in my document Exhibit 67.") *with* Ye's **July 11, 2012** Deposition, ECF No. 156-7 at APP0623:

> **Q. Is there any documentation that you maintain that would reflect the -- the source of the funds you wired; in other words, where the wire originated from that you say is reflected on Exhibit 2?**
>
> A. No.
>
> **Q. So how do we know today where those monies came from?**
>
> A. We don't.

*Compare* Ye's **October 27, 2016** Fifth Declaration, ECF No. 151 at ¶ 7 (stating that Exhibit 2 is an "accurate accounting starting in 2004 of the inflows and outflows of Exchange Funds to and from Terzakis except for a January 21, 2004 transfer) *with* Ye's **July 11, 2012** Deposition, ECF No. 156-7 at APP0623, 68:20-21 (testifying that Exhibit 2 "is inaccurate for the period for March 2nd, 2004, I guess, until 10/4/07"); *compare* Ye's **October 27, 2016** Fifth Declaration, ECF No. 151 at ¶ 41 (stating that deficit in the trust account was never replenished by Terzakis) *with* Ye's **July 11, 2012** Deposition, ECF No. 156-7 at APP0623, 66:1-68:2 (testifying that monies were paid back in to Vesta by Terzakis and that Exhibit 2—which indicates that between March 2, 2004 and May 28, 2008, Terzakis transferred over $37 million back to Vesta—reflected some, but not all, of the payments that Terzakis paid back into Vesta). The contradictory assertions demonstrate Ye's latest declaration is clearly a sham and should be disregarded. What remains to link "Vesta" Exchanger Funds to wires allegedly sent by Ye to Terzakis during the 2004 Vesta Policy Period is the information set forth in Exhibit 2. Because Ye admitted that Exhibit 2 is not accurate and does not reflect Vesta monies, Plaintiff has failed to establish through undisputed facts that Vesta Exchange Funds were "embezzled" during the 2004 Vesta Policy period.

Similarly, Plaintiff cannot escape prior deposition testimony and record evidence showing

that the transfer of funds involving Vesta Exchangers and IAG 1031 Exchangers is inexorably comingled. Plaintiff concedes that the Policy covers property "held in a financial institution account in a transaction involving [Vesta] as a qualified intermediary . . . ." Plaintiff's Opposition, ECF No. 162 at n. 6. Ye states in his Fifth Declaration that "Exchangers depositing Exchange Funds after January 9, 2004, regardless of whether they were IAG 1031 Exchangers or Vesta Exchangers, Vesta was the operating QI in control of all Exchange Funds deposited after January 9, 2004, . . . " Ye's Fifth Declaration, ECF No. 151 at ¶ 22. This assertion is unsupported and contrary to the record. It is undisputed that Vesta, although created in January 2004, did not open any bank accounts in its own name until August 2004. Indeed, the bank statement embedded in Plaintiff's Opposition is an IAG 1031 account. *See* Plaintiff's Opposition, ECF No. 162 at p. 7. To the extent Vesta took possession of client Exchange Funds while the 2004 Vesta Policy was in effect, the monies would have been deposited and commingled with IAG 1031 exchange funds in existing bank accounts held by IAG 1031. As Ye testified, there would be no way to determine if any monies wired to Terzakis during the 2004 Vesta Policy period were monies deposited while IAG 1031 acted as a QI or whether such monies were deposited while Vesta acted as a QI. *See* Ye Deposition, ECF No. 156-7 at APP0624 (69:19-23)(testifying that when Vesta was created, there was no attempt to segregate client exchange funds that were deposited by IAG 1031 from those deposited by Vesta). Conveniently, significant supporting documentation is missing as “all of the 2003 Exchange Agreements for IAG 1031 and the 2004 Exchange Agreements for Vesta were destroyed at [Ye’s] direction as old documents.” Ye's Fifth Declaration, ECF No. 151 at ¶ 21. Because Terzakis and Estupinian failed to make any effort to separate the business and bank accounts of IAG 1031 and Vesta, at least while the 2004 Vesta Policy was in effect, there is simply no evidence to support loss of property "held in a financial institution account in a transaction involving [Vesta] as a qualified intermediary."

In addition, Plaintiff falls woefully short of providing evidentiary support that Vesta complied with the 2004 Vesta Policy's internal controls requirements. Plaintiff does not dispute that the Policy requires that "each single exchange transaction . . . be identified by a specific file number or like tracking tool so as to provide a clear paper trail for each exchange transaction."

Plaintiff's Opposition, ECF No. 162 at p. 19. To prove this requirement, Plaintiff cites to exchange agreements entered into **between October 2, 2007 and June 4, 2008** (ECF Nos. 84-1 at pp. 14-101; 84-2 at pp. 1-68); account statements provided to exchangers dated **between October 3, 2007 and June 6, 2008** (ECF Nos. 84-2 at pp. 87-101; 84-3 at pp. 1-27); a single chart entitled "Merrill Lynch Accounts Wired from East West for the **period 12/22/2005 to 11/8/2006**" (ECF No. 97 79-2 at pp. 2-9); and a sham declaration that is speculative, lacks personal knowledge and is directly refuted by prior deposition testimony. *Compare* Terzakis' October 8, 2012 Supplemental Declaration, ECF No. 97 at ¶ 7 ("Each Exchange at Vesta was assigned a number and Vesta was directed to maintain a clear paper trail accounting for each transaction.") *with* Terzakis' June 5, 2012 Deposition, ECF No. 156-4 at APP0234:

**Q. What about in 2004, 2005, that time frame, 01:51:40**
**did you understand that Vesta was tracking loans 01:51:43**
**that you had taken of exchanger funds at Vesta's 01:51:47**
**offices? 01:51:50**
A. No, I didn't know that. 01:51:51

It is inconceivable how Plaintiff can assert that these documents establish a clear paper trail for his claimed loss, alleged theft of Exchanger Funds **in 2004**. Moreover, any assertion that Vesta maintained a clear paper trail for each exchange transaction is disingenuous at best when Dillon's Proof Of Loss includes a June 11, 2010 Memorandum describing, in detail, how the success of the scheme depended upon the ability of Terzakis and Estupinian to *obscure* a clear paper trial. *See* Plaintiff's Proof of Loss, ECF No. 156-11 at APP1005-08.

When the misleading statements and sham declarations are removed from Plaintiff's briefing, very little remains. As discussed below, any remaining arguments are clearly refuted by the evidence that is actually before this Court and the applicable law discussed in Continental's Cross-Motion. Continental therefore respectfully requests that its Cross-Motion for Summary Judgment be granted.

## IV. ARGUMENT

### A. Tolling The Discovery Period Will Not Cure The Defect In Plaintiff's Claim Against Continental

The 2004 Vesta Policy provides coverage for loss resulting from employee theft, and in order to trigger coverage, the loss must be discovered during the policy period (or extended period). Based on Plaintiff's own description of Vesta's 1031 exchange business, the loss alleged could not have taken place or been discovered until after the 2004 Vesta Policy expired, regardless of whether the discovery period is tolled. The nature of Vesta's business was such that it held client funds for a short period of time, between 45 and 180 days. When it received client funds, instead of maintaining them in a segregated account, Vesta transferred customer funds to Terzakis, who put those monies into real estate investments. In order to meet its obligations to customers, Vesta allegedly caused the company to use incoming funds from new clients to fund open exchange contracts for existing clients. In other words, Vesta would divert monies held for client/exchangers to another entity and would use those monies for personal and other business pursuits. The scheme unraveled in 2008, when Vesta sustained a shortfall and was unable to fund existing open client exchange contracts, totaling approximately $20 million. This shortfall is the “loss” which forms the basis of Plaintiff's claim against Continental in this case.

Plaintiff argues that tolling of the discovery period in 2004 Vesta Policy is appropriate because Vesta was "adversely dominated" by the individuals misappropriating client funds. Tellingly, he states that "where new escrows being opened on relinquished properties were sufficient to pay for the close of escrows on replacement properties, they were able to continue the scheme undetected." Plaintiff's Proof of Loss, ECF No. 156-11 at APP1008. In other words, because Vesta's obligations to its existing customers were being met by the use of new customer funds, Vesta was able to continue funding exchanges throughout the term of the 2004 Vesta Policy. Accordingly, at least during the 2004 Vesta Policy Period, no customers were aware of a loss. No customers were aware of a loss during that time because no loss of client funds took place at that time. *See* Plaintiff's Responses to Continental's Requests to Admit, ECF No. 156-16 at Response No. 15 (admitting that every exchanger that deposited money with Vesta during the

2004 Vesta Policy period had their 1031 exchange completed); Vesta's 30(b)(6) Deposition, ECF No. 156-6 at APP0459, 115:15-24 (Q: "Aside from [the transactions alleged in the complaint], were you aware of any other exchangers that did not close while you were at Vesta?" A: "No."). The loss claimed by Plaintiff is the money that clients who deposited funds with Vesta beginning on June 29, 2007 claim they lost. Consequently, the loss did not and could not have been discovered prior to the Discovery Date because it was not sustained until many years later. Because the alleged loss at issue was not sustained until after the 2004 Vesta Policy expired, it follows that the loss could not have been discovered during the policy period. Thus, tolling the discovery period would not bring the claim even arguably within the coverage of the 2004 Vesta Policy.[2]

### B. Even If Plaintiff Alleged A Covered Loss Within The 2004 Vesta Policy, This Court Should Not Toll The Policy's Discovery Period Under A Theory Of Adverse Domination

Even if Plaintiff alleged a loss within the 2004 Vesta Policy (and he does not), the policy provisions requiring discovery of loss during the policy period should not be ignored by "tolling" discovery based on adverse domination.

#### *1. California Law Does Not Recognize Adverse Domination in This Context*

Plaintiff relies on *Admiralty Fund v. Peerless Ins. Co.*, 143 Cal. App. 3d 379 (Cal. Ct. App. 1983) in support of the application of adverse domination in the fidelity bond context. See

---

2 Plaintiff continues to assert that a wrongful act alone triggers coverage. Under California law, an insurer is liable under a fidelity bond "only to the extent that the [insured] suffered an actual pecuniary loss." *Fletcher Jones Co. v. United Pac. Ins. Co.*, 181 Cal.App.2d 202, 206 (Cal. Ct. App. 1960). *See also Am. Employers' Ins. Co. v. Roundup Coal Mining Co.*, 73 F.2d 592, 595 (8th Cir. 1934)("Dishonesty in the abstract cannot be compensated in damages, and in a suit to recover on the bond the dishonesty must have resulted in pecuniary loss."). Plaintiff cites two criminal law cases (*State v. Grimes*, 46 P.3d 801 (Wash. Ct. App. 2002) and *People v. Talbot*, 220 Cal. 3 (Cal. 1934)) to support his premise that criminal embezzlement establishes a covered loss. Courts have refused to find fidelity coverage under bonds similar to Continental's based solely on a dishonest employee's prior guilty plea to criminal charges. In *FDIC v. Oldenburg*, 34 F.3d 1529 (10th Cir. 1994), the Tenth Circuit held that the employee's "guilty plea does not establish liability under the bond as a matter of law." *Id.* at 1539. Consequently, the Plaintiff cannot simply rely on the wrongdoing employees' convictions to meet its burden of proof.

Plaintiff's Opposition, ECF No. 162 at pp. 14-16. As Continental argued in its Cross-Motion, the rationale for adverse domination set forth in *Admiralty Fund*, however, does not justify tolling the discovery period in this case. Continental's Cross-Motion, ECF No. 155 at pp. 23-27. In *Admiralty Fund*, the court compared discovery periods to statutes of limitation. The court reasoned that, like discovery clauses, "statutes of limitation preclude those who have a valid claim from exercising unreasonable delay in pursuing the action." *Admiralty Fund*, 143 Cal. App. 3d at 385. This rationale does not translate to Plaintiff's claims against Continental. Plaintiff did not "delay" in pursuing an otherwise valid claim for coverage under the 2004 Vesta Policy. Rather, Plaintiff never had a valid claim against Continental in the first instance. The alleged loss did not take place during the 2004 Vesta Policy period, and therefore, could not possibly have been discovered in that timeframe.

In addition, *Admiralty Fund* involved an insured entity that, unlike Vesta, held customer funds for unspecified periods of time. In the mutual fund context, an investment advisor could cause loss to investors and then conceal that loss for years (perhaps by fabricating statements reporting the fund's progress). This situation engenders the potential for a long gap between when loss is sustained by the investor and when the loss is discovered. In contrast, no such gap could possibly arise in Vesta's line of work because Section 1031 of the Internal Revenue Code requires 1031 exchanges to be completed within 180 days. Indeed, Vesta's alleged losses were discovered nearly at the same time they were sustained, when Vesta was no longer able to fund open exchanges and the scheme collapsed.

Simply put, the rationale behind applying adverse domination does not apply in this case. No California court had applied adverse domination in the manner suggested by Plaintiff. In fact, the Ninth Circuit applying California law has twice rejected to broaden *Admiralty Fund's* application. *See Cal. Union Ins. Co. v. Am. Diversified Savings Bank*, 948 F.2d 556, 565-66 (9th Cir. 1991) ("We reiterate that in *Admiralty Fund*, the court began its analysis with the general rule; namely, that '[g]enerally, the courts have strictly enforced such [discovery of loss] provisions so that neither difficulty in discovering insured losses nor employee concealment excuse the insured's performance.'"); *Karen Kane Inc. v. Reliance Ins. Co.*, 202 F.3d 1180 (9th

Cir. 2000). This Court should not engage in the drastic extension of California law contemplated by Plaintiff where the rationale is not applicable.

### ***2. Plaintiff Fails to Meet His Factual Burden to Toll Discovery of Loss***

Even if adverse domination was potentially applicable under these circumstances – and it is not – the record conclusively demonstrates that Plaintiff cannot satisfy his burden of proof to establish adverse domination. In an apparent attempt to muddy the waters on the issue of adverse domination, Plaintiff goes to some effort to posit the irrelevant proposition that the non-wrongdoing employees of Vesta were not able to stop the improper transfers carried out by Terzakis and Estupinian. *See* Plaintiff's Opposition, ECF No. 162 at pp. 14-16. As Continental set forth in its Cross-Motion and case law makes clear, the relevant question for purposes of the adverse domination analysis is whether a Vesta employee could have discovered (not prevented) the transfers of Exchange Funds that Plaintiff claims constitutes the loss he seeks to recover. *See Cal. Union*, 948 F.2d at 565 (holding that a company is not adversely dominated where "non-wrongdoing employees [] could have discovered the losses"); *Admiralty Fund*, 143 Cal. App. 3d at 389 (framing the inquiry as whether the wrongdoers "controlled the [] operations to such an extent as to preclude discovery").

Plaintiff does not dispute the deposition testimony of Terzakis cited by Continental in its Cross-Motion that makes clear that the transfers to him were open and obvious to anyone in the company. In fact in his Opposition, Plaintiff quotes a declaration by a non-wrongdoing employee that unequivocally establishes that she was aware of the transferring of exchange funds. *See* Declaration of Kristine Carlos, ECF No. 65 at ¶ 7 ("While employed at Vesta, I did ask Robert Estupinian why Vesta was making a transfer of Exchange Funds out of the depository account for a purpose other than to close an Exchange or return the funds to the Exchanger.").[3] Further, Plaintiff does not dispute that others at Vesta were aware of the existence of Terzakis' transfers. *See* Plaintiff's Response to Continental's Separate Statement, ECF No. 164 at Fact No. 61 ("It is

---

[3] Continental objects to Plaintiff's citation of paragraphs 4 and 5 of Woo's Declaration. In her deposition, Ms. Woo testified that she could not attest to the information set forth in paragraphs 4 and 5. *See* Woo Deposition, ECF No. 156-8 at APP0708, 38:20-39:24.

undisputed that certain employees at Vesta and Single Site Solution believed Terzakis was taking 'loans', but he was embezzling money as a matter of law.").

The undisputed facts simply cannot support a finding that it was impossible for non-wrongdoing employees to discover the alleged loss. Because a non-wrongdoing employee could have discovered the alleged "thefts" during the 2004 Vesta Policy period or before the Discovery Date, Plaintiff's theory of adverse domination does not apply and the discovery of loss provisions must be strictly construed in favor of Continental.

***3. Applying Adverse Domination Would be Inappropriate Given the Existence of Coverage in Effect When the Loss Was Discovered***

The fact that Plaintiff sought coverage under multiple successive policies undercuts his argument that adverse domination should apply to toll the 2004 Vesta Policy discovery period. Plaintiff argues that tolling the discovery period is necessary because the wrongdoers' domination of the company made it impossible for Vesta to discover the loss. *See* Plaintiff's Opposition, ECF No. 162 at p. 9. Plaintiff further suggests that tolling should continue while "Vesta was wholly controlled by the persons perpetuating the criminal scheme." *Id*. at p. 14. Plaintiff's position is flawed, however, because discovery is not made impossible when the theft is committed by an owner. Vesta's losses were in fact discovered in 2008, when Vesta was still "wholly controlled by the persons perpetuating the criminal scheme."

More significantly, Plaintiff's position would force fidelity insurers to provide perpetual coverage. If the 2004 Vesta Policy was meant to provide perpetual coverage for owner theft, however, Vesta would have had no need to purchase a series of policies in consecutive years. In fact, Vesta and Excalibur had commercial crime coverage from U.S. Fire and Liberty Mutual in effect at the time the loss was discovered. Plaintiff has recovered under those policies. *See* Report of Receiver, ECF No. 132 at pp. 4-5; Dillon's Declaration, ECF No. 150 at ¶¶ 7, 29. Plaintiff's "tolling" argument would effectively extend the time period Continental agreed to be on the risk and have Continental's coverage run concurrently with the U.S. Fire and Liberty Mutual policy periods. Such a result clearly was never intended by Vesta and its carriers.

### C. Alleged Embezzlement Of Client's Exchange Funds Does Not Establish Manifest Intent To Cause Vesta To Sustain A Loss

Plaintiff does not dispute that the 2004 Vesta Policy requires that, in order for there to be coverage, the employee act with the "manifest intent" to "cause [Vesta] to sustain loss." Plaintiff's Opposition, ECF No. 162 at p. 16. Plaintiff argues "the wrongdoers' embezzlement of exchange funds held in trust by Vesta establishes manifest intent to cause Vesta to a loss regardless of the standard applied." *Id.*

Even when the policy covers loss of third party property, the claimant must still prove that wrongdoers had the manifest intent to cause the insured's loss. *See Shoemaker v. Lumbermens Mut. Cas. Co.*, 176 F. Supp. 2d 449, 457 (W.D. Pa. 2001)("[E]ven if the Plaintiff could show that the Ross Estate's funds were 'property covered' under the Policy, […] the Plaintiff still must prove that Mr. Moore had the 'manifest intent' to cause the insured's loss, a showing she has not made."). When an employee intends to cause loss to a third party, and not the employer, the employee does "not have the necessary manifest intent to trigger coverage." *Lynch Prop., Inc. v. Potomac Ins. Co. of Illinois*, 962 F.Supp. 956, 962 (N.D. Tex. 1996)(granting summary judgment in favor of insurer where employee embezzled assets of employer-insured's client because "the evidence demonstrates that [the client], rather than [the employer] itself, was [the employee]'s intended victim"); *Shoemaker*, 176 F. Supp. 2d at 455 (granting summary judgment for insurer where an insured "identifie[d] no evidence whatsoever indicating that [the employee] stole funds from the [underlying plaintiff] with the purpose of causing a loss to [the employer]").

An employee does not have the necessary manifest intent where the employee committed the dishonest act "to make money, not to cause her employer to lose money." *Municipal Securities, Inc. v. Ins. Co. of North America*, 829 F.2d 7, 9 (6th Cir. 1987)(affirming summary judgment for the insurer regarding coverage under fidelity bond); *see also Continental Bank, N.A. v. Aetna Cas. & Sur. Co.*, 626 N.Y.S.2d 385, 387 (N.Y. App. Div. 1995)(granting insurer's motion for summary judgment where "manifest intent of these scoundrels was to make money, not to cause [the employer] to lose money"). In *Investors Trading Corp. v. Fidelity & Deposit Co. of Maryland*, two employees of the insured retail securities broker violated the insured's policy

prohibiting the trading of uncovered index options in an employee's personal trading account by making very risky trades that the employer ultimately suffered the loss on because neither employee was able to meet the margin calls that resulted. 2004 WL 3045196 (N.D. Tex. Dec. 22, 2004). The insured argued that because the employees knew that any losses resulting from their trades would be borne by the insured, a fact issue existed as to the employees' manifest intent. The court disagreed, reasoning as follows:

> [K]nowledge that an employer will bear responsibility for losses an employee sustains in excess of its resources is not the same thing as intending to cause a loss to an employer. In this case, the undisputed facts are that neither [of the employees] desired to cause a loss to [the insured]. On the contrary, both employees wanted to make money off their trading activities. The knowledge that [the insured] would bear the losses, if any, simply created the security blanket for them to allow them to engage in the trades.

*Id*. at *2. Similarly, Plaintiff cannot establish that the wrongdoers' had the necessary manifest intent because there is no evidence demonstrating that the wrongdoers' took the exchangers' funds with the purpose of causing loss to Vesta. Terzakis' intent was to make money, not to cause Vesta harm. *See* Terzakis Deposition, ECF No. 156-4 at APP0333, 276:23-277:23 (testifying that he used Exchange Funds deposited by Vesta exchangers as mezzanine financing for real estate endeavors). Vesta's corporate designee testified that he believed Terzakis was "investing [the exchanger funds] for the benefit of -- of Vesta." Vesta 30(b)(6) Deposition, ECF No. 156-6 at APP0555, 327:4-10.

The fact that the wrongdoers' alleged actions caused Vesta to suffer a loss to a third party in the future does not alter this result. *See General Analytics Corp. v. CNA Ins. Companies*, 86 F.3d 51, 54 (4th Cir. 1996)("[I]f a dishonest act has the *un*intended effect of causing a loss to the employer or providing a benefit to the employee, the act is not covered by the policy."); *Fireman's Fund Ins. Co. v. Special Olympics Intern., Inc.*, 346 F.3d 259, 263 (1st Cir. 2003)(finding no manifest intent where the wrongdoers' "obvious intention to enrich himself reflects neither an expectation that his dishonesty would inflict a loss on his employer nor the

inevitability of such an outcome”). Moreover, Terzakis' express and demonstrated intention was to repay the borrowed Exchange Funds. *See* Terzakis Deposition, ECF No. 156-4 at APP0227, 104:6-16. While he clearly sought a benefit for himself, it is evident that he never manifested the intent for Vesta to incur a loss. Thus, under any standard adopted by this Court, Plaintiff has not proven that the wrongdoers acted with the manifest intent to cause Vesta to sustain a loss.

## V. <u>CONCLUSION</u>

For the foregoing reasons, as well as the arguments and undisputed facts set forth in both Continental’s Opposition to Dillon's Motion and Cross-Motion for Summary Judgment, filed on December 23, 2016, Continental Casualty Company respectfully requests that this Court grant its Cross-Motion for Summary Judgment and enter an Order dismissing the Plaintiff’s claims with prejudice.

Dated: March 24, 2017

Respectfully submitted,

CLYDE & CO US LLP

By: /s/ Eileen King Bower
Eileen King Bower

*Attorney for Defendant Continental Casualty Company*