UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

THOMAS DILLON,

Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY,

Defendant.

Case No. 5:10-cv-05238-EJD

**ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 148, 155

## I. INTRODUCTION

The Internal Revenue Code permits owners of investment property to defer capital gains taxes that would otherwise be due upon the sale of the property through a transaction known as a "1031 exchange." "In a typical 1031 Exchange, an exchanger [the owner of the investment property] sells a parcel of real estate and has 45 days to identify a 'replacement' property, and 180 days to close on the purchase of the 'replacement' property." Compl., at ¶ 24. For taxes to be deferred, the exchanger may not take possession of the sale proceeds but must place the funds in trust with a qualified intermediary ("QI") to avoid actual or constructive receipt of the proceeds while a substitute property is purchased. Id. The QI holds legal title to the funds held in trust, but the exchanger retains all rights in the proceeds except for the use and benefit of the money during the exchange period. Id. at ¶ 25.

This action involves a former QI, Vesta Strategies, LLC, which was looted through a Pozni-like scheme run by its owners, John Terzakis and Robert Estupinian, and for which Terzakis and Estupinian were criminally prosecuted. Plaintiff Thomas Dillon, Vesta's court-appointed receiver, now seeks to recover on a 2004 Crime Insurance Policy (the "2004 Policy") issued to

Vesta by Defendant Continental Casualty Company. Dillon filed a Complaint in this court asserting two causes of action against Continental: one for declaratory judgment, and one for breach of insurance contracts.[1]

Federal jurisdiction arises pursuant to 28 U.S.C. § 1332, and presently before the court are the parties' cross-motions for summary judgment filed subsequent to a remand from the Ninth Circuit Court of Appeals. Dkt. Nos. 148, 155. Because the record contains materially disputed facts and issues of credibility that must be resolved by a jury, the cross-motions must each be denied for the reasons explained below.

## II. LEGAL STANDARD

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the issue is one on which the nonmoving party must bear the burden of proof at trial, the moving party need only point out an absence of evidence supporting the claim; it does not need to disprove its opponent's claim. Id. at 325.

If the moving party meets the initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 324. A "genuine issue" for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

The court must draw all reasonable inferences in favor of the party against whom summary

[1] Because the factual and procedural background is well-known to the parties given the history of this case, it is not repeated in detail here but referenced where necessary.

judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. Id. ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000). "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." Id.

## III. DISCUSSION

### A. Evidentiary objections

Continental submitted several objections to the declarations submitted by Dillon.

Under Rule 56, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Consequently, the focus of an objection at the summary judgment stage is not "the admissibility of the evidence's form" but on the "admissibility of its contents." Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003). In consideration of the applicable standard, "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are superfluous. Burch v. Regents of the Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. June 5, 2006). So too are objections based on the best evidence rule, or which assert that a declarant's statement was made without personal knowledge, is given in the form of a legal conclusion, is improper lay opinion, or constitutes argument. See Alvarez v. T-Mobile USA, Inc., No. CIV. 2:10-2373 WBS, 2011 WL 6702424, at *3-4 (E.D. Cal. Dec. 21, 2011). Statements that are subject to these

objections "are not facts and can only be considered as arguments." Id. "Instead of challenging the admissibility of this evidence, lawyers should challenge its sufficiency" because "[a] court can award summary judgment only when there is no genuine dispute of material fact." Id. Continental's objections made on any of these grounds - the majority of them - are overruled.

What remains is an objection to a document attached to a declaration for lack of foundation. Because the court does not rely on that particular document in reaching a decision on these motions, the objection is overruled as moot.

**B. Authority Governing Dillon's Causes of Action**

Because this is a diversity case that arose in California, this court applies California law. HS Servs., Inc. v. Nationwide Mut. Ins. Co., 109 F.3d 642, 644 (9th Cir. 1997). "In a declaratory relief action to determine the insurer's obligations under the policy, the burden is on the insured initially to prove an event is a claim within the scope of the basic coverage." Merced Mut. Ins. Co. v. Mendez, 213 Cal. App. 3d 41, 47 (1989). To that end, the insured must show that the underlying claim is "of the nature and kind covered by the policy." Gray v. Zurich Ins. Co., 65 Cal. 2d 263, 274 (1966). "The burden then shifts to the insurer to prove the claim falls within an exclusion." Id. "Exclusionary clauses are strictly construed." HS Servs., 109 F.3d at 645.

In California, "[t]he standard elements of a claim for breach of contract are '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom.'" Wall St. Network, Ltd. v. New York Times Co., 164 Cal. App. 4th 1171, 1178 (2008) (quoting Regan Roofing Co. v. Super. Ct., 24 Cal. App. 4th 425, 434-35 (1994)).

Because Dillon would bear the evidentiary burden at trial for his declaratory relief and breach of contract causes of action, Continental need only point out a failure of evidence on the elements. Celotex Corp., 477 U.S. at 325. If it does so, Dillon must then sustain the burden of production. See Reza v. Pearce, 806 F.3d 497, 505 (9th Cir. 2015). The parties occupy opposite roles with respect to policy exclusions. See Gray, 65 Cal. 2d at 274; see also HS Servs., 109 F.3d at 644-45 ("The insurer bears the burden of bringing itself within a policy's exclusionary

clauses.")

### C. Analysis

#### i. Covered Loss

Continental argues Dillon cannot prove a covered loss was sustained during the 2004 Policy period. More specifically, Continental contends (1) Dillon cannot show the alleged $9 million loss at issue is covered by the 2004 Policy because of Vesta's poor record keeping, (2) Dillon cannot show the alleged loss involved any exchanger funds deposited before the 2004 Policy expired, and (3) no loss occurred during the 2004 policy period because Terzakis obtained the funds as loans.

##### a. The Relevant Policy Language

The 2004 Policy was in effect from August 15, 2003, through August 15, 2004, which is the applicable "Policy Period." Decl. of John Terzakis, Dkt. No. 76, at Ex. 10. The original insured was IAG 1031. Vesta became the insured under the 2004 Policy effective January 9, 2004. Id.

The Coverage Grant of the 2004 Policy provides that Continental "will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss." Id. The phrase "Covered Cause of Loss" is defined as "employee dishonesty." Id.

An "employee" under the policy is any natural person in Vesta's service who is compensated directly by salary, wages or commissions, and who Vesta has the right to direct or control while performing services. Id. An "employee" is not a director or trustee "except while performing acts coming within the scope of the usual duties of an employee." Id.

The "Discovery of Loss" provision provides:

> Discovery occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this insurance has been or will be incurred, even though the exact amount of details of loss may not then be known. Discovery also occurs when you receive notice of an actual or potential claim against you involving a loss covered by this insurance.

Id.

In addition, the "Policy Period" provision states:

> Subject to the Discovery of Loss condition, we will pay only for loss that you sustain through acts committed or events occurring at any time and discovered by you during the Policy Period.

Id.

**b. Poor Record Keeping**

The first part of Continental's argument challenges Dillon's ability to demonstrate that Vesta specifically sustained a loss of exchange funds during the 2004 policy period. According to Continental, such a showing is impossible because undisputed evidence shows that Vesta merely took over IAG 1031's exchange business where the latter left off, commingling its exchange funds with those of its predecessor in the same bank account at Borel Bank. To this argument, Dillon must respond with sufficient evidence upon which the trier of fact could find his claim comes within the "'scope of basic coverage.'" Merced Mut. Ins. Co., 213 Cal. App. 3d at 47. That is, there must be evidence in the record to establish a loss to Vesta due to employee dishonesty that was sustained and discovered consistent with the terms of the 2004 Policy.

While the evidence of commingling is undisputed to some extent, Dillon has nonetheless produced evidence on which a reasonable factfinder could attribute transfers made to Terzakis during the policy period to exchange funds deposited with Vesta once it came into existence, rather than from funds deposited with IAG 1031. In a new declaration submitted with Dillon's motion, Peter Ye, who became Vesta's Manager of Operations, states that when IAG 1031 was in existence, exchange funds for each client "were initially deposited into separate segregated sub-accounts in the name of IAG 1031, with a sub-account number for each Exchanger." Decl. of Peter C. Ye, Dkt. No. 151, at ¶ 14. Vesta maintained the same sub-account system and the same bank account at Borel Bank when it took over IAG 1031's exchange business in January, 2004, thereby combining IAG 1031's exchange funds with Vesta exchange funds in the same main account. Id.

Ye recalls, however, that one particular employee, Bill Carling, began working at Vesta in January, 2004, but did not work at IAG 1031. Id. at ¶ 16. He also recalls that Carling's first

exchange client was assigned the sequential client number 5653, and that "[a]lthough there could have been Vesta Exchangers with a number less than 5653, there would not be any IAG 1031 Exchangers with a number greater than 5653." Id. at ¶¶ 15-16. From this, Ye is able to deduce that most of the deposits made in January, 2004, were most likely from IAG 1031 customers who contracted with that company before Vesta started. Id. at ¶ 20. He is also able to deduce that "the majority of the deposits in February 2004 through June 2004 were from Exchangers with Exchange numbers greater than 5653, and they would be Vesta Exchangers who contracted with Vesta after January 9, 2004." Id. And by comparing the known sequential client numbers and sub-account numbers, Ye is able to conclude the seven wire transfers he completed at the direction of Terzakis and Estupinian from March 2, 2004, to June 24, 2004, totaling $9.3 million, came from funds received by Vesta after January 9, 2004. Id. at ¶ 23.

Continental argues the court should disregard Ye's declaration as a "sham" affidavit because it contradicts testimony given at his deposition that identifying individual exchange funds was not possible once those funds were deposited into the Borel Bank account. Though Ye's turnabout is certainly curious, an exclusion of his declaration would stretch the sham affidavit rule too far. "The rationale underlying the sham affidavit rule is that a *party* ought not be allowed to manufacture a bogus dispute with *himself* to defeat summary judgment." Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir. 2009) (emphasis added). "That concern does not necessarily apply when the dispute comes from the sworn deposition testimony of another witness." Id. Instead, "[t]he more appropriate analysis is the traditional summary judgment standard," under which the court must construe the facts in favor of the non-moving party and avoid weighing the evidence or rendering credibility determinations. Id.

By seeking an outright exclusion of Ye's affidavit, Continental invites the type of credibility determination that is prohibited by the standard applicable to this motion. That is not the function of the sham affidavit rule, nor is it this court's role to assess credibility at this stage. See House v. Bell, 547 U.S. 518, 559-60 (2006). Instead, Ye can be confronted with any inconsistent statements at trial and the finder of fact can assess whether to accept them or not. But

Ye's affidavit will not be disregarded for these motions.

On this record that now includes Ye's more recent declaration, whether Dillon can prove damage to Vesta in light of the state of its poor accounting practices presents a disputed issue of material fact that depends largely on an issue of credibility. For that reason, Continental is not entitled to judgment for failure of proof on this issue. But neither can summary judgment be entered in favor of Dillon since proving this issue with evidence a jury finds credible is central to his case under both coverage and breach of contract theories. See Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

**c. Connecting Thefts to Loss**

Continental's second argument fares no better than the first. Continental believes Dillon cannot show a connection between any alleged thefts of exchanger funds occurring during the 2004 policy period and a loss also occurring during that period. As Continental puts it, "even if 'thefts' took place during the 2004 Vesta Policy period . . . coverage would only apply to loss resulting from such 'thefts' and to the extent the loss was sustained during the 2004 Vesta Policy Period and discovered before the Discovery Date."

Ruling on a motion to dismiss, the court previously found that:

> [T]he 'loss' alleged by [Dillon] is the embezzlement of the original exchangers' funds by Terzakis and Estupinian for their personal use, which allegedly occurred during the discovery period. These thefts created a deficit in Vesta and Excalibur's accounts that was concealed by the continuous repayment of previous exchangers with the funds of new exchangers. Thus, although the initial exchangers were allegedly repaid while the scheme was successful, a concealed deficit in Vesta and Excalibur's accounts nonetheless existed. The proof of loss letter that Plaintiff submitted to Defendant, which identified the eighteen exchangers that Terzakis and Estupinian were unable to repay when the scheme collapsed in 2008, merely identified the ultimate damage caused by the original loss.

Dkt. No. 43.



United States District Court
Northern District of California

Though done in a different procedural context, this finding is still viable on summary judgment. As a matter of law, the court's interpretation of ambiguous terms in the 2004 Policy does not require alteration; those terms have not changed. As a matter of facts in the record, Dillon has produced sufficient evidence on which a reasonable jury could find that certain wire transfers initiated by Ye, and in turn purported embezzlements or thefts by Terzakis, occurred during the policy period. The court will not order summary judgment to Continental based on a lack of connection between the alleged thefts and a loss during the 2004 policy period.

**d. Actual Loss During the 2004 Policy Period**

Continental argues that loans taken by Terzakis did not actually result in a loss during the policy period because "the mere dispersal of a fraudulent loan does not constitute a loss under a fidelity bond policy because the loan may eventually be paid back and no loss would occur." The court disagrees.

To the extent this argument is based on an absence of proof of loss, the determination provided in the preceding section resolves it in Dillon's favor. And to the extent Continental contends the loans taken by Terzakis cannot be classified as losses as a matter of law, the argument is unpersuasive because the two opinions Continental relies on, Fidelity Savings & Loan Association v. Aetna Life & Casualty Company, 647 F.2d 933 (9th Cir. 1981), and Pacific-Southern Mortgage Trust Co. v. Insurance Company of North America, 166 Cal. App. 3d 703 (1985), do not support the premise for which they are cited. Fidelity Savings is one in a line of cases dealing with a unique issue not presented by these facts: the relevance of a bank's balance sheet when determining the knowledge element for "fraud in the acceptance of deposits or granting of loans." 647 F.2d at 936. Here, the mens rea for fraud need not be examined because Dillon does not assert such a claim against Continental.

Pacific-Southern is even less helpful to Continental. There, the issue was one of timeliness; whether the plaintiff brought its action within two years after discovery of its loss as required by the bond issued by the defendant. The California Court of Appeal determined the plaintiff's action was timely because "discovery of the loss" occurs when "the insured discovers it

has suffered a loss, not that time when it discovers it has a potential loss." 166 Cal. App. 3d at 711. To reach that conclusion, the court observed that under California law, "a 'loss' occurs in this context when the insured parts with money due to the fraud or dishonesty of an employee." Id. at 710. The court also noted this general rule "makes sense in the majority of cases where the dishonest acts and the loss occur at the same time such as when the loss is due to forged instruments or *embezzlement*." Id. (emphasis added). "However, in the case of a secured loan made because of fraudulent misrepresentations, the fraud and the loss do not necessarily occur at the same time." Id.

The facts of this case are more like embezzlement and less like a "secured loan made because of fraudulent misrepresentations." Though Continental cites to evidence showing that Terzakis documented the loans made to him during the 2004 policy period with promissory notes and had considerable assets to repay the loans, the record shows the loans to Terzakis were unauthorized ab initio regardless of his ability to repay them. The reasoning of Pacific-Southern does not apply because the loans were not, as in that case, permissible loans obtained through misinformation.

All of its arguments on this topic having been rejected, Continental does not prevail due to an absence of evidence supporting loss during the 2004 policy period.

**ii. Discovery of Loss**

The 2004 Policy contains a provision defining the period to discover loss. It provides in pertinent part:

> We will pay for loss that you sustained prior to the effective date of termination or cancellation of this insurance, which is discovered by you no later than 60 days from the date of that termination.

Terzakis Decl., at Ex. 10.

Under this definition, any covered loss to Vesta must have been discovered at some time between the commencement of the policy period on January 9, 2004, and October 15, 2014.

Dillon cites to no facts in the record establishing the discovery of a covered loss during that period, and Continental moves for summary judgment on that basis. Nonetheless, Dillon



United States District Court
Northern District of California

argues the contractual discovery date should be tolled under Admiralty Fund v. Peerless Insurance Company, 143 Cal. App. 3d 379 (1983), because Vesta was adversely dominated. The court agrees.

Faced with an issue of first impression, the Admiralty Fund court held that equitable tolling principles may be applicable to the loss discovery provision of an insurance contract in an action between mutual fund plaintiffs and their insurer. 143 Cal. App. at 381. In so holding, the court made several important observations about California insurance law. First, on issues of interpretation of an insurance contract, California courts have historically favored the insured over the insurance company "whenever possible." Id. at 385. Indeed, the "general tenor of insurance policy interpretation manifests a concern for fulfilling the purpose of the insurance, that is, to indemnify the insured in case of loss." Id.

Second, the court found similarities between discovery-of-loss clauses and statutes of limitation. Both seek to preclude the difficulties presented by stale claims. Id. at 386. Discovery-of-loss clauses also function to "provide insurance companies with a degree of certainty with regard to their reserve needs, enabling them to predict future requirements and to set policy accordingly." Id. "Therefore, individuals or organizations that have the opportunity to discover a valid claim within the contractual period occupy the same position as those faced with statutes of limitation." Id. at 386-87.

Third, the court noted that despite policy justifications for enforcing statutes of limitation, "courts have consistently refused to uphold such statutes strictly when a potential claimant has no opportunity to perform a condition precedent to asserting a right to recover." Id. at 387. One basis for tolling arises when a "claim arises from a director's or employee's defalcation and the wrongdoers' control makes discovery impossible," otherwise known as adverse domination. Id. The court reasoned that because of the similarities between a statute of limitations and a discovery-of-loss provision, a showing of adverse domination should toll operation of the latter in the same way it would toll the former. Id. at 388. And analogizing shareholders in a corporation to the mutual fund plaintiffs in the case, the Admiralty Fund court held the plaintiffs had submitted



United States District Court
Northern District of California

sufficient evidence about the dishonesty of the funds' president and other controlling officials to place at issue their ability to discover loss during the policy period, and in turn, whether the discovery-of-loss provision should be tolled.

Admiralty Fund applies neatly to the facts presented here. It is undisputed that Vesta's ownership was dominated by Terzakis and the Estupinans, and that these same individuals along with Ye perpetrated the wrongdoing against Vesta that is central to this action. Based on these facts, a reasonable jury could find that Terzakis and the Estupinians dominated Vesta to such an extent that discovery of the wrongdoing during the discovery-of-loss period was impossible.

Continental's arguments against applying Admiralty Fund in this manner are unpersuasive. Continental seeks to have the court strictly enforce the 2004 policy's discovery provision as a matter of public policy. But as noted, the considerations underlying that policy, such as the degree of certainty provided to insurance companies by uniform enforcement, gives way under facts showing the plaintiff had no opportunity to discover wrongdoing. Id. at 387-88.

Relying on Mosesian v. Peat, Marwick, Mitchell & Co., 727 F.2d 873 (9th Cir. 1984), and California Union Insurance Co. v. American Diversified Savings Bank, 948 F.2d 556 (9th Cir. 1991), Continental also argues that the wrongdoing at Vesta was not hidden or undisclosed and could have been discovered by other employees; as Continental puts it, "Terzakis' loans of exchange funds was such a routine part of the normal operations at Vesta" that other non-implicated employees could have known about it. Having reviewed Mosesian and California Union, however, the court disagrees that the potential for discovery by non-wrongdoing employees defeats Dillon's theory that Vesta was adversely dominated. Mosesian does not govern these facts because it involves the application of a statute of limitations rather than a discovery-of-loss provision. The 2004 Policy required discovery of wrongdoing by the insured, in this case Vesta, not employees of the insured. Nor does California Union apply here, since in contrast to that case the evidence in the record supports a "situation in which all involved but the wrongdoers were powerless to act in order to prevent the loss of coverage under the fidelity bonds." 948 F.2d at 565. Even if an employee discovered the loans, appreciated their significance in relation to the

2004 Policy, and reported it to Vesta's directors, Continental cites to no evidence showing that anyone but the wrongdoing directors would have triggered coverage by reporting it to Continental.

In any event, to the extent there was opportunity for Vesta to discover the loss through non-wrongdoing employees, such evidence cuts both ways. A jury could interpret that evidence as adequate proof that discovery was possible, or it could just as easily interpret the same evidence as incapable of proving an opportunity for discovery since, according to Continental, the loans were so common to the operations at Vesta that it would not raise a suspicion of wrongdoing. The court cannot decide which interpretation prevails at this stage. Instead, it can only examine whether the record could support a finding of Vesta's adverse domination during the 2004 policy period. It does.

In a related argument, Continental states the nature of the § 1031 exchange industry - where funds must be disbursed within 180 days - means that exchangers were in a position to discover the wrongdoing "if their monies were lost or misappropriated within six months of deposit." Continental, however, fails to support this contention with any evidence showing that an individual exchanger was situated as it describes. In fact, the record evidence relevant to this issue shows the opposite. Exchangers were unable to discover any wrongdoing at Vesta during the 2004 policy period because Terzakis was able to prevent any shortfall of funds with his own wealth.

Finally, Continental attempts to parse the Admiralty Fund decision and imply that adverse domination "is only considered in California when the allegedly dominant wrongdoers and the owners were adverse - i.e., not the same people." The court finds no support for this distinction in Admiralty Fund and rejects it on that basis.

In sum, whether the discovery-of-loss provision in the 2004 policy should be tolled to permit Dillon's claims presents materially disputed facts that preclude summary judgment.

**iii. Manifest Intent**

The 2004 Policy defines "employee dishonesty" as "acts committed by an 'employee,' . . . with the manifest intent to: (1) cause you to sustain loss; and also obtain financial benefit . . . ."



United States District Court
Northern District of California

Terzakis Decl., at Ex. 10. Continental argues Dillon cannot prove that Terzakis obtained unauthorized loans during the policy period with the "manifest intent" to cause Vesta to sustain a loss. The record belies this argument.

Regardless of which test a California court would ultimately adopt to analyze "manifest intent" in connection with a fidelity bond, there can be no quarrel with the idea that "[m]anifest intent involves a continuum of conduct, ranging from embezzlement, where the employee necessarily intends to cause the employer the loss, to the other end of the continuum, which does not trigger fidelity coverage, where 'the employee's dishonesty at the expense of a third party is intended to benefit the employer, since the employee's gain results from the employer's gain.'" Keybank Nat'l Bank Ass'n, v. Nat'l Union Fire Ins. Co., 3 N.Y.S. 3d 324, 326 (N.Y. App. Div. 2015) (quoting Aetna Cas. & Sur. Co v. Kidder, Peabody & Co., 676 N.Y.S. 2d 559, 563 (N.Y. App. Div. 1998)); see also FDIC v. Nat'l Union Fire Ins. Co., 205 F.3d 66, 72 (2d. Cir. 2000).

Here, the record undoubtedly contains evidence falling on the embezzlement side of the continuum, and upon which a reasonable jury could find that Terzakis acted with manifest intent to cause Vesta to sustain loss. On February 23, 2012, Terzakis plead guilty to criminal counts of conspiracy to commit wire fraud, wire fraud, and money laundering in connection with same conduct alleged in this action. Terzakis Decl., at Exs. 1, 2. "The wire fraud statute criminalizes conduct by any person who, 'having devised or intending to devise any scheme or artifice to defraud, . . . transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . .'" 18 U.S.C. § 1343. To obtain a conviction for wire fraud, the government must prove specific intent, that is, it must prove "the scheme was 'reasonably calculated to deceive persons of ordinary prudence and comprehension.'" United States v. Bohonus, 628 F.2d 1167, 1172 (9th Cir. 1980) (quoting Irwin v. United States, 338 F.2d 770, 773 (9th Cir. 1964)). Similarly, an element of conspiracy to commit wire fraud is "the requisite intent to commit the substantive crime." United States v. Sullivan, 522 F.3d 967, 976 (9th Cir. 2008). Absent other reasons for exclusion, Terzakis' convictions are admissible to prove intent,

preparation or plan. Fed. R. Evid. 404(b).

Given the intent elements of wire fraud and conspiracy to commit wire fraud, there is sufficient evidence upon which a jury could find that Terzakis manifestly intended to cause Vesta to sustain loss, consistent with the language of the 2004 Policy. Summary judgment for lack of intent evidence will not be entered to Continental.

**iv. Internal Controls**

Endorsement No. 2 of the 2004 Policy impose "internal control requirements" as special conditions. The endorsement states in relevant part:

> Any payment of loss under this policy for "Employee Dishonesty" involving a transaction intended to qualify as a tax-deferred exchange of property under Internal Revenue Code 1031 is conditioned upon the Insured's having complied with the following underwriting requirements:
>
> . . .
>
> ii. Proceeds from the relinquished property or properties of a single exchange transaction will be held in a financial institution account segregated from the intermediary's operating funds, and each single exchange transaction shall be identified by a specific file number or like tracking tool so as to provide a clear paper trail for each exchange transaction or series of related exchange transactions.
>
> iii. Countersignature is required for the release of all funds, or a monthly reconciliation of all accounts involving exchange transaction proceeds will be performed within two weeks of receipt of the account statement. Those reconciliations must be performed by an individual not authorized to deposit, withdraw or transfer funds from the account, or be reviewed by a CPA.

Terzakis Decl., at Ex. 10.

Continental argues coverage could not have been triggered under the 2004 Policy because Vesta failed to comply with these provisions. There is evidence in the record, however, that would permit a reasonable jury to find that Vesta did, in fact, comply with Endorsement No. 2. Though exchanger funds were eventually pooled into one account at Borel Bank, Continental cites no evidence showing the account also contained Vesta's operating funds.

Additionally, Vesta's internal documents, the account statements provided to exchangers, and Ye's declaration show that Vesta provided a unique exchange number for each exchange

transaction, permitting an arguable basis for tracing particular deposits from the commingled funds.

Furthermore, there is no dispute that Terzakis directed employees from one of his other companies, Single Site Solutions, to document each of his transactions and create a paper trial of notes or other memos or documents to memorialize his "loans" from Vesta's exchange account. Ye Decl., at ¶ 17. On that evidence, a reasonable jury could find that Vesta performed "a monthly reconciliation of all accounts involving exchange transaction proceeds." Continental's argument, therefore, fails.

**D. Conclusion**

Having examined the pleadings on their merits, the court finds there are genuine disputes of material fact that prevent either side from prevailing on its respective summary judgment motion. See Parks v. LaFace Records, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."); see also Fair Hous. of Riverside Cty., Inc. v. Riverside Two, 249 F.3d 1132, (9th Cir. 2001) (holding that "when parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'").

**IV. ORDER**

The cross-motions for summary judgment (Dkt. Nos. 148, 155) are each DENIED.

The court schedules this case for a Trial Setting Conference at **11:00 a.m. on November 9, 2017.** The parties shall file a Joint Trial Setting Conference Statement on or before **October 30, 2017.**

**IT IS SO ORDERED.**

Dated: September 29, 2017

EDWARD J. DAVILA
United States District Judge